**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

PWB
F#2016R00308

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 27, 2018

By E-Mail and ECF

The Honorable Vera M. Scanlon
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Bernard Raymond Augustine
Docket No. 16-M-1107

Dear Judge Scanlon:

The defendant, Bernard Raymond Augustine, is scheduled to appear before the Court this afternoon for his initial appearance and detention hearing. For the reasons set forth below, the government respectfully requests that the Court enter a permanent order of detention pending trial, absent any combination of bail conditions that would ensure the defendant's continued appearance before the Court and in light of the significant danger that the defendant's pretrial release would pose to the community at large.

## I. Procedural and Factual Background

The defendant was arrested pursuant to a criminal complaint charging him with attempting to provide material support to the Islamic State of Iraq and the Levant ("ISIL" or "ISIS"), in violation of Title 18, United States Code, Section 2339B. A copy of the complaint, authorized by the Honorable Marilyn D. Go, is attached hereto as Exhibit A.

### A. ISIS

ISIS is a foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, launching rocket attacks on eastern Lebanon in March 2014, the November 2015 terrorist attacks in Paris, France, and the March 2016 suicide bombings in Brussels, Belgium, among many others. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or

"caliphate"[1] in Iraq and Syria. On or about October 15, 2004, the United States Secretary of State designated al- Qaeda in Iraq (AQI), then known as Jam 'at al Tawid wa' al-Jahid, as a Foreign Terrorist Organization (FTO) under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant (ISIL) as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

In or about 2011, a civil war erupted in Libya between government forces loyal to Libyan leader Muammar Gaddafi and rebel forces who ultimately overthrew the Gaddafi government. After the civil war, conditions in Libya remained unstable. In or about February 2015, members of ISIS entered the port city of Derna, Libya, and subsequently attacked and took control of Sirte, Libya. Thereafter, ISIS sought to, among other things, use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its residents. Moreover, after ISIS established a base of operations in the country, numerous foreign fighters seeking to join ISIS traveled to Libya and settled in Sirte. These foreign fighters traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which existed primarily in Iraq and Syria, but which ISIS sought to expand to places in Libya and throughout the Middle East and Africa. During 2015 and continuing into 2016, it became increasingly common for foreign fighters who were attempting to join ISIS in Libya to enter that country through Tunisia (which borders Libya to the West). In or about 2016, military forces aligned with the Libyan government engaged in numerous battles in an attempt to expel ISIS forces and their supporters from Sirte. As of approximately October 2016, public statements by Libyan government officials and open source reporting indicated that ISIS fighters had been largely defeated and expelled from Sirte.

B. The Defendant's Attempt to Join ISIS

In or about February 2016, Tunisian government officials notified the U.S. Government that the defendant had been arrested in Tunisia and that he was charged with terrorism-related offenses in that country.

[1] "Caliphate" is a term that can be used to refer to ISIS's self-proclaimed system of religious governance, with Abu Bakr al-Baghdadi as the caliphate's self-proclaimed leader.

Records and information obtained during the course of the investigation revealed that on or about February 18, 2016, the defendant was a passenger on Turkish Airlines Flight No. 80, departing San Francisco, California, and arriving in Istanbul, Turkey. The day before he traveled, the defendant purchased a one-way ticket from San Francisco, California, to Tunis, Tunisia, via Istanbul, Turkey.[2]

On or about February 25, 2016, members of law enforcement interviewed Individual 1,[3] one of the defendant's family members, at the home in which he/she had resided with the defendant prior to the defendant's departure. During this interview and in multiple follow-up telephonic interviews, Individual 1 stated that he/she did not know that the defendant purchased a ticket to travel to Tunisia or that the defendant had any interest in traveling to Tunisia. Individual 1 also stated that they had no family members in Tunisia and, as far as he/she was aware, the defendant did not have any work or educational opportunities in Tunisia. Further, Individual 1 was not aware that the defendant had any friends or acquaintances in Tunisia.

Individual 1 also stated that in the days leading up to the defendant's departure to Tunisia, Individual 1 and the defendant communicated about ISIS on more than one occasion. For example, on February 13, 2016 (i.e., less than one week before the defendant departed for Tunisia), the defendant sent Individual 1 a text message that contained a link to a YouTube website that played what the defendant described in his text as a song "from the Islamic state." In his text message, and in reference to the ISIS song, the defendant stated: "would an evil people make something like this." The defendant further stated: "When I come home later I'll show you a video they made for eid[4] celebrations in raqqah, syria[5]. I swear you will see that it's not bad or evil or any of the lies people are saying about it." The song accessed via the link in the defendant's text message extols the virtues of living in the Islamic State.

Individual 1 also consented to a search of his/her cellular phone. Among other things, agents located text messages and emails between Individual 1 and the defendant. For

---

[2] Records obtained from Turkish Airlines indicate that, when the defendant arrived at the San Francisco airport on February 18, 2016, Turkish Airlines required him to purchase a return ticket to the United States.

[3] In order to protect his/her privacy, Individual 1 is referred to herein only by a pseudonym.

[4] This is likely a reference to "Eid al-Adha," also known as the Festival of the Sacrifice, which is one of the two major religious holidays celebrated worldwide by Muslims each year.

[5] This is likely a reference to "Al-Raqqa," which is a city in Northern Syria where ISIS had, until recently, made its headquarters in Syria.

example, investigators found on Individual 1's cellular phone an email from the defendant to Individual 1 that was sent on or about February 21, 2016 (i.e., after the defendant arrived in Tunisia). In the email, the defendant wrote, among other things, the following:

> My purpose in life is to seek the ultimate justice. I see a lot of very wrong and truly evil things happening in this world, things you dont know about, im not mad or mentally ill. I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me. There is two reasons why this is the best path in life for me. 1. When I die, if God accept me. We will all live in paradise forever. 2. If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it. I'm doing this so you [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies. … The good people in this world bring balance and push back against evil. And give their lives freely in the process. Today in this day and age I believe this is the right path.

The review of Individual 1's cellular phone also revealed numerous text messages between the defendant and Individual 1. Notably, in the weeks prior to his departure to Tunisia, the defendant increasingly engaged Individual 1 in discussions about ISIS. For example, on February 10, 2016, eight days before he traveled to Tunisia, the defendant sent a text message to Individual 1 stating: "If I ever get lucky enough to live in khilafah,[6] I'll burn my own passport lol. There's a lot you don't know about the justice of the sharia.[7] If Mabey you understood it you wouldn't want to live here either."

On March 16, 2016, the government obtained a search warrant authorizing the search of the defendant's laptop computer. The laptop computer was located in the home shared by the defendant and Individual 1. Among other items, agents found evidence that, in the months prior to his departure, the defendant had viewed numerous videos online that depicted ISIS leaders and fighters, including fighters engaged in acts of violence. For example, the defendant viewed a well-known, ISIS-produced video that showed the beheading of over 20 Ethiopian Christians who had been kidnapped in Libya. In addition, there was evidence on the laptop that, during the same period, the defendant viewed videos of well-known figures who were public supporters of ISIS and/or of engaging in violent acts

---

[6] ISIS commonly used the term "khilafa" to refer to their purported Islamic state, or caliphate.

[7] Sharia is a system of Islamic religious law.

against Westerners, including, among others, Usama Bin Laden, Anwar al-Awlaki, and other individuals who express support for ISIS.

In addition, search history information associated with one of the defendant's email accounts revealed that, in the weeks and months leading up to his departure from the United States, the defendant actively searched for information on ISIS, how to join ISIS, radical jihadist propaganda, and firearms. For example, on December 15, 2015, the defendant conducted an Internet search for "how to safely join isis." After conducting the search, the defendant clicked on one of the search results, which was a website entitled "How does a Westerner join ISIS? Is there a recruitment or application process?"

The investigation also revealed that the defendant maintained an account with a comment hosting service for websites and online communities – that is, a company that monitors and maintains the "comments" sections of various websites. In the weeks leading up to his travel from the United States, the defendant made numerous postings that were supportive of violent jihad and ISIS. For example, in February 2016, the defendant made the following public posts, among others:

- "True Islam can't be implemented without khilafah and khilafah can't be established and maintained except through the blood of the mujahedeen . . . who practice the true belief based on quran and the sunnah of the prophet."

- "Those 'Syrian refugges' are disgusting, not worthy to be called men and muslim. They are munafiqeen (hypocrites) They left the the country, abandoned their women, and ignored the call to the struggle for Khilifah. . . . The Muslims who leave the west, travel in the opposite direction of these 'refugees', answer the call for the struggle, and march until they are victorious or martyred are the true believers."

- Your government allowed these men into your countries and betrayed you because there is a war going on, between islam and the world. They would rather these men terrorize you than to join the Islamic state and support the Islamic state. . . . Why would thousands of men go to sacrifice their lives in Iraq and syria? So they can be evil and kill and donwrong. What a joke. A lie by western media. . . . How else was the true Muslims of the Islamic state able to expand so quickly. Because of their fearlessness of men and their fear of god. They do not fear for their lives because it is their lives to fight and do what's right.

Shortly after he departed the United States, the defendant sent a message to a family member through a social media account and stated that the family member should not ask him any questions through the account, that he/she should not try to contact the

defendant, that he/she should not talk to anyone who calls (other than a few select family members) and that the defendant would message him/her after three days when the defendant "reach[ed] where [he] is supposed to go."

Information provided by the Tunisian government revealed that the defendant was charged in a criminal case in Tunisia with at least two offenses: (a) entering Tunisia with the intent to travel to Libya to join a terrorist organization, and (b) intent to join, participate in training, and provide support to a terrorist organization. In or about November 2016, the defendant was convicted of these charges in a Tunisian court, and he was sentenced to two years' imprisonment. On or about February 23, 2018, the defendant completed his term of imprisonment in Tunisia. Because he no longer had a valid U.S. passport, he was in the custody of Tunisian immigration authorities since that date until earlier today, at which point the defendant was transferred to the custody of the FBI.

## III. The Court Should Enter a Permanent Order of Detention

The government respectfully requests that the Court enter a permanent order of detention on grounds of dangerousness and risk of flight.

### A. Legal Standard

Federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or poses a risk of flight. See 18 U.S.C. § 3142(e). A finding of dangerousness must be supported by clear and convincing evidence. See United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995). A finding of risk of flight must be supported by a preponderance of the evidence. See United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987). The government is entitled to proceed by proffer. See United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).

The factors to be considered in determining whether the applicable standard has been met include: (1) the nature and circumstances of the offenses charged; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g). Because the defendant is charged with attempting to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B, there is a statutory presumption in favor of detention. See 18 U.S.C. §§ 3142(e)(3)(C); 2332b(g)(5)(B).

### B. Analysis

As set forth above, there is a presumption that no condition or combination of conditions will permit the defendant to be released on bond based on the nature of the charge against him. Moreover, the factors referenced above weigh heavily against pre-trial release.

The charged offense is serious, particularly in light of the extremely violent nature of the terrorist group the defendant attempted to join and the group's international reach. Indeed, in listing the "nature and circumstances of the offense charged" as a criterion in the detention analysis, the Bail Reform Act specifically provides that the Court is to consider, among other factors, whether the crime charged is a federal crime of terrorism. See 18 U.S.C. § 3142(g)(1).

The weight of the evidence is also strong. The evidence obtained from the defendant's laptop computer and Individual 1's phone demonstrates a strong knowledge of ISIS, an understanding of their terrorist activities, and a desire to support that organization. The actions taken by the defendant – e.g., traveling without notifying family members or friends to Tunisia, which immediately borders what was at that time the ISIS stronghold of Libya – reflect a clear intent to travel to Libya to join ISIS. Finally, the defendant's own statements in various email and social media accounts establish that, in the weeks and months leading up to his travel, the defendant was increasingly inspired by ISIS' violent ideology and he was committed to supporting that ideology. All of this evidence shows a substantial commitment on the part of the defendant to support a notorious and violent terrorist organization.

The defendant's history and characteristics also confirm that he is a danger to the community and presents a substantial risk of flight. The defendant poses a danger to the community because his attempt to join ISIS reflects his embrace of an extremely violent ideology. As noted above, prior to and contemporaneous with his efforts to travel to join ISIS, the defendant made numerous statements evidencing support for ISIS and even a willingness to fight and die for the violent belief system espoused by ISIS. Moreover, the defendant's laptop computer contained numerous videos and images showing acts of violence perpetrated by ISIS fighters, including the beheading of over 20 Ethiopian Christians who had been kidnapped by ISIS in Libya. Were the defendant to be released, there is every reason to expect he might continue his effort to support ISIS by, for example, engaging in acts of terrorism on American soil. Not even the standard conditions of pretrial release would ensure public safety, as ISIS supporters have repeatedly used household items with intended deadly effect. See, e.g., United States v. Saleh, Case No. 15-393 (MKB), ECF No. 134 at 15 (E.D.N.Y. Jan. 12, 2018). Indeed, the defendant viewed or listened to sermons by the radical cleric Anwar al-Awlaki, who is frequently identified as an inspiration for United States-based terrorist attacks. See, e.g., Associated Press, "US terror attacks' common denominator: Anwar al-Awlaki" (Sept. 25, 2017).

With respect to flight risk, while the defendant is a United States citizen, he has traveled abroad on multiple occasions, and has family connections in a foreign country. His decision to travel to Tunisia, a country bordering Libya, indicates a willingness to cross international borders, even at the risk of being arrested. The circumstances of the defendant's apprehension overseas suggests that the defendant is willing to disregard any legal constraints to join and provide further support to ISIS. The defendant's decision to

travel on a one-way ticket using a near-expired passport to join a terrorist organization clearly demonstrates that he willing to leave the United States without any intent to return.

## IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court find the defendant to be a danger to the community and a risk of flight, and order that he be permanently detained pending trial.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/ Peter W. Baldwin
Peter W. Baldwin
Assistant U.S. Attorney
(718) 254-7000

Raj Parekh
Trial Attorney, Counterterrorism Section
National Security Division
U.S. Department of Justice

cc: Clerk of Court (by ECF)