DMP:CRH/MTK
F.# 2016R00308

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -                                                      18-CR-393 (SJ)

BERNARD RAYMOND AUGUSTINE,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANT'S PRETRIAL MOTIONS</u>

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

Craig R. Heeren
Michael T. Keilty
Assistant United States Attorneys
(Of Counsel)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................... 1

BACKGROUND ..................................................................................................................... 2

    I.    The Islamic State Of Iraq And Al-Sham (ISIS) ............................................. 2

    II.    The Defendant's Conversion To ISIS Supporter ........................................ 4

    III.    The Defendant's One-Way Trip To North Africa To Join ISIS .............................. 5

    VI.    U.S. Charges Against The Defendant ....................................................... 8

ARGUMENT ........................................................................................................................ 10

    I.    The Defendant's Motion To Dismiss Should Be Denied ........................................ 10

        A.    The Indictment States An Offense ................................................ 10

            1.    An Indictment Must Identify The Essential Elements Of The Offense ........................................... 10

            2.    The Indictment Alleges Each Element Of The Material Support Offense ........................................ 11

        B.    The Indictment Properly Charges The Defendant With Attempting To Provide Material Support To ISIS ......................................... 14

            1.    The Defendant Can Legally Be Charged With Providing Material Support To ISIS In Libya ....................................... 15

            2.    The Government Will Prove At Trial That ISIS Had A Presence In Libya During The Relevant Time Period ........................ 16

        C.    The Evidence Is Sufficient For A Jury To Find The Defendant Guilty Of Attempting To Provide Material Support To ISIS ......................... 19

            1.    The Defendant's Motion Should Be Denied As Premature ................... 19

            2.    The Factual Allegations Are Sufficient To State An Offense ............... 21

        D.    The Material Support Statute Is Not Unconstitutional As Applied To The Defendant ................................................. 24

        E.    The Indictment Does Not Constitute Double Jeopardy Due To The Defendant's Tunisian Conviction ................................ 26

F.     The Material Support Statute Does Not Violate The Non-Delegation Doctrine ................................................. 29

II.   The Motion To Suppress The Defendant's Statements To The FBI Should Be Denied.......................................................................... 30

A.    The February 23, 2016 Statements To The FBI ............................................ 31

B.    The Government Should Be Permitted To Use The Defendant's Statements Made To The FBI Agents For Impeachment And Rebuttal ........................... 32

III.  The Defendant Is Not Entitled To A Bill Of Particulars........................................ 37

A.    Legal Framework.................................................................... 37

B.    No Bill Of Particulars Is Warranted ................................................... 39

CONCLUSION............................................................................... 40

## TABLE OF AUTHORITIES

**Cases**

Bartkus v. Illinois,
359 U.S. 121 (1959)........................................................................................ 27

Blockburger v. United States,
284 U.S. 299 (1932)........................................................................................ 29

Gamble v. United States,
139 S.Ct. 1960 (2019)..................................................................................... 27

Harris v. New York,
401 U.S. 222 (1971).................................................................................. 32, 33

Holder v. Humanitarian Law Project,
561 U.S. 1 (2010)............................................................................................ 25

Holland v. McGinnis,
963 F.2d 1044 (7th Cir. 1992) ....................................................................... 35

J.W. Hampton Jr., & Co. v. United States,
276 U.S. 394 (1928)........................................................................................ 30

Kansas v. Ventris,
556 U.S. 586 (2009).................................................................................... 32, 33

Lyons v. Oklahoma,
322 U.S. 596 (1944)........................................................................................ 36

Mincey v. Arizona,
437 U.S. 385 (1978).................................................................................. 33, 35

Mistretta v. United States,
488 U.S. 361 (1989).................................................................................. 29, 30

Oregon v. Elstad,
470 U.S. 298 (1985)........................................................................................ 36

Oregon v. Hass,
420 U.S. 714 (1975).................................................................................. 32, 33

Russell v. United States,
369 U.S. 749 (1962)........................................................................................ 10

Schneckloth v. Bustamonte,
412 U.S. 218 (1973)........................................................................................ 33

Stone v. Powell,
428 U.S. 465 (1976)........................................................................................ 32

United States v. Aboumoussallem,
726 F.3d 906 (2d Cir. 1984)........................................................................... 29

United States v. Addonizio,
451 F.2d 49 (3d Cir. 1971).............................................................................. 39

United States v. Ahmed,
No. 12-CR-661, 2015 WL 2084628 (E.D.N.Y. Apr. 28, 2015) ............................................. 35

United States v. Ahmed,
No. 15-CR-49 (MJD), 2015 U.S. Dist. LEXIS 171561, (D. Minn. Sept. 1, 2015)................. 13

United States v. Albunio,
Case No. 91 CR 0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992).............................. 38

United States v. Alfonso,
143 F.3d 772 (2d Cir. 1998)...................................................................................... 11, 19, 20

United States v. Aliperti,
867 F. Supp. 142 (E.D.N.Y. 1994) ....................................................................................... 38

United States v. Assi,
414 F. Supp. 2d 707 (E.D. Mich. 2006)................................................................................ 30

United States v. Awan,
459 F. Supp. 2d 167 (E.D.N.Y. 2006) ................................................................................... 11

United States v. Bayer,
331 U.S. 532 (1947).............................................................................................................. 35

United States v. Bortnovsky,
820 F.2d 572 (2d Cir. 1987).................................................................................................. 38

United States v. Bozarov,
974 F.2d 1037 (9th Cir. 1992) .............................................................................................. 30

United States v. Brown,
321 F. Supp. 2d 598 (S.D.N.Y. 2004).................................................................................... 19

United States v. Brozyna,
571 F.2d 742 (2d Cir. 1978).................................................................................................. 10

United States v. Chandia,
514 F.3d 365 (4th Cir. 2007) ................................................................................................ 30

United States v. Daniel,
932 F.2d 517 (6th Cir. 1991) ................................................................................................ 36

United States v. Douglas,
525 F.3d 225 (2d Cir. 2008).................................................................................................. 32

United States v. Edmonds,
No. 15-CR-149 (N.D. Ill.)..................................................................................................... 16

United States v. Farhane,
634 F.3d 127 (2d Cir. 2011).................................................................................................. 23

United States v. GAF Corp.,
928 F.2d 1253 (2d Cir. 1991)................................................................................................ 38

United States v. Gambino,
809 F. Supp. 1061 (S.D.N.Y. 1992)....................................................................................... 19

United States v. Gonzales,
  686 F.3d 122 (2d Cir. 2012).................................................................................... 10

United States v. Gotti,
  457 F. Supp. 2d 411 (S.D.N.Y. 2006)..................................................................... 21

United States v. Guzman,
  85 F.3d 823 (1st Cir. 1996)...................................................................................... 27

United States v. Hammoud,
  381 F.3d 316 (4th Cir. 2004) ................................................................................... 30

United States v. Harun,
  232 F. Supp. 3d 282 (E.D.N.Y. 2017) ..................................................................... 37

United States v. Ianniello,
  621 F. Supp. 1455 (S.D.N.Y. 1985)......................................................................... 38

United States v. Kaziu,
  559 Fed. App'x 32 (2d Cir. 2014)...................................................................... 24, 26

United States v. Laurent,
  861 F. Supp. 2d 71 (E.D.N.Y. 2011) ....................................................................... 20

United States v. Ludke,
  2017 WL 9772960 (E.D. Wisc. Dec. 11, 2017)....................................................... 13

United States v. Maneti,
  781 F. Supp. 169 (W.D.N.Y. 1991) ......................................................................... 38

United States v. Mariani,
  725 F.2d 862 (2d Cir. 1984)..................................................................................... 21

United States v. Mottley,
  130 F. App'x 508 (2d Cir. 2005) ............................................................................. 37

United States v. Naseer,
  38 F. Supp. 3d 269 (E.D.N.Y. 2014) ....................................................................... 20

United States v. Pugh,
  937 F.3d 108 (2d Cir. 2019)............................................................................... 22, 23

United States v. Pugh,
  No. 15-CR-116 (NGG), 2015 WL 9450598 (E.D.N.Y. Dec. 21, 2015)...................... 12, 13, 14

United States v. Rafik Naji,
  16-CR-653 (E.D.N.Y.)............................................................................................. 16

United States v. Rashed,
  234 F.3d 1280 (D.C. Cir. 2000).......................................................................... 27, 28

United States v. Richardson,
  837 F. Supp. 570 (S.D.N.Y. 1993) ........................................................................... 32

United States v. Sattar,
  314 F. Supp. 2d 279 (S.D.N.Y. 2004)....................................................................... 38

United States v. Shafi,
    252 F. Supp. 3d 787 (N.D. Cal. 2017) .................................................................. 12

United States v. Singh,
    No. 12-CR-121 (DLI), 2012 WL 2501032 (E.D.N.Y. June 27, 2012) ................................... 31

United States v. Taleb-Jedi,
    566 F. Supp. 2d 157 (E.D.N.Y. 2008) .......................................................... 12, 29, 30

United States v. Thomas,
    150 F.3d 743 (7th Cir. 1998) ........................................................................ 20

United States v. Torres,
    901 F.2d 205 (2d Cir. 1990).......................................................................... 38

United States v. Urso,
    369 F. Supp. 2d 254 (E.D.N.Y. 2005) ................................................................ 38

United States v. Walsh,
    194 F.3d 37 (2d Cir. 1999).......................................................................... 38

United States v. Yakou,
    428 F.3d 241 (D.C. Cir. 2005) ...................................................................... 20

Wisconsin v. Mitchell,
    508 U.S. 476 (1992)................................................................................. 26

**Statutes**

8 U.S.C. § 1189........................................................................................ 15, 30

18 U.S.C. § 2339A ......................................................................................... 11

18 U.S.C. § 2339B ..................................................................................... 11, 12, 14, 15

**Other Authorities**

"Country Reports on Terrorism," Department of State (2004)....................................... 16

"Country Reports on Terrorism," Department of State (2014)....................................... 17

"Country Reports on Terrorism," Department of State (2015)....................................... 17

David D. Kirkpatrick, "ISIS Finds New Frontier in Chaotic Libya,"
    New York Times, Mar. 10, 2015 ................................................................... 17

David D. Kirkpatrick, Ben Hubbard and Eric Schmitt, "ISIS' Grip on Libyan City
    Gives It a Fallback Option," New York Times, Nov. 28, 2015.............................. 18

Executive Order 13224 ................................................................................ 15

**Rules**

Federal Rule of Criminal Procedure 7(c)........................................................ 37

Federal Rule of Criminal Procedure 12(b)(3)................................................... 19

**Regulations**

69 Fed. Reg. 61,292-03 (Oct. 15, 2004) ...................................................... 15

**Constitutional Provisions**

U.S. CONST. amend. V ................................................................................................ 27

U.S. CONST. amend. VI................................................................................................ 10

**PRELIMINARY STATEMENT**

Defendant Bernard Raymond Augustine traveled from the United States to North Africa with the goal of joining the Islamic State of Iraq and al-Sham ("ISIS").[1]  After watching violent terrorist propaganda videos, proselytizing the supposed virtues of the "Islamic state" to family and on the internet, and researching the details of the foreign terrorist organization—including an internet search for "how to safely join isis" [sic]—the defendant traveled to Tunisia, on a one-way ticket, so that he could provide himself as a willing participant in ISIS's terrorist activity.  The defendant was stopped by Tunisian government authorities before he could make it to ISIS-controlled territory across the border in Libya, convicted under Tunisian law of terrorism offenses and sentenced to two years' imprisonment.  Upon his return to the United States, the defendant was charged in an Indictment with attempting to provide material support to a designated foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B.  The defendant has now moved to dismiss the Indictment, to suppress statements that he made, and for a bill of particulars.  See Def.'s Mot. for Bill of Particulars ("MBP"), Docket Entry No. 32; Def.'s Mot. to Suppress ("MTS"), Docket Entry No. 35; Def.'s Mot. to Dismiss ("MTD"), Docket Entry No. 36.

Each of the defendant's motion should be denied.  First, the motion to dismiss makes claims that are without legal support, are contrary to binding precedent, and have been repeatedly denied by courts in this Circuit and elsewhere.  Second, the motion to suppress is

---

[1] The relevant foreign terrorist organization at issue in this case uses several different aliases, including the Islamic State of Iraq and the Levant ("ISIL"), the Islamic State of Iraq and al-Sham ("ISIS") and the Islamic State.  The government identified the organization as ISIL in the Complaint and as ISIS in the Indictment.  Consistent with the language of the Indictment, the government will refer to this organization as ISIS throughout this brief, except where a quotation refers to the organization as ISIL.

1

moot, because the government does not intend to introduce any of the statements at issue, but reserves the right to use the defendant's statements he made to U.S. law enforcement for impeachment or in rebuttal. Finally, the defendant is not entitled to a bill of particulars because the Indictment clearly specifies the nature of the charged acts, and because the Complaint and substantial discovery provide further specific details of the government's case.

## BACKGROUND

The factual background below is based on information contained in the affidavit in support of a complaint against the defendant, as well as materials produced to the defendant in discovery.

I.      The Islamic State Of Iraq And Al-Sham (ISIS)

ISIS is a designated foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, and launching rocket attacks on eastern Lebanon in March 2014. ISIS supporters have claimed responsibility for several attacks in the United States, including: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; and the June 2016 shooting in Orlando, Florida, at the Pulse nightclub.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an

2

August 2018 suicide bombing in Kabul, Afghanistan; and the Easter Sunday 2019 series of suicide bombings in Sri Lanka.  These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq, Syria, and beyond.

In or about 2011, a civil war erupted in Libya between government forces loyal to Libyan leader Muammar Gaddafi and rebel forces who ultimately overthrew the Gaddafi government.  After the civil war, conditions in Libya remained unstable.  In or about February 2015, members of ISIS entered the port city of Derna, Libya, and subsequently attacked and took control of Sirte, Libya.  In or about August 2015, residents of Sirte took up arms and attempted to expel ISIS from the city. The attempt failed, and ISIS forces largely maintained control of Sirte until late 2016.

ISIS has sought to, among other things, use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its residents.  Moreover, numerous foreign fighters seeking to join ISIS traveled to Libya and settled specifically in Sirte.  In particular, these foreign fighters traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which exists primarily in Iraq and Syria, but which ISIS expanded to places in Libya and throughout the Middle East and Africa.  Particularly relevant to this case, one common method by which these foreign fighters tried to join ISIS in Libya was by entering Libya through the neighboring country of Tunisia.

In or about 2016, military forces aligned with the Libyan government engaged in numerous battles in an attempt to expel ISIS forces and their supporters from Sirte. Throughout the summer of 2016, Libyan forces and ISIS fighters suffered significant casualties.  By October 2016, public statements by Libyan government officials and open source reporting indicated that ISIS fighters had been largely defeated and expelled from Sirte.

3

II.    The Defendant's Conversion To ISIS Supporter

The defendant, a U.S. citizen, was a resident of Keyes, California. Beginning in October 2015 and continuing up to his travel to Tunisia in February 2016, the defendant, who had previously identified as an atheist, began to engage his mother on the topics of Islam and ISIS. The defendant sent his mother various ISIS videos that extolled the virtues of living in the Islamic State. The defendant also sent text messages to his mother that expressed his desire to travel to the Islamic State. For example, on February 10, 2016—eight days before he traveled to Tunisia—the defendant sent his mother the following message:

> If I ever get lucky enough to live in khilafah,[2] I'll burn my own passport lol. There's a lot you don't know about the justice of the sharia.[3] If Mabey you understood it you wouldn't want to live here either. [sic]

During this same time period, the defendant actively searched the Internet for information on ISIS, how to join ISIS, radical jihadist propaganda, and firearms. For example, the defendant conducted Internet searches for, among others, (1) "Jihadi John," a British ISIS spokesperson who appeared in numerous graphically-violent Internet videos ordering the murder of captives and personally participating in executions, (2) Abu Musab al Zarqawi, a former senior al-Qaeda leader in Iraq, (3) Abu Bakr al-Baghdadi, the current leader of ISIS, and (4) Ayman al Zawahiri, the current leader of al-Qaeda. On December 15, 2015, the defendant conducted an Internet search for "how to safely join isis." After conducting the search, the defendant clicked on one of the search results, which was an Internet page titled

---

[2] ISIS commonly uses the term "khilafa" or "caliphate" to refer to their purported Islamic state, or caliphate.

[3] Sharia is a system of Islamic religious law.

4

"How does a Westerner join ISIS? Is there a recruitment or application process?" Besides conducting Internet searches, the defendant also posted numerous messages on social media platforms that were graphically supportive of violent jihad and ISIS.

III.     The Defendant's One-Way Trip To North Africa To Join ISIS

On February 18, 2016, the defendant traveled on Turkish Airlines Flight No. 80, which departed San Francisco, California and arrived in Tunis, Tunisia (via Istanbul, Turkey). The defendant's one-way ticket was purchased on February 17, 2016 – i.e., the day before he traveled. However, when the defendant arrived at the San Francisco airport on February 18, 2016, Turkish Airlines representatives required him to purchase a return ticket to the United States. Records indicate that the defendant purchased the cheapest available return ticket to San Francisco, which had a return date of March 3, 2016. Prior to departing the United States, the defendant was interviewed by a United States Customs and Border Protection ("CBP") officer at the San Francisco International Airport. The defendant told the CBP officer that he was planning to travel to Tunisia for vacation.

Shortly after arriving in Tunisia on February 20, 2016, the defendant contacted his family via a social media platform and stated that he was "in north africa bodering the mediterrainarian [sic]." The defendant then blocked his family members from his social media account. Additionally, on February 21, 2016, the day after arriving in Tunisia, the defendant emailed his mother the following:

> My purpose in life is to seek the ultimate justice. I see a lot of very wrong and truly evil things happening in this world, things you dont know about, im not mad or mentally ill. I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me. There is two reasons why this is the best path in life for me. 1. When I

5

die, if God accept me.  We will all live in paradise forever.  2.  If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it.  I'm doing this so you [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies. …  The good people in this world bring balance and push back against evil.  And give their lives freely in the process.  Today in this day and age I believe this is the right path.

On February 22, 2016, the defendant was detained by Tunisian law enforcement in Monastir, Tunisia on the suspicion that he was attempting to travel to Libya to join ISIS. The defendant provided a statement to Tunisian officials in which he admitted, among other things, that his purpose in traveling through Tunisia was to reach Libya to join ISIS.

IV.    The Defendant's Statements To U.S. Government Officials

On February 22, 2016, the United States Embassy in Tunis was notified via official diplomatic channels that the defendant had been detained and was the subject of a criminal investigation in Tunisia.  (Ex. 1 at BA0000009).  On February 23, 2016, two FBI Assistant Legal Attaches assigned to the U.S. Embassy (the "agents"), conducted an un-Mirandized interview of the defendant at the Tunisian National Guard headquarters in Tunis, Tunisia.  (Id.)  Present during the interview were a Tunisian National Guard Colonel and two Tunisian National Guardsman.  (Id.)  Prior to the commencement of the interview, the defendant was advised as to the identity of the agents.  (Id.)  The agents inquired into the defendant's physical well-being.  (Id.)  The defendant stated, in sum and substance, that he had been allowed to eat, use the bathroom, and get some sleep.  (Id.)  The defendant informed the agents that, just prior to the instant interview, he had been slapped on the back of the head by Tunisian authorities after requesting a cigarette from them.  (Id.)  The defendant advised the

6

agents, in sum and substance, that this was the first time since his arrest that he had been touched in an inappropriate manner. (Id.)  The defendant was offered something to drink by the agents but declined, and instead requested a cigarette. (Id.)

During the interview, in sum and substance and in part, the defendant provided the agents with pedigree information and certain information about his life in California. (Ex. 1 at BA0000009-10).  Thereafter, the defendant admitted that he was traveling in Tunisia on his way to the Islamic State. (Id. at BA0000010).   The defendant stated that his initial desire was to travel to the Islamic State in Raqqa, Syria, but due to issues with his passport, he instead attempted to travel to the Barqa Province of the Islamic State in Libya. (Id.)  After arriving in Tunisia, the defendant attempted to locate someone who could assist in his travel to Libya.  (Id. at BA0000011).  After this attempt was unsuccessful, the defendant decided to travel on foot to Libya, with his stated goal of reaching the Islamic State-held city of Sirte. (Id.)  The defendant stated that he was aware that the Islamic State required compulsory military service and that he may have to fight for the Islamic State.  (Id. at BA0000010).  The defendant also stated that he knew that the Islamic State was responsible for multiple terrorist attacks in the world, including in Tunisia. (Id. at BA0000010-11).  The defendant informed the agents that, following his arrest, he stated to Tunisian authorities that he was traveling to Libya for the purpose of writing a book, but later stated to them that he was traveling there to join the Islamic State. (Id. at BA0000011-12).

The defendant also informed the agents, in substance and part, that he was only traveling to Libya to see if he liked the Islamic State, and that he would leave Sirte if he did not like the Islamic State. (Ex. 1 at BA0000012).  The defendant stated that he had not broken any laws and wished to continue his travel to Libya. (Id.).  At the conclusion of the interview,

7

the defendant provided the agents with various email addresses and social media accounts that he had utilized. (Id.).

As part of their investigation, the FBI also interviewed the defendant's mother in California following his arrest. The defendant's mother stated, in sum and substance, that she did not know that the defendant had purchased a ticket to travel to Tunisia and that he had not previously shown any interest in traveling there. She also was unaware of anyone else who knew that the defendant was planning to travel to Tunisia. Further, the defendant's mother stated that there was no legitimate reason for the defendant to travel to Tunisia because they had no family members or friends in Tunisia and, as far as she was aware, the defendant did not have any work or educational opportunities in Tunisia.

V.      The Defendant's Conviction And Imprisonment In Tunisia

The defendant was charged in a criminal case in Tunisia with at least two offenses under Provisions 1, 12, 13 and 33 of Tunisian law: (a) entering Tunisia with the intent to travel to Libya to join a terrorist organization, and (b) intent to join, participate in training, and provide support to a terrorist organization. In November 2016, the defendant was convicted of these charges and was sentenced to two years' imprisonment.

VI.     U.S. Charges Against The Defendant

On December 9, 2016, the defendant was charged by complaint with attempting to provide material support and resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1). On February 27, 2018, following his release from Tunisian custody, the defendant was arrested by FBI agents in Tunisia and transported back to the United States. On July 30, 2018, a grand jury sitting in the Eastern District of New York charged the defendant with one count of attempting to provide material

8

support and resources to a foreign terrorist organization, in violation of the same statute.  The

Indictment charges:

> In or about and between October 2015 and February 2016, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States and elsewhere, the defendant BERNARD RAYMOND AUGUSTINE did knowingly and intentionally attempt to provide material support and resources, as defined in Title 18, United States Code, Section 2339A(b), including personnel, including AUGUSTINE himself, to a foreign terrorist organization, to wit: the Islamic State of Iraq and al-Sham, which, at all times relevant to this Indictment, had been designated by the Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act, knowing that the organization was a designated terrorist organization and that the organization had engaged in and was engaging in terrorist activity and terrorism, the defendant being a national of the United States (as defined in Section 101(a)(20) of the Immigration and Nationality Act) who, after the conduct required for this offense occurred, was first brought to and found in the Eastern District of New York, and the offenses having occurred in part within the United States and in and affecting interstate and foreign commerce.

(Title 18, United States Code, Sections 2339B(a)(l), 2339B(d) and 3551 et seq.)

9

## **ARGUMENT**

The defendant makes several motions: (1) a motion to dismiss the indictment; (2) a motion to suppress the statements he made to Tunisian and U.S. authorities; and (3) a motion for a bill of particulars.  Each motion should be denied.

## I.     The Defendant's Motion To Dismiss Should Be Denied

The defendant makes six discrete legal claims in support of his motion to dismiss.  None has any merit.

### A.     The Indictment States An Offense

The defendant argues that the Indictment should be dismissed because (1) the phrase "including personnel" in the charge permits the government to "pivot to another theory of material support" and (2) the Indictment fails to specifically allege that, as part of his plan to provide personnel, the defendant "attempted to work under an organization's direction and control."  (See MTD at 7.)  To the contrary, the Indictment alleges all of the essential elements of a violation of 18 U.S.C. § 2339B, and therefore the motion should be denied.

#### 1.     An Indictment Must Identify The Essential Elements Of The Offense

Every indictment must set forth "all of the essential elements of the crime[.]" United States v. Gonzales, 686 F.3d 122, 127 (2d Cir. 2012).  This ensures that defendants are not "convicted on the basis of facts not found by, and perhaps not even presented to, the grand jury" that returned the indictment.  Russell v. United States, 369 U.S. 749, 770 (1962).  An indictment must also be specific enough to permit the defendant to prepare his defense.  See, e.g., U.S. CONST. amend. VI; United States v. Brozyna, 571 F.2d 742, 746 (2d Cir. 1978) (indictment should be sufficiently clear so that the defendant "will not be misled while preparing his defense").  These requirements, important though they are, do not require that

10

every detail of the charged crime be spelled out: "[A]n indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998) (internal marks and citation omitted).

   2. The Indictment Alleges Each Element Of The Material Support Offense

The material support statute, 18 U.S.C. § 2339B, has three essential elements:

- The defendant knowingly and intentionally provided material support or resources to an FTO (or attempted to do so);

- The defendant knew that the FTO was an FTO, or that the FTO had engaged in terrorist activity or terrorism; and

- The defendant is subject to the jurisdiction of the United States.

See 18 U.S.C. § 2339B.  The government must also identify the type of material support provided.  See United States v. Awan, 459 F. Supp. 2d 167, 175-76 (E.D.N.Y. 2006) (dismissing indictment without prejudice and with leave to re-charge where court held that allegation of "material support," without specifying form of support, was insufficient notice of charges under 18 U.S.C. § 2339A).  The Indictment alleges each of these essential elements including the form of material support provided: "AUGUSTINE did knowingly and intentionally attempt to provide material support and resources . . . including personnel, including AUGUSTINE himself" (emphasis added).  Not only does the charge make clear that the form of support was "personnel," it also explicitly states that personnel in this case is the defendant himself rather than some other person.

   The defendant's claim that the term "including" somehow renders the indictment defective because it "leaves the door open" for the government to pursue a different

11

form of material support at trial (MTD at 8-9), is wrong.   Several courts have found indictments sufficient that use the same phrasing for a material support charge.  See, e.g., United States v. Pugh, No. 15-CR-116 (NGG), 2015 WL 9450598 at *11 (E.D.N.Y. Dec. 21, 2015) (finding that indictment that charged "including personnel, including [the defendant] himself" was sufficient); United States v. Taleb-Jedi, 566 F. Supp. 2d 157, 165-66 (E.D.N.Y. 2008) (holding that charge including phrase "including personnel" was sufficient).  In any event, the government hereby confirms that it does not intend to argue that the defendant provided any form of material support other than personnel based on the current charge.  See Taleb-Jedi, 566 F. Supp. 2d at 166 (government's confirmation that it would proceed only on personnel theory for charge further supported sufficiency of indictment).

The defendant's additional claim that the government needed to specifically allege in the Indictment that he attempted to work under ISIS's "direction and control" (MTD at 9-12) is also incorrect.  Indeed, the defendant concedes that every court to consider this argument has rejected it.  See id.  Where the material support at issue is "personnel," the government is required to offer sufficient proof—at trial—that the personnel in question meet the definition of personnel set out in 18 U.S.C. § 2339B(h) ("Section 2339B(h)").  That definition requires that the personnel the defendant attempted to provide, i.e. himself, were intended to "work under [the FTO's] direction or control." See Section 2339B(h).  Because Section 2339B(h) is merely a "definitional provision," and not an essential element, it need not be pleaded in the indictment.  See Pugh, 2015 WL 9450598, at *6 ("Section 2339B(h) further defines "personnel" and is not an affirmative defense or an essential element of the offense of providing material support to an FTO."); see also United States v. Shafi, 252 F. Supp. 3d 787, 793-94 (N.D. Cal. 2017) ("Construing [Section 2339B](h) as an element would

12

be largely redundant because it simply modifies the meaning of the word 'personnel' as used in subsection (a). In this way, [Section 2339B](h) functions in the same way a statutory definition section does."); accord United States v. Ludke, 2017 WL 9772960, at *6 (E.D. Wisc. Dec. 11, 2017).[4]

In Pugh, Judge Garaufis considered and rejected the same argument the defendant advances in this motion.  Reviewing the statutory text, Judge Garaufis identified two statutory features indicating that Section 2339B(h) was definitional:

> First, [Section 2339B](h) begins: "No person may be prosecuted under this section in connection with the term 'personnel'[.]" The use of the phrase "the term 'personnel,'" with personnel in quotation marks, indicates that [Section 2339B](h) was intended to piggy-back on the statutory term "personnel" as used in the defined term "material support or resources." [Section 2339B](h) then goes on to limit the scope of that definition. It appears, therefore, that Section 2339B(h) was intended by Congress to be definitional.
>
> Second, the structure of [Section 2339B](h) suggests that it was . . . intended to be definitional. [Section 2339B](h) provides . . . language [that] materially tracks the substantive offense outlined in Section 2339B(a)(1)[.] . . . Of course, "material support or resources" is a defined term that includes the provision of "personnel." The only material difference, then, between Section 2339B(h) and Section 2339B(a), in the context of "personnel," is that Section 2339B(h) pulls back on the breadth of the term "personnel." Put another way, [Section 2339B](h) is doing nothing more than limiting the breadth of Section 2339B(a)(1) with regard to "personnel" offenses.

---

[4] One district court has held otherwise—but that case does not help the defendant.  In United States v. Ahmed, the court concluded that Section 2339B(h) functions as an affirmative defense, not as an element that must be charged in an indictment.  United States v. Ahmed, No. 15-CR-49 (MJD), 2015 U.S. Dist. LEXIS 171561, at *6-7 (D. Minn. Sept. 1, 2015).

13

Pugh, 2014 WL 9450598, at *8.  Having concluded that Section 2339B(h) was definitional, Judge Garaufis then concluded: "That courts do not require an indictment to plead beyond the term "personnel" is unsurprising. In fact, it follows the longstanding rule that an indictment need not plead statutory definitions." Id. at *13.  The same result should control here.  Because the Indictment states all of the essential elements of the 18 U.S.C. § 2339B offense, and because Section 2339B(h) is definitional, this aspect of the defendant's motion should be denied.

B.      The Indictment Properly Charges The Defendant With Attempting To Provide Material Support To ISIS

The defendant next argues that the Indictment should be dismissed because the ISIS branch in Libya ("ISIL-Libya") was designated as a discrete foreign terrorist organization after his travel and arrest, and therefore he claims it was legally impossible for him to attempt provide material support to an FTO during the relevant charging period.  (See MTD at 12-16.) This argument fails.  The Indictment charges the defendant with attempting to provide material support to ISIS (not ISIL-Libya), an FTO that was designated long before the defendant's criminal conduct and which operated in Libya prior to the defendant's travel to North Africa. The subsequent designation of ISIL-Libya is irrelevant to the case.  Any argument that the defendant could not have provided material support to ISIS by traveling to Libya and volunteering to join the FTO is an argument that the government has failed to prove the elements of the crime, and therefore a factual argument not appropriate for resolution on this motion to dismiss.

14

1.    The Defendant Can Legally Be Charged With Providing Material
Support To ISIS In Libya

It is undisputed that, prior to the defendant's criminal conduct, ISIS was designated by the U.S. government as a foreign terrorist organization. See 69 Fed. Reg. 61,292-03 (Oct. 15, 2004) (original designation of ISIS by Department of State); (see also MTD at 13-14) (admitting that ISIS was first designated in 2004). In designating ISIS as an FTO, the Secretary of State needed to determine that (i) the organization is a foreign organization; (ii) the organization engages in terrorist activity or terrorism as defined by federal law; and (iii) the activity threatens the security of U.S. nationals or the national security of the United States. See 8 U.S.C. § 1189. Nowhere in the statute describing the FTO designation process, nor in Executive Order 13224 providing for the blocking of property and prohibiting of transactions with persons who engage in terrorism, nor in the Secretary of State's designations associated with ISIS has there been any limitation of that designation to a particular nation or geographic region. Nor is there any requirement that the government must prove that the conduct occurred in a particular country associated with the FTO. The government need only prove the elements described above—knowing and intentional attempted material support, knowledge that the support was for a designated FTO, and jurisdiction—which does not include any particular geographical component. See 18 U.S.C. § 2339B. Indeed, the government may prove attempted material support for ISIS by an individual whose only conduct took place within the United States.

Accordingly, there is nothing legally deficient or improper with charging the defendant with attempting to provide material support to ISIS (as opposed to ISIL-Libya) based on evidence that he wanted to provide support to that FTO in Libya. Other defendants

15

have similarly been prosecuted for attempting or conspiring to provide material support to ISIS (and not a more specific geographic branch like ISIL-Libya) based on their attempt to travel to Libya and other countries outside of Iraq and Syria. See, e.g., United States v. Edmonds, No. 15-CR-149 (N.D. Ill.) (defendants convicted of conspiracy and attempt to provide material support to ISIS based in part on evidence that defendant sought to join ISIS by traveling to Derne, Libya in 2015, prior to designation of ISIL-Libya); United States v. Rafik Naji, 16-CR-653 (E.D.N.Y.) (FB) (defendant convicted of attempting to provide material support to ISIS based on travel to Yemen prior to specific designation of ISIL-Yemen as separate FTO).

2.    The Government Will Prove At Trial That ISIS Had A Presence In Libya During The Relevant Time Period

As a factual matter, ISIS had supporters and a presence in a number of different countries around the world, including in Libya during the charged time period. As early as 2005, shortly after ISIS was designated as an FTO, the State Department warned that "[t]errorism remains a global threat from which no nation is immune," and "the Middle East and North Africa region continue[] to be the region of greatest concern in the global war on terrorism." See "Country Reports on Terrorism," Department of State (2004).[5] ISIS's role in Libya began by 2014 at the latest, predating the defendant's attempts to join the FTO in that country by nearly a year. As the State Department's 2014 report explained, "ISIL affiliates were active in Libya in 2014;" by November of that year, "Darnah [a port city in Eastern Libya]-based extremist groups pledged allegiance to the Islamic State in Iraq and the Levant (ISIL);" and in December a car bomb targeting Libya's diplomatic security headquarters in

---

[5] Available at https://2009-2017.state.gov/j/ct/rls/crt/c14818.htm (last visited Oct. 15, 2019).

16

Tripoli was claimed by "an online outlet associated with ISIL's Libya branch." See "Country Reports on Terrorism," Department of State (2014).[6]

By 2015, the year that Augustine first started taking steps to support ISIS, Libya had become a haven for the FTO: "Libya's porous borders, vast uncontrolled weapons stockpiles, and critically weak law enforcement institutions continued to make it a permissive environment for terrorist groups, including the Islamic State of Iraq and the Levant (ISIL)…." See "Country Reports on Terrorism," Department of State (2015). [7]  ISIS's presence in Libya in 2015 was well-publicized, both in international press and by the FTO's own propaganda. In March 2015, seven months before the beginning of the period of time identified in the Indictment, the New York Times reported that, in Sirte, Libya, "[t]he Islamic State has established more than a foothold in this Mediterranean port.  Its fighters dominate the city center so thoroughly that a Libyan brigade sent to dislodge the group remains camped on the outskirts, visibly afraid to enter and allowing the extremists to come and go as they please." David D. Kirkpatrick, "ISIS Finds New Frontier in Chaotic Libya," New York Times, Mar. 10, 2015.[8]  By November 2015, several months before the defendant traveled to Tunisia's border with Libya, another news article described the situation in Libya as follows:

> Iraqi commanders have been arriving from Syria, and the first
> public beheadings have started. The local radio stations no longer

---

[6] Available at https://2009-2017.state.gov/j/ct/rls/crt/2014/239407.htm (last visited Oct. 15, 2019).

[7] Available at https://2009-2017.state.gov/j/ct/rls/crt/2015/257517.htm (last visited Oct. 15, 2019).

[8] Available at https://www.nytimes.com/2015/03/11/world/africa/isis-seizes-opportunity-in-libyas-turmoil.html (last visited Oct. 15, 2019).

play music but instead extol the greatness of the Islamic State's self-proclaimed caliph, Abu Bakr al-Baghdadi.

When the Libyan arm of the Islamic State first raised the group's black flag over the coastal city of Surt [an alternative spelling of Sirte] almost one year ago, it was just a bunch of local militants trying to look tough.

<u>Today Surt is an actively managed colony of the central Islamic State</u>, crowded with foreign fighters from around the region, according to residents, local militia leaders and hostages recently released from the city's main prison.

David D. Kirkpatrick, Ben Hubbard and Eric Schmitt, "ISIS' Grip on Libyan City Gives It a Fallback Option," New York Times, Nov. 28, 2015 (emphasis added). [9]  As that same article notes, ISIS fighters in Libya beheaded 20 Egyptian Christian migrant workers that had been kidnapped in Surt; the Syria-based media arm of ISIS "released under its own logo a video of the killings that had been produced with its usual studio-quality sophistication but was filmed on the Libyan coast." Id.

As the above demonstrates, the defendant's claim that ISIS is only "located in Iraq and Syria" and "Western Asia" (MTD at 14) is fiction, manufactured from whole cloth and based on neither the law that designated the FTO nor the well-reported facts on the ground establishing ISIS's presence in Libya well before the period charged in the Indictment.  The allegation that the defendant attempted to support ISIS in Libya is legally cognizable.  At trial, the government expects to present evidence and expert testimony to prove that, as a matter of fact, ISIS was in Libya during the relevant timeframe, and that people interested in joining this FTO could and did travel to that country, including by crossing from Tunisia.  Any arguments

_____

[9] Available at https://www.nytimes.com/2015/11/29/world/middleeast/isis-grip-on-libyan-city-gives-it-a-fallback-option.html (last visited Oct. 15, 2019).

18

to the contrary are claims that the government has not proven its case, and are fact issues for the jury.

>C.    The Evidence Is Sufficient For A Jury To Find The Defendant Guilty Of Attempting To Provide Material Support To ISIS

The defendant also moves to dismiss on the basis that there is insufficient evidence to convict the defendant of attempted material support. This argument should be denied, because it would be premature for the Court to reach the factual allegations of the Indictment. If the Court does so, however, the government respectfully submits that the factual allegations set forth in the Indictment are more than sufficient to state an offense under Section 2339B for attempting to provide material support.

>1.    The Defendant's Motion Should Be Denied As Premature

The defendant argues that the Indictment fails to allege sufficient facts to state an offense under Section 2339B. (See MTD at 16-22.) However, "[i]t is axiomatic that, in a criminal case, a defendant may not challenge a facially valid indictment prior to trial for insufficient evidence. Instead, a defendant must await a Rule 29 proceeding or the jury's verdict before he may argue evidentiary insufficiency." United States v. Gambino, 809 F. Supp. 1061, 1079 (S.D.N.Y. 1992); United States v. Brown, 321 F. Supp. 2d 598, 600 (S.D.N.Y. 2004) (same). The government is not required in an Indictment to make a proffer of its trial evidence. See Alfonso, 143 F.3d at 776 ("an indictment need do little more than to track the language of the statute"). The defendant's motion is premature and should await the presentation of the government's evidence at trial, at which time the Court can revisit this question in the form of a Rule 29 motion at the close of the government's case.

Under Federal Rule of Criminal Procedure 12(b)(3), a defense that an

19

indictment fails to state an offense may be raised by a pretrial motion only "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits" (emphasis added). Where the motion cannot be determined without reference to the evidence that would be presented at trial, it must be denied. "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." Alfonso, 143 F.3d at 776-77. A technically sufficient indictment like the Indictment in this case "is not subject to dismissal on the basis of factual questions, the resolution of which must await trial." United States v. Laurent, 861 F. Supp. 2d 71, 110 (E.D.N.Y. 2011); see also United States v. Yakou, 428 F.3d 241, 246 (D.C. Cir. 2005) ("There is no federal criminal procedural mechanism that resembles a motion for summary judgment in the civil context"); United States v. Thomas, 150 F.3d 743, 747 (7th Cir. 1998) (Easterbrook, J., concurring) ("Summary judgment does not exist in criminal cases").

The district court's opinion on a motion to dismiss a material support of an FTO charge in United States v. Naseer, 38 F. Supp. 3d 269 (E.D.N.Y. 2014), is instructive. Like the defendant in this case, the defendant in Naseer challenged the sufficiency of the government's evidence in support of several charges related to terrorism, including a charge of conspiring to provide material support to al-Qaeda. Judge Dearie rejected the defendant's argument as not "cognizable on a motion to dismiss." Id. at 274. The court quoted Alfonso's holding that "the sufficiency of the evidence…is not appropriately addressed on a pretrial motion to dismiss an indictment" and explained that "the test of the evidence is the trial." Id. So too here. The defendant may offer his argument that he did not attempt to provide material support to ISIS as a trial defense, but a jury is entitled to hear the evidence of the defendant's

20

acts and determine for itself whether that evidence proves beyond a reasonable doubt that the defendant violated federal law.

The government has not made a full proffer of the evidence that it intends to prove at trial in support of the Section 2339B charge.  Once the government has made such a proffer by presenting its case at trial, the Court can revisit – if appropriate – the defendant's argument in the form of a Rule 29 motion at the close of the government's case.  Without the government having the opportunity to present its evidence to the jury, the defendant's motion is premature.

2.      The Factual Allegations Are Sufficient To State An Offense

Should the Court reach the merits of the defendant's motion now, the government submits that the factual allegations set forth in the Indictment and Complaint in this case are sufficient to state an offense under Section 2339B.  "On a motion to dismiss pursuant to Rule 12(b), a court must accept all factual allegations in the indictment as true." United States v. Gotti, 457 F. Supp. 2d 411, 421 (S.D.N.Y. 2006).  In reviewing the sufficiency of the allegations, the court must "view all of the evidence in the light most favorable to the Government and determine if there is any evidence 'upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt.'"  Id. (quoting United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984)).

The Indictment charges the defendant with knowingly and intentionally attempting to provide material support to ISIS, in the form of offering himself as personnel to be used for the FTO's benefit.  The defendant argues that there is "no evidence" to prove that the defendant "intended to join, fight for, or otherwise work under the direction and control of ISIS" and "no evidence of a substantial step" towards providing material support to ISIS.  (See

21

MTD at 18.)  However, as detailed above, the complaint alleges and the evidence at trial will prove, that the defendant (i) researched ISIS's activities and bureaucratic structure; (ii) watched jihadist and ISIS propaganda videos, (iii) argued with others about the righteousness of ISIS's cause; (iv) researched how he could formally join ISIS; (v) researched how to travel to parts of the world where ISIS was known to have a presence; and (vi) bought a one-way ticket to Tunisia for the purpose of joining ISIS where he expected to help establish and maintain a caliphate "through the blood of the mujahedeen."  Viewing all of these factual allegations in the light most favorable to the government, a rational juror could find beyond a reasonable doubt that the defendant knowingly and intentionally attempted to provide material support to ISIS.

Several cases, including Second Circuit decisions, have held that evidence similar to the allegations presented in this case are sufficient to support an attempted material support charge.  Most recently, in United States v. Pugh, 937 F.3d 108 (2d Cir. 2019), the Circuit affirmed a conviction of a defendant for attempting to provide material support to ISIS. The facts of that case are remarkably similar to the present case:  the defendant in Pugh "research[ed] the Islamic State of Iraq and the Levant ("ISIL" or ISIS"), and download[ed] propaganda materials, as well as discuss[ed] ISIS tactics and activities online," conducted internet searches relating to ISIS and its presence in certain countries, wrote a letter to his wife pledging his support to ISIS, and traveled to Turkey. Id. at 114.  The court explained that "a defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed," and that "a substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support—even benign support—for an organization committed to such harm." Id. at 119.  Like

22

the defendant here, the defendant in Pugh claimed that a lack of a specific ISIS contact precluded any determination that he took a substantial step necessary to attempt to provide material support.  The Circuit rejected this argument:

> The evidence, taken together and viewed in the light most favorable to the government, provides ample support for the jury's conclusion that Pugh engaged in a substantial step toward providing material support to ISIS.  Although he was apprehended by Turkish officials before he was able to complete his plan, the evidence supports the finding that he was traveling to Turkey to cross the Syrian border in an effort to join ISIS. Although he did not have an ISIS contact, nor had he sworn a formal oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were "planned to culminate" in his support of ISIS….But for the interference of Turkish officials, there is no indication that Pugh would not have completed his journey to Syria to join ISIS.  Accordingly, there was sufficient evidence to sustain the jury's conclusion that Pugh took a substantial step toward providing material support to a foreign terrorist organization.  His conviction on count one is affirmed.

Pugh, 937 F.3d at 119–20 (citations omitted).

Other decisions in this Circuit, faced with similar factual issues (typically reviewed after full consideration of the evidence at trial) have likewise held that conduct like that at issue in the present case are sufficient to support a guilty verdict for attempting to provide material support.  See, e.g., United States v. Farhane, 634 F.3d 127, 149 (2d Cir. 2011) (holding that meeting with purported al-Qaeda member, swearing oath of allegiance, providing his contact number and promising to be on call as a doctor to treat wounded al-Qaeda members were sufficient to support attempted material support conviction); see also id. at 151 (explaining that Section 2339(B) "criminalizes providing personnel through self-recruitment (i.e., volunteering oneself to serve under the direction of a terrorist organization) no less than through recruitment (securing another person to serve under such direction)"); United States

23

v. Kaziu, 559 Fed. App'x 32 (2d Cir. 2014) (holding that "the evidence of [the defendant's] travels overseas with the intended object of joining [an FTO] in its war against the Somali government was sufficient to permit the jury to find the substantial step necessary for attempt").

The Circuit's decisions in Pugh, Farhane, and Kaziu are controlling precedent and directly applicable to the facts of this case.  A rational jury could conclude that the defendant's research, his admitted support for ISIS' cause and awareness of ISIS' violent conduct, and his decision to travel to Libya by way of Tunisia are sufficiently substantial steps towards providing material support to an FTO.  Accordingly, the defendant's sufficiency challenge should be denied.

D. The Material Support Statute Is Not Unconstitutional As Applied To The Defendant

The defendant also moves to dismiss the Indictment based on the claim that the material support statute is unconstitutional as applied in this case.  The defendant splits the evidence into two parts.  He argues that, absent evidence of his travel to Tunisia, the charge violates his First Amendment right to freedom of speech because the evidence consists only of statements that he has made.  He then argues that, absent the evidence of statements reflecting support for ISIS, the charge violates his Fifth Amendment right to freedom of movement, because the evidence consists only of his trip to Tunisia.  (See MTD at 25-30.) This is not how the law or U.S. Constitution works.  The defendant cannot break the evidence into individual components, demand that the Court ignore one part that does not help his argument, and claim that the other sub-set of the evidence causes a violation of his Constitutional rights.

24

The defendant is not charged for protected speech or association for his actions in attempting to provide himself as personnel to ISIS by traveling to Libya in order to support the FTO. The Supreme Court's decision in Holder v. Humanitarian Law Project, demonstrates how this charge is constitutionally valid in this particular case. See 561 U.S. 1 (2010) ("HLP") (holding that material support statute was not vague as applied to defendant's activities, nor a violation of the defendant's freedom of speech nor freedom of association). In HLP, the Court held that Section 2339B does not violate the First Amendment, even where the material support alleged is "support…in the form of speech." HLP, 561 U.S. at 28. As the Court explained, Congress found that FTOs are so tainted by criminal conduct that "any contribution to such an organization facilitates that conduct." Id. at 29 (emphasis in original). The Court concluded that, among other things, "teaching [FTO] members how to petition various representatives bodies" and "engag[ing] in political advocacy on behalf of [the FTO]" was an appropriate restriction and not a violation of the First Amendment. The conduct here—knowingly providing oneself as personnel to ISIS—is significantly further removed from either protected speech or the political advocacy that passed muster in HLP.

The Court also concluded in HLP that the defendant's freedom of association was not violated because "the [material support] statute does not penalize mere association with a foreign terrorist organization." HLP, 561 U.S. at 40. Likewise, the defendant's right to freedom of movement is not violated by the statute in this case, because the statute does not penalize mere movement. It penalizes the decision to provide personnel to ISIS, which happens in this case to involve travel to North Africa so that the defendant could submit directly to the command of the foreign terrorist organization.

25

As the defendant concedes (see MTD at 26), the evidence related to statements made by the defendant are not themselves charged as criminal acts, but rather are evidence of the defendant's knowledge and intent.   The First Amendment "does not…prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." Kaziu, 559 Fed. App'x at 35 (quoting Wisconsin v. Mitchell, 508 U.S. 476, 489 (1992)).   In this case, like the terrorism defendant in Kaziu, the defendant is not charged for his speech; rather his statements will be used "to prove the mens rea element of the charged crime[]."   Id. The defendant's statements are evidence, among other things, that (1) he knew ISIS was an FTO and involved in terrorist activity; (2) he intended to travel for the express purpose of joining ISIS rather than simply "researching" the FTO; and (3) his intent was to provide a benefit to ISIS in the form of working on the organization's behalf upon his arrival.   Contrary to the defendant's claim that he was going as a journalist, or just curious, his speech is evidence that he knew of ISIS' violent conduct and wanted to support its goals.   Such use is clearly permissible and not a violation of the First Amendment.

E.      The Indictment Does Not Constitute Double Jeopardy Due To The Defendant's Tunisian Conviction

The defendant argues that the Indictment violates the Double Jeopardy Clause because of his prior convictions in Tunisia for the same underlying conduct.  The defendant identifies no court that has ever found a Double Jeopardy violation based on separate prosecutions by the United States and a foreign government, and there is no basis to do so in this case.

Generally, the Double Jeopardy Clause of the Fifth Amendment provides that "no person shall be subject for the same offense to be twice put in jeopardy of life and limb."

26

U.S. CONST. amend. V.  Thus, a defendant cannot face multiple prosecutions for the same offense by the same sovereign.  However, under the "dual sovereignty" doctrine, successive prosecutions by separate sovereigns for the same offense (e.g. prosecutions by the federal government and a U.S. state) are permissible.  See, e.g., Gamble v. United States, 139 S.Ct. 1960 (2019) (affirming dual sovereignty principle).

In Bartkus v. Illinois, 359 U.S. 121 (1959), the Supreme Court upheld a state prosecution for robbery after the defendant had been acquitted of the same charge in federal court.  The court noted that the evidence failed to show that the state had been "merely a tool of the federal authorities" or that its prosecution was "a sham and a cover for a federal prosecution."  See id. at 123-24.  Based on this dicta, some courts have read an implied exception into the dual sovereignty principle, concluding that the Double Jeopardy Clause could apply where the facts demonstrated one sovereign was a "tool" of another or a "sham and cover" for the other.  The courts to recognize such a hypothetical exception "have stressed that the Bartkus exception is a narrow one and difficult to prove" and at least two circuit courts "have questioned whether this exception even exists."  See United States v. Rashed, 234 F.3d 1280, 1282 (D.C. Cir. 2000) (collecting cases).  The courts recognizing an exception have stated that the conduct of one sovereign must go beyond "the concept of privity or control" and instead must rise to a level where the evidence shows that one sovereign 'thoroughly dominates or manipulates the prosecutorial machinery of another."  Id. (quoting United States v. Guzman, 85 F.3d 823, 827 (1st Cir. 1996)).  Setting aside whether such an exception even exists, the government has been unable to find, and the defendant has not cited, any decision where the facts were so significant as to conclude that the Bartkus exception applied between the United States and a foreign sovereign.  See, e.g. Rashed, 234 F.3d at 1282 (finding no

27

Double Jeopardy violation based on U.S. prosecution of defendant following Greek prosecution, and noting that "we have uncovered no case where a court found successive prosecutions by different nations to fall under the Bartkus exception").

Nor can the defendant make such a showing in this case. The defendant has presented no evidence to demonstrate that Tunisia's prosecution of the defendant was a "sham." To the contrary, the Tunisian prosecution appears to have been based on a legitimate concern of the country—a foreigner traveling through Tunisia's territory to join a terrorist organization operating in a neighboring country. See Rashed, 234 F.3d at 1285 (explaining that Greek government's interest in prosecuting terrorism cases, even where conduct was not committed in Greece, was legitimate and evidence that prosecution was not a sham). Indeed, as the defendant himself concedes, far from being a sham pursued at the direction of the United States, the facts indicate that the Tunisian government initiated its investigation before the United States was even aware of the defendant's conduct and detention. (See MTD at 32.)

The fact that the U.S. and Tunisian authorities were thereupon in communication while the prosecution was pending, and assisted each other in their efforts, does not render the Tunisian prosecution a sham. See Rashed, 234 F.3d at 1284 ("[E]xtensive law enforcement and prosecutorial cooperation between two sovereigns does not make a trial by either a sham."). Nor does the fact that the U.S. government deferred and awaited the Tunisian prosecution before proceeding with U.S. charges constitute evidence of manipulation that could give rise to this theoretical exception. As the Second Circuit explained in considering the Bartkus exception in the context of state and federal prosecutions, "even if federal prosecutors had previously agreed that the state prosecution should proceed first in the expectation that substantial punishment would be imposed, the federal prosecutors would not

28

thereby be 'manipulating' a state prosecution in any sense that might implicate double jeopardy or due process concerns." United States v. Aboumoussallem, 726 F.3d 906, 910 n.3 (2d Cir. 1984). The defendant's claims are not evidence of manipulation or a sham prosecution, and he therefore cannot rely on the Bartkus exception to the Double Jeopardy Clause.

Even were the defendant's theory cognizable under Bartkus, his claim must still fail because he does not present any evidence to indicate that the defendant is being prosecuted for the "same offense," as would be required pursuant to Blockburger v. United States, 284 U.S. 299 (1932) (Double Jeopardy Clause does not apply where criminal statutes require proof of different facts).

F.      The Material Support Statute Does Not Violate The Non-Delegation Doctrine

The defendant further claims that the FTO designation process constitutes an unconstitutional delegation of authority to the Executive Branch because it allows designation of a foreign terrorist organization without congressional oversight. (See MTD at 34-50). However, all courts to examine this issue, including courts in this District, have rejected the defendant's argument. Indeed, in Taleb-Jedi, Judge Cogan rejected this argument because "an FTO designation is subject to judicial review—the decision may be challenged by the organization itself." 666 F. Supp. 2d at 172. Further, Congress has established procedures to designate FTOs and retains power to revoke any such designation. Id. In Mistretta v. United States, 488 U.S. 361, 372 (1989), the Supreme Court stated:

> So long as Congress "shall lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power."

29

Id. (citing J.W. Hampton Jr., & Co. v. United States, 276 U.S. 394, 409 (1928)).    Here, Congress has provided clear standards and detailed procedures to govern the process by which the Executive Branch designates FTOs.  In order to issue an FTO designation, the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, must find that "(A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States." 8 U.S.C. §§ 1189(a)(1), 1189(d)(4).    The definition of "terrorist activity" is further spelled out by statute.  Id. Moreover, under the statute, Congress retains a role in the designation process.  The Secretary of State is required to provide advance notification to congressional officials prior to making a designation.  See 8 U.S.C. § 1189(2)(A)(i).  The statute also explicitly reserves for Congress the authority to prevent a designation from taking effect: "Congress, by an Act of Congress, may block or revoke a designation."  Id. § 1189(a)(5).

Thus, courts have routinely rejected claims that Section 2339B violates the nondelegation clause.  See, e.g., Taleb-Jedi, 566 F. Supp. 2d at 172; see also United States v. Chandia, 514 F.3d 365, 371 (4th Cir. 2007); United States v. Hammoud, 381 F.3d 316, 331 (4th Cir. 2004) (en banc); United States v. Bozarov, 974 F.2d 1037, 1041-45 (9th Cir. 1992); United States v. Assi, 414 F. Supp. 2d 707, 726 (E.D. Mich. 2006).

II.    The Motion To Suppress The Defendant's Statements To The FBI Should Be Denied

The defendant moves to suppress all statements he made following his arrest and detention in Tunisia.  The government, however, will not seek to admit or use the statements that the defendant made to Tunisian officials while in Tunisian custody for any purpose at trial.  As a result, the defendant's argument as to these statements is moot.  (See

30

MTS at    The government also will not seek to admit in its case-in-chief at trial the un-Mirandized statement that the defendant made to the FBI while in Tunisian custody, but reserves the right to use the statements made to the FBI on February 23, 2016, for the limited purposes of impeachment and rebuttal.    Accordingly, only that limited portion of the defendant's motion is contested.

A.    The February 23, 2016 Statements To The FBI

The defendant argues that the statements he made to FBI agents on February 23, 2016, the day following his arrest by Tunisian law enforcement should not be admitted for any purpose, including impeachment, because they were made to FBI agents immediately after a period of mistreatment by the Tunisians and because they were taken in violation of his Miranda rights.    (See MTS at 21-22).    In support of these mistreatment allegations, the defendant submitted the sworn declaration of a Dr. Katherine Porterfield that claims to detail the defendant's abuse at the hands of the Tunisians.    (See Ex. A to MTS (Declaration of Dr. Katherine Porterfield dated September 19, 2019)).    The defendant's counsel has also submitted a sworn declaration from that purports to describe interviews conducted by both Tunisian law enforcement and FBI agents.    (See Decl. of Allegra Glashausser, dated September 20, 2019). Notably, the defendant did not submit his own sworn declaration in support of his motion to suppress.    Accordingly, the defendant has failed to present any facts based on personal knowledge in support of his motion, and the motion should be denied on that basis alone.  See, e.g., United States v. Singh, No. 12-CR-121 (DLI), 2012 WL 2501032, at *2 (E.D.N.Y. June 27, 2012) (explaining that "[c]ourts in this Circuit have repeatedly denied motions to suppress, without a hearing, where defendants have failed to provide affidavits alleging facts based on

31

personal knowledge."); United States v. Richardson, 837 F. Supp. 570, 572 (S.D.N.Y. 1993) (noting insufficiency of attorney affidavit in support of motion to suppress).

B.    The Government Should Be Permitted To Use The Defendant's Statements Made To The FBI Agents For Impeachment And Rebuttal

It is well-settled that while the exclusionary rule bars the government from using in its case-in-chief statements obtained in violation of a defendant's constitutional rights, such as a violation of the defendant's Miranda rights, the exclusionary rule generally does not bar the use of such evidence to impeach testimony given by the defendant in direct examination. See, e.g., Kansas v. Ventris, 556 U.S. 586, 594 (2009) (statements deliberately elicited from defendant in violation of Sixth Amendment right to counsel); Oregon v. Hass, 420 U.S. 714, 722-24 (1975) (statements obtained in violation of Miranda); Harris v. New York, 401 U.S. 222, 224-26 (1971) (same). Citing some of these cases, the Second Circuit has held that "statements taken from a defendant in violation of his Miranda rights, though they may not be introduced by the government during its case-in-chief, are nonetheless admissible to impeach statements made by the defendant in the course of his testimony." United States v. Douglas, 525 F.3d 225, 248 (2d Cir. 2008).

In Ventris, the Supreme Court explained the logic behind permitting improperly obtained statements to be used for impeachment purposes: the interests safeguarded by excluding improperly obtained statements are "outweighed by the need to prevent perjury and to assure the integrity of the trial process." 556 U.S. at 593 (quoting Stone v. Powell, 428 U.S. 465, 488 (1976)). Put another way, "[o]nce the defendant testifies in a way that contradicts prior statements, denying the prosecution use of the traditional truth-testing devices of the adversary process is a high price to pay for vindication" of the constitutional right at issue. Id.

32

(internal quotation marks and citation omitted).  As the Court stated in Hass, "the shield provided by Miranda is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances." Hass, 420 U.S. at 722; see also Harris, 401 U.S. at 225 (the right of a criminal defendant to testify in his own defense "cannot be construed to include the right to commit perjury").

Nevertheless, the Court has also held that the Fifth Amendment prevents a "truly coerced confession" from being admitted at trial, even to impeach a defendant.  Ventris, 556 U.S. at 590; see also Mincey v. Arizona, 437 U.S. 385, 397-98 (1978) ("any criminal trial use against a defendant of his involuntary statement is a denial of due process of law").

Whether a confession is voluntary or coerced marks the dividing line in terms of what is admissible for impeachment and rebuttal purposes and what is not.  Where a defendant's statements are voluntary, even if obtained in violation of Miranda, then they are admissible for impeachment purposes.  Hass, 420 U.S. at 722; Harris, 401 U.S. at 224.  But where a defendant's statements are not "the product of a rational intellect and a free will," then the statements are not admissible for impeachment purposes.  Mincey, 437 U.S. at 398.

The standard for voluntariness is the same as that for any confession: whether the defendant's "will has been overborne" in making the statement at issue.  Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973).  The test is one that considers the totality of the circumstances, taking into account factors such as the defendant's age, intelligence, educational achievement, length of detention, provision of Miranda warnings, repeated or prolonged nature of questioning, and use of physical punishment.  See id. at 226.

Here, the evidence demonstrates that the defendant's statements to FBI agents were voluntary and not coerced.  At the time of the interview, the defendant had been in

33

Tunisian custody only for a period of approximately 24 hours.  The defendant stated that he had been fed, allowed to use the bathroom, and had been able to sleep.  He was not mistreated while being interviewed by the agents.  Indeed, there was no prolonged questioning or physical punishment while the defendant was interviewed by the agents.  None of the defendant's statements to the agents indicated any ongoing physical or emotional issues that would render his statements involuntary.  In fact, the defendant admitted to the agents—in front of his Tunisian guards—that he had been slapped in the head by the Tunisians after requesting a cigarette prior to the interview.  The defendant informed the agents that this was the only incident of that nature that he had been subjected to since his arrest.

Moreover, in addition to his detailed account of his attempt to join ISIL, the defendant also provided statements that he believed were exculpatory in nature, including, in substance, that he was traveling only to visit the Islamic State (not to join), and that there was nothing inherently illegal about that venture.  If this interview had been involuntary or coercive in nature, as the defendant now suggests, it is highly unlikely that the defendant would have divulged at the interview that he had been slapped on the back of his head or claimed that the nature of his trip was innocuous.  Even more improbable, if the defendant felt coerced, is that he would have made these statements while Tunisian authorities were present in the room.  Thus, the totality of the circumstances point to the defendant's statements being voluntary.

Although the defendant was not provided with a lawyer or given his Miranda warnings, it is well-settled that those defects render the statements inadmissible for purposes of the government's case-in-chief, but not for impeachment or rebuttal purposes.  The factual circumstances surrounding the defendant's questioning does not rise to the level found to be involuntary in Mincey.  In that case, the Court held that the statements were coerced because

34

the defendant was in the hospital at the time of making the statements (having been shot by police several hours earlier), was in great pain, was "depressed almost to the point of coma," was confused and unable to think clearly, was "encumbered by tubes, needles, and a breathing apparatus," wrote his answers on paper because he could not speak, passed in and out of consciousness, and repeatedly asked for a lawyer. Mincey, 437 U.S. at 398-401. As the Court found, "[t]he statements at issue were thus the result of virtually continuous questioning of a seriously and painfully wounded man on the edge of consciousness." Id. at 401. That was clearly not the case here while the defendant was interviewed by the Agents.

Even assuming, arguendo, that the defendant may have been subject to mistreatment or provided a prior coerced confession to the Tunisian authorities does not mean that his later statements will be deemed inadmissible as a result. A "confession [made] under circumstances which preclude its use" does not "perpetually disable[ ] the confessor from making a usable one after those conditions have been removed." United States v. Bayer, 331 U.S. 532, 541 (1947); see also Holland v. McGinnis, 963 F.2d 1044, 1050 (7th Cir. 1992) (even where an initial confession is the product of being beaten by police "does not permanently disable [a defendant] from giving a voluntary statement at a later time") (internal quotation marks omitted). Rather, "the question must be whether the lingering effects of torture or reasonable fear of future torture had a coercive effect" at the time that the statements were made. United States v. Ahmed, No. 12-CR-661, 2015 WL 2084628, at *2 (E.D.N.Y. Apr. 28, 2015).

The Supreme Court has identified several factors relevant to determining whether a confession obtained in the wake of a coerced statement was sufficiently insulated from the prior constitutional violation as to be considered voluntary, including "the time that

35

passes between confessions, the change in place of interrogations, and the change in identity of the interrogators." Oregon v. Elstad, 470 U.S. 298, 310 (1985); see also United States v. Daniel, 932 F.2d 517, 519 (6th Cir. 1991) ("[S]uch factors as intervening time, removal of the prisoner to a different place, and change in the identity of interrogators could make a second, warned statement voluntary, despite the prior involuntary statement.").

Here, these factors weigh in favor of finding that the statements to U.S. law enforcement were not the product of any earlier alleged mistreatment. The changes in the place and the identity of the interrogators were significant. At the time of the statements to the agents, the defendant was aware he was being interview by FBI agents, and therefore had no reason to believe that he would be mistreated. On the contrary, the defendant informed the agents that he had been allowed to use the bathroom, sleep, and eat. In fact, the defendant requested a cigarette in lieu of something to drink. Moreover, there is no indication that the defendant was suffering any effects of the alleged abuse he now claims. Indeed, the record does not indicate that the defendant had any physical injuries or appeared to be malnourished or dehydrated.

In other cases, subsequent confessions have been held admissible in similar circumstances. For instance, in Lyons v. Oklahoma, the Supreme Court held admissible a second confession that was made after an initial confession that resulted from physical force used by the interrogators. The second confession took place 12 hours after the first one, followed the defendant's transfer from the control of the sheriff's office to the prison warden, and the evidence showed that the defendant had no reason to fear mistreatment from the warden. Lyons v. Oklahoma, 322 U.S. 596, 604-05 (1944).

36

In short, none of the circumstances of the defendant's questioning by the agents rise to the level of involuntariness that warrants finding the defendant's statements inadmissible for impeachment and rebuttal purposes.

Lastly, as discussed above, the defendant's motion is not supported by a sworn affidavit that provides factual allegations by an individual with personal knowledge. Accordingly, the government respectfully submits that an evidentiary hearing is not required on this issue. Indeed, "there are requirements as to what sort of evidence can create a factual dispute that would necessitate an evidentiary hearing on a motion to suppress. It is well settled that a hearing is not required if a defendant fails to support his factual allegations with an affidavit from a witness with personal knowledge." United States v. Harun, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017) (citing United States v. Mottley, 130 F. App'x 508, 510 (2d Cir. 2005)).

III.    The Defendant Is Not Entitled To A Bill Of Particulars

The Court should deny the defendant's motion for a bill of particulars. The indictment in this case clearly specifies the nature of the charged acts, and the defendant also has the benefit of a 19-page complaint that sets forth further detail. The defendant also has received voluminous discovery.

A.    Legal Framework

Under the Federal Rules of Criminal Procedure, an indictment need only set forth a "plain, concise, and definite written statement of the essential facts constituting the offense." Fed. R. Crim. P. 7(c). Additional details, in the form of a bill of particulars, are not appropriate unless the indictment is too vague to inform the defendant of the nature of the charges so as to allow the preparation of a defense, avoid unfair surprise, and preclude double

37

jeopardy.  See United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990).  If the information sought by a defendant is provided in the indictment or through some other means, a bill of particulars is not warranted. See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Urso, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005). "[T]he burden is on the defendant to show that non-disclosure of the requested particulars will lead to prejudicial surprise at trial or will adversely affect his rights." United States v. Maneti, 781 F. Supp. 169, 186 (W.D.N.Y. 1991).

It is improper for a defendant to use Rule 7(f) as a mechanism to limit the government's evidence, or to flush out the prosecution's theories in advance of trial. See Urso, 369 F. Supp. 2d at 272; United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985) ("To require most of the further disclosure the defendants seek would do little more than restrict the government's proof at trial, which is not the purpose of a bill of particulars."); United States v. Albunio, Case No. 91 CR 0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established.").  The ultimate test of the appropriateness of a bill of particulars is whether the information is necessary, not whether it is helpful, to the defendant. See United States v. Aliperti, 867 F. Supp. 142, 148 (E.D.N.Y. 1994).  Importantly, "the Government may not be compelled to provide a bill of particulars disclosing the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crimes charged, or a preview of the Government's evidence or legal theories." United States v. Sattar, 314 F. Supp. 2d 279, 318 (S.D.N.Y. 2004) (citation omitted).

38

B.      No Bill Of Particulars Is Warranted

In this case, the complaint, Indictment and discovery more than adequately informs the defendant of the nature of the charged offense and the periods within which the crimes occurred.  Indeed, the defendant's own description of the case in its motions reflect the degree of detailed information that they have been provided, and which is more than sufficient to be informed of the nature of the charge.  In reality, through the motion for a bill of particulars, the defendant inappropriately seeks to compel the government to "weave the information in its command into the warp of a fully integrated trial theory for the benefit of the defendant[] . . . ."  United States v. Addonizio, 451 F.2d 49, 64 (3d Cir. 1971).  The defendant's request that the government provide a step by step syllabus of what the defendant intended to do in Libya under the direction and control of ISIS is exactly the type of mining for "evidentiary details" that courts have warned against.  The Indictment, and ithe defendant's motion itself, answers one of the questions he puts to the government.  That is, the defendant is charged with providing material support to ISIS in the form of personnel, namely himself.  For these reasons, the Court should deny the defendant's motion for a bill of particulars.

39

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court

deny the defendant's motions.

Dated:        Brooklyn, New York
              October 21, 2019

RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York

By:      /s/ Craig R. Heeren
         Craig R. Heeren
         Michael T. Keilty
         Assistant U.S. Attorneys
         (718) 254-7000