UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
UNITED STATES OF AMERICA      * Case No. 18-CR-00393(SJ)
                              *
                              * Brooklyn, New York
                              * October 30, 2018
     v.                       *
                              *
BERNARD AUGUSTINE,            *
                              *
             Defendant.       *
                              *
* * * * * * * * * * * * * * * *
```

TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:            MICHAEL T. KEILTY, ESQ.
                               Asst. United States Attorney
                               United States Attorney's Office
                               271 Cadman Plaza
                               Brooklyn, NY 11201


For the Defendant:             SAMUEL JACOBSON, ESQ.
                               ALLEGRA W. GLASHAUSSER, ESQ.
                               Federal Defenders of New York
                               One Pierrepont Plaza, 16th Fl.
                               Brooklyn, NY  11201




Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

**Fiore Reporting and Transcription Service, Inc.**
**4 Research Drive, Suite 402**
**Shelton, Connecticut 06484 (203)929-9992**

2

1          (Proceedings commenced at 1:43 p.m.)

2          THE CLERK:  Criminal cause for a bail hearing,

3     United States vs. Augustine, case no. 18-CR-393.

4          Counsel, Please state your appearances for the

5     record.

6          MR. KEILTY:  Good afternoon, Your Honor.  Mike

7     Keilty for the Government.

8          THE COURT:  Good afternoon.

9          MR. JACOBSON:  Good afternoon, Your Honor.  Sam

10    Jacobson, Federal Defenders, on behalf of Bernard Augustine,

11    who's present next to us.  We're joined today by Allegra

12    Glashausser, co-counsel, and Rachel Bass, a paralegal in our

13    office.

14         THE COURT:  Good afternoon.

15         MS. CARTER:  Bianca Carter from Pretrial Services.

16         PRETRIAL SERVICES OFFICER:  Shanay Kehehei (ph).

17    Pretrial Services.

18         THE COURT:  Good afternoon.

19         MS. CARTER:  Good afternoon, Your Honor.

20         THE COURT:  So I believe we're here on defendant's

21    motion.

22         MR. JACOBSON:  Yes, Your Honor.  Thank you.

23         I'm not sure if Your Honor has had a chance to

24    review the pretrial report that we just received --

25         THE COURT:  No.

3

1       MR. JACOBSON:  -- or the Government's detention

2  memo in this case, but I'm happy to fill the Court in on some

3  of the background.

4       THE COURT:  Sure.  I'd like to see the pretrial

5  memo if I could.  Oh, here it is.  All right.  Give me just a

6  minute to take a look at it.  I have read the Government's of

7  February 27th.

8       (Pause.)

9       THE COURT:  All right.  Thank you.  I've read it.

10       MR. JACOBSON:  Thank you, Your Honor.

11       If I may, I'd like to start by backing up a little

12  bit in the time line.  I think the Government sort of

13  outlines their understanding of what happened with Mr.

14  Augustine in Tunisia.  I just wanted to talk a little bit

15  about his family history leading up to his time in Tunisia.

16       So Mr. Augustine's parents divorced.  Mr.

17  Augustine's father remarried.  And then -- and this was just

18  an incredibly traumatic episode for the family.

19       But Mr. Augustine's father, when Bernard was 18,

20  was arrested and convicted of a double homicide and two

21  attempted murders.  It was a domestic dispute.  And he had

22  tried to kill his new wife, Mr. Augustine's stepmother.

23  Bernard had just graduated from high school.  The family was

24  just totally reeling from this experience.

25       Bernard lived with his mother and continued to live

4

1       with his mother and his two sisters.  And they're still in

2       the same house that they've always been in in Keyes, which is

3       outside of Modesto, California.  Bernard had a very normal

4       childhood growing up in California.  And all of a sudden this

5       totally unexpected horrific thing happens to the family.

6               He's 18.  Within a few months, he, like a lot of

7       young kids, is on the internet.  He is looking at alt-right

8       blogs, at far right message boards, at just a whole range of

9       sort of political ideology.

10              And he -- and again, it was just a very diverse

11      series of ideological opinions on message boards.  There's

12      obviously a lot of strange and often radical stuff, not just

13      about ISIS, but alt-right, forum posters, and he's reading

14      all of this stuff.

15              And within a few months of this murder that his

16      father committed, and is now serving a life sentence for,

17      Bernard gets on an airplane to Tunisia.  And we have no --

18      there's no dispute about that.

19              He hadn't really been outside of the United States

20      except to Canada other than having been born in India.  So

21      he's living this very small town suburban life.  This

22      horrific thing happens.  Within a few months he's on an

23      airplane.

24              And a few days after that, he's arrested in a town

25      in Tunisia, really just walking through Tunisia.  He had been

5

1    in the capital, Tunis.

2         He had essentially been a tourist and had been

3    seeing the sights and writing letters home to his family.

4    And he's arrested and he is processed through the Tunisian

5    court system and is ultimately convicted and is sentenced to

6    two years in Tunisian custody.

7         And by all accounts, he really -- he did great in

8    Tunisian custody.  I mean, it's a -- it was horrible,

9    abominable conditions, but he -- I mean, while other kids

10   might be in college, he's in Tunisian prison simply for --

11   he's in Tunisia.  He's arrested.  He's in Tunisian prison.

12   He's educating himself.  He is friends with a very diverse

13   group of individuals in Tunisian prison.

14        And he was -- they assigned him to what was called

15   -- they segregate people by nationality.  He was assigned to

16   the European room.  He was doing great in the European room.

17   He was by all accounts somewhat of a peacemaker in the room

18   and was reading books.  And he learned French from some of

19   the French individuals.  And served his time with no

20   incidents whatsoever, no infractions, no bad words about him

21   from the Tunisian authorities.

22        And at the end of his two-year sentence, he's

23   turned over to the FBI.  He's in Tunisian -- because he's an

24   American citizen, they send him into Tunisian immigration

25   custody to deport him and the FBI comes and gets him and

1    flies him back to the Eastern District of New York where he's

2    arrested for attempting to provide material support to ISIS.

3           He knew that that was going to happen.  He was

4    informed -- the FBI had come to see him much earlier in his

5    two-year time in Tunisian custody and he basically knew that

6    this was going to happen and he was resigned to it.

7           And, in fact, we have letters -- after he knew that

8    he was going to be prosecuted here in the United States --

9    where he tells his mother and his sisters how much he wants

10   to come home, how much he misses them.  He just wants to see

11   them again.

12          So I think that -- and I'll address that more

13   specifically later when we discuss risk of flight -- but I've

14   a letter of March 9th, 2017.  He's in Tunisian custody.  A

15   letter of October 6th, 2017.  He's in Tunisian custody.  And

16   this is -- this was all provided by the Government as part of

17   their Rule 16 discovery.

18          He says -- this is to -- he addresses his mother as

19   Mama, and his sisters, Elysia and Natasha -- he says, I'm so

20   excited to come back home, exclamation mark.  I'm more

21   looking forward to working and making some dollar sign,

22   dollar sign, dollar sign, but I'm most looking forward to

23   sleeping with my head on your lap and watching TV and eating

24   your delicious cooking.

25          So I know that the Government is going to say that

7

1    he's a risk of flight, and I understand that that's their

2    position on these cases, but I think any objective analysis

3    of what his state of mind and what he's writing and what's

4    he's feeling, all signs point to he's not a risk of flight,

5    he's not a risk of danger.

6              Cut to March 9th of 2017, I hope -- this is towards

7    the end of his sentence in Tunisia -- "I hope to come home

8    before my birthday. I want to find a job and work as soon as

9    possible, preferably something with a regular day schedule,

10   and something physical so that I can sleep at night.  I am so

11   tired of feeling restless.  Lowell, get it, restless, without

12   rest."

13             And then he says "I really miss reading quality

14   books and articles.  I think I could be happy if I could have

15   that.  All I want is a room somewhere, far away from the cold

16   night air, and one big, enormous chair, wouldn't that be

17   lovely.  And lots of chocolates for me to eat."  Smiley face,

18   smiley face.  And I didn't know this, but that's a quote from

19   Mary Poppins.

20             So this is the person that the Government is going

21   to say is a risk of flight, who letter after letter is just

22   saying I want to come home to the U.S.  I know that this

23   might happen.  I just want to put this behind me and come

24   home.  I miss my mother.  I miss my sister.  I want to have a

25   normal life working with the family, making money, just a

8

1    normal life.

2          So that's the context of being in Tunisian custody.

3    I also think his time -- the record of his time in Tunisian

4    custody goes to risk of danger because zero incidents in

5    Tunisian custody.  He was -- everyone liked him.  He was the

6    peacemaker.  He was reading.  He was sharing books with

7    people.

8          The other thing I want to mention about his custody

9    is there's some -- there's a good Samaritan in Tunis who runs

10   the Anglican Church, a European man and his wife, who would

11   come visit Christian people at the Tunisian prison.  They

12   came to visit Bernard and developed a very strong

13   relationship with him.

14         These are Anglican pastors who are -- the supposed

15   man who is in charge of material support here, this 19-year-

16   old kid, and they're meeting with him in a Tunisian jail when

17   he should be in college or at home working as a security

18   guard, which he had been doing -- they were able to send

19   letters home from him.  Some of these letters which are --

20   these letters read like a 19-year-old kid emailing home to

21   his mom and his sisters.

22         So no incidents whatsoever.  And I should point out

23   that the pastor in part was visiting him because Bernard is a

24   Jehovah's Witness and his family are very devout Jehovah's

25   Witnesses from India.

1        So what does the FBI say about why this -- why he

2   was attempting to support ISIS?  What is their case?  Their

3   case is, when the FBI went and interviewed him in Tunisia, he

4   said I was curious to see it.  That's what the FBI report

5   says.  That when asked why he was in Tunisia, sort of walking

6   in the -- again, he was hundreds of miles from Libya, but he

7   was walking in that direction, and they said what were you

8   doing?  Why were you going towards the Islamic State?  He

9   said I was curious.  I wanted to see it.

10       So as to risk of danger, the gap between curiosity

11  and wanting to see something and attempting to provide

12  material support to that organization is huge.

13       So the Government's going to point to a few

14  isolated things that he posted on some of these alt-right

15  message boards.  And again, these are message boards for --

16  right -- for what we know as the alt-right in the United

17  States, which is diametrically opposed from -- to ISIS.

18  Right?  These are sort of Trump supporters who are talking

19  about border security and caravans.

20       And he posted a few things that seemed -- that to

21  the Government indicated were good words about the Islamic

22  State.  But what he says about his intent is I was curious.

23  I wanted to see it.

24       And I want to point out about these message boards,

25  these are the same alt-right message boards that are

10

1    constantly harping on fake news.  Right?  So you have a kid

2    who is 18 years old.  This traumatic thing just happened to

3    his family.

4          He's on alt-right message boards that are talking

5    about how there's all sorts of fake news.  And then what he

6    tells the FBI about why he's in Tunisia is I was curious to

7    see the Islamic State.  I didn't believe what the -- I wasn't

8    sure if what the media was saying was true.  Right?  So sort

9    of like almost you're a one-man journalist.

10         And that is -- for a 19-year-old kid, growing up in

11   this atmosphere of everything is fake news, right -- the

12   current president is talking about fake news -- obviously

13   this was before that -- but certainly the writing on these

14   message boards that was already the theme, everything CNN and

15   New York Times is saying is fake news -- he's curious.  He's

16   never been outside of Keyes, California.  He wants to see it.

17   That's what he says to the FBI.  This is the Government's

18   case.  Okay.

19         And once he's there and he's in Tunisian custody,

20   all he wants to do is come home to his mother and his

21   sisters.

22         He has spent -- he spent his two years in Tunisian

23   custody educating himself, reading, writing, learning

24   languages, befriending people from incredibly diverse

25   backgrounds.

1          I mean, in a way, Tunisian prison is more diverse

2     than MDC.  I mean, there are people from Europe and Asia and

3     all over the world and he's talking to all of these people.

4     Now he's been at MDC.  He was brought back by the FBI a

5     number of months ago.  He's been at MDC.

6          What has he been doing at MDC?  Does he have any

7     infractions?  He doesn't.  What he's been doing at MDC is

8     educating himself, giving himself the equivalent of a college

9     education, constantly asking for books, reading, reading

10     feminist authors, discussing Roxanne Gay with people, reading

11     languages, reading novels, reading math, really applying

12     math, who just wants to learn and be back with his family.

13          He had this crazy experience after this traumatic

14     episode in his family's life.  It's stabilized.  He was 18

15     years old at the time.  He is a 22-year-old -- 22 years old

16     now.  He's been in custody the entire time.  He gets it.

17     There's zero risk of flight or danger here.

18          And I think when Your Honor reads the Government's

19     detention memo, the crux of their detention memo is ISIS is

20     bad.  And we're not disputing that ISIS is bad.

21          Our only point is Bernard has nothing to do with

22     ISIS.  And Bernard is good.  He is incredibly good.  And he's

23     one of -- I really look up to him in many ways in how he's

24     dealt with this adversity and what he wants to do to move

25     forward with his life.

12

1           The Government is prosecuting him for a crime where

2   the guideline range of imprisonment is 20 years.  My personal

3   view is I can't imagine a worse way to help Bernard

4   reintegrate and rehabilitate than what they are trying to do

5   to him.  But those are their decisions.  They're not mine.

6           But I think the best thing for the community

7   ultimately is for him to be out of jail and reintegrating,

8   and as a 22-year-old now living a normal, productive life.

9           I have letter after letter from Bernard to his

10  parents talking about how he wants to be productive.  That's

11  what he talks about from MDC.

12          He wants -- just getting a job, continuing to

13  educate himself, going to school, doing the things that a

14  normal kid would do as opposed to what derailed him when he

15  was 18 years old after what understandably for any 18-year-

16  old kid would be just unthinkable that your father, who you

17  respected and looked up to, is arrested for this crime.

18          And I can imagine what I -- you know, the crazy

19  things that I might do in that situation.  But nothing he did

20  is attempting to support in any way ISIS.

21          So I want to briefly talk about the other cases

22  that I know the Court has seen, the other cases that the

23  Government and all the parties here have seen.  These

24  material support cases always involve at least one of the

25  following, right?

13

1      Recruiting personnel, sending money, purchasing

2      body armor weapons or discussing with people doing those

3      things.  Telling people that you were going to go fight.

4      Being on encrypted ISIS-specific message boards and chats

5      where you're communicating with people who could be your

6      future handlers, people who would help you get across the

7      border, people who you would enter into a conspiracy with.

8      The list goes on and on.  We always see one of those in these

9      sorts of cases.

10      Zero of those factors are present in this case.  He

11      didn't talk to anyone who is a supporter of ISIS.  And the

12      Government has to agree with me on this -- because they have

13      all of his electronic communications, both on the internet,

14      on his phone -- he never spoke to any human who is involved

15      in ISIS.

16      He never tried to recruit anyone to ISIS.  He never

17      sent money.  He never fought for ISIS.  All he did was get on

18      a plane after being on these alt-right message boards.  And

19      his -- I don't even know how the Government characterizes it,

20      certainly not as a confession -- but he says I was curious to

21      see it.  That is the extent of this case.

22      So when I think about -- I think there are a couple

23      hundred or more across the country over the last few years,

24      material support cases, the vast majority of those are

25      substantive material support charges or conspiracy to commit

1   material support charges.

2           Bernard's is attempting to provider material

3   support because there's -- obviously he never got anywhere

4   where ISIS is.  Even if he had gotten to Libya, ISIS is on

5   the other side of Libya.

6           But he didn't know that because he had never done

7   research on this sort of thing.  Right?  Even if you get over

8   the border into Libya, it's hundreds of miles to Sirte where

9   ISIS had already been obliterated by Libyan forces.

10          So even if he had gotten there, there would have

11  been nothing for him to do or see.  And he's never expressed

12  any desire to do or see anything when he got there.

13          So really when I think about material support cases

14  in this country -- and certainly there are many of them that

15  are worth prosecuting and where people actually pose a danger

16  to the community -- this has to be -- and we've read most of

17  them -- this has to be the weakest case by far of any

18  attempted material support for ISIS case.

19          And I don't know that the Government has any

20  response to that because I think they know that.  And so

21  those are the charges.

22          But other than the Government detention memo, which

23  is ISIS is a dangerous organization, therefore, Bernard is a

24  dangerous person, the connection just doesn't hold up.

25          And I think everything points to -- if Your Honor

1        puts that trust in him, he's going to go home.  He's going to

2        find a job.  He's going to continue to educate himself and

3        continue doing the things that he's done from the time he was

4        incarcerated in Tunisia for the last three years up until

5        today's date.

6               The other thing I want to mention because I think

7        Bernard's state of mind is very important in this case -- I

8        think it's important for bail -- I also think it's important

9        for when you're charging someone with attempt, you have to

10       show that their intention was to do that, obviously.

11              But when we think about Bernard's state of mind --

12       and I know Your Honor is familiar with her work, but Dr. Kate

13       Porterfield from the NYU Center for Trauma has been meeting

14       with him since he arrived in the United States.

15              And they've been working on sort of uncovering his

16       thoughts and feelings and state of mind.  And she has had an

17       opportunity to speak to his family in California.

18              And again, this is a family that experienced this

19       horrible trauma, almost four years ago at this point, but

20       it's a family that has recovered and in many ways grown

21       stronger.

22              We have had the -- and Your Honor is happy to --

23       they're available by phone today, all three of our proposed

24       suretors, and that's his two sisters and his mother.

25              But Dr. Porterfield has observed that it's an

1    incredibly resilient and strong and supportive family that is

2    ready to receive him. And I think by the same token Bernard

3    is ready to be reintegrated into the family and to have their

4    support and also to support them.

5            And I think regardless of the merits of the

6    Government's case, Bernard feels in many ways like he owes

7    them for not being present these last years and just wants to

8    be there with them.

9            Again, the letters from Tunisia all express how

10   sorry -- to his mother, but also to his sisters, how sorry he

11   is that he's not there with them and how he just wants to

12   come back to be with them, and how strong his commitment is

13   to being there with them.

14           And I think it really is a family where, if Your

15   Honor were to release him, he would show that it's a family

16   that can heal a lot of these traumas together and support

17   each other in a meaningful way.

18           And I think the occupations of the suretors are

19   important here. It's a family that is devoted to healing

20   professionally. Bernard's mother, Cheryl Alphonso, is a

21   clinical nurse educator for Kaiser Permanente in California

22   and makes approximately $170,000 a year. His sister is also

23   a nurse.

24           THE COURT: This Elysia?

25           MR. JACOBSON: Elysia is a nurse as well, Your

17

1   Honor.  And the third sister is currently a student and doing

2   missionary work as a Jehovah's Witness.  But is willing to

3   sign for moral suasion and is also available with Cheryl and

4   Elysia today.

5           And so what --

6           THE COURT:  What was the reason why he went to

7   Tunisia?  Or can you -- is that not something you want to

8   discuss at this hearing?

9           MR. JACOBSON:  I don't want to say anything that

10  could be privileged.

11          THE COURT:  Okay.

12          MR. JACOBSON:  I don't see anything inconsistent

13  with what the FBI -- I don't see any -- I haven't heard or

14  seen anything different from what the FBI has recorded in

15  their own 302 and from their own investigations, which is I

16  went because I wanted -- I was curious to see it.

17          We know that he was on message boards which were

18  talking about fake news from an alt-right perspective.  And a

19  few months after his father commits this -- shoots four

20  people, he's on the plane.

21          And we also know that most of what he was doing in

22  Tunis is what a normal tourist would do because we have his

23  messages saying I'm at this site.  I'm at the beach.  I'm at

24  this restaurant.  It's really great.  The food is great.

25          So that's what I have.  I guess what we're asking

18

1    the Court to do is disaggregate the charges.  Which always

2    sound scary, right, because in a case like this -- from

3    Bernard, the human being -- who has just no affiliation with

4    ISIS which is very rare in these cases.  There's almost

5    always communication or substantive fighting for them or

6    something.

7              And you know, the statute, the material support

8    statute, requires that you be under the direction or control

9    of a designated terrorist organization.  And I just -- I

10   don't see it.  I don't see their case.

11             And I -- certainly everything I see in our personal

12   interactions with him, Dr. Porterfield's interactions with

13   him, everything points to this guy is -- I'd say honestly --

14   less of a risk of flight or danger than almost anyone who

15   comes before the Court for a bail hearing.  There's just no

16   risk of it.

17             THE COURT:  All right.  Thank you.

18             Mr. Keilty?

19             MR. KEILTY:  Your Honor, I'll be -- I'll be

20   somewhat brief.

21             Mr. Jacobson is a zealous advocate for his client

22   and he's done an excellent job of downplaying the seriousness

23   of what we have before the Court right now.  The Government

24   is going to rely on its detention memo for the most part, but

25   I just want to highlight a few things in that memo for the

1    Court.

2         Let's be clear, this defendant tried to join a

3    terrorist organization whose mean tenet -- or one of the mean

4    tenets is to kill westerners and kill Americans. And he came

5    incredibly close to that, Your Honor. He got to the border,

6    the country right before one of the strongholds of ISIS,

7    Libya.

8         And we have evidence that he also researched

9    possibly going into Syria through Turkey, Your Honor, but he

10   realized that was too difficult, that the Turkish authorities

11   might restrain him from doing that.

12        I think the important thing here is this is not

13   somebody who was sitting behind a computer, who was just

14   sending out derogatory messages on message boards, who was

15   just espousing sympathy for ISIS. That's one thing. That in

16   itself would be considered a danger to the community, that he

17   agrees and espouses the same views as this terrorist

18   organization.

19        This defendant took it one step further. He had

20   the will to travel thousands upon thousands of miles with the

21   intent to join ISIS. How do we know that? We've done

22   searches of his computers.

23        We've done searches of family members' phones,

24   consent searches. And those searches have revealed that he

25   reviewed incredibly disturbing ISIS videos, beheadings. It's

20

1       all laid out in our detention memo, Your Honor.  He's

2       listened to sermons of radical Islamic preachers.

3               And Mr. Jacobson just -- Mr. Jacobson mentioned

4       that when he got to Tunisia he did the same thing as any

5       other tourist would do.

6               I think it's interesting -- and we quoted this on

7       page 4 of the detention memo, Your Honor -- that he sent an

8       email back to a family member from Tunisia.  And if you read

9       that email -- I'll just read a couple of excerpts from it --

10      he talks about what is clearly martyrdom.  He talks about

11      when I die, if god accepts me, we will all live in paradise

12      forever.

13              The good people in this world bring back balance

14      and push back against evil and give their lives freely in

15      this process.  This is not somebody enjoying, you know,

16      tourist activities in Tunis.  This is somebody who is

17      planning to go to Libya to join ISIS.

18              And if we go back to the searches of some of his

19      messages on the message board, he's clearly talking about

20      martyrdom in a lot of these messages.

21              True Islam can't be implemented without Khalifah

22      and Khalifah can't be established and maintained except

23      through the blood of the mujahideen who practiced the true

24      belief based on Quran and Sunnah, the prophet.  It's on page

25      5.  The Muslims who leave the west travel in the opposite

1    direction of these refugees, answer the call for struggle,

2    and march until they are victorious or martyred are the true

3    believers.

4           Now Your Honor, again, if this was all we had, if

5    this was Mr. Augustine sitting behind his computer in

6    California sending out these messages, doing these searches

7    for how to join ISIS, it would be one thing -- I'd still say

8    he's an incredible danger to the community based on what we

9    have here -- but he bought a one-way ticket to join ISIS.

10   And but not for the Tunisians arresting him, he might be with

11   ISIS right now, Your Honor.

12          To say he's not a danger to the community ignores

13   the Government's evidence that's proffered in this detention

14   memo right now.  I'll leave it at that with danger to the

15   community.

16          With respect to risk of flight, Your Honor, this is

17   somebody who was willing to purchase a one-way ticket to a

18   completely foreign land.  He wasn't going to London on a one-

19   way ticket.  Paris.  He was going to Tunisia.  He had no idea

20   what he was getting into.  And he tried to go to Syria having

21   no idea what he was getting into.

22          And in fact, his family had no idea where he was

23   going or what he was up to.  I mean, the first time they hear

24   about him in Tunisia is when he's writing these incredibly

25   inflammatory messages back to his mother talking about

22

1    martyrdom.

2         I just think, based on the evidence here in this

3    case, Your Honor -- I mean, like I said, Mr. Jacobson

4    downplays it -- but again, this is not somebody who's

5    sitting, eating Cheetos at a computer, you know, typing

6    messages about how good ISIS is and how to kill Americans,

7    this is somebody who tried to go over there to do it.

8         So for all these reasons, we agree with Pretrial

9    Services that the defendant should remain detained, Your

10   Honor.  Pending your questions, that's all I have.

11        THE COURT:  So why do you believe he went to

12   Tunisia and what evidence do you believe there was that he

13   went there to provide material support to terrorism?

14        MR. KEILTY:  Your Honor, searches of this

15   particular defendant's computer, search warrants executed,

16   show searches on how to join ISIS, show searches on how to

17   travel to join ISIS, to Libya, to Turkey in order to get to

18   Syria.

19        I quoted some of the martyrdom language that he

20   espoused on these various forums.  He tells nobody what he's

21   doing.  He gets over to Tunisia and then starts sending

22   messages back to his mother talking about martyrdom.  The

23   messages don't say I'm at this beautiful café.  I plan on

24   spending a couple of weeks here and then flying back.  He was

25   on his way to join ISIS.

23

1          I'll give you one example, Your Honor.  On December

2     15th, 2015, the defendant conducted an internet search.  This

3     is on page 5 again of the detention memo.

4          THE COURT:  Right.

5          MR. KEILTY:  How to safely join ISIS?  How does a

6     westerner join ISIS?  Is there a recruitment or application

7     process?

8          And also I fundamentally disagree with Mr.

9     Jacobson's assertion that you have to have a handler in order

10    to join ISIS.  There's documented examples, Your Honor, of

11    people going who just wander into ISIS territory and join

12    ISIS.  So the fact that he didn't have a handler is not the

13    be all and end all for his wanting to join or his ability to

14    join the Islamic State.

15         THE COURT:  On page 6, you have a discussion of the

16    information provided by the Tunisian government, and you

17    discuss his conviction on charges of entering Tunisia with

18    the intent to travel to Libya to join a terrorist

19    organization, and intent to join, participate in training,

20    and provide support to a terrorist organization.  Do you have

21    -- is there anything more you have that was provided by the

22    Tunisian government or --

23         MR. KEILTY:  Your Honor, we have information that's

24    been provided by the Tunisian government, various statements

25    that the defendant has made.  We don't feel comfortable

1      turning it over in this forum.

2                 THE COURT:  Okay.

3                 MR. KEILTY:  If necessary, we will turn it over in

4      the proper channels through the defense.

5                 THE COURT:  All right.  And do you believe that

6      that -- is your proffer that that information -- whether you

7      present it in camera to the Court or through 3500 material --

8      that that supports -- that that provides further evidence of

9      his intent to join ISIS?

10                MR. KEILTY:  I believe so, Your Honor.  And he was

11     convicted.  Off the top of my head, I could not tell you

12     exactly what his statements were other than he was convicted

13     of attempting to travel to Libya in a Tunisian court of law.

14                THE COURT:  Do you have access to those statements

15     now or would that be something that would be more difficult?

16                MR. KEILTY:  I would have to go back and check,

17     Your Honor.  We do have access to statements he made, yes.

18                THE COURT:  Right.  And do you know whether they

19     discussed ISIS?

20                MR. KEILTY:  I'd have to find out.

21                THE COURT:  Part of them?

22                MR. KEILTY:  I'd have to check, Your Honor.

23                THE COURT:  Okay.

24                MR. KEILTY:  If you give me one second, Your Honor,

25     I could talk to --

1          THE COURT:  Sure

2     (Pause.)

3          MR. KEILTY:  Your Honor, after speaking with the

4     agents, there's some questions whether that material is

5     classified right now. So I wouldn't feel comfortable, at this

6     point, in this setting informing the Court.

7          THE COURT:  Okay.  And is that something, if the

8     Court thought it was necessary, you could provide in camera?

9          MR. KEILTY:  Yes, Your Honor.  But it's the

10     Government's position, Your Honor, that there's more than

11     we've -- more than enough evidence in our detention memo.

12          THE COURT:  I understand.

13          Pretrial Services, Ms. Carter, Ms. Kehehei, do you

14     have anything that you could highlight from your report that

15     bears on your conclusion that there are no conditions or

16     accommodations of conditions that would support this

17     defendant's release?

18          MS. CARTER:  Your Honor, I think the Government

19     pointed out a lot of things that we have concerns about as

20     far as his risk of flight.  The fact that his family did

21     know, he has family in India, which his mother is currently

22     traveling to, that does make him a flight risk.

23          The nature of the offense does warn us as a danger

24     to the community, and the prior arrest in Tunisia.

25          Additionally, we'd also like to note to the Court

1    that if Your Honor is considering release, the defendant,

2    based on our conditions that we would impose in these type of

3    cases -- which you know, Your Honor, would be GPS monitoring

4    -- would not be capable where his family lives.

5               THE COURT:  Mm-hmm.

6               MS. CARTER:  So that would be another, you know,

7    issue we'd have as far as him being on bail.  And we still

8    stick by our recommendation that there's no condition or

9    combination of conditions to ensure the safety of the

10   community or his return to court.

11              THE COURT:  I have a question for the Government

12   and it's a slightly different one.

13              What's the effect of the fact that he's already

14   been convicted and served some time for a similar offense on

15   the prosecution in this country?  I take it they're separate

16   laws.  There's no bar against that obviously.

17              MR. KEILTY:  Yes.  Not that I'm aware of, Your

18   Honor.

19              THE COURT:  And does that bear at all on whether,

20   at this point, he is a risk of flight or he's a danger?

21   Those two years incarcerated, is that -- is there anything in

22   that history that you think is relevant either way pro or

23   con?

24              MR. KEILTY:  Not particularly, Your Honor.  That

25   may be an issue at sentencing, the fact that he's served two

27

1    years.  But I wasn't in the Tunisian jail with him.  I mean,

2    Mr. Jacobson has proffered that he was a model prisoner.  I

3    don't know if he could have been radicalized more for all I

4    know, Your Honor.  So I can't comment on that.

5              THE COURT:  Right.  And do you know -- if he were

6    released, is the plan that he would be released to

7    California, is that it, to live with his family?

8              MR. JACOBSON:  Your Honor, I'd say that that is our

9    main proposal.

10             But taking Pretrial's points, and understanding

11   that there might be logistical issues with him residing at

12   the family home, we have an alternative plan, which is

13   feasible, in that Ms. Alphonso, his mother -- we've discussed

14   it with her -- she would be willing to take leave from her

15   job at Kaiser Permanente, rent an apartment here New York

16   City and reside with him here.

17             Understandably, he would be under electronic

18   monitoring.  She could stay with him.  I'm sure she would be

19   happy to sign as a third-party custodian in the case.  So she

20   -- wanting to make this happen, she's extremely flexible.

21             Anticipating that this could have been an issue in the

22   future, she's already applied to have her nursing license

23   transferred to the State of New York so that she could stay

24   in a more long-term environment here.  So she's open to that.

25   She's open to it.  And she can discuss it with the Court.

28

1    She's available today.

2           I do have a few responses to some of the things the

3    Government has said at some point, Your Honor.

4           THE COURT:  Okay.  Yes, briefly.

5           MR. JACOBSON:  Thank you, Judge.

6           I think also in response to the Court's question

7    about the conviction in Tunisia going to risk of flight, I do

8    think it's relevant in that of course there's no legal double

9    jeopardy reason that he can't be prosecuted here.

10          But at some point, especially when it comes to

11   crimes of universal jurisdiction, we have to say this is the

12   end of it.  Right?  He has paid his dues in Tunisia for the

13   exact same crime.

14          And so because it's a universal jurisdiction crime,

15   what's to stop -- after he -- if he's -- if there was a

16   conviction here, France could then extradite him.  Any

17   country could extradite him and say he's still a risk of

18   flight, he's still a risk of danger.

19          So there's this -- in cases where any country is

20   able to prosecute, there is a -- and it's a hypothetical

21   risk, if it has happened yet in this case -- but I think we

22   have to say he's been prosecuted and sentenced and has served

23   his time in this exact case, without incident, when he was

24   18-19 years old.  Now he's 22.  Tunisia has, to my mind, more

25   sober laws on this subject than the United States does.  He's

29

1    paid his dues.  It's time for him to show that he can

2    reintegrate, instead of prosecuting him yet again for the

3    same exact conduct, which is merely walking through Tunisia.

4            The Government said he wasn't doing touristy

5    things.  He was.  I mean, they take an isolated martyrdom

6    post from this crazy, alt-right message board that he was on.

7            But if you actually read his messages from Tunis --

8    this is before he was arrested -- his text messages to his

9    mother from Tunis.  "Hi, Mama.  Love you too a lot.  I made

10   it.  I'm in North Africa bordering the Mediterranean.  It is

11   so awesome here.  I have a lot to tell you about my trip.

12   Love you.  I'm sending this message. I'm using the internet

13   café, but I'll try to make an international call as soon as

14   possible.  Love you.  I'll come back to the café to check for

15   more messages."  And there are other messages where he's

16   talking about his time there in other letters.

17           So I think we need to make the distinction that 18-

18   year-old kids post all manner of insanity on message boards.

19   It's just a fact of the world.  I don't -- as a 36-year-old,

20   I didn't quite experience it.

21           But seeing younger people in my family and all over

22   -- we see the sons of politicians in this country posting

23   insane things on message boards, on Snapchat, on Instagram --

24   it's how the world works.  So the isolated things about

25   martyrdom, what he's actually saying to his family about what

1    he wants to do totally contradicts that.

2          So I want to -- you can look at the same message --

3    the same alt-right message board and he also says it's the

4    same god, Jews, Christians, Muslims, it's the same god.  I

5    highlighted a few pieces of it.  He's talking about martyrdom

6    in the context of open borders and migration and Syrian

7    refugees.

8          But he says -- he's talking about monotheism, it's

9    all the same god.  Men don't have to fight each other.  He

10   talks about -- he sends a message to his mother.  Of course,

11   I don't want -- he talks about how he doesn't want to be a

12   martyr in other messages.  There's a lot of messages here on

13   the board.  I don't tell anyone to join.  I'm just looking

14   for a discussion.

15         So I don't know what -- the Government's position

16   is somehow he was radicalized at 18.  He's still radical now

17   at 22.  But the messages he sends people --

18         MR. KEILTY:  Your Honor.

19         I'm sorry.  Are you finished?

20         MR. JACOBSON:  He never says he wants to join the

21   Islamic State.  He couldn't have joined the Islamic State.

22   He was no -- and the Government I think said he was caught

23   near the Libyan border.  He was well within central Tunisia

24   when he was arrested.  He had been in Tunis.

25         He was in a fruit market when he was arrested.  I

1        just think he was 18.  He's been convicted of something.

2        It's 19, sorry.  He's 22 now.

3                Can't we just give him a chance to show that he can

4        -- what is the value of punishment in this case just for the

5        same of punishment?

6                Can't we have a sense that a kid -- even if you

7        don't think it's criminal -- that a kid did something really

8        foolish when he was 19 after this traumatic thing?

9                And maybe we owe it to our citizens to say we want

10       you to be part of this community and to be able to live a

11       productive life, especially when for the last three years

12       everything he's been saying is that's what I want to do.

13               Everything he's -- he doesn't say it in those

14       words, but everything shows I'm not a risk of danger.  I'm

15       not a risk of flight.  I want to come home.  I want to -- why

16       would he -- he's not trying to game future discovery when he

17       says I hope to come home before my birthday.  I just want a

18       job with a regular day schedule so I can sleep good at night.

19       And then quotes Mary Poppins.

20               This is the terrorist that the Government wants to

21       have in jail for having already been in jail for the exact

22       same conduct?  How long do they want to keep him in jail?

23       How long do they want to keep him in jail?  That's my

24       question.

25               THE COURT:  All right.

1          Mr. Keilty?

2          MR. KEILTY:  Your Honor, to put a bow on this, the

3     defendant repeatedly searched how to join ISIS.  How does a

4     westerner join ISIS?  His computer is littered with beheading

5     videos.  I've seen them.  He speaks about martyrdom.  He gets

6     to Tunisia on a one-way ticket.  Right?  He previously looks

7     how to join ISIS in Syria and he can't do it.

8          So then he switches over to going to Tunisia.  When

9     he gets there, it's not like, oh, this was a mistake.  Let me

10    get back.  He sends out this disturbing message to his family

11    member about martyrdom.

12         I don't know why he quotes Mary Poppins.  But Mr.

13    Jacobson makes it sound out like he was going to join the

14    Peace Corp, but he just didn't get there.  He was going to

15    join ISIS.  The evidence is overwhelming in this case, Your

16    Honor.

17         And it's a little bit perplexing that Mr. Jacobson

18    would take this -- I'm not even sure of the correct word --

19    but this is a serious, serious case.  The defendant's a

20    danger to the community.  He tried to join a group that wants

21    to kill Americans.  We have no evidence that if he's released

22    today he wouldn't go right back to believing that same

23    philosophy.

24         THE COURT:  Okay.  All right.  Thank you.

25         I think a number of the arguments that the defense

33

1    makes go to whether or not you believe there should be a

2    prosecution, or whether or not you believe, if he were

3    convicted, what sentencing would be and what would be

4    appropriate.

5            And I believe also part of the argument, sort of

6    implicit, is that whatever this defendant was thinking at the

7    time he went, he got his one-way ticket to Tunisia, he's a

8    changed man or at least he's not of a risk of flight or a

9    danger to the community.

10           The Government's position is the evidence is pretty

11   clear as to what he was doing when he went to Tunisia.  And I

12   find that that evidence is persuasive and that there's no

13   evidence that there really has been a change.

14           One of the difficulties for a court in this

15   situation is to know what's in someone's mind.  All we know

16   are his actions at this point and those actions are the ones

17   that, you know, weigh in the balance.

18           There is no alternative to incarceration program

19   for people who were young who went to, you know, to join

20   ISIS, at least not in this district.  If there were, that

21   would be something that would be, I think, useful in a

22   situation like this.  But we don't have that.  And the

23   safeguards that would come with that we don't have.

24           So based on evidence, which at this point is

25   several years old, it's my finding that the Government's

1    arguments do show that there was, at least at the time, at

2    the last time that we really understood what this defendant's

3    intentions are, a serious risk of flight and a danger to the

4    community at that time.  Whether he's changed, it's quite

5    possible.  But I just don't see the evidence there at this

6    point.

7             And again, I wish we had an alternative to

8    incarceration program with safeguards and with the kinds of

9    supervision that would in a graduated way allow courts, and

10   even the Government, to understand what a person's true views

11   are, but we don't have that at this point.

12            So I find that the Government has met its burden on

13   both counts.  And I do think that there is some question as

14   to what Mr. Augustine's current intentions are.

15            And it's difficult for a court to speculate as to

16   what those are in the face of evidence that we've had in the

17   past.  So therefore, I'm finding that the Government has met

18   its burden and that the defendant, at this time, his

19   application is denied.

20            MR. KEILTY:  Thank you, Your Honor.

21            THE COURT:  Do we have a -- is there a trial date?

22   I mean, what's the -- how much time are we looking at before

23   this case will --

24            MR. JACOBSON:  We've only had an initial status

25   conference, Your Honor, so the Government is still in the

1    process of producing Rule 16.

2            THE COURT:  Mm-hmm.  And he was originally

3    arraigned sometime back in March?

4            MR. KEILTY:  He was arraigned, Your Honor, in

5    August of this past year.  And our first status conference in

6    front of Judge Johnson was held on I believe October 9th.

7            MR. JACOBSON:  That's right.  There were a number

8    of pre-indictment orders of excludable delay in the case.

9            THE COURT:  Oh.  So what happened in February?  I

10   mean, what triggered this initial letter?  It was just an

11   initial appearance then?

12           MR. KEILTY:  Yes, Your Honor.

13           THE COURT:  Okay.

14           MR. KEILTY:  There was a complaint.

15           THE COURT:  But the indictment, it took a while for

16   the indictment to be filed?

17           MR. KEILTY:  Correct, Your Honor.

18           THE COURT:  Okay.  All right.  Thank you.

19           MR. JACOBSON:  Thank you, Judge.

20        (Proceedings concluded at 2:36 p.m.)

21

22

23

24

25

1          I, CHRISTINE FIORE, Certified Electronic Court

2     Reporter and Transcriber, certify that the foregoing is a

3     correct transcript from the official electronic sound

4     recording of the proceedings in the above-entitled matter.

5

6

7

8

9     _____        October 22, 2019

10         Christine Fiore, CERT

11

12

13

14

15

16

17

18

19

20

21

22

23