UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------X

UNITED STATES OF AMERICA, : 18-CR-00393 (SJ)

v. : 225 Cadman Plaza East
: Brooklyn, New York

BERNARD RAYMOND AUGUSTINE, : November 15, 2019

Defendant. :

-----------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
AND BAIL APPLICATION
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government: MICHAEL KEILTY, ESQ.
U.S. Attorney's Office
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

For the Defendant: ALLEGRA GLASHAUSSER, ESQ.
SAMUEL JACOBSON, ESQ.
Federal Defenders of New York
One Pierrepont Plaza
Brooklyn, New York 11201

Court Transcriber: SHARI RIEMER, CET-805
TypeWrite Word Processing Service
211 North Milton Road
Saratoga Springs, New York 12866

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

(Proceedings began at 2:49 p.m.)

THE CLERK: Criminal Cause for a Status Conference and Bail Application, United States v. Bernard Augustine, Case No. 18-CR-393.

Counsel, please state your appearances.

MR. KEILTY: Good afternoon, Your Honor. Mike Keilty for the Government.

MS. GLASHAUSSER: Good afternoon, Your Honor. Allegra Glashausser and Sam Jacobson representing Mr. Augustine. We're joined by two NYU Law interns Aluthra Cy and Albert Huber [Phs.]. And Mr. Augustine's family is in the audience, Cheryl Alfonso and Natasha Augustine and Alicia Augustine, his mother and two sisters.

MS. CARLSON: Amanda Carlson from Pretrial Services.

THE COURT: Thank you. So while waiting for the electronic sound recording machine to work we had a brief discussion of discovery, and the defense has requested certain discovery materials that are outlined in the letter from July of this year and reiterated in a more recent filing and the Government has been -- has agreed to and been ordered to respond no later than the 27th of November to make a rolling production. So whatever materials are available now will be produced and any materials as soon as they're located will be produced.

MR. KEILTY: Yes, Your Honor.

THE COURT: What other procedural issues are there at this point?

MR. KEILTY: Your Honor, there's the pending motion and I believe that we talked about potentially having oral argument within the next few weeks if the Court is open to that.

THE COURT: Yes. Just for the record, could you specify the motion?

MR. KEILTY: The motion to dismiss, Your Honor, as well as a motion for a bill of particulars and a motion to suppress I think is -- is that correct?

MS. GLASHAUSSER: That's correct, Your Honor, although with respect to the bill of particulars motion which I think is a separate and much more discrete and smaller motion, it would be -- if Your Honor is amenable we would like to have a quick sooner date that we -- I got the Government to agree to or be ordered to submit a bill of particulars because that would help with all of the other motions, particularly the motion to dismiss if the Government is ordered to give a bill of particulars that specifies what conduct they're actually alleging Mr. Augustine attempted to do. I think that would help the Court and the parties specify their arguments with the motion to dismiss better. So I'd ask that Your Honor rule on that as soon as Your Honor is able to. I'm not sure if we need --

THE COURT: Is it fully briefed?

MS. GLASHAUSSER: It's fully briefed and I'm not sure if we need this sort of more expensive oral argument on that motion that we do on the motion to dismiss and motion to suppress.

THE COURT: Why don't we take two minutes to discuss the bill of particulars?

MR. KEILTY: Your Honor, there's a 25 page complaint in this matter. Voluminous discovery has been turned over so far. The Circuit is pretty clear on it that he has notice of the conduct and the charges that he has -- that he faces. So the Government briefed it in its opposition and it's pretty open and shut that a bill of particulars given the lengthy complaint, given the voluminous discovery is not warranted here.

THE COURT: What is it -- I've read the complaint today and I re-read the transcript of the last bail hearing. What's the -- what specifically is the Government alleging that this defendant did?

MR. KEILTY: That he traveled to Libya to join ISIS to provide personnel himself to ISIS.

THE COURT: Attempted to travel to Libya?

MR. KEILTY: Correct, Your Honor. He did travel -- he traveled to Tunisia en route to Libya.

THE COURT: All right. That was with the intention

to join ISIS?

MR. KEILTY: Yes, Your Honor.

THE COURT: So what in addition is the defense looking for?

MS. GLASHAUSSER: We're looking for the information that the Government thinks shows that he was attempting to join ISIS or what it was that the Government believes he was intending to do for ISIS. They use phrases like join ISIS or work for ISIS without ever explaining what those phases mean.

The reason is [inaudible] motion to dismiss is because there's a general problem of a lack of notice to Mr. Augustine about what the Government is alleging he's done here or attempted to do.

The discovery is not voluminous. I have it basically sitting here in a binder and none of the discovery answers this question either. The Government hasn't defined what personnel would mean in this context and they haven't today either. They basically recited the indictment.

So we're seeking further information about what it is that they would be seeking to prove at trial and in their motion to -- in response to our bill of particulars motion they cite some cases where the court actually did order a bill of particulars. There's one case actually where what the defense was trying to do was use the bill of particulars at trial in order to uphold the Government to the theory in a

bill of particulars but the bill of particulars had been ordered by the court in order to provide the defendant in that case with more notice of the charges against him.

MR. KEILTY: I don't have anything else to add, Your Honor. The Government's theory of the case is that the defendant traveled to -- intended to travel to Libya to join ISIS to provide personnel himself to join the Islamic state.

MS. GLASHAUSSER: Your Honor, if I may. There's one other thing that Mr. Jacobson has helpfully pointed out to me. The phrase joining ISIS, joining ISIS is not actually even a crime. Mere membership in a federal -- a federally designated terrorist organization is not a crime. That's what the Supreme Court has said and [inaudible] War Project. You have to be trying to do something more, namely work under the direction and control of that organization. Here, we don't have any information about what the Government believes he was attempting to do to work under the direction and control. We only have a repetition of these phrases of join ISIS and work without any specifics.

THE COURT: Do you believe you need anything more particular than that?

MR. KEILTY: No, Your Honor.

THE COURT: At trial will you be attempting to prove that he intended to fight or that he intended to provide financial support or that he intended to work in some regard

to promote the interests of ISIS?

MR. KEILTY: Yes, Your Honor. We plan to show that -- under the statute all we have to show is that he would work under the direction and control of ISIS. He attempted to join ISIS to provide personnel himself to ISIS. That's all the Government has to show to put him on notice of the charges he faces at this point, Your Honor.

THE COURT: And it's your position that what specifically he intended to do in order to either provide personnel for ISIS or to work under its control is not --

MR. KEILTY: I mean the Government -- Your Honor, the Government would prove at trial that joining ISIS inherently involves fighting for ISIS. That is part of the rules if you will of joining ISIS.

THE COURT: Physically fighting?

MR. KEILTY: Yes, Your Honor.

MS. GLASHAUSSER: Your Honor, we're -- I'm surprised to hear the Government is articulating it in that way but from the perspective of what's been shown to us we don't know if Mr. Augustine is alleged to have attempted to become a homemaker in ISIS, a baker or a fighter or a doctor or some other -- any possible paths that one could be doing and some of those things like, for example, being a homemaker raises additional constitutional questions of whether that would be enough to meet the Government's burden and without knowing

what the Government is alleging we cannot defend against those allegations.

Your Honor asked if he was going to be a fighter or to provide money as different possibilities and the Government just said yes. So we're left without --

THE COURT: A fighter. I don't know about money. I didn't --

MS. GLASHAUSSER: I thought you said to provide financial resources.

THE COURT: I did but I think the yes was to the fighting, not the -- Mr. Keilty, what was your response?

MR. KEILTY: I'm sorry, Your Honor.

THE COURT: What was your response fighting, yes. Providing financial support?

MR. KEILTY: Your Honor, it's the Government's position that we don't have to get into the details of what we intend to prove at trial. The case law that we've cited in the brief here is that we don't have to give our theory of the case at this point. He's on notice that the indictment says he attempted to join ISIS through the use of personnel himself. That is enough under Second Circuit case law to provide notice of what the Government intends to prove at trial.

THE COURT: I think you went beyond that though. I think you said that anyone who joins ISIS is signing up to

fight physically.

MR. KEILTY: I believe there will be testimony to that, Your Honor.

THE COURT: Okay.

MS. GLASHAUSSER: Your Honor, just with respect to the case law, I think perhaps you'll see in our motion response the Government's case law relates to cases where bill of particulars were in fact ordered. It's not a high burden on the Government to articulate what it is in this context that they are planning to prove as their theory of direction and control and work. If it is that some expert is going to testify at trial that everybody needs to be -- whoever is a member of ISIS is also fighting that's news to us and something that hasn't been noticed either. I just ask Your Honor to order the bill of particulars. There's a lack of information here.

THE COURT: I'll reserve decision on that.

MS. GLASHAUSSER: Thank you.

THE COURT: Let's talk about the suppression hearing.

MR. KEILTY: Your Honor, it's the Government's position that a hearing in this matter is not needed. The defendant hasn't filed an affidavit in this case. The only facts here are -- were provided though a hearsay affidavit of somebody treating the defendant. We believe the case law is

clear that in order for a hearing to be necessary the defendant has to or somebody with firsthand knowledge has to submit an affidavit, and that's not the case here, Your Honor.

MS. GLASHAUSSER: Your Honor, the Government hasn't disputed any of the facts that were put forward in Mr. Augustine's motion and it is the Government's burden to show that statements are voluntary. It's not a requirement that there can be no hearing without an affidavit.

The Government also hasn't put in an affidavit and when there's no dispute or fact it may be that hearing isn't necessary [inaudible] because there's no disputed fact and the facts that Mr. Augustine has put forward are the ones that the Court should consider as the facts that the parties agree on and rule on those facts.

We've cited a number of cases in our brief about why an affidavit is not required in any circumstance and in particular when the Government doesn't dispute any of the facts. If Your Honor has questions about those I'm happy to address them.

THE COURT: I will not at this time.

So what is your request? What would you like the Court to do?

MS. GLASHAUSSER: We do not believe that we need a hearing given that the Government is not disputing the facts. So just oral argument would be what we'd be asking for in this

case.

THE COURT: So both sides agree --

[Pause in proceedings.]

MR. KEILTY: Your Honor, perhaps after oral argument if Your Honor believes that a hearing is necessary then we can schedule one at that time.

THE COURT: So we'll schedule argument and if a hearing is necessary we'll schedule that.

[Pause in proceedings.]

THE COURT: Is there anything else that needs to be scheduled?

MS. GLASHAUSSER: Just the argument on the motion to dismiss. Perhaps it will be at the same time as the motion to suppress.

[Pause in proceedings.]

THE CLERK: December 19th at 3:00.

THE COURT: Did you all hear that?

THE CLERK: December 19th at 3:00. Is that amenable?

MS. GLASHAUSSER: That's fine for the defense.

THE COURT: The Government?

MR. KEILTY: I believe so, Your Honor.

THE COURT: So that will be for the suppression motion and the motion to dismiss.

MR. KEILTY: Yes, Your Honor.

THE COURT: So that leaves us with the bail application. Is that correct? Anything else?

MS. GLASHAUSSER: No, Your Honor. Thank you, Your Honor.

So since we last appeared before the Court, I think it was almost a year ago last time, we have brought a much stronger bail package and have all of Mr. Augustine's family here so that the Court can ask the family questions if the Court has questions. They have spoken to Pretrial.

We have discovery and clearer evidence of the Government's case has serious problems as we have laid out in our motion to dismiss, our motion to suppress and Mr. Augustine has really been incarcerated for a long time at this point. It's been almost four years.

Looking at the bail factors, everything except just the nature of the charge strongly points to release. Mr. Augustine was -- has a long history in the California community. He lived there his entire life since the age of eight. He lived with his family. He had jobs. He went to school. He had no contact with the police. He has absolutely no history of violence or any -- really any negative bail factor in his history and he has very strong family ties as I think Your Honor already knew but also just seeing the family who's come here to visit for a couple of weeks from California and to see the judge -- to see the Court.

The Government hasn't articulated the specific danger that they believe that he poses and I think that our package can mitigate any danger that the Government or the Court might be concerned about particularly given his history of not just no violent conduct but no conduct that anybody would be concerned about except for the allegations in this case.

I can speak to the bail package itself if that would be useful to Your Honor. I know that Pretrial also thinks that it is a much stronger package than was presented before. It has --

THE COURT: It clearly is. I agree.

MS. GLASHAUSSER: And it has all possible monitoring so that the Court can feel assured that if anything didn't go as planned everyone would know and I don't think there's any reason to think that anything -- that everything wouldn't go as planned. Mr. Augustine --

THE COURT: Let me just interrupt you for a second because I've read your application. I re-read the transcript of the hearing and I've spoke to Pretrial Services and there was something that I wanted to know. I think it would be helpful if Pretrial Services could report on what it knows.

Amanda, if you wouldn't mind.

MS. CARLSON: Sure, Your Honor. Yes, we do agree that is correct that this bail package is a lot stronger than

it was in the past. However, we have two major concerns logistically. The defendant would be residing in California. So we have spoken to the Eastern District of California about the bail conditions that are proposed here. They are not able to monitor someone via a GPS technology bracelet. They simply would be able to monitor him in an RF fashion which would show that he was either home or he was not home. Therefore, we would not be able to reasonably assure the court that he wasn't deviating from any schedule to go somewhere such as mental health treatment or anything of that nature which is a big concern for us.

Also, in terms of cyber monitoring, the Eastern District of California is not able to monitor cell phones. They are only able to monitor computers and that is also a concern for us because we would want to assure the Court that any cell phone was being monitored that the defendant were to be using.

So if the bail package were to have all -- of what the defense has proposed plus those technologies, we would think that to be sufficient. However, logistically that does not seem to be the case.

THE COURT: So what that means is that the district that would be supervising Mr. Augustine doesn't have the technology that's needed to provide the assurances that your package was hoping to.

[Pause in proceedings.]

THE COURT: I think what we can do is go back on the record when the machine starts working again.

[Pause in proceedings.]

THE COURT: We're apparently back on the record.

So my impression after having read the proposed bail package is that it was much stronger and that if all the conditions could be met that there's a reasonable likelihood the Court would grant that package but still I would hear from the Government and if the Government had some concerns.

MR. KEILTY: Yes.

THE COURT: But it can't be met at this point. So my question then is is it sufficient with only the residential monitoring without the GPS, and the second issue is transportation from California to the Eastern District to make sure that when Mr. Augustine flew from whichever airport he would in California to New York that there would be some monitoring, some safeguards to make sure that he's no flying alone and that he's with someone who is trusted at that time. Those are two issues.

Not being able to monitor a cell phone is a big issue.

MS. GLASHAUSSER: Your Honor, I would propose in response to that at least until we can figure out an alternative that Mr. Augustine would just not have a cell

phone. That would address that concern and then Pretrial can monitor whatever computer was in the home. So I think that we could have --

THE COURT: That's issue one.

MS. GLASHAUSSER: That's issue one. As far as GPS, I think one way to deal with that as well while trying to figure out if there is -- I understand that there's a nearby district that does GPS monitoring, the LA County District. While trying to figure out whether that could be feasible that Mr. Augustine would be confined to his home and that he wouldn't be allowed to go to school or to work during that beginning period of time while we figured out the GPS monitoring or until the Court was comfortable that he was doing everything else that he was supposed to be doing during that time.

I do think that it is likely we would be able to with some time find an alternative district to do the GPS monitoring. I have had one client who was monitored in California before in a very similar and strict conditions but -- and I remember also having these sorts of discussions. I do think that it would be something they would be able to figure out with time and we could have more severe restrictions while we were figuring out the monitoring situation of both the phone -- him just not having a phone and with just not leaving his residence in the beginning period of

time.

As far as flying to court appearances, of course I would have to talk to the family about that but I feel reasonably sure that his mother would come with him and would be willing to be the third party custodian and have that be part of her duties to travel with him to court appearances.

THE COURT: Can I hear from the Government?

MR. KEILTY: Your Honor, you won't be shocked to hear that we obviously oppose this application for the same reasons that we opposed it in October of last year and for the same reasons that Your Honor found that this defendant was in fact a danger to the community.

We received this letter last night at 9:00. So to the extent Your Honor is considering this bail package, we would ask at least for some time to respond to the letter in writing. Obviously we don't think the package is sufficient. We believe that detention is appropriate here.

This is an individual who despite what the defense counsel says it's -- the evidence is clear that he went to -- intended to join ISIS in Libya. ISIS only has one goal and that's to kill westerners, to kill infidels. So he's obviously still a danger to the community were he to be released.

To the extent that Your Honor is willing to entertain releasing Mr. Augustine today, we would ask that --

THE COURT: No, I would give you time to respond.

MR. KEILTY: I would ask that you stay the order until we can appeal to Judge Johnson on Monday but we would ask for time to respond in writing to this, Your Honor.

THE COURT: Absolutely. I want to consider the proposals that the defense is making and I'd also want to talk to Pretrial Services about the feasibility of some of the other plans.

I'm also interested in knowing more about his adjustment at the MDC. I think there's been -- there was some discussion at the initial bail hearing on that on both how Mr. Augustine did in Tunisia and how he was doing at the MDC. Whether there were any incidents at the MDC since that time would be something I would want to know about.

I understand he's been seeing a counselor or a therapist. It would be important for me to know -- to hear from the therapist as to whether there have been any discussion of some of the ideology that had been present in the emails and texts that were presented at the last bail hearing and just to get a sense of where to the extent possible Mr. Augustine's mind is at this point with respect to the Islamic state.

MR. KEILTY: Your Honor -- I'm sorry to interrupt.

THE COURT: Go ahead.

MR. KEILTY: I think the Government's letter would

be able to provide some color to that as well.

THE COURT: I mean that's a big issue for me because people do change over time and what I want to know -- apparently Mr. Augustine, if the Government is to be believed, changed after a tragic incident in his life and may well have adopted an ideology that was foreign to him before and the question is is that still his ideology and to what extent is he -- would he be acting on those ideas.

MS. GLASHAUSSER: Understood, Your Honor. We will have his doctor either -- we'll talk to her about the most appropriate way to respond to that aspect.

As far as what he's -- his adjustment to MDC, I think he spends a large, a vast majority of his time reading. He had a *New York Times* subscription for a while. He since switched to *The Economist* to get something a little different. He reads on a wide variety of topics. We send him books regularly. His family sends him books regularly and he -- much of our discussions that are non legal related relate to what he's been reading lately and he thinks about what's in the news, feminism novels, all these sort of things. So that's my understanding of how he spends most of his time at MDC. And dreaming of home cooked meals.

THE COURT: Are you aware of any incidents, any disciplinary incidents, any fights, any issues?

MS. GLASHAUSSER: I'm certainly not aware of any

physical fights that have occurred at MDC but I'll confirm with Mr. Augustine and we can put that in writing as well, Your Honor.

THE COURT: I am concerned about a lengthy period of pretrial detention. That is a concern I think to -- I assume to all of us and there is a concern on the one hand for not having an appropriate lengthy pretrial detention and on the other hand insuring the safety of the community and preventing a risk of flight. So I'm looking at the conditions which to me seem much stronger than they were previously but I need a little bit more information a) from the Government; and b) from the defense.

MR. KEILTY: Yes, Your Honor. Your Honor, I would just note that the lengthy pretrial detention is of no fault of the Government. Defense counsel asked for a lengthy adjournment so they can do additional investigation in Tunisia. The defense counsel has filed these motions which obviously is their right but there was multiple adjournments that they asked for before they filed these motions. There was a rather lengthy pretrial -- pre-indictment phase where the parties were engaged in plea negotiations. So the Government has been ready for trial. I just wanted to put that on the record.

MS. GLASHAUSSER: Your Honor, if I just may respond briefly. The two years that Mr. Augustine spent in Tunisian

prison was delayed solely at the Government's discretion. They were involved from the first day of Mr. Augustine's arrest and Your Honor will see those facts in our motion is related to our double jeopardy issue. But they've been involved for the past almost four years.

So any extension for our motions which is reasonable given the length of those motions is a short amount of time in the context of the lengthy delay before Mr. Augustine's case here even started.

THE COURT: So I think what I'm going to do without -- well, two things. I think we need to schedule a resumed hearing. Is the family going to be here or were they not or do we need their signatures on a hypothetical bond?

MS. GLASHAUSSER: They're here until November 24th only. So through next week. That may even be mid next week. So if it would be past -- November 24th actually. Through next week, excuse me. So if our hearing would be past that time yes, I'd ask that Your Honor ask them any questions that Your Honor has today and get any signatures needed today.

THE COURT: They could also sign in California.

MS. GLASHAUSSER: Yes, Your Honor.

THE COURT: Has the Government had a chance to speak to the family?

MR. KEILTY: No, Your Honor.

THE COURT: Is that something you'd like to do?

MR. KEILTY: No, Your Honor.

THE COURT: I'm going to ask the family to come up, please.

[Pause in proceedings.]

CHERYL ALFONSO, SURETOR, AFFIRMED

THE CLERK: Can you state your name for the record?

MS. ALFONSO: Cheryl Alfonso.

NATASHA AUGUSTINE, SURETOR, AFFIRMED

THE CLERK: State your name.

MS. N. AUGUSTINE: Natasha Augustine.

THE CLERK: Thank you. Raise your right hand, please.

ALICIA AUGUSTINE, SURETOR, AFFIRMED

THE CLERK: Please state your name.

MS. A. AUGUSTINE: Alicia Augustine.

THE COURT: Good afternoon. Thank you for coming in.

So could you tell me a little bit about -- well, let me ask you. Do you understand what it means to have Mr. Augustine released on bond?

MS. ALFONSO: I do. [Inaudible] have very clearly spoken to us, everything that's involved, and yes. I take it very seriously and yes, we do want my son back.

THE COURT: So you understand you would be what's called jointly and severely liable on the bond, that you would

be responsible for the full bond amount -- we don't know how much that amount would be or even if he will be released on bond. But that the full amount could be taken any one of you or divided up any way the Government wishes if there were a violation of the bond.

MS. N. AUGUSTINE: Yes, Your Honor.

MS. ALFONSO: Yes.

MS. A. AUGUSTINE: Yes.

THE COURT: The bond conditions would be very strict and that would mean that he may be confined to the home for an extended period of time, which is not an easy thing for anyone --

MS. ALFONSO: Yes, Your Honor.

THE COURT: -- for you or for him.

MS. ALFONSO: Yes, Your Honor.

THE COURT: Where do you live?

MS. ALFONSO: I live in California.

THE COURT: Where would he be living, with you?

MS. ALFONSO: He'd be living with me.

THE COURT: Do you own a house there?

MS. ALFONSO: Yes, I do own a house.

THE COURT: Is anyone else on the deed?

MS. ALFONSO: No. Just me myself.

THE COURT: Just you. And is there room for him in the house at this time?

MS. ALFONSO: Yes, Your Honor. A whole room is going to be for him.

THE COURT: I don't want to get into the merits of the case, what he was doing or why, but are you -- do you fully understand what the Government has charged him with in this case?

MS. ALFONSO: Yes, Your Honor.

THE COURT: Do you understand that the Government is concerned that he will provide some kind of material support to a foreign terrorist organization that could cost people's lives and could cost him his life as well?

MS. ALFONSO: I understand the concerns.

THE COURT: Do you understand that it's possible -- I mean if he is in fact -- if he does believe in the ideology of that organization it is possible that he may have deep rooted feelings about the organization that might be different from -- make him different from the person you thought he was years ago.

MS. ALFONSO: I've talked about it, Your Honor. It could be possible but I know my son does not have all this intentions or -- and I know that he will not cause anybody harm.

THE COURT: If he were released on bond, do you understand that you and your daughters might be named as what are called third party custodians?

MS. ALFONSO: Yes, Your Honor.

THE COURT: So he would have a moral and legal responsibility to make sure that he comes back to court when he's supposed to and that he would not engage in any way in any kind of contact with a foreign terrorist organization, that he wouldn't use computers, a whole list of conditions that -- are you familiar with the conditions?

MS. ALFONSO: Yes, Your Honor.

THE COURT: So do you understand that you would be responsible for --

MS. ALFONSO: Yes, Your Honor.

THE COURT: -- making sure that he followed all those conditions?

MS. ALFONSO: Yes, Your Honor.

THE COURT: And if he didn't you would be financially liable.

MS. ALFONSO: Yes, Your Honor.

THE COURT: And could be a lot of money and you could be owing a tremendous amount of money over a long period of time.

MS. ALFONSO: Yes, Your Honor.

THE COURT: The Government could take part of your wages each pay period, could take -- seize your house. It could take all your assets. It's a very serious responsibility.

MS. ALFONSO: Yes, Your Honor.

THE COURT: I'm going to speak to each one of you. Did you hear everything that I said to your mother?

MS. N. AUGUSTINE: Yes, Your Honor.

THE COURT: Could you say your name again for the record?

MS. N. AUGUSTINE: Natasha Augustine.

THE COURT: So do you -- you don't have to bend down. So do you understand what your obligation would be if you were on this bond?

MS. N. AUGUSTINE: Yes, I do.

THE COURT: Do you have any questions about it?

MS. N. AUGUSTINE: Not at this time, no.

THE COURT: Can you say your name again for the record?

MS. A. AUGUSTINE: Alicia Augustine.

THE COURT: Again, did you hear everything that I said?

MS. A. AUGUSTINE: Yes, Your Honor.

THE COURT: Do you understand your obligations under the bond?

MS. A. AUGUSTINE: I do.

THE COURT: Are you all -- and you understand you would be joint and severally liable for the full bond amount? I haven't said whether he'll be released yet or what the

amount would be if he were but do you understand that you'd be fully liable for that and the Government could take all your property and garnish your wages for many years until that amount has been reached?

MS. A. AUGUSTINE: I understand.

THE COURT: Are you all making this decision voluntarily?

MS. ALFONSO: Yes.

MS. N. AUGUSTINE: Yes.

MS. A. AUGUSTINE: Yes.

THE COURT: Does anybody have any questions?

MS. ALFONSO: No.

MS. N. AUGUSTINE: No.

MS. A. AUGUSTINE: Not at this time.

THE COURT: Does Pretrial Services have any questions? Have you had a chance to interview the family thoroughly?

MS. CARLSON: We've spoken to the defendant's mother but we can do that at another time, Your Honor.

THE COURT: So do you think anyone else would like to ask --

MR. KEILTY: No. Thank you, Your Honor.

MS. GLASHAUSSER: No, Your Honor.

THE COURT: So I'm not making the decision today. There's going to be a continued hearing. In case you're gone

when that happens if he is not released there will be no obligation on your part. If he is released you would have an obligation and you would have to go into court in -- I think in Sacramento to sign the bond.

Thank you very much.

I'd like to set another date. Can you tell me when -- when is the Government going to have its letter in?

MR. KEILTY: Can we have until Tuesday, Your Honor?

THE COURT: Sure. Tuesday is the 19th; correct?

MR. KEILTY: Yes, Your Honor.

[Pause in proceedings.]

THE COURT: Does Mr. Augustine want to submit anything in response to the Government or would you rather do it in court?

MS. GLASHAUSSER: Your Honor, if we submit anything in writing we'd like -- we're hoping to get back on the court's calendar while the family is still here. So we would submit something quickly by the next day, by Wednesday if we submit something --

THE COURT: By the 20th?

MS. GLASHAUSSER: By the 20th.

THE COURT: Okay. Then with respect to just some discussion of how Mr. Augustine has been adjusting at the MDC and whether or not anything relevant has been discussed during the therapy sessions with respect to his frame of mind, how

would you like to submit that? Would you like to have someone come in and testify? Would you like to submit records, statements, affidavit or --

MS. GLASHAUSSER: I do think we --

THE COURT: What's appropriate?

MS. GLASHAUSSER: -- have to consult with the person who would be doing either the testimony or the writing. If we could, Your Honor, submit that on Wednesday or explain to the Court if we think it's more appropriate to have her come in would that work for the Court?

THE COURT: Yes. Of course. I know it's a somewhat unusual request but I think it's important.

MS. GLASHAUSSER: Understood.

THE COURT: We're going to set a date now.

[Pause in proceedings.]

THE COURT: Thursday at 11:30.

MR. KEILTY: Thursday of next week, Your Honor?

THE COURT: Yes.

MR. KEILTY: I am not around, Your Honor. I'm going to be traveling for --

THE COURT: For the holidays?

MR. KEILTY: No, for work, Your Honor. I can --

THE COURT: What's your schedule?

MR. KEILTY: I can check my co-counsel's schedule to see if he's around and get back to the Court later on today.

THE COURT: What's an alternative date for you?

MR. KEILTY: I guess the following week is Thanksgiving week.

THE COURT: But there's Monday the --

MR. KEILTY: The Monday. Does Monday work?

THE COURT: They're gone by then. They leave the 24th.

MS. GLASHAUSSER: Yes, they leave the 24th, on Sunday.

THE COURT: So we'll try to schedule it before then but if we can't then is Monday the 25th good for us?

THE CLERK: For us we have grand jury selection in the morning and then the afternoon is full.

THE COURT: Tuesday?

THE CLERK: We have the 1:00 hour open.

THE COURT: 1:00 on Tuesday. That's the 26th.

MR. KEILTY: Okay, Your Honor.

THE COURT: Should we just say the 26th?

MR. KEILTY: Yes, Your Honor.

THE COURT: Do you want to try to see the 21st for counsel?

MR. KEILTY: I can try.

MS. GLASHAUSSER: Your Honor, if co-counsel is available we'd prefer the 21st.

THE COURT: So we'll hold the 21st for you. That's

at 11:30. So if you could just let us know.

MR. KEILTY: This afternoon, Your Honor, I'll let you know.

THE COURT: So it's -- so right now we scheduled it for November 21st at 11:30. If that doesn't work it will be November 26th at 1:00.

We've scheduled everything else. So anything else that needs to be done?

MR. KEILTY: I don't think so, Your Honor.

MS. GLASHAUSSER: No, Your Honor.

THE COURT: Is there anything else Pretrial Services needs?

MS. CARLSON: No, Your Honor.

MR. KEILTY: Your Honor, there's one thing. There is a -- I believe there is a date next week that Judge Johnson has put on the calendar earlier before you heard these motions to Your Honor. So we'll reach out to I guess is chambers and see if we can have that adjourned.

THE COURT: Is that a status conference?

MR. KEILTY: Scheduled for a status conference, Your Honor, yes.

MS. GLASHAUSSER: We agree.

THE COURT: What date is that?

THE CLERK: I believe it's Tuesday. I'm sorry, Wednesday at 11:00 of next week.

THE COURT: Thank you.

MS. GLASHAUSSER: Thank you.

MR. KEILTY: Thank you, Your Honor.

(Proceedings concluded at 3:28 p.m.)

* * * * *

I certify that the foregoing is a court transcript from an electronic sound recording of the proceedings in the above-entitled matter.

Shari Riemer

Shari Riemer, CET-805

Dated: November 18, 2019