1                      UNITED STATES DISTRICT COURT
                       EASTERN DISTRICT OF NEW YORK

2    ------------------------------------X
                                         :
3    UNITED STATES OF AMERICA,           :
                                         : 18-CR-00393 (SJ)(RML)
4              v.                        :
                                         : December 19, 2019
5    BERNARD RAYMOND AUGUSTINE,          :
                                         : Brooklyn, New York
6                   Defendant.           :
                                         :
7    ------------------------------------X

8
             TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
9               BEFORE THE HONORABLE ROBERT M. LEVY
                     UNITED STATES MAGISTRATE JUDGE
10

11   APPEARANCES:

12

13   For the Plaintiff:        CRAIG HEEREN, ESQ.
                               MICHAEL KEILTY, ESQ.
14                             United States Attorney's Office
                               271 Cadman Plaza East
15                             Brooklyn, New York 11201

16   For the Defendant:        ALLEGRA GLASHAUSSER, ESQ.
                               SAM JACOBSON, ESQ.
17                             The Federal Defenders of New York
                               1 Pierrepont Plaza- 16th Floor
18                             Brooklyn, New York 11201

19
     Court Transcriber:        SHARI RIEMER, CET-805
20                             TypeWrite Word Processing Service
                               211 N. Milton Road
21                             Saratoga Springs, New York 12866

22

23

24

25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

2

1   (Proceedings began at 3:30 p.m.)

2          THE CLERK:  Criminal cause for a bail application

3   and various other pretrial motions, Case No. 18-CR-00393,

4   United States v. Bernard Augustine.

5          Counsel, can you please state your appearances.

6          MR. HEEREN:  Good afternoon, Your Honor.  Craig

7   Heeren on behalf of the United States.  With me is my

8   colleague Michael Keilty.

9          MR. KEILTY:  Good afternoon, Your Honor.

10          MS. GLASHAUSSER:  Good afternoon, Your Honor.

11   Allegra Glashausser and Sam Jacobson representing Mr.

12   Augustine.  We're also joined at counsel table by Rachel Bass,

13   a paralegal at the Federal Defenders.

14          THE COURT:  Good afternoon.  All right.  We have a

15   number of issues.  Does it make sense to do the argument on

16   the motion dismiss first?

17          MR. HEEREN:  Your Honor, I think it might make sense

18   to do that last.

19          THE COURT:  Okay.

20          MR. JACOBSON:  We did have one preliminary issue

21   that we wanted to address which is our continuing inability to

22   meet with Mr. Augustine.  We had advised the Court on November

23   22nd by letter that there were numerous times over the past

24   couple of months that we've been unable to meet with him

25   despite waiting at MDC virtually the entire day.  We filed the

3

1   letter last night as well indicating that two days earlier

2   this week we spent at MDC waiting for him to come down.  He

3   never came down.

4          Ms. Glashausser and Ms. Bass were at MDC on Tuesday

5   and were unable to see him.  I spent most of yesterday trying

6   to see him at MDC, as well.  There was an emergency count in

7   the morning.  I was finally able to enter the building a

8   little after noon.  I waited for several hours in the visiting

9   room and was told numerous times that he couldn't currently

10  come but that may be he would come in a little bit, although

11  no timeline was given.  And right before the afternoon count

12  started, I was informed that even if I waited until after the

13  count, he'd not -- he would not be able to move in the

14  building because his movements were frozen due to separation

15  orders.

16         Now, we could have rectified some of what we had

17  hoped to discussed with him had we been able to see him today,

18  but we again spent most of the day trying to meet with him in

19  the pens here in the courthouse and were again unable to.

20         THE COURT:  Why is that?

21         MR. JACOBSON:  So, we spent from roughly 10:00 a.m.

22  until noon in the waiting room of the pens downstairs and were

23  told by the marshals that they would not be able to put him in

24  a visiting room and they had no timeline about when he'd be

25  able to be put in a visiting room.

4

1          THE COURT:  Was that due to lack of staff or what?

2          MR. JACOBSON:  We were not informed of why.

3          THE COURT:  Okay.

4          MR. JACOBSON:  So that was two hours that I spent

5    this morning trying to see him.  In the early afternoon, Ms.

6    Bass and Ms. Glashausser tried to see him again.  I think

7    roughly 1:00 or 1:30 they tried to see him in the pens that

8    they could at least spend a few minutes with him before court

9    and were again told that the marshals would not be able to put

10   him in a visiting room.  And I don't -- for whatever the

11   reason is that that happened, it's of course the marshals have

12   staffing issues, but I think combined with our total inability

13   to see him at MDC and for him to assist in preparing his own

14   defense, I think it's really -- it's becoming a greater

15   concern over the past few weeks.

16          So we have not been able to discuss our argument on

17   the motions.  He has not -- other than a few minutes before

18   Your Honor came down to the courtroom, he has not seen any of

19   the most recent filings, doesn't know about the substance of

20   the filings.  And so largely, what he hears on the record

21   today will be a surprise to him.  And I think he of course is

22   the most important person in these proceedings, and I think it

23   feels like he is no longer a participant at all in his own

24   case.  And we're hoping -- we continue to believe that bail is

25   the appropriate remedy for that, both under the ordinary

1  provisions to the Bail Reform Act (a) through (c), but we are

2  moving in the alternative under (I) for special release in

3  order to assist in the preparation of his defense.

4          THE COURT:  What can the Government do to correct

5  this situation?

6          MR. HEEREN:  Sure, Your Honor.  So I can't speak to

7  what happened today at the pens.  I'm not aware of it, and I

8  haven't confirmed an issue like that previously.  We're happy

9  to ask the Marshal Services to what exactly happened and can

10  discuss it with Your Honor or defense counsel as Your Honor

11  chooses and see if that can be rectified in the future so that

12  doesn't happen again.  But that's an unusual one, to be honest

13  with you.

14          THE COURT:  I've never heard of it before.

15          MR. HEEREN:  Yeah.

16          THE COURT:  In terms of the MDC as well, similarly,

17  I have not had a complaint like this before.  I mean I've been

18  involved in cases where individuals have separation orders and

19  other restrictions and they're able to visit.  I have had

20  complaints about certain dates where things have not gone the

21  right way but not the degree that's being alleged by defense

22  counsel here.  I'm currently unaware of any present separation

23  order against the defendant, though it's possible there could

24  be one or more.

25          But in any event, what the Government I think can do

6

1   is we'd be happy to contact the MDC counsel and discuss what

2   can be done to remedy the issue so to the extent defense

3   counsel wants to meet with him, they can do so in a timely

4   fashion.  I think one way that that might be done is we're

5   learning about -- we learned about this last night.  And from

6   the prior occasion similarly from their letters to the Court,

7   if counsel wants to let us know that they're going over on a

8   particular day, we're happy to let MDC counsel know and, you

9   know, they can do whatever they deem appropriate.  But,

10  obviously, what we can do is a bit limited as well.

11          You know, counsel indicated there was an emergency

12  count.  However unfortunate it is, that might have been a very

13  good reason why individuals were frozen.  And, you know, it's

14  not my place to second-guess it, and I think under the law I

15  don't have any ability or right to second-guess it in any

16  event.  But, you know, we're happy to take measures to see

17  what we can do to facilitate it.

18          THE COURT:  Is it possible to schedule appointments

19  when counsel is going over to schedule them so you know --

20          MR. JACOBSON:  They've never allowed --

21          THE COURT:  -- they could make him available?

22          MR. JACOBSON:  -- us to do that.  They only make a

23  determination whether movement is possible once we are already

24  in the visiting room and have turned in our form.  And then

25  they analyze who's in the building where and whether he can be

7

1  brought down.  And it seems like basically he can never be

2  brought down, at least in the last month or so.  And I'm not

3  at all calling into question what the Government is saying.  I

4  just think it's a matter of the wires being crossed, but when

5  I spoke to staff at MDC, they said very clearly that these are

6  not MDC-initiated separation orders.  These were separation

7  orders instituted by the prosecution and that we would -- that

8  the prosecution would have to lift the separation orders for

9  him to be able to move in the building.  And I'm not saying

10 that that's the case.  I'm simply saying that there's clearly

11 a lack of information that MDC and I don't even know if --

12 they seem to not be clear on why these separation orders are

13 even in place.

14         MR. HEEREN:  Your Honor, we can look into it.  I

15 mean we have not issued any separation order.  To the extent

16 that counsel from another office has or one of our other

17 colleagues has, we'll look into it.  Obviously, if there's --

18 they have a reason to do so, I don't know if we can -- we're

19 going to second-guess that either.  But I think the fact of a

20 separation order is a little bit of a -- it shouldn't

21 necessarily be the issue here.  I mean there's many people at

22 the MDC who have separation orders, and they -- I think as far

23 as I know they are able to meet with their counsel.  So, I

24 think they should be able to meet with their client as well,

25 and we're happy to figure out what the problem is recently.

8

1        THE COURT:  Can you give me a status report by

2   tomorrow?

3        MR. HEEREN:  Yes.  It would be helpful for the

4   Government to know how many times this issue has happened in

5   the past, you know, 30 days or so.

6        THE COURT:  Do you have a count or --

7        MR. JACOBSON:  We can try to provide a rough

8   estimate.

9        THE COURT:  Okay.

10        MR. JACOBSON:  Twice this week and a number of times

11   in the weeks prior to that, but we'll try to get specifics to

12   you.

13                    [Pause in proceedings.]

14        MR. JACOBSON:  And our expert as well has had

15   similar issues, Mr. Augustine just reminded me.  And that

16   actually -- that does address Your Honor's question which is

17   when an expert is trying to visit someone at MDC, they do

18   require it to be scheduled.  So we advise MDC Legal 48 hours

19   in advance whenever the expert is trying to meet with Mr.

20   Augustine, and a number of times in the last few weeks, she

21   scheduled it, arrived, and not been able to see him.

22        THE COURT:  So scheduling an appointment is no

23   guarantee as I think both sides are saying.

24        MR. JACOBSON:  That seems to be the case.

25        THE COURT:  Is there anything else that the Court

1   could or should be doing to make this --

2          MR. JACOBSON:  Releasing Mr. Augustine.

3          THE COURT:  Well, I hear that one, you know.

4   Anything else that we can do just now just technically?

5          MR. JACOBSON:  I don't think so, Judge.  And we're

6   happy to proceed on the motion to dismiss argument.  I think

7   from our perspective, it might make sense to discuss bail

8   first, but we'd defer to Your Honor.

9          THE COURT:  Well, I'd rather do the motion to

10  dismiss because it's longer and it's more complicated.  I mean

11  they're all complicated, but it's an involved one and I want

12  to make sure that all the questions are answered on that

13  first.  And then --

14         MR. HEEREN:  The Government has no preference so

15  that's fine with the Government, Your Honor.

16         THE COURT:  Then we have the bill of particulars as

17  well, don't we, or did we decide to do that another time?

18         MR. JACOBSON:  We're happy to discuss it.  We'd

19  defer to the Court.

20         THE COURT:  Okay.

21         MR. JACOBSON:  I think our position is there's no

22  reason why the Court shouldn't order it today as well as the

23  motion to compel discovery.  So there are those four pending

24  motions.

25         THE COURT:  Okay.

1        MR. JACOBSON:  And the suppression motion, as well,

2   we'd like to argue before the Court.

3        THE COURT:  You know, on the suppression motion, I

4   think there's some questions about the procedures whether or

5   not -- are there factual disputes with respect to the

6   suppression motion or -- in other words, as to what happened

7   as opposed to how the defendant felt about what happened?

8        MR. HEEREN:  I think there's a factual dispute as to

9   what Mr. Augustine claims happened to him, yes.  I think

10  there's no -- at least from my reading, I wasn't here when

11  they discussed it, but at least as in my reading of the

12  transcript, my understanding from defense counsel is that

13  there's no dispute, legal dispute such that if you're deciding

14  it based on counsel's representation of the facts sitting here

15  today that it couldn't be decided one way or the other.

16       So it's a little convoluted, but what I'm trying to

17  say is my reading of the last transcript was that defense

18  counsel and we agreed that there's no need for a hearing on

19  the matter and we can decide it based on the facts as alleged.

20       THE COURT:  And for that to be true, I would have to

21  be sure that you all agree to what the facts are.

22       MR. HEEREN:  Well, to be clear, Your Honor, I think

23  we disagree as to Mr. Augustine's claimed as to what happened

24  to him.  But what we're saying is as --

25       THE COURT:  You mean as to whether he was hit,

1  struck by a --

2         MR. HEEREN:  To the degree that he describes.  We

3  don't dispute that he previously stated that he was hit once

4  in the back of the head to the FBI.  The additional claims,

5  which again he hasn't made in the sworn affidavit which are

6  made by a third party, we don't -- we do dispute those.

7         THE COURT:  Which part do you dispute?

8         MR. HEEREN:  All of the additional allegations made

9  by Dr. I believe Porterfield in her affidavit to the Court

10 about essentially alleging torture.  None of those claims were

11 made by Mr. Augustine when he was asked initially.  He only

12 said that he was hit in the back of the head once after he

13 asked for a cigarette.

14        THE COURT:  And what about standing for six hours

15 without --

16        MR. HEEREN:  He didn't claim any of that.  So we

17 dispute all of that.

18        THE COURT:  All right.  So there is some -- so there

19 are some factual disputes, in fact, key factual disputes?

20        MR. HEEREN:  Yes, Your Honor.  But I think the point

21 we made is two-fold.  One is even if you accepted their facts

22 as true, we're not using these statements in our case in

23 chief, and we're permitted to use those statements in the

24 rebuttal case to cross-examine him and to impeach him as well.

25 Separately, however, our additional point is to the extent the

1  Court believes a hearing is necessary, the law is clear that

2  the defendant needs to put in a material factual dispute which

3  he can only do through his own affidavit, not through a third

4  party affidavit.  And he has not done so still.

5          THE COURT:  And if part of the issue -- well, I

6  don't know if you want to be heard on that issue.

7          MS. GLASHAUSSER:  Well, this is the first time the

8  Government has stated that it's disputing any of the facts.

9  This is a surprise to us.  In their response, they did not

10  dispute any of the facts at all.  So if they're planning to

11  dispute the facts, then we surely would need a hearing and we

12  would also need to know what facts they're disputing and on

13  what grounds and -- so that is a surprise to me.  Legally, we

14  obviously disagree.  We agree that the statements can't come

15  in during their direct case, but they also cannot come in on

16  their rebuttal case or as cross-examination because of what

17  had happened to Mr. Augustine in the circumstances of those

18  interrogations making them not only involuntary but more than

19  that, the types of interrogations that shock the conscience.

20          So, I'm not sure what to say exactly, but this is

21  the first time I'm hearing that they dispute those facts.

22          THE COURT:  Right.  And I was -- I had thought that

23  there were no factual disputes, but the more I thought about

24  it, the more it seemed to me that there had to be some factual

25  disputes.

13

1          MR. HEEREN:  I think, Your Honor, the point is they

2    have not made a material factual dispute.  The documentation

3    from Dr. Porterfield is insufficient.  If Mr. Augustine wants

4    to allege the claims that were made in an affidavit, they may

5    meet their burden, their prima facie burden, in order to

6    secure a hearing on the issue, in which case he may be able to

7    testify on that and we can cross-examine him on those issues.

8          But sitting here today, they haven't met that.  So

9    the only facts the Court really should consider is his claim,

10   the one claim he made which is that he was hit once on the

11   back of the head.  And based on that claim, the Government

12   while again, we're not going to use his statements, his own

13   mirandized statements in our case in chief, we can use them to

14   impeach or in a rebuttal case.

15         MS. GLASHAUSSER:  Your Honor, if I may?  Putting

16   aside for a moment the affidavit question which I'm happy to

17   address fully as a legal matter, it's shocking to me to hear

18   the Government say these things.  It's not only that Mr.

19   Augustine suffered this sort of physical coercion and torture

20   in Tunisia.  It was well-known to the Government and well-

21   documented that these things happened routinely precisely

22   where Mr. Augustine was held when Mr. Augustine was held and

23   particularly for people charged with a crime he was charged

24   with.  That's in our motion, and it's something that's known

25   to the United States Government.  Everything that Mr.

14

1  Augustine has stated in his papers fits directly with what we

2  all know to be true and what was going on at that time in

3  Tunisia.

4           THE COURT:  Right.  So rather than getting too deep

5  into this, it seems to me we need to just set up what the

6  structure is going to be for the suppression hearing.  In

7  thinking about this, in addition to thinking that there were

8  probably more material disputes of fact than you all were

9  aware of, ultimately, for the voluntariness of the statements,

10  there has to be some kind of a statement from Mr. Augustine as

11  to the impact of those events on him as to whether or not it

12  was voluntary or involuntary and whether he felt coerced or

13  how he felt coerced, at least it seem to me that that's

14  something that would be important for a fact-finder to hear if

15  that's part of the burden of proof.

16           MS. GLASHAUSSER:  We --

17           THE COURT:  That could be done through an affidavit.

18  It could be done through testimony or both.

19           MS. GLASHAUSSER:  Okay.

20           THE COURT:  So I would suggest an affidavit just to

21  avoid any dispute and to clarify what the issues are so that

22  we know from both sides before the hearing starts what is in

23  controversy and then any testimony that's needed to supplement

24  that.  I'm guessing that the Government will probably want to

25  cross-examine Mr. Augustine on the affidavit, so he might just

1  want to be a witness in chief for his case as well.

2          MS. GLASHAUSSER:  Well, Your Honor, if the

3  Government -- for the Government to -- we can put it in an

4  affidavit from Mr. Augustine relating to the facts, but if the

5  Government wishes to dispute those facts, they also need to

6  put in an affidavit with their version of events and what the

7  facts they believe are --

8          THE COURT:  Exactly.

9          MS. GLASHAUSSER:  -- which they haven't done yet.

10         THE COURT:  Yeah, both sides need to do it so that

11  the Court can see what the factual disputes are.

12                     [Pause in proceedings.]

13         MR. HEEREN:  Your Honor, I'll just note for the

14  record the Government has already included a statement from a

15  first-person witness who spoke to Mr. Augustine about what he

16  alleged at the time.

17         MS. GLASHAUSSER:  There's no affidavit.  We don't

18  even have the name of any of these people.  It's actually hard

19  to even match up the documents that the Government has

20  provided us with each other to figure out which interrogations

21  they refer to because the names are redacted.

22         MR. HEEREN:  Your Honor, the burden is on the party

23  seeking the motion to suppress and seeking the hearing to put

24  in affidavit to dispute fact.  It's not our burden.

25         MS. GLASHAUSSER:  That's not correct, Your Honor.

16

1  We have more than met our burden here.  The Government hasn't

2  disputed any facts.  They've put in no affidavits disputing

3  facts.

4         MR. HEEREN:  Your Honor, it's their motion.  Again,

5  in not aware of any case that says we're required to put an

6  affidavit.  Nonetheless, after they put in an affidavit for

7  their client, that likely based on -- depending on what the

8  affidavit says, may meet the prima facie burden in order to

9  get a hearing, in which case we'll have a hearing, the

10  Government may call witnesses on our behalf, and then we can

11  have a hearing on the disputed issue of fact that they will

12  have finally raised with an affidavit.

13         MS. GLASHAUSSER:  The burden is on the Government to

14  show voluntariness and the appropriateness of the hearing.  It

15  is not on the defense.  We have more than alleged sufficient

16  facts to met not only a prima facie burden here but also to

17  win if the Government is not disputing the facts which up

18  until now they had not done so.  There's no requirement that

19  we put in an affidavit when there is no dispute of fact.  If

20  the Government wishes to dispute the facts, they need to do so

21  in writing, ideally in a sworn affidavit.

22         There's case law in my motion about all the times

23  that hearings are ordered without affidavits, particularly

24  when the Government doesn't put in its own affidavit.  And in

25  this case, when the burden is on them to show voluntariness,

1   we've more than met our burden here.

2        MR. HEEREN:  Your Honor, again, I'll just quote

3   Chief Judge Irizarry, courts in this circuit have repeatedly

4   denied motions to suppress without a hearing where defendants

5   have failed to provide affidavits alleging facts based on

6   personal knowledge.  No such affidavit is here.  If the

7   defense wants the Court to decide the issue on the one fact

8   that is not disputed, which is that Mr. Augustine alleged that

9   he was hit once in the back of the head and that is what we're

10  going to proceed on that claim, that's fine.  I think the

11  Government agrees you can decide it based on that.  But if

12  they're going to proceed and argue that all of this additional

13  conduct that he never mentioned previously should be

14  considered as facts, disputed facts, they need to put somebody

15  with personal knowledge an affidavit on that issue and they

16  have not done so.  That's all.

17        MS. GLASHAUSSER:  I'm sorry, Your Honor.  The Second

18  Circuit is clear it's the Government who bears the burden of

19  showing a confession is voluntary.  There are two cases cited

20  in my papers, <u>Siddiqui</u> and <u>Capers</u>.  After that there are a

21  number of cases cited from courts in this district and the

22  Southern District of holding suppression hearings without

23  affidavits even in situations where it's not a confession case

24  where it's clearly the Government's burden to prove that the

25  confession is voluntary.

1          Here, some of the facts that we've put in that I'm

2     not sure if the Government is disputing revolve around the

3     circumstances that the United States Government knew existed

4     in Tunisia at the time, and I can't imagine that they are

5     disputing those facts, although maybe they are.  And all of

6     the reports from the State Department and to in-rights groups

7     about what sort of physical coercion specifically terrorism

8     suspects were facing in the precise place where Mr. Augustine

9     was at the same time.  We need to know what the Government is

10    disputing in order to respond to it.

11          MR. HEEREN:  Your Honor, defense counsel's

12    conflating two points.  The Government does not dispute that

13    the Government bears the burden of voluntariness, the ultimate

14    question of voluntariness that the Court decides.  Whether a

15    hearing is merited for a disputed issue of fact, the initial

16    burden is on the defendant.  That's all.  That is a different

17    standard, and they have not met it because they have not put

18    in an affidavit from somebody with personal knowledge on

19    issues of disputed fact.

20          The only undisputed fact is his allegation, his

21    claim that he was hit on the back of the head once.  All of

22    the rest of it are -- is disputed.  Our point was simply that

23    they haven't raised a disputed fact on those issues.  And so

24    given as much, they can't -- on the factual record as it

25    exists voluntariness has been established.

19

1          MS. GLASHAUSSER:  I don't know what to say, Your

2     Honor.  If the Government wishes to dispute the facts, I would

3     ask that the Court order that they do so in writing because

4     their motion did not dispute the facts.  I think that should

5     be the first step here.

6          MR. HEEREN:  There was no facts to dispute because

7     no affidavit with personal knowledge was put in.  If an

8     affidavit with personal knowledge was put in, the Government

9     would have facts to dispute.  That's all.  So once the

10     affidavit is put in, we'll be able to dispute facts because we

11     will know what a person with personal knowledge, presumably

12     defendant, claims happened that day as opposed to a third

13     party who's hearing it secondhand.

14          THE COURT:  So I assume that the purpose of the

15     affidavit that the Government's requesting is to ensure that

16     there's a factual basis of admissible evidence for the

17     suppression hearing and that in order to be certain of that,

18     there needs to be some kind of a showing, either through

19     documents or through an affidavit, that there is in fact such

20     evidence.  It would also seem to me that if the defense were

21     required to present that -- to make that kind of a showing,

22     the Government would be required to make a response as well in

23     writing so that the Court and the defendant would be aware of

24     what the Government's disputing and that way no one will be

25     surprised about the scope of the hearing.

1          MR. HEEREN:  Yes, Your Honor.  We have no problem

2    making clear what we dispute from an affidavit that comes in.

3          THE COURT:  Right.  And what you have an evidentiary

4    basis for because I don't think --

5          MR. HEEREN:  Yes.

6          THE COURT:  -- anyone wants to get to a hearing and

7    find that there isn't an evidentiary basis for the claims that

8    the parties are making that are in dispute.  And so then the

9    question really would be who would go first.  And it would

10   seem to me to make sense to have the defendant go first.

11   Again, I could do some research on that.  But if the defendant

12   went first with an affidavit and then the Government followed

13   with an affidavit or some evidentiary support, then I think we

14   would all know the scope of the hearing.

15         MS. GLASHAUSSER:  Perhaps, Your Honor, but the

16   defense has already gone first and did put in an affidavit

17   from Dr. Porterfield which discusses both the things that she

18   has observed now that are facts that are relevant to the issue

19   as well as discussed other things that Mr. Augustine has told

20   her.  So we have put in an affidavit.  It really should -- the

21   ball should be in the Government's court, and really they had

22   their chance and submitted papers and chose not to say -- they

23   didn't even indicate in their papers that they believed the

24   information not to be true.

25         The requirement of the affidavit is when there is a

1    disputed fact and you need -- you need more information about

2    that disputed fact.  Right now the defense has already taken

3    that first step in putting in the affidavit.  The defense also

4    made clear in the reply that nothing in the Government's

5    response stated any dispute of the fact and then cited

6    numerous cases about where no affidavit was filed by the

7    Government in response to a defense motion that a hearing

8    could be appropriate or a ruling could be done on the facts as

9    undisputed.  I just think --

10           THE COURT:  Is the Government's problem that you

11   don't think that there's -- that Dr. Porterfield's affidavit

12   provides a sufficient evidentiary basis for the facts that

13   they want to allege?

14           MR. HEEREN:  That's correct, Your Honor.  You need

15   an affiant with personal knowledge.

16           MS. GLASHAUSSER:  Right.  And she --

17           MR. HEEREN:  I mean she wasn't in Tunisia.  She does

18   not have personal knowledge of what he claims happened to him.

19           THE COURT:  Well, she has personal knowledge of what

20   he claims happened, but --

21           MR. HEEREN:  Personal knowledge of the events.

22           THE COURT:  Right.

23           MR. HEEREN:  He can say this is what happened to me.

24   That would be a proper evidentiary basis for a suppression

25   hearing.  In the same way that in an ordinary suppression case

1  involving a felon in possession, the person who claims that

2  the police officer did something unconstitutional like

3  stopping them without a basis or planting evidence has to say

4  I didn't have a gun on me, he planted it on me.  That is

5  standard issue in all of those cases that you have to have an

6  affidavit.  That's why -- I mean I don't want to requote.

7  That's what --

8           THE COURT:  Right.

9           MR. HEEREN:  -- Judge Irizarry's talking about.

10           THE COURT:  Yeah.  And so what you're saying is that

11  the -- it's not sufficient for Dr. Porterfield to say that the

12  defendant told me this.  You need the defendant to say that --

13           MR. HEEREN:  Correct.

14           THE COURT:  -- in an affidavit to make sure.

15           MR. HEEREN:  Otherwise, you'd be able to find anyone

16  to say, well, he told me that the gun wasn't on him, he told

17  me this.  That's not a proper basis.  That's not a disputing a

18  fact appropriately.

19           MS. GLASHAUSSER:  So there are two things.  First of

20  all, Dr. Porterfield does have firsthand knowledge about the

21  effect of these events on Mr. Augustine to this day and the

22  post-traumatic disorder that he experiences from them.

23           THE COURT:  Right.

24           MS. GLASHAUSSER:  So she does have firsthand

25  knowledge about some of the facts.  The second thing is this

1  case is not like a standard felon in possession case.  In

2  those cases, there's a sworn affidavit from the police officer

3  usually explaining the Government's version of the events.  So

4  the Government already has the affidavit that's in the record

5  and the defense has to respond to that.  And in many cases,

6  judges order affidavits from the defense before proceeding.

7  And many other judges don't, which are the cases that are

8  listed on Page 14 in our reply.

9          This isn't that situation.  We don't have a sworn

10  affidavit from the Government with their version of events

11  that we're now rebutting.  We've put in the first version of

12  events in our motion papers through the sworn affidavit from

13  Dr. Porterfield, and it was then in the Government's court to

14  respond by disputing the facts which is fine.  That is their

15  choice.  But if they wish to dispute the facts they should do

16  so with an affidavit or even with briefing explaining which

17  facts they dispute and why.

18          THE COURT:  This is the chicken and the egg kind of

19  situation as well.  Your statement is that your position is

20  that Dr. Porterfield's affidavit's enough because it's enough

21  for the effect on the plaintiff because she's an expert and

22  that's her job to figure that out.  That I get.  But as to

23  what he claims happened to him, what is -- what would the

24  reason be for not having the defendant submit an affidavit

25  stating what happened to him which was the evidentiary -- or

24

1  the factual basis on which Dr. Porterfield made her

2  assessment?

3          MS. GLASHAUSSER:  Well, we can do that, but it's not

4  -- there's no reason to do that when the Government doesn't

5  dispute our facts.

6          THE COURT:  But the Government's disputing it

7  though.  I think we're hearing that now.

8          MS. GLASHAUSSER:  Right.  And I'm just saying that

9  the Government should be required to in the first instance

10  explain which facts they're disputing and that that is their

11  burden now.  Legally, we don't have the burden of putting it

12  in first.  And just as a practical matter as we've already

13  been discussing, it is very difficult to meet and speak with

14  Mr. Augustine right now.  And putting -- creating the

15  affidavit and making sure that it is a hundred percent correct

16  is something that is -- will not be simple to do under the

17  current circumstances.  And I just don't -- it's not our

18  burden to do it at this moment.  So that's why I'm asking Your

19  Honor to order the Government to specify what facts they

20  dispute and why.

21          MR. HEEREN:  I mean, Your Honor, again, the

22  statements by counsel presupposes that some facts were put

23  into dispute by the defendant.  There are none that were put

24  into dispute.  The third -- a third party --

25          THE COURT:  They were put into dispute by

25

1  defendant's expert.

2           MR. HEEREN:  Right, but the defense expert has no

3  basis in which to say I was there, I know this.

4           THE COURT:  You're saying it has to be a person with

5  personal knowledge rather than --

6           MR. HEEREN:  Correct.  In order to make that motion

7  --

8           THE COURT:  -- a person who can form an opinion

9  based on hearsay.

10          MR. HEEREN:  Correct, and I apologize, Your Honor.

11 I didn't mean to interrupt you there.  That's right, Your

12 Honor.  Again, the movant bears the burden in the first

13 instance of showing that disputed fact.  And I'd just, you

14 know, again, the idea that the expert has a firsthand

15 knowledge of how it impacted him afterwards --

16          THE COURT:  That's a different issue.

17          MR. HEEREN:  It's a different issue than what

18 happened.

19          THE COURT:  Right.  Well, I think we spent enough

20 time on this.  I've never had a suppression hearing where

21 there wasn't -- that didn't start off with an affidavit from

22 the defendant him or herself, so this is a different issue for

23 me.  We'll be glad to look it up if the case law says that

24 what's sufficient -- what's been submitted so far is

25 sufficient, then the Government will respond.  If not, then

1   the defendant will place the firsthand statement as to what

2   happened to him.  And we'll have to find some way to make sure

3   that you have access to see him so that this can be done.

4            MS. GLASHAUSSER:  Understood, Your Honor.  So we

5   should wait for Your Honor's ruling in the first --

6            THE COURT:  Yes.

7            MS. GLASHAUSSER:  Okay.  Thank you.

8            THE COURT:  It will be a short one.

9            And the requirement of a person with personal

10  knowledge, where does that come from?

11           MR. HEEREN:  Your Honor, I think there's a string

12  cite, but the key case that I have cited here, 2012 WL

13  2501032.  That's United States v. Singh, S-I-N-G-H, before

14  Judge Irizarry.  The other case we cited in our brief, this is

15  Pages 31 and 32 of our brief, is U.S. v. Richardson, 837

16  F.Supp. 570.  I know there's other cases like that that --

17           THE COURT:  Okay.  That should be enough.

18           MS. GLASHAUSSER:  Your Honor, if I may just because

19  the Government has quoted from Singh and now that I've been

20  pointed to it, what the Court says in Singh is that the

21  defendant didn't submit an affidavit rebutting the

22  Government's version of events.  And Richardson is the same

23  situation.  The Court doesn't have to resolve factual disputes

24  without affidavits.

25           The issue here is the lack of the factual dispute on

27

1  the Government's behalf in their papers, in their response

2  papers.  And that is a different situation.  And then our

3  sting cite is on Page 14 of numerous cases where district

4  courts have ordered hearings despite no affidavits from the

5  defense, particularly without any sworn affidavit from the

6  Government which is an unusual circumstance because most

7  suppression hearings start with the complaint that is sworn.

8          THE COURT:  Okay.  Let's get to the motion to

9  dismiss.

10         MR. HEEREN:  Your Honor, it's just a technical

11  point, but Exhibit 1 to our motion has the Government, the

12  agent's report, the 302 report that contains the Government's

13  version of events.  That was turned over prior to the motion

14  to suppress and could have been disputed with a personal

15  affidavit.

16         MS. GLASHAUSSER:  Wait, I'm sorry.  I missed that.

17  Was there a sworn affidavit in our discovery that you cited

18  to?  I just didn't hear you, I'm sorry.

19         MR. HEEREN:  The 302, Exhibit 1.

20         MS. GLASHAUSSER:  That's signed and sworn by a

21  particular person who was there?

22         MR. HEEREN:  It's a 302.  It's a report from the

23  FBI.

24         THE COURT:  If you were to submit an affidavit,

25  would it essentially be the 302?

28

1          MR. HEEREN:  Yes.

2          THE COURT:  And so the only argument here is whether

3    it's in proper affidavit form?

4          MR. HEEREN:  I think that's -- I mean, again, I'm

5    not aware of any case that says that the non-movant is

6    required to in the first instance submit an affidavit.  To the

7    extent that's their argument, I suppose that's their argument,

8    but again, I'm not aware of it.  There are many cases -- we

9    keep talking about a case in our complaint -- there are many

10   cases that start with an indictment where there's no sworn

11   complaint by a police officer and then there is a motion to

12   suppress on it and the motion to suppress has to be supported

13   by an affidavit with personal knowledge.  That's our

14   understanding of the law.  If the Court disagrees, we

15   understand, but that's our understanding.

16         MS. GLASHAUSSER:  The reason I was asking for

17   clarification just about the document is I believe they are

18   referencing a 302 about specifically the interrogation that

19   occurred with American officials which was unmirandized.  And

20   it does not discuss the --

21         THE COURT:  And what happened before that.

22         MS. GLASHAUSSER:  -- right, exactly, Your Honor.

23         THE COURT:  Okay, right.  So that's the question I

24   guess.  What's the scope of the facts that you dispute?  Is it

25   only the FBI interrogation or is it also what happened with

29

1   the Tunisian officials?

2           MR. HEEREN:  We don't know what -- I apologize.  We

3   just don't know what the factual allegations -- if they're

4   going to represent that Mr. Augustine is going to say what Ms.

5   Porterfield said, then I think we will be disputing most of

6   that.

7           THE COURT:  Yes, I think they're representing that.

8   They're saying her affidavit --

9           MR. HEEREN:  I think based on what we've learned

10  from the FBI based on what Mr. Augustine told them.  And I

11  think that would be the main point is we would cross-examine

12  Mr. Augustine and point out these are not allegations he made

13  at the time.

14          THE COURT:  It seems to me that the most efficient

15  way to do this rather than wait until the Court gives you a

16  decision on it would be to take Dr. Porterfield's affidavit as

17  having the content of what the defendant's affidavit would say

18  and then you could respond to that.  And then the defendant

19  could respond to you.  Is there any reason you couldn't do

20  that?

21          MR. HEEREN:  Well, I think the problem is there's a

22  reason why he has to swear and affirm under penalty of perjury

23  that these facts are true.  So if they're going to swear and

24  affirm in his name and he's going to sign something that says

25  that those are true facts, then I think we can respond to it.

1   Yes, Your Honor.

2          THE COURT:  And so that's the flaw in the

3   Porterfield affidavit that there's no penalty of perjury in

4   his statements?

5          MR. HEEREN:  To him, no.

6          MS. GLASHAUSSER:  That's not a reason that the

7   Government can't respond with what even in papers which they

8   didn't do about what they think is incorrect about what we

9   have stated in the affidavit and in our papers.  And I can't

10  imagine why the Government isn't doing that other than to try

11  to just make sure he's pinned down before they have to say

12  something about what they think has happened.  Normally, the

13  Government responds to our suppression papers with their

14  version of events either in writing just in their brief or

15  with additional affidavits.  I'm not sure why they're

16  unwilling to do so here.

17         THE COURT:  Would the defendant be willing to sign

18  an affidavit saying I have read Dr. Porterfield's affidavit

19  and with respect to the facts that were attributed to me with

20  respect to my interrogation, I swear under penalty of perjury

21  that they're true?

22         MS. GLASHAUSSER:  Yes, that might be the easiest way

23  to do it, Your Honor.  I would want to review the affidavit

24  again with Mr. Augustine, but of course Mr. Augustine did

25  review it before it was filed with the Court.

1          THE COURT:  All right.  So that's my ruling.  I

2    think that's how we'll proceed because y'all have to do it

3    afterwards anyway after their affidavit.  So this way we're

4    cutting out a step and hopefully advancing the case for your

5    client.

6                    [Pause in proceedings.]

7          THE COURT:  Are you ready on the motion to dismiss?

8          MR. JACOBSON:  Yes.  Thank you, Judge. May I be

9    heard?

10         THE COURT:  Please, of course.  Why don't you pull

11   the mic close to you?

12         MR. JACOBSON:  Your Honor, this prosecution is a

13   sham.  This prosecution has been a sham since the day that the

14   FBI entered into the case, and it continues to be a sham

15   today.  I use that language very purposefully because it is

16   the standard that's set forth in the case law on our double

17   jeopardy issue, but I think it equally applies to a number of

18   our other issues as well.

19         We'd like to focus today on two issues in particular

20   that where we believe the facts are not disputed.  We would

21   reserve argument on a number of other issues, including the

22   sufficiency of the evidence because they're extremely fact-

23   intensive and we'd like to discuss them more substantively

24   with Mr. Augustine before we argue them before the Court.

25         THE COURT:  Okay.

32

1          MR. JACOBSON:  But we are prepared to day to discuss

2    double jeopardy and the indictment, and Ms. Glashausser will

3    address the issue of whether Isolibya [Ph.] was a designated

4    FTO at the time that Mr. Augustine was arrested.

5          Your Honor, on the double jeopardy issue, because

6    Mr. Augustine was previously convicted for the exact same

7    conduct in Tunisia, he cannot be twice put in jeopardy for the

8    same offense.  Courts have held including the Second Circuit

9    that a second prosecution is barred notwithstanding the rule

10   -- the dual sovereign rule, a prosecution, a second

11   prosecution is barred in a number of circumstances.

12         First, when one prosecuting sovereign can be said to

13   have been acting as a tool of the other and, yet, that's the

14   Aboumoussallem case in the Second Circuit that was cited in

15   both our brief and the Government's brief.

16         Second, when one prosecution amounts to a sham or a

17   cover for another, that's also in Aboumoussallem, or where one

18   prosecuting sovereign manipulated the other sovereign to

19   accomplish what they could not constitutionally do themselves.

20   And that's the Liddy case in the D.C. Circuit.

21         And, finally, as suggested by the Supreme Court in

22   Richards v. Jefferson County which is cited in our reply brief

23   on Page 29, where the two countries are in privity with their

24   prosecutions, res judicata attaches and the second prosecution

25   is barred.  We believe that all of these standards apply in

1   Mr. Augustine' case for reasons that I will articulate and

2   that the indictment must be dismissed.

3        Now I know we've already discussed today a little

4   bit about legal burdens and who has the -- which party has the

5   obligation to produce evidence, but I think the case law in

6   all circuits is clear that once the defense has showed some

7   evidence of any of these standards, the burden rests squarely

8   on the prosecution to prove that there was no privity, that

9   there was no sham or tool, and that there was no manipulation.

10  And that's squarely on the Government.

11       As far as I know, they have not disputed any of the

12  facts that we set forth in our briefing.  They did not proffer

13  any of their own facts on this issue.  They did cite a case

14  Rashed in the D.C. Circuit heavily in their opposition, and I

15  want it to be clear that Rashed says that the tool inference

16  can be supported by evidence of a prosecutorial advantage in

17  either of the two countries especially where one prosecution

18  proceeds first and where the chronological ordering of those

19  prosecutions benefits the U.S. and where the U.S. in some way

20  helped bring about that ordering of prosecutions.  All of

21  those Rashed factors apply here, and I can go through them one

22  by one.  They're also set forth in our briefing.

23       But in Mr. Augustine's case, Tunisia lacked an

24  independent interest in prosecuting Augustine, and I think

25  that's clear because they knew that he was there for a limited

1    period of time.  He was passing through, as the Government

2    would argue.  And they immediately notified the United States,

3    they notified the Legal Attache at the U.S. Embassy in Tunis

4    and asked the United States to take custody of Mr. Augustine,

5    which I think shows that they -- that Tunisia, the Ministry of

6    Justice, believed that the interest in the prosecution lay

7    with the United States and not with Tunisia.

8          And they explicitly tried to turn him over to the

9    United States and, in fact, they noted to the Legal Attache

10   and this information was passed onto the FBI that in previous

11   cases similar to Mr. Augustine's they in fact were able to

12   turn over the people that they had detained to the other

13   countries if those detainees were foreign nationals.  And

14   Tunisia specifically noted to the Legal Attache that they had

15   recently turned over two, I believe, French nationals who were

16   detained on similar charges to Mr. Augustine and, of course,

17   France knowing that they had an interest in taking those

18   individuals did so.

19         THE COURT:  So you're saying this was the exception?

20         MR. JACOBSON:  As far as we know, as far as the

21   discovery we have from the Government and the notes provided

22   form the Tunisian officials, it is their practice to turn over

23   detainees charged with these offenses if they're foreign

24   nationals to the country or origin.  And they tried to do so

25   in this case.

1            Now, I think it's also clear from the discovery and

2    from the exhibits that we attached to our briefing that at

3    least in part the reason the U.S. refused to take Mr.

4    Augustine at that moment in time is because that they didn't

5    have sufficient evidence to arrest Mr. Augustine and in fact

6    spent the next two years investigating Mr. Augustine's case

7    taking it to a grand jury, trying to build probable cause for

8    an arrest that they knew that they could not lawfully execute

9    at the time he was detained in Tunisia.  And that goes

10   directly to the Liddy case which is also cited in our briefs

11   in the D.C. Circuit which talks about evidence of tool or sham

12   recover and manipulation being if the second prosecuting

13   country was using the first prosecuting country to do

14   something that it could not itself lawfully do, which in this

15   case would be take custody of Mr. Augustine.

16            Additionally, on the Liddy factors is the fact that

17   the Tunisian prosecution, and we've already discussed this

18   today, was used as a means of procuring unmirandized

19   statements.  And those unmirandized statements in this case

20   were procured first by extremely physically coercive if not

21   torturous methods by the Tunisian interrogators and then while

22   those same Tunisians who had obtained coerced statements were

23   sitting in the room with the U.S. agents obtained a second set

24   of unmirandized statements by the FBI agents in this case.

25            Also, going to both the Liddy and Rashed factors,

1  during the entire Tunisian prosecution, U.S. federal

2  prosecutors, FBI agents consulted closely with the Tunisian

3  authorities, certainly with the Tunisian prosecutors.  There's

4  also evidence in the record that they consulted with the

5  Tunisian judiciary.  How closely, Judge, we don't know.  We

6  don't know how closely they coordinated because the Government

7  has indicated that they don't dispute our facts, they do not

8  wish a hearing in this case, and in fact they have refused to

9  turn over any discovery that goes to the heart of the

10  coordination issue.

11          And that is -- that's the basis of our motion to

12  compel discovery.  All of those requests would have been

13  directly relevant to this question of coordination, which

14  leads me to believe and I think an inference could be made

15  that they don't believe whatever they have would be good for

16  their case.  And I would reiterate here that the burden of

17  showing that the dual sovereigns doctrine doesn't apply falls

18  squarely on the Government.  And every circuit that has looked

19  at this issue has decided as such.

20          And I think, finally, in terms of the facts that are

21  relevant to the Liddy and Rashed factors, it's worth noting

22  that when the U.S. Legal Attache at the Embassy in Tunis was

23  negotiating Mr. Augustine's deportation after he had finished

24  serving his sentence in Tunisia, the Tunisian Ministry of

25  Justice unequivocally stated to the Legal Attache and we have

37

1   a letter that we attached as an exhibit that -- this is from

2   the Tunisian Ministry of Justice: "An individual cannot be

3   tried for the same crime twice" and that "Augustine would NOT

4   be extradited to face U.S. charges for the same crime twice."

5   And that's a letter that was forwarded from Legat Tunis to FBI

6   Special Agent Larkin.

7           So we know that the FBI was clearly aware that the

8   Tunisian Ministry of Justice did not believe that the U.S.

9   could lawfully prosecute Mr. Augustine for these crimes and in

10  and of itself would be a reason to dismiss the indictment

11  under the double jeopardy clause but certainly in combination

12  with the other facts that I've outlined, the Government is

13  unable to meet its burden and indeed has not attempted to meet

14  its burden by proffering any additional evidence.

15          So, Your Honor, it's our position that for a number

16  of reasons, the Court must exercise its supervisory powers to

17  dismiss the indictment.  There's of course Mr. Augustine's

18  right under the double jeopardy clause.  There's the Court's

19  supervisory interest in protecting core principles of

20  international comity.  And there's the supervisory powers to

21  effect justice in the system and to ensure that there's no

22  unfair manipulation in the second prosecution as there is here

23  today.

24          I don't know if -- that's sort of my opening

25  statement on the issue.  I don't know if the Court wants to

38

 1    now move to our argument on another issue or let the

 2    Government respond.

 3              THE COURT:  No, I just have a couple of questions

 4    then I'd like to hear from the Government.  No, obviously,

 5    this is a complex area of law.  Is it the defendant's position

 6    that Tunisia didn't have any independent interest in

 7    prosecuting Mr. Augustine and, if so, why is that?

 8              MR. JACOBSON:  I don't know that I would go that

 9    far.  I think we certainly don't concede that Tunisia did have

10    an interest because their interest seemed to be to get rid of

11    Mr. Augustine as quickly as they could.  I don't know given

12    the totality of the circumstances that it matters --

13              THE COURT:  Well, it might.  Sorry to interrupt, but

14    what if the U.S. -- what if you're correct and the U.S. had

15    not completed an investigation that would have provided

16    probable cause at the time and Tunisia didn't want him simply

17    to be released if they didn't prosecute him?  Would Tunisia

18    then not have had -- would Tunisia then have had an

19    independent interest in prosecuting him if they thought the

20    U.S. wasn't going to at that time?

21              MR. JACOBSON:  Well, to answer your question, Your

22    Honor, the first thing I would say is that that would then be

23    evidence of manipulation, right, which goes to the Liddy

24    factors of the United States seeking his continued detention

25    in Tunisia because they couldn't lawfully do it themselves and

1    spent the next two years investigating the case and until they

2    could finally lodge a sworn complaint in the Eastern District.

3           But whether Tunisia had an interest in continuing to

4    detain him, I would say no because they made it very clear to

5    the Legal Attache that they didn't want to detain him and

6    then, in fact, it was -- seems to have been their practice not

7    to continue to detain people.  If the Government wanted to put

8    in evidence that somehow Tunisia said, no, actually now that

9    you're not taking him, we'd love to prosecute him here, they

10   can do so, but they haven't and it would be their burden to

11   show that Tunisia did have an independent interest.

12          What I gather from the discovery is that they were

13   coordinating closely with the Tunisians and we don't know for

14   sure, but filling in the gaps likely encouraged Tunisia to

15   institute the Tunisian prosecution.  But --

16          THE COURT:  But I guess the question is is simply

17   declining to take custody of Mr. Augustine enough to

18   constitute manipulation?

19          MR. JACOBSON:  Well, but we know that it's far more

20   than that.  I think it would be enough under the Liddy case

21   because in the Liddy case, the federal government -- before

22   the federal government instituted its prosecution, it asked

23   California to dismiss its separate sovereign prosecution.  So,

24   I think it would be enough to show manipulation under that

25   standard of manipulation articulated in the D.C. Circuit and

1    in Rashed.   But what I would say is I don't think it's enough

2    to show Tunisia's interest in the prosecution merely to say

3    that all countries have an interest in protecting their own

4    laws and law-abidingness, right.   Of course, anyone who's

5    physically in a -- detained in a country and has committed a

6    crime that is a crime of universal jurisdiction would be

7    sufficient.

8            And I think when we looked at the opinions in the

9    other circuits, it's not sufficient because they've all

10   articulated a standard that could be met.   And no court has

11   pronounced that merely the fact that that person is detained

12   in that country shows that country's interest.   They all look

13   at the context and the conversations between the two countries

14   which we have very little of.   And the Government has sole

15   access to whatever is below the tip of this iceberg, but we

16   know from the top of this iceberg that Tunisia tried to turn

17   him over, said that it was their practice in other cases to

18   turn people over, the U.S. refused.

19           We know from bits and pieces of the discovery that

20   the FBI and, in fact, an AUSA who's not here today who could

21   be a potential witness on this issue flew to Tunisia numerous

22   times to coordinate with the Tunisian government during those

23   two years that Mr. Augustine was detained there.   So we don't

24   know.   All we know is that they tried to turn him over, the

25   U.S. refused, and that it was Tunisia's position that any

1  additional prosecution in the United States would be unlawful.

2  I think we know why the U.S. refused to take him, and that's

3  because they didn't have a case and they spent two years

4  building a case and because they spent a period of time

5  extracting unlawful, unmirandized statements and because they

6  have an interest in these cases where the guidelines are far

7  in excess of the statutory maximum to secure multiple

8  prosecutions so that they can rack up potential exposure since

9  they seek a statutory maximum sentence on virtually every one

10  of these cases.

11         THE COURT:  All right.  Could I hear from the

12  Government?

13         MR. HEEREN:  Yes, Your Honor; thank you.  I want to

14  start off with some preliminary but important points.  The

15  first and probably most important is this doctrine or test or

16  however it's been referred to, I think they've used different

17  terms, is purely hypothetical.  It was raised in dicta by the

18  Supreme Court.  Not a single case in this country, not a

19  single case has decided what they're asking you to decide.

20  There is no case, unless I'm missing something about Liddy,

21  and forgive me if I am, but I'm not aware of any case where a

22  foreign jurisdiction where there is a double jeopardy claim

23  found based on conduct in a foreign jurisdiction prior to

24  prosecution in the United States.  I think that's --

25         THE COURT:  Are you saying that that's not

42

1   prohibited -- that it's prohibited or it just hasn't been

2   permitted yet?

3          MR. HEEREN:   I am saying that at least two circuits

4   have concluded or have questioned whether that is even truly a

5   test as the Rashed case mentions.   I think there are a variety

6   of reasons to think that those two circuits are correct that

7   whatever hypothetical circumstances the parties can come up

8   with as a practical matter given the very real interest that

9   every jurisdiction has in enforcing its laws when somebody

10  commits a crime in their country, that whatever hypothetical

11  standard there might be can almost never be met, possibly

12  never be met.

13         But we don't have to get there.   I just try to make

14  the point that what we're talking about is trying to carve out

15  new law.   And I'll get to the reasons why we don't have to get

16  there in a minute, but I want to make one other point.

17  Counsel spent some time, again, claiming that the burden is on

18  the Government full-stop.   The burden is on the Government.

19  The defendant's own brief, own reply brief indicates that a

20  defendant has the burden of going forward with the evidence

21  that one prosecution was a mere tool of the other sovereign's

22  authorities.   Once the defendant tenders a prima facie double

23  jeopardy claim, the burden shifts back to the Government.

24         THE COURT:   I think that's what he said.   That's how

25  I interpreted what he said.

43

1              MR. HEEREN:  Fair enough, Your Honor.  And I want to

2    make --

3              THE COURT:  Production and then --

4              MR. HEEREN:  Yes, Your Honor.

5              THE COURT:  -- you have to rebut it.

6              MR. HEEREN:  We don't believe they've met their

7    burden of production here because, remember, it's burden

8    production to show that there's double jeopardy here.  I will

9    get to the main issue that they have addressed in a second

10   which is the issue of whether this Bartkus exception exists

11   and whether it applies in this case.  But there's two parts to

12   the -- in this circumstance to double jeopardy.  The second is

13   whether there is actually two charges that meet the

14   Blockburger test.  Even if we get past this idea of a Bartkus

15   exception, even if we get past that, they need to make a prima

16   facie showing that what the defendant was convicted of in

17   Tunisia meets the Blockburger test as it pertains to 2339(b).

18              Now, I believe they addressed that briefly and said,

19   well, they're the same facts and, frankly, that's

20   [indiscernible], Your Honor.  The test is very clear.  There

21   has to be a showing that there is no material fact that needs

22   to be proven in the additional case.  If there is, so, for

23   example, if the United States Government needs to prove

24   something like perhaps venue or some other fact that is

25   different than what needs to be proven in Tunisia, setting

1    aside the Bartkus exception and all that other stuff, there's

2    no double jeopardy.  This claim should be dismissed.  They

3    haven't met their burden there, so we don't even need to get

4    to this issue.  They had an opportunity in their reply and

5    they did not do so.

6            THE COURT:  Okay.  Time out for one second.  We have

7    to do a scheduling issue since I had something scheduled for

8    4:30, and we're not going to get through everything here

9    today, so I want to schedule us for -- can we do -- can

10   everyone come back tomorrow?

11           MR. JACOBSON:  I have oral argument on a --

12           THE COURT:  All day?

13           MR. JACOBSON:  -- relatively complicated motion

14   tomorrow.

15           THE COURT:  What time?

16           MR. JACOBSON:  At 12:30 and then I have a brief due

17   at five.

18           MR. HEEREN:  The Government's available, Your Honor.

19           THE COURT:  Are we going to -- well, we might be

20   able to get through much of what we need to today by five.  I

21   have to -- five is the end and we can move that case, the 4:30

22   to tomorrow.  Yeah, move it tomorrow I guess at twelve.

23           So you're not available at all tomorrow?

24           MR. JACOBSON:  No, Your Honor.

25           THE COURT:  Because we're definitely not going to be

45

1  able to get to the bail hearing issue.  We're going to have to
2  find another date for that.
3          MR. HEEREN:  And, Your Honor, we're happy to proceed
4  as long as the Court wants, but I mean to the extent we're
5  going till five, I mean they made six -- I think six, it might
6  have been more, different motion to dismiss arguments.  I'm
7  just not sure --
8          THE COURT:  Oh, they're only prepared to go ahead on
9  two today.
10         MR. HEEREN:  Oh, of the arguments?  Oh, that's fine.
11 I thought they were prepared to go ahead on all their motion
12 to dismiss arguments.
13         THE COURT:  No, I think only two, correct?
14         MR. JACOBSON:  That's right, Judge.
15         MR. HEEREN:  I apologize.
16         THE COURT:  I get through those two, but otherwise,
17 we could schedule something.
18                     [Pause in proceedings.]
19         THE COURT:  Let me just look at the calendar here.
20 I know we're getting into the holidays, which will make it
21 difficult for everyone.
22         MR. HEEREN:  Your Honor, I misunderstood.  If we're
23 just doing double jeopardy and the Isolibya argument, that's
24 fair.  I think we can get through that in a half hour.
25         THE COURT:  We could do that.  We'll be done before

46

1   five --

2            MR. HEEREN:  Yeah.

3            THE COURT:  -- I think.  Okay.  But we need -- this

4   case deserves time, and I don't want it to go on too long.

5   I'd like to see if our schedules will all mesh.  Monday, the

6   23rd?

7            And, Lisa, you don't have to come in.

8            THE CLERK:  Okay.

9            MR. HEEREN:  I'm available, Your Honor.  I don't

10  know if Mr. Keilty will join us, but I can handle it.

11           THE COURT:  I'm technically off that day, but I'll

12  come in for that if you all can come in.  I can give you the

13  whole day.  You don't want the whole day, but --

14           MR. HEEREN:  No, thank you, Your Honor.

15                    [Pause in proceedings.]

16           THE COURT:  Mr. Augustine, we're trying to get this

17  -- as much in as possible so that you aren't -- you don't have

18  to wait forever to have your claims decided.

19           THE DEFENDANT:  Thank you, Your Honor.  I appreciate

20  it.

21           THE COURT:  The 24th won't work, and the 25th won't

22  work.

23           MS. GLASHAUSSER:  Is the Court available the 26th or

24  27th?

25           THE COURT:  The Court will not be in this part of

47

1   the world on the 26th and 27th.

2           MR. JACOBSON:  What about --

3           THE COURT:  The Court will be back the following

4   week, but --

5           MR. JACOBSON:  -- the week of December 30th,

6   obviously, excepting the two days that the Court is closed?

7           THE COURT:  So you're saying Monday isn't good; the

8   23rd doesn't work?

9           MR. JACOBSON:  The issue is Ms. Glashausser is

10  starting a trial and --

11          MS. GLASHAUSSER:  Not on the 23rd, Your Honor.  I

12  have a number of deadlines on the 23rd, but I --

13                      [Pause in proceedings.]

14          MR. JACOBSON:  The issue with the 23rd in addition

15  to Ms. Glashausser's conflicts is I don't see any way that we

16  can see Mr. Augustine before then.

17          THE COURT:  Okay.

18          MR. JACOBSON:  And that was -

19          THE COURT:  The next time would be January 2nd or

20  3rd.

21          MR. JACOBSON:  Both of those days are fine for us.

22          MR. HEEREN:  That's fine, Your Honor.  Both are

23  fine.

24          THE COURT:  Any preference?

25          MR. HEEREN:  I guess the 3rd.  I'm not feeling

48

strongly about this, so if defense counsel has an issue,
that's fine.

         MR. JACOBSON:  I think the 3rd is fine with us.

         THE COURT:  Okay.  I think the 3rd I can manage.  In
fact, we have two cases on.  We have an 11:00 and 11:30, so.

         MR. HEEREN:  I was just going to say I have an 11:00
a.m., Your Honor, but I believe that will be brief.

         THE COURT:  So we could start at 12, take lunch, and
then do the afternoon.  So we should be able to get through
everything on the 3rd then.

                  [Pause in proceedings.]

         THE COURT:  Would it make more sense then to defer
everything until the 3rd or do you want to try to push through
today?

         MR. HEEREN:  I have no preference.  I imagine this
may -- I'm sure they have some rebuttal points to what I was
saying, too, so I'm sure --

         THE COURT:  It probably makes more sense to do it
all on the 3rd I think because otherwise you'll feel that you
don't have enough time to make your arguments.

         MR. HEEREN:  That's fine.

         MR. JACOBSON:  And it's up to the Court.  We're
happy to finish double jeopardy today and do everything else
on the 3rd.

         THE COURT:  Okay.  Let me just see what did she do

49

1   with the other case.

2                    [Pause in proceedings.]

3        THE COURT:  I think we're going to postpone

4   everything until the 3rd.  I'm going to do this conference now

5   because scheduling it for tomorrow is going to be too

6   complicated.

7        MR. HEEREN:  Understood, Your Honor.

8        THE COURT:  Is that going to be a problem for you?

9        MR. JACOBSON:  No.  I think that --

10        THE COURT:  Oh, okay.  Too late?  I think we're

11   doing double jeopardy.

12                    [Pause in proceedings.]

13        MR. HEEREN:  I'm sorry?

14        THE COURT:  We're just waiting to hear.

15        MR. HEEREN:  Oh, okay.  I didn't know if we were

16   proceeding.

17        THE CLERK:  He wants to do it now.  Are they still

18   on?  Did you hang up with them already?

19        THE COURT:  If she's already dismissed them, I'll do

20   it tomorrow.

21        THE CLERK:  The 4:30?

22        THE COURT:  Okay, fine; tomorrow at 12.

23        THE CLERK:  Okay, that's good.  We'll keep it that

24   way.

25        THE COURT:  Okay.  I'll just answer the phones.

50

1          All right.  So we'll finish double jeopardy today.
2  We're back on the record.
3          MR. HEEREN:  May I proceed, Your Honor?
4          THE COURT:  Yes.
5          MR. HEEREN:  Thank you.  So, just as I said, no case
6  has held this, the burden is on the defendant.  They have not
7  met their burden because they have not met the Blockburger
8  test, setting aside the Bartkus test, which again, the
9  Government argues doesn't apply here.
10          Now as to the -- to the extent such a test were to
11  apply, certainly, this would not be that first case that
12  reaches this extraordinarily high standard, and the cases make
13  clear that the standard is truly high.  I mean effectively
14  what they are describing is a second jurisdiction acting as a
15  puppet for the first.
16          THE COURT:  Right.
17          MR. HEEREN:  A pawn, I mean these are the terms,
18  manipulated.
19          THE COURT:  Right.  In GPS out of the Second
20  Circuit, it said that the Bartkus exception which it does
21  recognize, I believe the Circuit does recognize the Bartkus
22  exception, but it says it applies only in extraordinary cases.
23  I think the defense is saying this is an extraordinary case.
24          MR. HEEREN:  And we would submit that it is not.
25  First, as Your Honor honed in on, I think the most significant

51

1  point which is the foreign jurisdiction has a legitimate

2  prosecution interest.   This is not a case similar to <u>Rashed</u>

3  which, again, the exception was denied, where the Greek

4  government -- that the crime hadn't even occurred in Greece.

5  They just happened to arrest him and kept him and decided to

6  try it himself -- themselves, excuse me.

7          Here, the crime happened on Tunisian soil.   It's an

8  extremely serious crime, and it's unsurprisingly one that they

9  would want to vitiate in the first instance themselves.   Now,

10  I know they rest almost exclusively on the fact that Tunisia

11  said, well, we can turn him over to you, the United States.

12  Now, simply because as a matter of international comity, one

13  foreign jurisdiction may for a variety of reasons offer a

14  citizen of a foreign country back to their home country rather

15  than -- and defer prosecution as a result, that doesn't rise

16  to a sham or manipulation.   That's ordinary foreign policy.

17  And to criminalize what amounts to the functioning of foreign

18  policy is really troubling.   I mean defense counsel alleges

19  that the fact that DOJ officials and the FBI agents went over

20  and coordinated during the pendency of his prosecution is

21  somehow nefarious, that's the MLAT [Ph.] process, Your Honor.

22  Actually, I don't know if there's a treaty here so it might be

23  the MLAA or letters rogatory, but in any event, this is --

24          THE COURT:   I think it's standard procedure for --

25          MR. HEEREN:   It's a standard procedure.   You know,

52

1   in their case, they have, as I understand it, what limited

2   knowledge I have of the Tunisian court system, it's a

3   continental-style system so there's a judge involved in all of

4   it once it came into the prosecution process and my DOJ

5   colleague was there.

6          So my point is simply that, and I believe several

7   cases which we've cited point this out, which is interaction

8   between the two entities, cooperation between the two

9   entities, the sharing of information, those sort of things are

10  to be expected and are not evidence of some sort of fraud or

11  sham as defense counsel said.

12         THE COURT:  What would it take to be evidence of

13  fraud or sham?

14         MR. HEEREN:  I think what -- so I think there's

15  several things.  I think there would have to be no significant

16  interest in prosecution.  I think there would have to be a

17  demonstration that the U.S. government had some form of

18  domination over the foreign country, put differently, that the

19  foreign country couldn't say no.

20         The best -- I had thought about this myself, the

21  best example I could come up with hypothetically is probably

22  the coalition government in Iraq, right.  There you might be

23  able to show you've got a U.S. person heading the government.

24  It may be technically a separate sovereign, but I can see,

25  again, a hypothetical argument made if there are appropriate

1  facts that that separate sovereign was effectively dominated

2  by the U.S. government, and if the facts show that they were

3  using them for an improper purpose, I could see it, again,

4  potentially applying.  I think there's sound reasoning why it

5  shouldn't apply at all, but that would be I think the

6  standard.

7          Again, there's no evidence that the Government, the

8  U.S. Government thoroughly dominated or manipulated it.  I

9  think another notable fact that goes towards that is the

10  Government didn't know about his present in Tunisia until the

11  Tunisians arrested him.  The initiation of the prosecution was

12  done by the Tunisians, not at the behest of the U.S.

13  Government.  That again is different than Rashed, for example,

14  where the arrest was made, I forget if it was a red notice or

15  for some other basis.  But the arrest was made at the behest

16  of the U.S. government.

17          And I'd note even in those circumstances, I think I

18  believe it's the Second Circuit case Aboumoussallem that

19  points out that even if they are interacting with each other

20  during that process, that was a federal state process.  Even

21  if they are interacting in their process, that is not

22  indicative of some sort of fraudulent conduct.

23          So, I think all of these factors, I just want to

24  address a few points raised by defense counsel.  I think I've

25  addressed all of them, but I just want to make sure I have all

54

1   of them here.  Oh, just a simple factual point, again, the

2   Exhibit A to the defendant's motion, this is not a letter from

3   the Tunisian government.  It's a status update from Legat

4   Tunis.  I read it as saying that the Tunisian government

5   wouldn't engage in the extradition process, and that's Legat's

6   opinion of it.  But this wasn't an extradition process.  This

7   was an individual who was turned back over to the U.S.

8   government, and the U.S. government has its own interests in

9   prosecutions in appropriate circumstances where the facts

10  warrant it and that's nefarious.

11          And I would push back on the claim that simply

12  because one sovereign has the facts sufficient to prosecute

13  somebody that because a second sovereign doesn't have those

14  same facts at hand immediately, that that automatically

15  triggers a double jeopardy conclusion.  First, you haven't

16  been able to tell if the Blockburger test applies.  Second,

17  that isn't manipulation or domination.  Frankly, that's common

18  sense.  If one jurisdiction has an interest in prosecuting

19  somebody and they have the evidence to do so and they believe

20  it's a righteous prosecution, they should do so.

21          So I think the case law is clear that to the extent

22  such an exception should apply, it should not apply in a case

23  like this.  If the Court has any other questions on the issue,

24  I'm happy to answer them.

25          THE COURT:  So it sounds like your position would be

1  even if the defense could show that there was an advantage to

2  the U.S. to have Mr. Augustine prosecuted in Tunisia and to do

3  time in Tunisia if he was convicted, that's not enough to meet

4  the test that we're talking about?

5         MR. HEEREN:  That's right, Your Honor.  I don't

6  think -- I would dispute that if the Government believes

7  somebody was guilty of a crime and another jurisdiction could

8  prove that and could detain him for that period of time for

9  their own prosecution lawfully that we would look at it as a

10  bad thing.  The defendant was trying to join ISIS, so I don't

11  think we can dispute that it's a good thing that he was

12  detained after trying to join ISIS.  The fact that Tunisia did

13  so and didn't have to do so, they believed they had a

14  prosecution and, in fact, got a guilty verdict on it.  The

15  fact they did so does not amount to manipulation.

16         THE COURT:  When you say they didn't have to do so,

17  could they have then released Mr. Augustine?

18         MR. HEEREN:  Yes.

19         THE COURT:  And then let the U.S. decide what to do?

20         MR. HEEREN:  Absolutely.  Even though the U.S.

21  Government said proceed, if they had said no thank you, they

22  could have put him back on a plane.  They could have said

23  you're free to go and let him off of the border of their

24  country.

25         THE COURT:  Did the U.S. Government ever say if you

56

1  don't prosecute him, we're not going to so he'll end up with a

2  criminal in your country?

3          MR. HEEREN:  I'm not aware of any statement like

4  that; no, Your Honor.

5          THE COURT:  Or that the U.S. would decline to

6  prosecute him if Tunisia didn't prosecute him?

7          MR. HEEREN:  I'm not aware of anything like that,

8  Your Honor.

9          THE COURT:  So the extent of the pressure that the

10 defense alleges the U.S. put on Tunisia, what's the most that

11 one can reasonably infer from the facts?

12         MR. HEEREN:  Based on my understanding of the facts,

13 I think the most pressure that they could feel is that the

14 Government -- because the U.S. Government said they weren't

15 going to take him at that moment, I think it's fair to say

16 that the Tunisians would think that we weren't prepared to

17 prosecute him.  I think that's fair, but I don't think a

18 concern that another country won't prosecute somebody that you

19 can prosecute amounts to you being manipulated or making that

20 prosecution a sham prosecution or a tool for the first

21 country.  They had an independent, appropriate interest in the

22 prosecution regardless of what the U.S. Government wanted to

23 do, and there's no indication that they ceded to our wishes

24 simply because we're the U.S. Government as opposed to drawing

25 their own conclusions and making their own independent

1   decisions as a foreign government.

2            MR. JACOBSON:  Thank you, Judge.  And I have a

3   number of points to make, so if we reach a time where we

4   should cut off for the evening, we can of course --

5            THE COURT:  You have 13 minutes, 12.

6            MR. JACOBSON:  Thank you.

7            THE COURT:  Okay.

8            MR. JACOBSON:  The Court has asked the Government a

9   number of fact-based questions.  Did the U.S. encourage, did

10  the U.S. -- about the actual relationship.  And the

11  Government's answer's essentially I don't believe that that

12  was the case, I don't think it happened that way.  This is

13  information that is -- that only the Government has.

14           THE COURT:  Right.

15           MR. JACOBSON:  This all should have been provided as

16  basic Rule 16.  In every case I've had, international case in

17  fact, Mr. Keilty has turned over to me extradition documents

18  in other cases, MLATs, letters rogatory.  If the Government

19  wants to rely on things that they think were in the record,

20  they should produce this because this is all directly relevant

21  to ideas of control and manipulation and sham.  And the reason

22  -- I can only infer that the reason they've been so vociferous

23  and refusing to turn it over and opposing our motion to compel

24  this discovery is that they think it's bad for them.

25           And so when the Court engages in a colloquy with the

1  Government about what might have happened and the Government

2  says I think it was this, we could all find this out, and it's

3  the Government's burden.  And we don't have this information.

4  All we can do is speculation, and all the Court can do is

5  speculate.  And so I think that's a real issue here.

6          We're saying we have made our prima facie case based

7  on what's in the record, and that's all we can do.  And for

8  the Government then to turn around and say we haven't made our

9  prima facie case, the facts are not in our control.  They're

10 unilaterally in the control of the U.S. Government.  If it was

11 just letters rogatory and it was just normal MLAT procedures

12 and it wasn't the FBI issuing encouragement to the Tunisian

13 Ministry of Justice, fine, they can make that case.  But the

14 burden is on them, and they haven't produced us any Rule 16

15 that's relevant other than what we have in the initial

16 discovery.  And I think that's a real issue, and I don't think

17 the Court can rely on what the Government says they think may

18 have happened.

19         THE COURT:  Are you saying that -- what if the

20 Government says there is no evidence that the Government has

21 seen that the U.S. threatened Tunisia if it didn't prosecute

22 Mr. Augustine?  I mean are they -- I'm guessing their answer

23 is going to be, well, we don't have to turn over a negative

24 because if it doesn't exist, we can't turn it over.  What are

25 you hoping to find or what do you think is there if -- you

1   just want to know if that kind of evidence does exist

2   basically?

3          MR. JACOBSON:   Right.   And I think what we do have

4   in the record is little snippets of communications between the

5   Ministry of Justice and Tunisia and Special Agent Larkin and

6   the Legal Attache.   We have small snippets of that from which

7   we have inferred our prima facie case.   There's clearly vast

8   amounts of this that we think is discoverable under Rule 16

9   and that is certainly discoverable because it goes directly to

10  the heart of this issue.

11         THE COURT:   Give me a snippet or two that would show

12  that there is how they say not simply cooperation between two

13  authorities but manipulation of the actions of a second

14  government so that officials of Tunisia retain little or no

15  independent volition.   Do we have any snippets that show that?

16         MR. JACOBSON:   Well, the fact that we have in the

17  record in the 302s that the Government mentioned, the fact

18  that he was offered by the Tunisian government.   And I want to

19  be -- and the reason I think that's relevant I want to be very

20  clear what our position is about what the word "interest"

21  means.   The Government has reduced interest to the most

22  diluted form possible, which is that if -- and, again,

23  physical presence of commission of a crime.   But when you look

24  at what the Rashed court says, what the Liddy court,

25  Aboumoussallem, they all have a much more robust understanding

60

1   of what it is for a prosecution to be in the interest of a

2   country.

3            And I think the Government has somehow tried to use

4   <u>Rashed</u> to their advantage.  I think it says the exact opposite

5   and in fact is helpful to the point we want to make about

6   interest.  What was dispositive for the <u>Rashed</u> court was that

7   clearly Greece had an interest because they refused to turn

8   him over to the United States, right, and that's directly from

9   the <u>Rashed</u> opinion.  Far from being controlled by the U.S.,

10  the Greek trial occurred only because Greece rejected the U.S.

11  demand for Rashed's extradition.  That's what they mean by

12  interest.  It's a much more robust understanding or what would

13  be in Tunisia's interest.  So --

14            THE COURT:  It might say that's one thing they mean.

15  Is that the only thing they mean by interest?

16            MR. JACOBSON:  Well, that's the -- what's what they

17  rely on.

18            THE COURT:  That particular case.

19            MR. JACOBSON:  Right.

20            THE COURT:  But --

21            MR. JACOBSON:  But I think if you --

22            THE COURT:  But you have to go that far in order to

23  show that Tunisia didn't have an interest?

24            MR. JACOBSON:  Well --

25            THE COURT:  I mean I think the Government is simply

61

1    saying the U.S. declined to prosecute him, Tunisian decided to

2    prosecute him, there wasn't a gun put at Tunisia's head.  But

3    Tunisia assumed that it had an independent interest in

4    prosecuting him because someone had to.

5         MR. JACOBSON:  Well, we don't know what was said,

6    whether the U.S. said you should prosecute, you have to

7    prosecute.  It seems from the record that they prosecuted

8    reluctantly, at best.  They certainly, of course, as we said

9    -- I think if the facts were before the Rashed court of

10   Tunisia trying to get rid of him and saying we've gotten rid

11   of everyone else in these circumstances and the U.S. refusing,

12   I think the Rashed court would say it wasn't in the interest

13   of Tunisia and there was some -- we don't know exactly what

14   because we don't have the facts, but there was some

15   manipulation in the background here.

16        We know from the record that an AUSa traveled to

17   Tunisia multiple times and had through discussions with the

18   Tunisian Ministry of Justice and possible with the courts.  We

19   know that the court itself in Tunisia, the judge in Tunisia

20   told Mr. Augustine to cooperate with the FBI.  I mean that

21   seems like it goes beyond just coordination for a judicial

22   officer in Tunisia to threaten prosecution if he didn't

23   cooperate with the FBI.  I think that goes to the cover and

24   control and manipulation that all of these courts are pointing

25   to, Liddy, Rashed, the Second Circuit case, and --

1          THE COURT:  This was the investigating magistrate

2  who was making --

3          MR. JACOBSON:  That's right.

4          THE COURT:  Yeah.

5          MR. JACOBSON:  And, also, the investigating

6  magistrate who essentially interrogated Mr. Augustine with the

7  -- and I'm not talking about the Tunisian interrogators.  I'm

8  talking about the Tunisian judicial officer himself

9  interrogated Mr. Augustine with FBI agents present who didn't

10 intervene.  And I have no doubt that they spoke to the

11 Ministry of Justice about this beforehand and knew exactly

12 what was going to take place.

13         But I also want to say that I don't think it's

14 necessary -- I think some circuits have pointed to this high

15 standard of control and manipulation, but I think the Supreme

16 Court itself has suggested a lower standard for res judicata,

17 and that's the standard of privity which is addressed in a

18 number of footnotes of the Circuit.  And I think we certainly

19 see privity here between the countries that goes beyond mere

20 coordination.  I think the -- I have a number of points.  I

21 know we're running out of time.

22         I'll just very briefly say that I think it's wrong

23 for the Government to say that courts have spilled so much ink

24 on a standard that they think doesn't exist.  I mean I think

25 it's very clear that courts believe Bartkus, the Bartkus

63

1  exception exists and are willing to apply it.  And the fact

2  that they haven't means that there hasn't been an exceptional

3  case like this before.  This is the --

4      THE COURT:  I agree with you the Circuit has

5  mentioned, I mean in GPS Auto, the Circuit does mention the

6  Bartkus exception.  But that Circuit also does talk about

7  manipulation as being one of the standards.

8      MR. JACOBSON:  Right.  And that's dicta.  I think we

9  would still argue that the Supreme Court's decision suggesting

10  privity, controls, I think it's certainly not a settled area

11  of law in the Second Circuit.  I think it's rare that this

12  happens.  I think it's rare that you see a criminal defendant

13  where the U.S. has that person prosecuted in another country

14  and then prosecutes them for the exact thing here in the U.S.,

15  which leads me to the Blockburger test issue.

16      I don't really understand the Government's point on

17  that.  All we have to do is make a prima facie case, again, on

18  the Blockburger issue and then the burden falls to the

19  Government to prove that Blockburger applies.  I think it's --

20  again, we don't have discovery from the Government on this,

21  but I think it's obvious that he's being prosecuted and it's

22  not just -- the Government called it hand-waving.  It's not

23  hand-waving to say that he was brought here to face charges on

24  the exact same conduct and the exact same elements that were

25  at stake in the Tunisian prosecution.

1          The Government also mentioned that this is not like

2    -- and, again, I think Rashed is a case in our favor because

3    it talks about what it really means for Greece to have an

4    interest.  But the Government mentioned that in Rashed, he had

5    only been arrested in Greece at the U.S. government's behest.

6    I don't think that bears much weight here because this is not

7    a case where he was -- he was detained on probable cause by

8    the Tunisians or their version of it.  He wasn't detained at

9    the behest of anyone.

10          But I do think it's important, excuse me, that the

11   Tunisian authorities notified the U.S. the same day he was

12   arrested, right, and that same day wanted immediately to get

13   the Legal Attache and the FBI involved so that they could get

14   rid of him and in fact said to Mr. Augustine, we're getting

15   rid of you, we're turning you over to the Americans and then

16   the Americans, as we know, said, no, we won't take him.

17          That's some of what I want to say, but I think what

18   I really want to say is if the Government's going to rely on

19   facts that we don't have on an issue where it's their burden

20   and then argue that we haven't made a prima facie case, I

21   think that is concerning to me.

22          MR. HEEREN:  May I be heard for the last --

23          THE COURT:  Yeah, but --

24          MR. HEEREN:  -- two minutes, Your Honor?

25          THE COURT:  Yeah, one and a half.

1          MR. HEEREN:  They haven't made the prima facie case.

2     The Blockburger test is a legal test, and there's nothing in

3     any of their papers to tell us anything about what the

4     elements of the Tunisian charge is.  So we haven't -- we could

5     avoid this whole issue entirely based on that.  So we don't

6     know if they would even meet that test even if it applied

7     here.  We submit it doesn't apply, but that's one route here.

8     There's no discovery needed for that.  That's research into

9     international law or another jurisdiction's law, excuse me.

10          As to kind of these discovery arguments, the

11     Government has turned over everything it received from the

12     Tunisian government pursuant to an MLAT.  So they have the

13     materials we received from the Tunisians.  We turned over all

14     of the statements that constitute all the evidence that

15     constitutes Rule 16 from the State Department and from the FBI

16     related to the defendant.  What they are doing is making bald

17     allegations about conduct that's pure speculation.  And it's a

18     classic fishing expedition.  We don't know what we don't have,

19     so we should be allowed to comb through it.  That's not

20     appropriate.  That's not Rule 16 discovery.  We've turned over

21     everything relevant in this matter.

22          So I think that that's most of the points I wanted

23     to make.  The one last one I wanted to make is there's the

24     claim that the judicial officer threatened the defendant.  I

25     believe there's a transcript or notes of that interaction.  I

1  think it's a transcript, but I could be wrong, that was turned

2  over in discovery.  And the interaction involved the judicial

3  officer advising the defendant of the rights he had in Tunisia

4  which included the right to remain silent and the right to an

5  attorney.  And he invoked those rights, and he didn't speak to

6  anybody.  I don't recall any threats.  I think it's possible

7  they said you should cooperate.  I don't recall specifically.

8          But I think I just want to make sure it's clear to

9  the Court that this was an ordinary -- again, through the MLAT

10  process or some letters rogatory or something similar, it was

11  a request to meet with the defendant.  The foreign government,

12  as they often do, permitted us to meet with them in

13  circumstances that the foreign government decided was

14  appropriate in that case in front of a judge.  And the judge

15  provided the defendant with certain rights he had in that

16  country, and he didn't speak to us.

17          To call that a manipulation or a sham, it doesn't

18  make sense to me.  It's not correct.  We haven't met the

19  Bartkus exception here, and they haven't shown that the

20  Blockburger test applies.  So I think the judge should deny

21  that portion of their motion to dismiss.

22          THE COURT:  All right.  I think it's always better

23  to leave lawyers wishing that they'd said more, but I think

24  you've all said enough.  I understand the issues.  The Court

25  will do its own research.  If there's anything that has --

67

1  that you've referred to that I should see that is not included

2  in the papers, send it to me.  Otherwise, I'll assume I have

3  everything that I need.  And we will reconvene on Friday, the

4  3rd at 12 o'clock.

5          MR. HEEREN:  Thank you, Your Honor.

6          MR. KEILTY:  Thank you, Your Honor.

7          MS. GLASHAUSSER:  Thank you, Your Honor.

8          MR. JACOBSON:  Thank you.

9  (Proceedings ended at 5:02 p.m.)

10                    *  *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

68

1    I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                    _Shari Riemer_____

6                    Shari Riemer, CET-805

7   Dated:  January 3, 2020