UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Docket#** 18-cr-00393-SJ-RML-1 |
| - versus - | U.S. Courthouse<br>Brooklyn, New York |
| BERNARD RAYMOND AUGUSTINE,<br>Defendant | January 3, 2020<br>2:38 PM |

TRANSCRIPT OF CRIMINAL CAUSE FOR PROCEEDING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Richard P. Donoghue, Esq.**
United States Attorney

BY: **Craig Heeren, Esq.**
**Joshua Hafetz, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Allegra Glashausser, Esq.**
**Samuel Jacobson, Esq.**
Federal Defenders of New York
One Pierrepont Plaza
16th Floor
Brooklyn, NY 11201

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
laferrara44@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Criminal Cause for Oral Argument, United States v. Bernard Augustine, case number 18-cr-393.

Counsel, please state your appearances.

MR. HEEREN: Good afternoon, your Honor.

Craig Heeren on behalf of the United States. With me is my colleague, Michael Keilty.

THE COURT: Good afternoon.

MS. GLASHAUSSER: Good afternoon, your Honor.

Allegra Glashausser and Sam Jacobson representing Mr. Augustine, who is here with us. We are also joined by Rachel Bass, a paralegal at the Federal Defenders.

THE COURT: Good afternoon.

So we're resuming where we left off. Who would like to go first at this point? We had completed -- I think we had completed -- well, why don't you tell me where you think you were.

MR. JACOBSON: We were nearing completion of the double jeopardy and I'm happy to --

THE COURT: We completed it, and we (indiscernible).

MR. JACOBSON: And we can transition into other issues whenever the Court sees fit but I did have a few points that I wanted to make on double jeopardy --

THE COURT: Okay.

MR. JACOBSON: And these are somewhat new points, so I am happy to put this all in writing if it would be -- if the Court would prefer to have a submission on this. But I wanted to briefly suggest one other way of looking at the double jeopardy issue, and the separate sovereigns doctrine.

And this is -- after re-reading some of the language in Rashed, and thinking about some points that the government made, of course the most -- Rashed is the case where the U.S. demanded extradition of the defendant from Greece, and Greece refused and prosecuted the defendant itself.

Of course the most obvious difference is that here we have the exact opposite, which is that Tunisia tried to turn Bernard over to the U.S., and the U.S. refused.

But I think there's another important difference between this case, and the Rashed case, and that's that Tunisia is not Greece. And what I mean by that is that Greece and the U.S. are essentially co-equal partners. Greece has a stable government. They have money to fund their prosecutors, but Tunisia, as it's currently constituted, is an extremely young country. The Jasmine revolution was in 2011. The constitution in

Tunisia, and the Tunisian penal code wasn't written until 2014.

So we were dealing with a totally new body of law in Tunisia, within a year of Bernard being arrested in Tunisia. And what made me think of that was Mr. Heeren's point on the coalition provisional authority in Iraq, and that that might satisfy the Bartkus exception, if you had control to that extent.

Now I disagree with that, I think there are -- I think the case law is clear that a far lesser degree of control would satisfy the Bartkus exception. You don't need the U.S. government to actually be in charge of the foreign government. I think Rashed is clear about that interest means something much lesser there.

But what I wanted to do is make a record of the ways in which the U.S. relationship with Tunisia is not dissimilar from the U.S.'s relationship to Iraq under the CPA.

So since the 2011 revolution in Tunisia, the U.S. has committed more than $1.4 billion to the Tunisian government, and an additional $1.3 billion of low interest secured financing from U.S. markets. And this is at the same time in 2015, that Tunisia knew that it was about to lose IMF funding because they hadn't made the reforms -- the justice reforms that IMF had required

them to make. So the U.S. essentially was one of the primary funders of the Tunisian government on the day that Mr. Augustine was arrested.

In May of 2015, a few months before Bernard was arrested, the White House released a major announcement of potential procurement of aid. President Obama said that he was going to ask Congress for an additional hundred million dollars on top of the $700 million that he had already secured from Congress in that fiscal year, or in the previous fiscal years since the revolution. And that that money was specifically to go to Tunisian law enforcement to counter terrorism, and to military programs.

So U.S. antiterrorism and justice aid more than tripled between fiscal year '15 and '17, which is exactly the period that Mr. Augustine was arrested. Military funding tripled in the same period, and law enforcement -- and rule of law, and counterterrorism made -- and this is all, by the way, from U.S. DOJ press releases, and U.S. State Department press releases.

The U.S. also in 2015 was funding the construction of a wall between Tunisia and Libya, also providing surveillance equipment for the wall on the Tunisia and Libyan border, and in fact it was the U.S. Defense Threat Reduction Action that was operating the

surveillance equipment in securing the Tunisian and Libyan border.

The U.S. was also providing extensive training to the Tunisian military, and to their counterterrorism personnel. When Bernard was arrested, a few months prior to that, the U.S. had granted to Tunisia numerous Black Hawk helicopters, other military aircraft, reconnaissance aircraft, body armor rifles, night vision goggles, fast boats, encrypted radios, hundreds of millions of dollars worth of military, and justice aid, which was out at zenith right at the time that Bernard was arrested in February 2016.

And the United States Marine Corps was actively engaged in combat in Tunisia, and stationed at multiple Tunisian bases securing a large part of Tunisian's territory.

There was just an article in the New York Times in March of 2019, so more recently, that revealed that a lot of this was going on that we didn't know. The title of this New York Times article is "Why the U.S. and Tunisia Keep Their Cooperation Secret." And it lays out a number of reasons why that's the case, and why the U.S. has a significant interest in not revealing the extent of its involvement in the Tunisian government.

But much more to the point, I think that's a --

generally, more to the point is aid specifically from the U.S. Department of Justice to the Tunisian Ministry of Justice. U.S. DOJ trains Tunisian prosecutors, and was actively engaged in that at the time of Bernard's arrest.

So essentially what we have here is the people who are training you, who are giving you hundreds of millions of dollars, who are helping you stabilize your brand new government that's less than a year old, and brand new constitution, who have military forces engaged in active combat in your country, and those people say to you after the Tunisians say we would like to give you Bernard, those people, the U.S. government, says to you no, you take him.

It's impossible to imagine a scenario where Tunisia would say no, and I think that we don't even know the extent of the entanglement between U.S. prosecutors and Tunisian prosecutors but we do know that the coordination was much closer than something like in the Rashed case where Greece has a very well established prosecutorial system.

And we know that DOJ personnel were present at all of Mr. Augustine's hearings, and we know that there was other coordination. We know that they controlled the initial decision to prosecuting Tunisia.

And again, I'm happy to - this is publicly

available on foreignassistance.gov that shows the expenditures made by the U.S. Department of Justice to the Tunisian Ministry of Justice in the millions of dollars, specifically in the 2015 to 2017 range. You have U.S. Department of Justice making payments to Tunisia for -- specifically by the U.S. Department of Justice Criminal Division, for international criminal assistance and training, and there are -- I mean, it's too many to put on the record here but it's easily available on foreignassistance.gov, the many, many payments made right around the time that Mr. Augustine was arrested.

So when the Rashed court talks about would be normal cooperation between two countries, I think this is -- far exceeds that normal cooperation. This is exactly the sort of special relationship, and that's in quotes, "special relationship", that the Rashed court is talking about, that the D.C. Circuit is talking about, which they say would satisfy the Bartkus exception.

So I mean look, it's in the news, right, what the U.S. -- what a president of the U.S. could do to, for example, withhold aid, to get a foreign country to do certain types of investigations or prosecutions. We don't know what happened here, but I think it's -- I think this is not far from that. That the Tunisian

Ministry of Justice is essentially funded, trained, controlled by the U.S. Department of Justice.

And I don't mean to be flippant by that comment, but I think the extent of the entanglement here is nearing the level that the government said at the last conference of what the CPA was doing in Iraq in terms of helping Iraq get its Ministry of Justice on its feet.

And the Rashed court is very clear on that. The pin cite is 1285, a prosecutorial advantage coupled with some evidence that the United States had helped bring it about, or that its existence had induced the U.S. to prefer and promote the foreign prosecution would support the tool inference.

The Liddy court says the same thing, at pin cite 79, where they say that U.S. federal authorities are prescribed from "manipulating state processes to accomplish that which they cannot constitutionally do themselves."

And we know in this case that the U.S. could not have constitutionally arrested Mr. Augustine in February of 2016, and took two years to continue their investigation, warrants obviously, unmirandized statements from Mr. Augustine. They needed Tunisia to hold Mr. Augustine.

And if the government had thought that we were

overstating this relationship between the Tunisians and the government, they would have turned over documents that showed that we're overstating it, but they haven't. They've rejected our request for discovery. They've opposed our motion to compel discovery about the relationship between U.S. and Tunisia, but if they did think we were overstating it, I would think that they would be begging for a hearing on this issue.

And I think -- you know, I just wanted to sort of provide the Court with one additional avenue of thinking about this, and the relationship between the countries, but I think this is the case, but I think at the very least, we have established the prima facie threshold that the Courts require, and I think that the government is square -- the burden is squarely with the government at this point.

In other cases, and this is my final point on the issue, the government has not provided any proffer of what the relationship was but in other cases on this very Bartkus exception issue, the government has provided sworn affidavits about the extent of the entanglement in detail.

AUSAs have provided sworn affidavits about the extent of the relationship. One case that I would cite to is Rosatti, 717 F.2d 27 at 31, and that's a Second

Circuit case. So I would rest on that and say that we think the burden is on the government, and the government has not met their burden.

THE COURT: Assuming hypothetically everything you say is true, and that there is a substantial entanglement, inducement, desire by the U.S. for Tunisia to conduct the prosecution, where does this -- what about the doctrine of or the question of whether or not Tunisia had a significant interest in the prosecution?

In other words, even if everything you say is true, is the government correct in saying that if there is -- that if Tunisia has a significant interest in the prosecution, that satisfies their burden essentially? Is that --

MR. JACOBSON: I --

THE COURT: What's the relationship between these two concepts?

MR. JACOBSON: Right. I think -- well, I would say three things. First, the fact that they tried to turn Mr. Augustine and were rebuffed, shows that they didn't have an interest.

And I think second that understanding of interest is consistent with Rashed's understanding of interest, and what the Rashed court relies on for defining interest is the idea that Greece refused to

extradite the defendant in that case, and so that is what Rashed says shows that Greece had an interest in prosecuting that defendant.

The fact that they asked to prosecute in themselves, and then refused to give him -- truly refused. There is -- you know, there is extensive discussions between the U.S. and Greece. It went through the Greek courts until finally the Greek political branches said we're just not giving them to you.

That's what I think the word interest means in the case law. It -- the third thing I would say is it can't mean what the government says it means, and the reason it can't mean what the government says it means is because then there'd be no Bartkus exception, because of course every country has an interest in prosecuting people in that country at all times, right? So it would never -- if all we mean is that another country can prosecute, and does prosecute, then there's no Bartkus exception because of course if you're talking about Bartkus, you're talking about an instance where the first country did in fact prosecute. So I think it has to mean something more robust than that. And I think Rashed says that it means something more robust than that.

THE COURT: Thank you.

Mr. Heeren?

MR. HEEREN: Thank you, your Honor. I think the defense counsel stumbled into our point at the very end there which is he's right, there is no Bartkus exception for foreign jurisdiction. I understand that there may be one for the state and federal, but no case has ever held that such an exception should apply. They have considered it in the D.C. Circuit, and they declined. No other case has held that in the context of U.S. and foreign jurisdiction, largely for the reason that defense counsel has pointed out which is sovereigns -- independent sovereigns, foreign sovereigns under entirely different system do typically have their own interest in prosecuting their own charters in their own country.

I would disagree, to the extent you want to hypothesize a Bartkus exception in the foreign context, that -- I would note that there are circumstances that are different from Tunisia where, for example, in the Rashed case itself, the Greeks took a person who was never in Greece, who they literally grabbed because they requested it. The crime was not related to Greece, it was a terrorism offense if I recall correctly, and the D.C. Circuit pointed out that generally speaking, foreign governments do have some interest, all governments have some interest in crimes of that nature, which was a

factor in their favor.

But I would note that that is probably the weakest example, right, a case where there's no real tie to the country that arrested him, and want to pursue charges.

By contrast, Bernard Augustine bought a ticket, and independently traveled to Tunisia where he decided to go and try to join ISIS in a neighboring country to Tunisia, that as defense counsel points out was bringing war and terror to the country of Tunisia. I can't think of a more significant interest than prosecuting terrorists within your own borders.

So I want to get back to my main point though which is we need to remember the standard here. It must -- the -- to the extent any exception exists, the issue may arise where one sovereign thoroughly dominates or manipulates the prosecutorial machinery of another. And I think that all parts of that are important; thoroughly dominates or manipulates, and the prosecutorial machinery.

First, there's no evidence that the U.S. government thoroughly dominated or manipulated the Tunisian government in this case. The only evidence related to Mr. Augustine that has been presented is that the Tunisian government offered Mr. Augustine because he

was a U.S. citizen, back to the United States in the first instance, the United States declined to take him at that moment.

There's no evidence, apart form all assertions, that the government said you must try him, try him for these charges, so we can use this evidence, interrogate him for this stuff. These are conclusion allegations. There's no evidence of that sort of stuff. There's no evidence of the Tunisians saying we don't have them for anything, but we'll do it anyway because you give us so much money. There's none of that. There's no evidence of any domination or manipulation of the prosecutorial machinery.

Now defense counsel raises new facts today for the first time. None of those facts have anything to do with the defendant's case or even prosecution in general in Tunisia, let alone Mr. Augustine's case.

I would note that defense counsel said that this was a prosecution that the U.S. government helped bring about. The U.S. government didn't even know he was arrested until the Tunisians informed us. So the idea that we brought about it, the person who brought about it is Mr. Augustine when he traveled there. The U.S. government didn't connive to make Tunisia arrest this man. He traveled there and tried to join ISIS. That's

why they arrested him.

You know, defense counsel also talks about that we're hiding something. To the contrary, as we noted last time, we turned over all discoverable material related to Mr. Augustine's presence in Tunisia, which included State Department communications related to Mr. Augustine, which included the conversations, the reports of the interviews with Mr. Augustine, which included the entire file provided by the Tunisians as part of the MLAT or interrogatory -- letters rogatory process.

What they are seeking is well beyond the bounds of discovery. It is a fishing expedition based entirely on conclusory allegations about a conspiracy that doesn't exist.

This does not even get to the level of any of the cases, Rashed or otherwise, that have considered this issue, and parenthetically, in those cases with greater facts have denied such an exception.

I just note controlled the initial decision to prosecute and other comment there that it's not true. The U.S. government said we are declining to take him from you right now. If the Tunisian government had let him go that day and said be gone, dropped him off at the border, that was entirely within their control. Instead, they chose to prosecute him. Again, entirely within

their control. No evidence to the contrary.

Finally, so in addition to not meeting any such exception here, I would note that although defense counsel had time to raise these additional issues, they have not met the separate prong in issue in this -- in any double jeopardy analysis which is the Blockburger test. Even if we get past the exception, there is no indication that the charges here would meet the Blockburger test of identical law in fact. There's none. They have not met their burden there.

So setting aside that we don't meet this exception, the Court could dismiss this outright based on the fact that they have not met their prima facie case with regard to double jeopardy which includes the Blockburger test.

I could go on, your Honor, but we've talked about this for many hours between yesterday and today, and I'm just happy to answer any questions the Court might have.

THE COURT: No, I think we went through this pretty thoroughly.

MR. JACOBSON: Two sentences, Judge, if I may?

THE COURT: Sure.

MR. JACOBSON: The first is the Blockburger test, like the Bartkus exception, we have to make a prima

facie case. They then have to rebut it. Mr. Augustine was convicted of four counts in Tunisia. One of them was provided -- attempting to provide material support to a terrorist organization. That is plenty sufficient to meet our prima facie case that the elements of the crimes are the same on at least one of the four counts.

And then what I -- I just wanted to point out what the standard in fact is in the Second Circuit. The government just used language of thoroughly dominating and controlling to prove a Bartkus exception. The language in the Second Circuit is simply using the other sovereign as a tool to do something that you couldn't otherwise do, or to get some advantage. And that's in the Abu Masolemn (ph.) case.

THE COURT: Okay. Thank you.

Next issue?

MR. JACOBSON: And if the Court has a preference about the order of the issues, we can --

THE COURT: No, I'm happy to take them in the order that you wish.

MS. GLASHAUSSER: Thank you, your Honor. So if I may, I am going to turn to what I believe was point -- let's see which point it was in our motion, point 2 that ISOL Lybia was not designated at the time that Mr. Augustine was arrested.

So basically, Mr. Augustine was charged with material support of a foreign -- designated foreign terrorist organization, but the one that the government chose to charge him with was ISIS rather than the group that was subsequently designated in Lybia just a few short months after he was arrested.

And the government tries to completely ignore this but this is important because there are two material support of terrorism statutes. There's the ones that Mr. Augustine was charged with which is 2339B where the government has to show that the attempted support was for a specific designated group that was designated by the Secretary of State, and then there's other statute that's 2339A, if the government's alleging some sort of material support of terrorists in general, but not of any particular terrorist group.

And here, we have a situation where the place where the government alleges Mr. Augustine was trying to go and the people that he was allegedly trying to join were not designated as a terrorist group until after Mr. Augustine was already arrested.

And the government says that basically the Court should just completely ignore that, and completely ignore that the designated terrorist list includes numerous different, I guess ISIS affiliates, maybe is the

right term. I don't know, they're designated as separate terrorist groups that may bear some similarities to the main ISIS group in the list but are not the same. And we know they're not the same because the Secretary of State has chosen to designate them separately. And one of them is ISOL Libya, and ISOL Lybia was designated in May 2016 when Mr. Augustine was already in custody. There isn't any other terrorist group that had been designated in the region at the time Mr. Augustine traveled.

And what the government is, as I see their argument and their response, is that they're saying that factually there were terrorists in Lybia at the time, and they cite to the State Department reports about that, and they cite to the New York Time and, you know, there's no reason to dispute those facts right now because it's not -- those aren't the relevant questions because what the government needs to show is that Mr. Augustine was attempting to support a specific designated terrorist group, not that there were some terrorists in Lybia, or that those loose affiliation of ISIS-inspired rebels were there.

What they need to show is that this support was for a specific group, and that's what they failed to show. They've just ignored the issue and acted like it's not there.

And I think that in doing that, they're essentially rewriting the terrorist list, or asserting their own power to just kind of decide which groups count as designated groups, and which groups don't, and to ignore the Secretary of State's determination about that, and I think there's no justification for that. They've certainly cited no cases that would allow them to do that.

And so this is a straightforward legal issue that doesn't depend on the facts of Mr. Augustine's case, other than in the broadest sense of the place where they're saying he was trying to go, and the people he was trying to join, and they haven't met out an element of the specific statute they charged. So 2339B which requires this designated foreign terrorist organization. And we just don't have that here.

So I am happy to answer questions but it's fairly straightforward.

THE COURT: Well, let me hear from the government first.

MS. GLASHAUSSER: Thank you, your Honor.

THE COURT: Yes.

MR. HEEREN: Thank you, your Honor. Mr. Augustine was charged with providing material support to ISIS. This is correct.

Now defense counsel said there isn't any other terrorist group in the region at the time he traveled there. An entire city in Lybia was "an actively managed colony of the Central Islamic state" at the time he traveled there.

There is ample evidence that we intend to prove at trial that you could join ISIS, you could show up and provide -- hold yourself out to be a fighter for ISIS, to be a supporter of ISIS, to benefit ISIS in Lybia by way of Tunisia. It has happened prior to Mr. Augustine going there, it is something that was known, it was something that was researched.

I would note -- and I would note, if we can't -- they're correct. If we cannot prove that Mr. Augustine intended to support ISIS by what he was doing, what we charge he did, he'll get acquitted, and we look forward to addressing that issue at trial.

I would note just in addition to the factual record, the public record that supports the fact that as a factual matter, ISIS, the designated terrorist organization, which was in fact designated before Mr. Augustine left, and traveled to Lybia, was in that region of the world, was in Lybia, right next door to Tunisia.

I would note that Mr. Augustine -- we have evidence that Mr. Augustine -- even if that weren't true,

even if he went to somewhere where there was -- where ISIS was not, it was a factual -- arguably a factual impossibility. We know that he tried to support ISIS. He attempted to support ISIS. He was researching how to join ISIS. He was researching -- he was watching propaganda videos by ISIS. He was watching videos by Baghdadi, the head of ISIS. And he tried to travel to Syria in the first instance.

So I don't want to go on too long; yes, it is true that ISIS Lybia or ISOL Lybia was designated after the fact, and if we wanted to prove, if our case was that he was intending to support ISOL Lybia, this would be a different case, and maybe they would have an argument for it. We are not trying to prove that. We are trying to prove that he attempted to support ISIS. We can do so, and we'll do so at trial, and they can argue to the contrary.

MS. GLASHAUSSER: If I may, your Honor, so what the government is saying, I am not sure exactly where the actively managed colony quote comes from, perhaps from a State Department report. They are saying that they believe based on State Department reports that there were people affiliated with ISIS of Syria, for example, that were operating in Lybia, but the problem is what the DOJ thinks about which terrorists are where isn't the

relevant inquiry.

The statute requires the Secretary of State to designate groups, and if someone is going to be prosecuted under 2339B, that their support be for one of those groups.

Here, we have the Secretary of State determining that the group of ISIS-inspired people that were in Lybia at the time, were sufficiently separate from the other ISIS group to get their own designation. That's the only logical reasoning -- the only logical reason of why the Secretary of State has designated ISOL Lybia separately. And it's not the only geographical region that receives a separate designation.

What it indicates is that that group is distinct and separate from what I will call the main branch of ISIS for lack of a better word to describe it but ISIS that isn't --

THE COURT: Do you both -- do you disagree about that? I mean it's -- is there a factual disagreement about the difference between ISOL and ISIS and whether or not there was a presence of ISIS in Lybia or whether there need to be a presence of ISIS in Lybia? I mean it sounded -- I thought I heard the government say we're not making any allegations about ISOL.

MR. HEEREN: ISOL Lybia.

THE COURT: ISOL Lybia, right.

MS. GLASHAUSSER: Well, but they need to show that there is support for a designated group, in their complaint, and the indictment doesn't go into it but the complaint talks about how the government believes that ISIS in Lybia was operating in Lybia, and I believe they call it ISOL, operating in Lybia. They just gloss over the fact that there's a separate terrorist group that's designated ISOL Lybia.

And the government hasn't, as I read their papers, and what they say today, they haven't offered any alternative meaning for what the Secretary of State meant in designating ISOL Lybia separately as a different group, other than ISOL Lybia is a different group than the ISIS that we designated, we the Secretary of State, back in 2012 or 2014.

The determination of the Secretary of State that the people, the terrorists in Lybia were a separate group, is the one that we all have to rely on, and it's not one that I have any explanation for other than the obvious one that it was a different group, a different terrorist group, that was designated on the terrorism list. That --

THE COURT: And both of them weren't operating in Lybia?

MS. GLASHAUSSER: I have no indication. So all I know is that the Secretary of State indicated that ISOL Lybia was a different group than ISIS of Syria, for example.

THE COURT: What --

MS. GLASHAUSSER: And ISIS of the Greater Sahara, and there's a list of --

THE COURT: Right.

MS. GLASHAUSSER: -- separately designated geographically specific ISOL or ISIS groups.

THE COURT: Right. So maybe I missed what the government was saying, but can you just repeat what you were saying?

MR. HEEREN: Yes, your Honor. ISIS, the organization designated as a foreign terrorist organization is or was in Lybia during the relevant time period. The fact that the -- and the Department of State says as much, as we show in our papers.

The fact that the Secretary of State designated an additional organization that exists in Lybia after the fact, is simply not relevant. There are lots of terrorist organizations, Al-Qaeda and Maghreb is in Africa, too.

THE COURT: And Mr. Augustine is not charged with --

MR. HEEREN: No.

THE COURT: -- anything that has to do with ISOL Lybia.

MR. HEEREN: There's a host of terrorist organizations that are designated in Syria.

THE COURT: Right. So if you can't -- as you said, if you can't prove that he was providing material support to ISOL --

MR. HEEREN: To ISIS.

THE COURT: ISIS?

MR. HEEREN: Yeah, they've changed the name from ISOL to ISIS. It's gone back and forth. I don't know why.

THE COURT: All right. I think President Obama always called it ISOL.

MR. HEEREN: Yes.

THE COURT: All right. So --

MR. HEEREN: I think the most current name that we use is ISIS, but you are correct, they are interchangeable.

THE COURT: Okay. But if it's not -- but if you can't prove that it was the -- either ISIS or ISOL, as opposed to ISOL Lybia, then he has to be acquitted --

MR. HEEREN: Yes, I think that's right.

THE COURT: -- on that charge.

MR. HEEREN: Right.

MS. GLASHAUSSER: But your Honor, this isn't a factual question.

THE COURT: But what --

MS. GLASHAUSSER: I'm talking about a legal issue, and an insufficiency in the way that they've charged the case because the distinction that the government lawyers are making between the designated groups of ISIS or ISOL in Syria, and ISOL Lybia is not one that the Secretary of State has made, and the reason this is important is because specifically in 2339B, it has to be the group that the Secretary of State has designated is the one operating in the region.

The Secretary of State designated a specific separate group of ISOL fighters in the Lybia region. It was really just a couple of months after Mr. Augustine was there. There was no designation of that group was somehow the other groups two months prior, or something like that, and it -- this isn't as --

THE COURT: Hold on. Can I just stop you for a second?

MS. GLASHAUSSER: Sure.

THE COURT: So we aren't -- is the distinction with the geographic reach is then of the ISIS or ISOL, as opposed to ISOL Lybia, whether there was a presence in

Lybia?

MS. GLASHAUSSER: No, I think it's a legal question that when the Secretary of State decides that this geographic region has its own distinct ISOL group, the name is similar, and they may have many similarities, I'm sure that they do, but they were different enough that the Secretary of State said this group in this region needs a different designation. And that decision was made --

THE COURT: Is that the -- would that be the exclusive group operating in Lybia?

MS. GLASHAUSSER: I don't know, your Honor.

THE COURT: As a matter of law? I mean, that's -- isn't that the heart of the dispute?

MR. HEEREN: Yeah, I mean I think that's my reading of what defense counsel is saying.

THE COURT: You're saying it's more than one group.

MR. HEEREN: Defense counsel, as I read what they are saying, they're saying that because the Secretary of State designated ISIS Lybia in -- at 2016, that retroactively renders or that does one of two things. That presumes that there was no other group in Lybia, and we would submit that's not true. There's no geographic limitations on ISIS in the designation. As a

factual matter, ISIS was in many locations outside of Syria including Lybia beforehand, and the fact that a separate discrete group was designated after the fact doesn't change that analysis.

Just because something happened after the fact, doesn't change the facts on the ground at the time, and doesn't make it retroactive that you can't charge him for committing -- for trying to support a group in that region if they were.

Again, as a factual matter, if we can prove that he was trying to support ISIS anywhere, we can do that.

THE COURT: I mean the example -- this will be an absurd example but if the Symbionese Liberation Army had been on the designated terrorist list, and the Secretary of State didn't designate where that organization was located, but if I went to Lybia to join the Symbionese Liberation Army, and there was in fact a way to do that, I could provide material support, is there anything in the statute that would declare that only ISOL Lybia could be a designated terrorist organization.

MS. GLASHAUSSER: Of course no, your Honor, but when we have a situation -- this isn't about retroactive anything. It's a situation where -- I think it's

actually one month after Mr. Augustine was arrested, the Secretary of State is looking at the specific region that they're charging him with going to, and saying these groups that we have been talking about as ISIS affiliates, ISIS rebels, an actively managed colony, whatever it is that the phrases that were used by the State Department, that now the Secretary of State is looking at those groups and saying you know what, these are not the same as ISIS, these are ISOL Lybia, and making that determination right after Mr. Augustine is arrested, that's a different situation than the one that your Honor is positing where there's a terrorist group and someone is supporting them from a different geographical region.

THE COURT: So is that in the legislative history? Is that -- where would I go to find that the State Department had determined that there was only one group that could be operating in Lybia?

MS. GLASHAUSSER: Well, that's not what I am arguing, your Honor. I think there are actually many different warring groups in Lybia.

THE COURT: Okay.

MS. GLASHAUSSER: But what I am arguing is that the State Department looked at the ISIS-related groups, and said that ISOL Lybia is separate. And the government

hasn't offered any alternative reading of what the State Department, what the Secretary of State meant by designating ISOL Lybia separately, or any of the other geographical regions because what their argument is basically saying is that these geographical distinctions don't matter. All of it is ISIS, ISOL Greater Sahara, ISOL Lybia, and the other listed separate geographical things, it doesn't really matter. It's just ISIS.

But that's not what the Secretary of State said, and this statute is a very specific one with respect to the list. It's not -- I'm not saying that they charge him with a terrorism-related crime because of this argument. What I am saying is they can't charge him under 2339B, that the more appropriate statute is 2339A because that one does not have the requirement of a designated terrorist group. It's just for a situation where maybe there are loosely affiliated terrorists in a region, or rebel groups, or whatever it is that the government is saying based on the New York Times, and reports from the State Department, but the State Department -- the Secretary of State hasn't yet made that decision that this is a designated terrorist group that is operating in the region.

And here we have a situation where that decision was made just after Mr. Augustine's arrest.

THE COURT: So designated terrorist group A operating in the region B.

MS. GLASHAUSSER: Well, the Secretary of State chose to make the designated terrorist group connected to the region. I don't -- the only -- the reasonable explanation that I can gather from what we know is that that was a decision based on this region having a separate group.

The government hasn't offered an alternative explanation of why the Secretary of State has chosen to designate some geographical regions as having their own designation of ISOL or ISIS based on their region, and why others do not.

THE COURT: Um-hum. So before the designation of ISOL Lybia, could the government have designated -- could the government have charged material support to ISIS in that region? I mean did --

MS. GLASHAUSSER: Do you mean in the context we have here or do you mean at --

THE COURT: Yeah, in this case.

MS. GLASHAUSSER: -- some much further removed point?

THE COURT: Right, if this had happened before --

MS. GLASHAUSSER: If the Secretary of State had

never designated ISOL Lybia as a separate --

THE COURT: Never had.

MS. GLASHAUSSER: -- state, then maybe we would be in a factual question of whether there were people associated with the main designated group of ISIS that were operating in Lybia, even though that designation --

THE COURT: Okay.

MS. GLASHAUSSER: -- indicated it was for Syria.

THE COURT: Okay.

MS. GLASHAUSSER: But that's not the situation we're in. This is different because the Secretary of State did make that decision right afterward to designate a specific terrorist group, and the DOJ and these prosecutors can't just rewrite the designation list and wish -- you know, it's -- I'm sure they wished that it was designated the month before, and then this would be no issue, but it's the Secretary of State specifically that is given this power to put groups on the list, and we can get into a nondelegation argument --

THE COURT: Okay.

MS. GLASHAUSSER: -- later down the road, but if the DOJ can then just rewrite the list or essentially ignore it, and be like well it doesn't really matter that there are these specific groups designated here.

THE COURT: Well, they're saying they're just -- that the Secretary of State simply added another group to the list, right, basically.

MS. GLASHAUSSER: But they added the group that was operating in the region that they said Mr. Augustine was traveling. They can't just ignore that. I mean, that --

THE COURT: Well --

MS. GLASHAUSSER: -- essentially ignores the list than what the Secretary of State chose to do at exactly the same time, just one month later, after Mr. Augustine was alleged to try to join them.

THE COURT: So in someways did that undesignate ISIS as operating in Lybia?

MS. GLASHAUSSER: Well, they hadn't designated ISIS as operating in Lybia. They had designated ISIS for Syria, and they had designated ISIS -- I would have to look at the timing of the other geographical regions that they had designated, but there are different points when they choose to designate separate --

THE COURT: Right.

MS. GLASHAUSSER: -- geographical regions as separate ISIS groups.

THE COURT: But I think the bottom line is that you're saying that there's -- with the designation,

there's a geographic tag to it.

MS. GLASHAUSSER: The ones that have the geographic tag.

THE COURT: Okay.

MS. GLASHAUSSER: Not all of them do.

THE COURT: Uh-hum.

MS. GLASHAUSSER: And I can't presume why the Secretary of State did that, other than that they meant that the geographic tag was relevant in that instance.

THE COURT: Okay. All right. I think we've probably exhausted this issue at this point.

MR. HEEREN: Yeah, your Honor, all -- I think you get our argument. I think our argument is actually a simple one. The Secretary of State also designated ISOL Lybia.

THE COURT: Yeah. Your argument is it broadened the number of groups that were designated.

MR. HEEREN: Right.

THE COURT: And I think the defense's argument is in some ways it narrowed it.

MR. HEEREN: Yes.

THE COURT: It broadened and narrowed it.

MR. HEEREN: Yeah, I don't know -- I mean, I don't follow it, but I think that's the argument.

THE COURT: All right. Next point?

MS. GLASHAUSSER: I am going to move onto the lack of notice in the indictment --

THE COURT: Okay.

MS. GLASHAUSSER: -- if I may, your Honor, and then we'll move from there into insufficiency because I think those points go together.

So this is point -- I apologize, I am not going exactly in order with our motion. This is point 1 --

THE COURT: Okay.

MS. GLASHAUSSER: -- in our motion, and then we'll move to point 3.

So looking at again at the specific statute that Mr. Augustine is charged with, 2339B, there's the requirement that the person who is charged with that statute be attempting, in Mr. Augustine's case, or have actually worked under the direction and control of the foreign terrorist organization.

That requirement is an element of the statute -- your Honor should find that it's an element of the statute, that keeps -- that provides notice to the defense about what the government is charging, and keeps the statute from being unconstitutional.

So the main Supreme Court case about material support, the Humanitarian Law Project makes clear that Section 2339B does not criminalize mere membership in a

designated foreign terrorist organization. And that's something that is really important, I think, throughout our motion, and which is in strong conflict with the articulation that the government keeps providing of what they think Mr. Augustine planned to do, which was attempt to join the foreign terrorist organization. Mere membership is not prohibited.

So this idea that saying that he was going to join ISIS is sufficient notice, and that that's enough doesn't work with the statute. And so focusing on the indictment itself, the failure in the indictment to allege this direction and control element means that the indictment is not sufficient because it skipped an important element of the statute that saves the statute from unconstitutionality.

As we cited in our papers, the Mathis (ph.) -- another Supreme Court case not about terrorism, explains the difference between elements and facts. Elements are things that the prosecution has to prove to get a conviction, and then facts are sort of real world things that the Court says are "extraneous to the crime's legal requirements."

The direction and control element can't be extraneous to the crime's legal requirement because it's that portion of the statute, 2339B(H) that basically

saves the statute from being unconstitutional, makes sure that people aren't prosecuted for just membership.

And the government cites, I believe three cases where courts have found the opposite on this -- on the element issue, but it's important to know that no Court of Appeals has ruled on this. So this is an area with little --

THE COURT: So I just have a black screen here every time I try to look it up.

MS. GLASHAUSSER: Oh, no.

THE COURT: But I think I --

THE CLERK: Do you want me to (indiscernible)?

THE COURT: It won't do any good.

So I'm following what you had to say. I've read the indictment.

MS. GLASHAUSSER: Okay. No Court of Appeals has ruled on this issue, and I think importantly, one of the differences in our case from some of the others --

THE COURT: Oh, I got it.

MS. GLASHAUSSER: -- is that we are alleging that Mr. Augustine hasn't gotten sufficient notice of what he did.

THE COURT: Right.

MS. GLASHAUSSER: And then some of the other cases specifically, in Straffey (ph.), the Court makes

strong note of the fact that the defense wasn't arguing they had no notice, that this was more of a technical legal argument, as opposed to one where they really didn't know what the charges were, and that's the situation we have here.

The government doesn't allege the direction and control, or what it is that he was attempting to do under the direction and control of a terrorist group, whether just being there was enough, whether as I believe Mr. Keilty had argued at one of our earlier hearings, just by being a part of the group, you had to fight, and therefore that's enough, or whether it's something else, like he was going to be in an administrator, or a homemaker, or a doctor, or any of the other things that one might do in a place.

So the problem here is with the lack of notice, and the lack of the indictment to charge this element, which means that the grand jury didn't have to find the element, and that makes the indictment invalid.

THE COURT: Okay.

MR. HEEREN: So I think defense counsel is mixing the sufficiency argument, and what needs to be charged in the indictment argument. So I am going to focus first on the question of what needs to be charged in the indictment, which is really what the notice

question boils down to.

And as the cases that we've identified show, the essential elements need to be charged, which are the three elements we identify in our paper, as well as through the Awan (ph.) decision, as the specific type of support which is satisfied by identifying personnel, one of the forms of support in the statute, which we've done.

We have met our burden in the charging language. It is consistent with the indictments in all of these other cases. And it is consistent with the charging language that these other cases like Pugh, Ludkey (ph.), Cioffi (ph.), have all upheld as appropriate.

The only notice issue that they have raised, as to what should be charged in the indictment, separate from the sufficiency issue about whether what we are alleging is sufficient to show material support, which I want to separate out here --

THE COURT: Right.

MR. HEEREN: -- the only thing they are identifying as saying that we had to specifically allege the definition in subsection (H) about direction and control.

And defense counsel's argument, as I understand it, is that it's not definitional, that it is effectively

an element, too. All of the cases to pass on this have ruled to the contrary.

And with the exception of one, they've all ruled it's definitional. And although I agree none of those cases on that specific issue were appealed, I would note that Pugh was appealed to the Second Circuit more broadly, and was upheld.

I would note that in the case that defense counsel pointed out was the seminal case on it, humanitarian law project, the Supreme Court itself described 2339B(H) as "a limiting definition, and that's at pin cite between 23 and 24.

As for personnel, Congress enacted a limiting definition. I think that that plus all the cases that ruled similarly establishes our point. We don't need to charge that. No case is held otherwise. The Court would have to conclude that everyone is wrong here.

The other arguments that defense counsel made are sufficiency arguments which I am happy to address, but I imagine there are other arguments that defense counsel wants to make as to sufficiency based on what she said a minute ago, so I can reserve them for the moment.

THE COURT: Do you want to go back to the issue again?

MS. GLASHAUSSER: Thank you, your Honor. Mr.

Jacobson will address sufficiency in a moment, but in response to the notice issue, the government said all the cases a number of times. It's three cases from district courts around the country. So this isn't -- there isn't some body of case law that we're asking your Honor to come to a different position on. There are three district courts that found that personnel was definitional, and at least two of them noted that there were certainly alternate readings of the statute that would be reasonable, and that it's just that those particular courts came out the other way. None of those cases are controlling on your Honor.

And Pugh, which was appealed, and was upheld, did not -- the Circuit did not consider this issue at all. It was not raised. So that doesn't provide any support for the government's argument with respect to the element issue.

Humanitarian Law Project is also not about this issue, and the Supreme Court uses different language when talking about subsection (H). It does, at one point, use the word "definition". It also says that subsection (H) clarified the scope of personnel It also says that subsection (H) clarified the scope of personnel.

It doesn't -- in other words, it uses different language in a more colloquial sense is because it's not -

- the Court is not talking about the legal requirement of whether it's an element or a definition, it is addressing the statute for other reasons.

And the definition from Mathis about what is an element, and what is a fact is from the Supreme Court, and that's the one that makes sense here. An element of an offense is something that the government has to prove to get a conviction, and I don't think the government is disputing that it has to prove direction and control here to get a conviction, and that's what an element is, and that's why your Honor should find it's an element that should be charged in the indictment.

THE COURT: Okay, thanks. I the issue is well defined.

MR. JACOBSON: Should we move onto sufficiency, your Honor?

THE COURT: Yes.

MR. JACOBSON: Thank you.

I know we've been making a number of legal points, and points about the indictment on its face, but I think what I don't want to lose sight of is put simply, Judge, this is the weakest case that has ever been brought under Section 2339B, and we've been saying that since the day Mr. Augustine was brought into the Eastern District of New York, and the government has never said

otherwise in any of their papers. And I want to -- and I want to go through that point by point.

But the weakness of this case under that section has constitutional implications under Humanitarian Law Project, and the First and Fifth and Eighth Amendments, and it has implications for whether there's sufficient evidence to proceed with the prosecution.

But I wanted to start with the sufficiency issues, and talk about the elements of 2339B and what's required. And I wanted to start with the intent element. The intent element requires that the government prove at trial that Mr. Augustine intended -- not just intended to join an FTO, but intended to work under the direction, and control as personnel of a designated foreign terrorist organization. And the evidence in this case just does not support that.

The majority of the government's evidence is statements that were made by Mr. Augustine prior to his travel to Tunisia, and we've been laying out a little bit about the contextual issues in our bail filings in this case. I would point to our letter of November 22nd, for instance, starting on page 5, but when the government proffers what their evidence actually is in this case, it's all snippets of out-of-context conversations and

posts on social medial sites that Mr. Augustine made.

And I know your Honor has read this in the context of bail, but I think the -- there are sort of three examples that I would give. The first is the evidence about procuring guns. When you actually read what he is saying, he's talking about is this a good investment, while at the same time talking about what other financial investments might be good for someone wanting to make some money.

The government relies heavily on something that he posts on the Return of Kings website, and we've discussed this in the past. Return of Kings is this Christian values, men's rights, pick-up artist website, that has teenagers posting toxic things about women, and religion, and politics, and a number of other subjects. And at one point -- and the government cites it in isolation where Mr. Augustine says that he wants to "seek the ultimate justice".

And the government sort of elides that and says, wants to "join ISIS" to seek the ultimate justice. Nowhere in any of these posts is he talking about ISIS. The full statement is, "My purpose in life is to seek the ultimate justice. There are two ways to learn the truth. I'm not talking about religion. If you are a good person, and not Muslim, God knows that, and he will

reward you. He is not unjust. Follow not the morals of what's said in religious texts, but what's deep in your heart that you know is morally right."

No reasonable jury could find that to have anything to do with an intent to work under the direction and control of a terrorist organization.

These statements are not even -- they're milk toast, almost platitudes. They're sort of "new agey" statements about being a good person, about following what's inside your heart. He says, "Don't look at religious text. It has nothing to do with religion. Whether you're a Muslim or not a Muslim, be a good person and God will reward you."

For the government to infer as part of a central point of their case-in-chief, that that shows an intent to join ISIS, among with -- amongst other posts on return of the Kings, is just not sufficient for a Reasonable jury to find.

And we've laid out another -- several other snippets that the government cites. For example, the government cites a snippet about true Islam from the same message boards, and in fact what Bernard is talking about when you read the whole quote is that he's talking about his Dad who is living in Pakistan, and he says again, I hope that whatever is true and just be victorious,

whether it's Muslim or not.

And then in that same thread, he goes onto say, and of course the government doesn't include this, but what he says in posts subsequent to that is that "Everyone gets to decide their own path, based on their own personal understandings of Islam and religion, and that if a nonbeliever is ever attacked by Muslims, those Muslims must be punished." This was seven days before he flew to Tunisia.

So I think what we have here is yes, taken in isolation, some of these posts could suggest that he had thoughts that were sympathetic to the foundation of a Caliphate, but when you read what he's actually saying, separating it from the fact that this is essentially a website for trolls to say toxic things, and everyone is accusing everyone of being a troll, including Mr. Augustine. No one is taking anything that people post on that website seriously. That's part of their understanding of what the website is about. You can say crazy things as a teenager, and it doesn't mean that you intend to join a terrorist organization.

And so I think when you look at what the government points to as intent, it's insufficient. And even if it did show some sympathy with ISIS, and I think it absolutely does not, but even if it did, it's

insufficient to prove that he wanted to work under their direction and control, and I think we've discussed that in the context of the indictment, but the government has to prove at trial that he not only intended to support ISIS, but that he intended to work as personnel under their direction and control. And there's just zero evidence of that.

And when pressed, the government -- when pressed about what their theory of direction and control is, the government's response is that he intended to join ISIS, and we haven't heard them articulate anything beyond that.

And as the Court knows, evidence of wanting to join ISIS, even if there was, and I don't think there is evidence of wanting to join ISIS, even if there was, that is -- that would be an unconstitutional prosecution under Humanitarian Law Project, and that is black letter law that is not a crime to want to -- to intend to join ISIS, to advocate for ISIS, to support them only if you're working under the direction and control, and that's what subsection (H) does because Congress understood the potential constitutional infirmities of these prosecutions. Mere membership is not enough.

The government also points to an internet search, and they've mentioned this earlier today. His

internet search for how to join ISIS, how to safely join ISIS, sorry, which is a bit of an oxymoron but fails to point out that during the same period, a jury would hear that while Googling how to join ISIS, he's also Googling, I don't know what to do -- and the Court has this, it's on page 6 of that November 22nd bail letter, should I be an underwater welder, oil and gas, multiple trades, or just one, Alaska, fisherman, architect. Should I be a high-paid corporate lawyer, jobs in finance. What are the best med schools in America. How to become a surgeon.

Should I get an offshore oil and gas job in California? Living in Goa, India. How to move to Finland. Working as a Salmon processor in Alaska. Jobs in the Australian outback. On and on and on, like a teenager does. Internet searches, he doesn't know what to do with his life. He's searched -- how to join ISIS is one search among many searches, just like his isolated and admittedly toxic comments on Return of the Kings, they're isolated statements among many, many posts on this website, and other interests that he has, and comments that he's making at the same time.

Now the --

THE COURT: Can I ask you a question?

MR. JACOBSON: Yes.

THE COURT: What's the minimum the government would have to allege under the direction and control?

MR. JACOBSON: So that -- Judge, I think that is left open under Humanitarian Law Project. Humanitarian law Project said that the degree of coordination on those facts was sufficient to trigger criminal liability.

But there are suggestions that -- and this is just -- I'm only talking about the constitutional framework.

THE COURT: Right, but going back to Humanitarian Law Project, what specifically were they doing?

MR. JACOBSON: They were -- they suggested that they were going to train the foreign terrorist organization.

THE COURT: Right, but how are -- in what sense was that acting under the direction and control, rather than providing a benefit to the organization.

MR. JACOBSON: Well, they were going to work. Another way to -- HLP alternatively defines -- and again, the legislation was in flux at this time, right, and I think there had been a remand. Congress hadn't amended subsection (H) yet, but I think, and Ms. Glashausser will correct me if I am wrong, I think they framed direction

and control alternatively as close coordination, but on these facts because it was a nonprofit organization that wanted to go work in concert with the FTO, right?

So someone was going to be under someone's direction and control. I think actually 2239B says that as an alternative means of liability -- right, you can either -- the government can either prove that the defendant wanted to work under the organization's direction and control, or was the organizer, manager, supervisor, or otherwise directed the operation of that organization.

And, of course, this case isn't about that latter provision but in HLP it was because it was about an organization that wanted to go, and in a way assume control of certain aspects of that FTO's training and implementation.

So to the extent that HLP focuses on that, that's not really relevant here. As I understand it, the government is arguing that former prong, which is the alternative liability for working under the direction and control. And I don't think anything that they would describe as intent evidence shows anything more than maybe vague statements that could be interpreted as supporting some things that the organization does, but of course there are other posts where he says that -- he

says things that no one who actually wanted to provide support to ISIS would ever say about Islam and punishing Muslims for hurting non-Muslims, and following what's in your heart, and that is has nothing to do with religious texts.

And I think this is especially important in an attempt case, and I'll get to that in a moment. But what I first wanted to do is point to what I think is the government's attempt to show cases that they think are akin to Mr. Augustine's case. And that's Pugh, Farhane, and Kaziu. And I don't want to -- it's in our reply brief, pages 17 to 19, but I think when you look at the facts in Pugh, and Farhane, and Kaziu, they are just totally different from what we have here, both in terms of the evidence of intent, and in terms of the evidence of substantial steps required for an attempt.

Pugh, for instance -- in Pugh, the defendant actually did attempt to recruit. In other words, he was acting as the FTO, recruiting other individuals. He was extremely clear in his statements that -- about what he wanted to provide for ISIS. He uses the word ISIS constantly. He's not must making generic statements about Islam. He's saying that he wants to martyr himself for the Islamic state. He says that -- he talks about getting paid for that, or selling himself for that.

And specifically, he says he wants to use his training as an air force avionics technician to go be the aircraft technician for ISIS. I think he also, at the time of his arrest, seized from his person were numerous items of tactical gear, which went to his intent. So there are just several things that are far in excess of what we have in this case. Same in Farhane, Farhane is a Columbia University trained physician, and said that he wants to use his skills as a physician to go work for Al-Qaeda to be their doctor, right? And then he doesn't -- he swears allegiance to Osama bin Laden. He says he's going to be a soldier for Al-Qaeda. I believe he tries to recruit other individuals to join him which is a substantive material support offense, not just an attempt.

Kaziu, you have the same thing. He's talking to actual members of Al Shabaab, is in contact with these members, and coordinating, you know, weapons, transfers, and -- there are other individuals involved.

So I think now -- Pugh -- again Pugh has facts that I think are far more -- that really go to the heart of proving direction and control. So I don't think Pugh is -- Pugh is very different from this case, but what I would point to in Pugh is Judge Dearie's dissent.

THE COURT: Right.

MR. JACOBSON: And I think -- and again, the majority had good points about why Pugh is sufficient.

THE COURT: Uh-hum.

MR. JACOBSON: But you could essentially take Judge -- I'm sorry, in Farhane, Judge Dearie's dissent in Farhane. You can essentially take Judge Dearie's dissent, and that could be the opinion of this Court in Mr. Augustine's case, because the facts in Mr. Augustine's case fall so short of what you have in Farhane.

So the government, and I don't know if they're disputing this or not, but the government has not pointed to any case where the evidence of intent is as de minimis as it is in this case.

And the reason that's so dangerous is the next element I want to talk about, and that's the element -- the fact that this is -- they're trying to prove attempt, and not a substantive offense.

THE COURT: Can we just get back to direction, just briefly --

MR. JACOBSON: Yes.

THE COURT: -- and I know the government is going to want to say a few things on this. What's the -- where's the threshold for direction? In other words, what does a defendant have to do, or an individual have

to do to come under the direction of ISIS?

I mean for example, the person doesn't sign a membership card, join the organization, go to a recruiter, but simply says I've read the website, I believe with -- I agree with the goals of the organization, and I want to -- and I am going to take some steps to further them. Is that acting under the direction or is that not? I mean what is direction?

Is direction merely the ideology of the goals, or is it some actual supervision by a human being? And I know you mentioned a lot about recruiters and other things, but --

MR. JACOBSON: I think --

THE COURT: I mean, the lone wolf. I think we're talking about the lone wolf.

MR. JACOBSON: I think you have to do what Mr. -- and to some extent, Pugh, Farhane, or lone wolves, in that they were self-radicalized, but at some point they showed their intent to be under direction and control by doing something more than just speech, right?

Constitutionally speaking, HLP is clear that just the speech is insufficient, that that's protected, that advocacy is protected, that mere membership is protected, but what you see Farhane, and Pugh, and Kaziu do, is then make contact with people who are actual

members or affiliates of the organization, procure weaponry.

THE COURT: Okay. Let me give an example again. There's nothing to do with this terrorism, but let's go back to Nazi Germany, and let's say someone reads Mein Kampf for a Nazi manifesto that says all upstanding German citizens should break the windows of any Jewish shop on a particular night.

If someone does that, but doesn't join the Nazi party, doesn't go speak to a recruiter, but merely reads what's in the -- and we're not getting into attempt yet, but if someone reads the Nazi manifesto and follows it essentially, is that acting under the direction, or is that below the threshold?

MR. JACOBSON: I think it's below the threshold. I think the government's charging decisions show that. For example, in a pending case in the Southern District of New York, because the defendant was saying things that seemed favorable to the FTO, and then did a terrorist act, potentially in -- to further the interest of that FTO, the government didn't -- charged a RICO indictment, right, because the person was acting as a lone wolf essentially.

But I think in the Nazi German example that the Court just gave, that would be insufficient under HLP,

that's protected speech. I think perhaps the government could charge some form of incitement if they're telling other people to go break windows, but just saying I want to go break windows, and I love Mein Kampf, is insufficient.

THE COURT: What if they take some steps towards -- what if they get some rocks, and walk up to a window, and get ready to do something, but the police stop them?

MR. JACOBSON: I think the two elements bleed together because -- and I'll discuss that but I think then we're talking about attempt and substantial step. But in a substantive offense -- it's much easier when the government is not charging an attempt, but is charging an actual violation of 2239B, and saying this person did, in fact, provide material support to ISIS, and they did so while working under the direction and control of ISIS. And that's why the vast majority of these cases are not attempt cases.

They're just -- there has to be some evidence of -- in the substantive cases that that organization, in fact, directed you, and controlled you to do something.

THE COURT: So in other words, you'll simply read it -- if the organization says we can't -- we would like to create citizen armies around the world, and we

invite you to come either to Lybia or in your own home country to do these following acts, or similar types of acts, is that acting under the direction or not, or when would it be?

MR. JACOBSON: It's not.

THE COURT: Oh.

MR. JACOBSON: I don't think under HLP it would be.

THE COURT: Okay.

MR. JACOBSON: And I also don't think just as a matter of statutory interpretation, even if you didn't have -- HLP puts constitutional limits on these prosecutions. In other words, I think there's some -- there probably is a subsection of these cases where the government could secure a conviction, would have sufficient evidence, but it would be unconstitutional as applied to that defendant.

I don't think we're in that zone. I think it's both unconstitutional as applied to Mr. Augustine, and they don't have sufficient evidence, now for overlapping reasons, but I think the --

THE COURT: Could I just get the government's view on that? Where does direction start?

MR. HEEREN: Sure.

THE COURT: what's your view?

MR. HEEREN: Your Honor, so I think the best way to answer that is the better analogy here is one that comes out of the Farhane decision. And the analogy can pivot off of what Farhane says at pin cite 151, "Section 2339B criminalizes providing personnel through self-recruitment, i.e., volunteering one's self to serve under the direction of a terrorist organization, no less than through recruitment, securing another person to serve under such direction."

So what I think the circuit is telling us is that you have to volunteer yourself. You have to submit to their direction and control, or in this case attempt to submit to the direction and control of a foreign terrorist organization.

Now what does that mean? I think the better analogy whether it's Nazi Germany or any sort of military or quasi-military organization is recruitment, which I think the Court was driving at towards the end of the colloquy with defense counsel.

If you know, you go to this place, if you go to Quantico, if you go Paris Island, if you go to Lybia, if you go here, and you know when you get there and say hey, I'm here, how can I help, you don't know exactly what you're going to do for that organization, but you know you want to submit to their direction and control. You

want to work for them, and with them, and support them.

We are not talking about a case here where the defendant sat in his room and just talked about what he wanted to do, nor are we talking about a case here where while there's interesting constitutional questions, we're not talking about a lone wolf case. We're not talking about caliphate on the West Side Highway saying I want to do this and kill some people for ISIS, and does that tactually reach the threshold, direction, and control, depending on what they're told.

What we're talking about is a person who said how do I join ISIS, who looked that up, who looked up videos of ISIS beheading people in Lybia, bought a one-way ticket to go to Lybia where he saw that video of people getting beheaded by ISIS members after saying how do I join ISIS, looked into going to Syria in the first instance, the hub, of ISIS, and didn't go there because of the passport issues, and then ultimately went to Lybia -- to Tunisia to get to Lybia.

That plus the other facts we identify in our briefing, as well as additional facts that we'll present at trial through witnesses and experts which parenthetically is why this is not a ripe argument for a pre-trial proceeding, is sufficient to show providing personnel to a foreign terrorist organization, because he

attempted to join the organization, and submit himself to the direction or control.

Now I think -- I submit that the government has ample evidence based on -- as defendant puts it, the toxic statements by defense counsel on -- excuse me, on defendant on message boards, as well as to his mother, and to other places about what he wanted to do which is to fight, and die for ISIS.

How he talked about the blood of Mujahideen. How in that same message board about doing things that are morally right, and you can be different religions, he also as an aside said well, but obviously if you're a different religion, you go up against people who practice Islam. They'll chop off your heads in a supporting manner.

I think we have more than sufficient evidence to convince a jury that his intent was to submit himself to fight and die for ISIS. I think that is there. They're welcome to argue with us at it at trial, and we'll see which way it goes.

But I would note parenthetically that that is not the standard. The standard is to provide himself as personnel. We do not need to prove the specific personnel. To be frank, he might not even have known what he was going to do, in the same that a person who

joins the military, doesn't know necessarily what MOS they have.

Maybe he was going to be the potato peeler to feed the troops. Maybe he was going to be the banker to raise money for the terrorist acts. Maybe he was going to do something to let somebody else fight the battles for him.

We don't need to prove that so long as we can prove his intent, substantial step, to join -- to provide material support for a foreign terrorist organization. And I know -- I mentioned join again, I know there's a lot of back and forth about it. If you'll notice in the case law, the Second Circuit frequently uses that as shorthand. We don't dispute that we have to show that they provide material support as it's defined.

The last point I would make is with regard to Pugh, there was a big -- a significant showing by defense counsel that while Pugh is trying to recruit other people, he was charged -- the charge that we're referring to here is this charge for attempting to provide material support in the form of personnel himself, the same charge Mr. Augustine is charged with.

And as the circuit court explained there, in rejecting a very similar argument here, "Although Pugh did not have an ISIS contact, nor had he sworn a formal

oath of allegiance to the organization, the steps he had completed were nonetheless substantial and were planned to culminate in a support of ISIS."

That is the same situation we have here. The government has, through its complaint, through its indictment, through discovery, we have more than enough evidence to withstand a motion to dismiss challenge. It is now time to go to trial and let the 12 jurors conclude, whether or not that's sufficient to support -- to prove our case.

MR. JACOBSON: Only a little more on intent to address points made by the government. In Pugh, I think what the circuit is requiring is because you have to be -- because of the care required in an attempt case, there has to be an unequivocal statement of working under the direction and control of the organization.

Now we have said what we think about the government's idea that they don't have to say what type of personnel it was going to be but I think in terms of the direction and control prong, when you look at a case like Pugh, he's saying -- he says specifically, ISIS is looking for pilots and mechanics. He describes himself as a terrorist, who is going to use his talents and skills for the Islamic state, specifically to be their aviation technician.

This is page 18 of our reply. He has a long statement about martyring himself, about the Islamic state, and he's caught with tactical gear. He was prepared to be under their direction and control, and to be, as he said, a solider, and a terrorist.

And the jury -- the government says that's not what he was charged with but the jury, of course, heard that he had in fact tried to recruit other individuals to join him, and was advising other individual on how to successfully be under the direction and control of ISIS.

So I do not think that they're equivalent cases. I think that was a close case. I think Judge Dearie's dissent in Farhane really gets at the idea that why there has to be a more clear statement of intent in an attempt case, because of the dangers of prosecuting someone for speech.

Because there's -- the only actus reus in this case is getting on airplane and touring around Tunisia. Everything else is protected speech, and it's protected travel, and it's protected under I think the plain meaning of HLP.

Before I turn to attempt and substantial step, I just want to respond to again, the Court's hypothetical about Nazi Germany. I think the purpose of 2239B is the substantive offense of working under direction and

control of the organization. They're a myriad of federal statutes for actually doing something that's a terrorist act.

So in the fact pattern that your Honor mentioned, throwing bricks at a window, encouraging other people to do that, there are hundreds of federal terrorism statutes that are not this one, that apply to someone who actually attempts to do something, attempts to set off a bomb, attempts to fund bomb making, attempts to break a window, that have nothing to do with showing that they were going to be a part of an organization. And the reason those statutes are used is because HLP is trying to narrow 2339B, so that it doesn't encompass what the government in this case wants it to encompass.

So I don't think there's sufficient evidence of intent. Even if there was, there is not evidence that's sufficient of a substantial step in this case.

Substantial step is defined in different ways by different courts, but the act itself, the actus reus itself, has to in some way be evidence of intent. It can't be an act that would otherwise be innocent, and it has to be corroborative of the intent to complete the offense, and that is a constitutional limit on what's considered a substantial step, and that's in some ways what HLP is articulating.

But I think if you look at all of the -- in the Second Circuit, the jury instructions for an attempt, say things like preparation is not enough. It has to be a step that is further than preparation, and obviously not so far that the offense is completed.

But I think when you look at a case where someone is arrested, really doing normal tourist stuff in Tunisia. He's going to see the sights in Tunis. He's going to see the sites in other towns in Tunisia. Talking -- telling his mother how wonderful the sights are in Tunisia.

Even if he had shown intent, that is mere preparation that cannot be said to be a step closer to actual complete -- that evinces the actual completion of the offense.

And federal -- the federal attempt language comes from the Model Penal Code which I think really is illustrative in this case. The Model Penal Code, because this is such a difficult area, tries to give examples of what a substantial step might be, and this is Section 501 of the Model Penal Code examples of substantial step.

It says, for example, lying in wait, enticing or seeking to entice the contemplated victim, to go to the place contemplated for its commission, reconnoitering the place contemplated for the commission, unlawful entry

of a structure where the crime is about to be committed, not just entry, unlawful entry, into the structure where you are about to commit a crime.

And possession of materials to be employed in the commission of the crime that are specifically designed for unlawful use, or that can serve no lawful purpose.

So I think what the Model Penal Code contemplates what the federal jury instructions contemplate, is something that is far closer to the offense than what we see here. Right? For example, unlawful entry into the structure, or enticing or lying in wait, or reconnoitering the actual scene of where he would want to do the crime, maybe the government would have a better argument if Mr. Augustine had crossed the border into Lybia, gone all the way -- and again, there was -- there was no evidence that ISIS is anywhere in Northwest Lybia, so he would have had to cross hundreds of more miles through civil war torn, daily combat territory to a place where ISIS had anyone, right, insert far to the east, maybe then if he was actively trying to link up with someone in the ISIS -- you know, buildings that ISIS was occupying, something like that, that is a -- and he had just fallen short of completing the crime, that is what -- that's the only constitutionally valid

way to show an attempt.

And I think that is why Pugh and Farhane wrestle with the idea of they really had to be specific; I pledge allegiance to Osama bin Laden. I am a terrorist for ISIS and there's exactly what I am going to do under the direction and control of ISIS when I get there.

So what counts as a substantial step? When we look at the cases, speaking to someone who is in the organization, that seems to be acceptable. If you contact -- if you're in touch with a recruiter or a facilitator, someone who is trying to vet you to get you into the organization, like in Pugh having combat gear, weaponry, while you're attempting to -- something that shows that you're going to -- you intend to be a soldier for the organization. You yourself recruiting or facilitating for someone else, that's what you see in Pugh when he tries to recruit two undercover agent, and you see in Farhane, and you see in Kaziu, where he, in fact, is in touch with people who are fighters for Al-Shabaab and is coordinating with those fighters.

Actually doing a violent act in the name of ISIS, that would be sufficient, if it was done under the direction and control, or actually -- and because these are usually in conjunction with each other, extremely focused language about exactly what you intend to do when

you get there like in Pugh, although in Pugh, and Farhane, it's many of these things that I just listed, it's not one.

And in Mr. Augustine's case, it's zero of those things. All it is is speech and travel. There's simply not actus reus that comes remotely close to what the common law with the Model Penal Code says has to be far enough along the chronology to count as a substantial step.

And we pointed this out as well in a case chart which is Exhibit A to our reply brief, where we looked at what we think are the 80 cases that have gone through the courts that charge ISIS-related conduct under 2239B. All of those things I just listed are present, usually multiple of those things are present in all of those cases. There's not a single case where none of those things are present, except Mr. Augustine's and it's simply deficient.

And the government hasn't cited a single case that says otherwise or where the substantial step that -- or the intent is as de minimis as it is here.

It's always travel plus speech, plus the other things that I've described, being in contact, having combat gear, extremely focused statements.

Now in some -- I don't usually quote Oliver

Wendell Holmes in oral argument but he -- but I am only doing so because it the basis for our common law understanding of attempt, and it's basically this case that he is talking about. And it's why it has to be more than mere preparation and be substantially further along than we have here.

But Holmes in his book, The Common Law, says that "The law doesn't punish acts which are done with the intent to bring about a crime," mere acts, right, preparatory acts. And he says, "If a man starts out from Boston to Cambridge for the purpose of committing a murder when he gets there, it's not sufficient. It's no more punishable than if he had sat in his chair and resolved to shoot somebody but on second thought, had given up the notion."

So traveling from Boston to Cambridge, walking, starting on your journey to Cambridge with the intent, even if it's a clear intent to murder someone, is not a substantial step, and I think there are core, fundamental notions of our system that rely on that, and why that's the case.

And I think what -- and Holmes goes onto talk about buying matches, to light a haystack on fire. It's all relevant to his. He talks about starting a journey, intending to do a murder at the end of it. That journey

is not enough. It has to get far closer.

And what he is saying is that if you punish the person who is just on the journey, you're punishing of someone who is not guilty of an attempted crime, and it's no different than punishing someone for their thoughts. It's speech and travel.

And Bernard was doing the equivalent of journeying from -- even if you agree with the government that he had an explicit intent to work under the direction and control of ISIS, all he is doing is journeying from Boston to Cambridge, and that it's protected under HLP, it's protected under fundamental notions of due process.

He didn't get across the border. He wasn't laying in wait. He wasn't surveilling or unlawfully entering the place that ISIS was. He wasn't in contact with anyone.

And the one thing that I wanted to point out because it's only -- and I'm still honestly trying to digest it, and it's point out in a footnote of our motion to dismiss, page 30, note 3, is this argument by Norman Abrams in his article, "A Constitutional Minimum Threshold for the Actus Reus of Material Support Offenses."

Norm. Abrams is a -- he's a very prominent

scholar of federal criminal law. He's been writing on this for decades, and specializes in attempt doctrine. I didn't know there was such a specialty but he is it, and I think he would agree with Judge Dearie that it is impermissible to try Mr. Augustine for attempt on these facts, in particular because of the doubly inchoate nature of 2239B, right?

Substantively violating 2239B merely means that you're being complicit with an organization. You're not even doing anything for that organization. You're providing support that could be used by that organization.

So there's often no actual harm in a substantive violation of 2239B, and Farhane says that explicitly, and I think it's important in Farhane, "Actual material support to a foreign terrorist organization is different from drug trafficking, and any number of activities, for example, murder, robbery, fraud, that are criminally prescribed, because those activities are inherently harmful, whereas the material support statute criminalizes a range of conduct that may not be harmful in and of itself, even indirectly."

So Farhane says that, essentially acknowledging that you can substantively violate the statute and not cause any harm, and just be complicit with people who

cause harm. So to then charge an attempt of that, basically intending to be complicit in an organization that may indirectly cause harm on facts where we're so attenuated from that, and where we're just on the journey from Boston to Cambridge, has to be unconstitutional, has to be insufficient in any reading of the statute.

THE COURT: Thank you. Let me --

MR. JACOBSON: So I think it's vague as applied. I mean, I won't go on but I -- it has to be unconstitutionally vague, and it has to be insufficient when applied to Bernard.

MR. HEEREN: Thank you, your Honor. I think the rest of the paragraph in Farhane that defense counsel is important to continue with. I actually had that part circled, too because the point Farhane is making is this is enough. The statute properly criminalizes conduct that may not in of itself be harmful, but that may assist even indirectly organizations committed to devastating -- acts of devastating harm.

And here's the other important part. "Accordingly, while a substantial step to commit a robbery must be conduct planned clearly to culminate in that particular harm, a substantial step towards the provision of material support need not be planned to culminate in actual terrorist harm, but only in support,

even benign support, for an organization committed to such harm."

I think that's important to keep in mind. The government submits that there is evidence that we will show at trial that Mr. Augustine, the defendant, had more than benign thoughts in his mind in terms of how he would support ISIS, but we don't need to get there.

Defense counsel's argument keeps amounting to wanting to segregate out his conduct into discrete pieces, and saying well this isn't bad, this isn't bad, so it all can't be bad.

There are a number of steps the defendant took to show that he was going to try and provide material support. That he was going to attempt to provide material support to ISIS.

He -- excuse me -- among other things, he bought a one-way ticket. He researched whether to go to Syria, or to Lybia, to the locations -- again, we're not talking about a random location, we're talking about a location where he can join up with the military forces of the organization, and support them directly through whatever means he can provide, even benign support.

He, in fact, traveled. He, in fact, left from here to there, after saying how do I join ISIS, after watching the videos of what ISIS does, knowing what they

did, he went to the location where he saw them beheading people.

That is powerful evidence of what that step really meant. And I know we've talked about Justice Holmes, and having a -- buying a match or something, the defendant is the match here. That is what this law criminalizes because when he shows up there, and provides them that support, he is furthering their terrorist aims.

And you don't need to take my word on it. As -- while Justice Holmes is good, Judge Raggi, Judge Lynch, and Judge Chin are good, as well, and what they said in Kaziu, K-A-Z-I-U, is first it was not necessary for that defendant to succeed in assisting the FTO in its war, for him to be convicted of attempting to do so, and second, "The evidence of the defendant's travels overseas with the intended object of joining that FTO in its war against the Somali government, was sufficient to permit the jury to find the substantial step necessary for attempt."

Now I know, and I am sure they will do it again, they will point to other evidence of conduct, but what the Second Circuit said is that's enough, full stop. We intend to show other evidence of conduct as well, but that's enough.

Among the other conduct, that he engaged in

operational security by blocking people from the social media accounts after speaking to them, like his family members. He researched items that could be used when he went abroad.

There's a number of items here but we don't need to get there. And I would note parenthetically again, this is precisely why this needs to be decided at trial because a jury in the first instance, can conclude whether after being told about what attempt is and what substantial step is, whether the facts are sufficient to support it. And if they acquit him, we're done. If they convict him, they will be able to appeal and say even if that is all true, this is unconstitutional, it's not enough.

So this is why it's premature, and even if it weren't premature, the government's case is sufficient.

THE COURT: Okay. Anybody want to take a couple of minute break?

MR. JACOBSON: Sure.

MR. HEEREN: Thank you, your Honor.

THE COURT: Sure, a five-minute break, and then we'll come back.

MS. GLASHAUSSER: Thank you, your Honor.

MR. HEEREN: Thank you.

(Off the record)

THE COURT: We're back on the record.

Next issue?

MS. GLASHAUSSER: If I may, your Honor, I just want to briefly discuss the bill of particulars issue because --

THE COURT: Sure.

MS. GLASSHAUSSER: -- I think it marries into what we were just talking about.

Throughout today, and in the previous hearings, the government has articulated different theories of what it is that they believe Mr. Augustine was planning to do, in addition to the vague, join ISIS formulation. And this is exactly the sort of situation that merits the bill of particulars. It's when the bill of particulars would be vital to the defense's understanding of the charges pending into the preparation of a defense, and that's from Bornofsky (ph.) which is cited on page 37 of our motion papers.

We can't prepare a defense if we don't know what the government's theory is, and today they said that maybe he was going to be a potato peeler, or maybe they don't know what he was going to do. Maybe he was going to just submit himself, and maybe he was going to be physically fighting.

These are different theories of the case that

would require different defenses, and this is exactly the sort of situation that calls out for a bill of particulars. In some of the other cases, the government has cited, some of them are cases where a bill of particulars were ordered, so those -- I'm not sure why the government cited those, like GAF Corp., which is cited in our brief, as well.

But others are cases where a bill of particulars is not ordered because the government says we are going to rely on what we've said in our briefs and an argument as the theory of the case is essentially an oral bill of particulars, even though it's not in that form, and that's for example, in the Sattar which was cited by the government, that's an SDNY case from 2004. It's on their brief at page 38.

And I don't think that they've done that here even, they haven't said well we're not going to do the actual bill of particulars but this is what the theory is, and we're articulating it to the Court, and to counsel, and now we're all on notice of what it is. It kind of keeps changing, and that's what the problem is here, and so that's why we're asking for the bill of particulars, as well.

THE COURT: How specific does the government have to be?

MS. GLASSHAUSSER: They have to specify what they believe Mr. Augustine was going to do, and what steps they believe he took.

THE COURT: Okay.

MR. HEEREN: Thank you, your Honor.

A bill of particulars as we elaborate on in our motion, a bill of particulars is not necessary when the defendant has received materials, like a complaint, fully briefed complaint, and discovery, all of the discovery, in the case that shows what the case is.

Defense counsel is essentially conceding why they want a bill of particulars is so they can flush out our trial strategy and the law is absolutely clear that that is an impermissible use of the bill of particulars.

The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established, which is the Albunio (ph.) case, that's a long Westlaw cite, that I point to on page 38 of our brief.

The defendant knows that he is charged with providing material support to a particular foreign terrorist organization, ISIS in Lybia by traveling to Lybia, as well as the surrounding facts related to his travel, and his other substantial steps that we've

discussed earlier.

Again, defense counsel's position boils down to effectively a policy argument that it's not okay that any form of support, provided the other elements are met, is sufficient, but that's the reality. We don't need to prove the particular form of support. We only need to prove that he intended to give support of any sort.

Again, the defendant may not have known what particular support he wanted to provide, so long as we can prove to a jury that his intent by going to Lybia and joining ISIS, and getting into the location of ISIS was to provide them with support, that will be sufficient.

And the reason why, I would note, the reason why the complaint and discovery is important to this analysis and why the case law always mentions that is because that does provide a road map, a fairly clear one, between the complaint and the discovery, the defendant knows and the ample briefing in this case, the defendant knows precisely what happened, as well as the form of material support that he is charged with, personnel.

If they believe that is a valid argument to say well, we didn't prove the type of support, they have seen the evidence. They have the evidence. They can prepare for trial by saying we're going to tell the jury that there's no evidence of any of that type of support.

How again, we submit that that's legally immaterial, but that's what they can do. I don't want to belabor the point. A bill of particulars is needed in complex cases like complex fraud cases, white collar cases where there's numerous transactions, where there's numerous victims, where there's a complicated scheme, conspiracies with numerous actors.

It is a single attempt charge of a single person for a discrete set of conduct that occurred over a short period of time. No bill of particulars is necessary in such a case.

THE COURT: Brief reply?

MS. GLASSHAUSSER: Just briefly, your Honor, I'm not sure -- I don't understand the government's argument that this is a policy argument. It's not a policy argument, it's a legal argument, and the government -- it's now -- I think this is even a new version of their formulation that now they don't need to prove a particular type of support. So they're moving from oh, we're going to choose prove fighting, or maybe we're going to prove potato peeling, or maybe we're going to prove submission, to we don't need to prove anything in particular.

The case law says, and I was reading it from the Second Circuit case, that the defense has rights to

notice of the charges pending with some particularity. And I know that the government has repeatedly said well, the discovery is enough here, but they've also opposed our motion to compel discovery, including just to get all of the documents related to the Tunisian prosecution.

I know that they said earlier today at the beginning of our session that we had the entire file from the Tunisians, but that doesn't seem to be accurate based on what we have, and what we don't have. We have some documents from Tunisia.

THE COURT: Let's get into that because I heard that in the beginning, too. So is there a disagreement about whether or not all the Tunisian documents have been provided?

MR. HEEREN: I mean the government will certainly double-check, but my recollection when we did this is we received through, I believe OIA forwarded it to us, the documents that we received in the mail from the Tunisians in response to our request for the materials for Mr. Augustine's case, and we turned over all of that.

I will double-check to make sure that there wasn't something pulled out but I don't recall pulling anything out.

THE COURT: All right. So you're saying that

the government made a request.

MR. HEEREN: Yes.

THE COURT: You asked for all the Tunisian documents. You received a response to the request, and you turned everything over to the best of your knowledge.

MR. HEEREN: Yes, I want to be careful about what the request said. I don't specifically recall what it said. I presume it would have asked for everything related to this case, but I don't have the language in front of me.

THE COURT: Can you clarify that?

MR. HEEREN: Sure.

MS. GLASSHAUSSER: Because that is different than -- in their motion to compel a response, they didn't say that we've tuned it all over, they said it's not discoverable, and I think that difference is important.

THE COURT: Right.

MR. HEEREN: Both are true, your Honor. Like we are providing stuff out of an abundance of caution.

THE COURT: Right. But since you're proceeding on that front, it makes sense to follow through.

MR. HEEREN: Certainly.

THE COURT: Is there anything else on the discovery motion that you wanted to mention, or does that cover everything at this point?

MS. GLASSHAUSSER: I mean, I think it mostly covers it, your Honor. It's just that I think that the parties don't -- I think the government agrees that the Tunisian documents are relevant and material to their case, and that they are material to -- discoverable materials, and I think the question is just whether we've received them all or not.

THE COURT: All right. Well, whether they agree or not, they're going to provide it. They've agreed to provide it. We can --

MS. GLASSHAUSSER: I don't think I have anything further on that, your Honor.

THE COURT: Okay, great. Anything else on that discovery? Any other discovery issues?

MR. HEEREN: I mean, I just would clarify for the record, we don't agree that it's all material and discoverable. Yeah.

THE COURT: And we don't have to reach that now.

MR. HEEREN: Yes.

MS. GLASSHAUSSER: If I may move briefly to nondelegation, your Honor.

THE COURT: Yes.

MS. GLASSHAUSSER: Okay. So I mentioned this briefly in the context of ISOL Lybia, that argument, and

the reason it came up there is because I think in that case, the government is pushing the nondelegation issue even further than what already is the problematic issue in the statute.

And it specifically, what we're talking about, about the nondelegation problem is in 2239B(g)(6), which has this definition of terrorist organization, as an organization that is designated as a terrorist organization, under the INA, and then when we look to the INA, we get into kind of this circular situation where it refers to another statute that defines terrorist organization as one that is designated as a terrorist organization by the INA.

And when you have that kind of circular reasoning, particularly in the criminal context, that's a nondelegation problem. Here we have a situation where the Secretary of State is essentially delegated this power to create criminal liability without a sufficient principle to cabin the Secretary of State's power in the creation of criminal liability.

And it's specifically with respect to this criminal liability that we're arguing it's a problem here, not that your Honor would have to find that the entire scheme of federal -- excuse me, designating of foreign terrorist organizations was unconstitutional, but

that in particular for the criminal context there has to be more than this kind of circular definition where a terrorist organization is one that's defined as a terrorist organization, and it's defined as such when the Secretary says so. That's not enough. That's all I have.

THE COURT: Okay. I know this is hard doctrine to argue since it's only been granted twice, but it's intellectually interesting.

MS. GLASSHAUSSER: And it's coming back, it seems.

MR. HEEREN: Your Honor, the issue has been decided in this case. The question really still amounts to whether the delegation of the power to designate a foreign terrorist organization can be designated by the Secretary of State.

The fact that it's in the INA, and I would say literally directed to from 2339, as opposed to in 2339 again on top of in the INA statute, it is besides the point. It's the same argument, can Congress delegate it or not, and the Courts to consider this, it concluded it can.

The only other point I would make is to avoid - and they've conceded effectively, that they're not challenging the INA delegation. So what I understand

defense counsel to be arguing is the more nuanced point that well, to the extent a delegation impacts a criminal prosecution, there must be some other burden, some other higher nondelegation analysis that must be applied.

I'm not aware of any case to say as much. And to the contrary, the one case I was able to find after our briefing says the opposite. This is US v. Bozarov, B-O-Z-A-R-O-V, 972 F2d 1037. This is out of the Ninth Circuit. This was with regard to the EAA, which is the Export regulations that provides for various -- among the provisions of it include criminal punishment for violating sanctions, and other elements of the regulations promulgated out of the EAA.

And the defendant in that case who was charged, made what I see as the identical argument. The argument as the Ninth Circuit described it was the fact that the delegation at issue here eventually leads to criminal sanctions, counsels in favor of his position, and they go into that.

According to Bozarov, the Secretary essentially has discretion to criminalize any conduct he chooses, similar to what defense counsel here argued, and it is thus possible that the executive could create purely political crimes entirely free from judicial review.

And then the Ninth Circuit goes on and says,

"However, it's well established that Congress may constitutionally provide a criminal sanction for the violation of regulations which it has empowered the president or an agency to promulgate."

Moreover, the Secretary of Commerce is not creating a crime when he exercises his authority under the EAA. Congress crated the crime when it prohibited the export of goods without a valid license, and set the penalties for that crime.

All the secretary does is decide when goods require a license. Therefore, although the regulation calls the statutory penalties into play, the statute, not the regulation, creates the offense, and imposes punishment for its violation.

Now it's obviously a different statute but I think that can be applied directly to this case. I see your Judge nodding, I don't want to belabor it.

THE COURT: Yeah.

MR. HEEREN: I think you get the point. So I don't think I have anything more on that unless the Court has any questions.

MS. GLASSHAUSSER: Just one very brief response, your Honor.

THE COURT: Sure.

MS. GLASSHAUSSER: Just so it is clear, because

I think there are two different issues in the briefing, the argument about the intelligible principle, and the lack of an intelligible principle isn't the same as the argument about judicial review. It's a separate thing. It's like Congress hasn't sufficiently defined the delegation, hasn't given enough of an intelligible principle to --

THE COURT: Right.

MS. GLASSHAUSSER: -- cabin the authority.

THE COURT: Right. Got it.

Okay, so what have we missed on the motions?

MS. GLASSHAUSSER: On the motions to dismiss, I think that's everything.

THE COURT: And discovery we've taken care of, so it's only the bail application that's left?

MS. GLASSHAUSSER: The bail application, and also we do have the affidavit we discussed at our last session from Mr. Augustine relating to the suppression motion, which we can provide to the Court or file electronically, but we have that ready today.

THE COURT: Great. Has the government seen it as well?

MR. HEEREN: No.

MS. GLASSHAUSSER: No, your Honor.

THE COURT: Okay.

MS. GLASSHAUSSER: I have only the original. Well, I can provide an unsigned copy to the government, and then I have an original signed copy with me. I haven't had a chance to just get --

THE COURT: All right.

MR. HEEREN: The unsigned copy is fine. Thank you.

MS. GLASSHAUSSER: Would you like an unsigned copy, too?

THE COURT: Yes, please.

MS. GLASSHAUSSER: And then I will scan --

THE COURT: Sure. Okay. You might as well keep it. Where do you want to proceed with the suppression issues at this point?

MR. HEEREN: So I think -- one note, and I don't think this is deliberate, but I just want to put it on the record obviously. It doesn't indicate that it's being made under penalty of perjury. I am sure by saying it's being duly sworn, deposes, that that is the intent but I want to make sure that that's on the record, that this would be done under penalty of perjury.

THE COURT: Correct?

MS. GLASSHAUSSER: Yes, your Honor, that's the standard language --

THE COURT: Yes.

MS. GLASSHAUSSER: -- we use in affidavits.

MR. HEEREN: Your Honor, the only thing we need -- so it sounds like your Honor wants to have a hearing on the issues that he's put into play, based on what we talked about last time.

THE COURT: If it's still the defendant's request, yeah. Or you wanted to have it on papers? How do you want it done?

MS. GLASSHAUSSER: Well, I believe first the government needs to respond, and indicate which facts in writing they are disputing.

THE COURT: Right.

MS. GLASSHAUSSER: And that then we would proceed to a hearing, if they are indeed disputing particular facts.

MR. HEEREN: We can do that, your Honor.

THE COURT: Yes. So are we looking at a hearing with witnesses, and testimony?

MS. GLASSHAUSSER: I think it depends what the government's response is.

THE COURT: Okay.

MS. GLASSHAUSSER: I am not sure what their dispute is precisely.

THE COURT: All right.

MR. HEEREN: I mean, I can say I think we will

-- I anticipate, well obviously giving a careful look again, but I anticipate we're going to dispute all of the allegations as it pertains to his treatment prior to his interview. There's some allegations I believe that occurred after his interview which I think as a legal matter, we'll argue are irrelevant.

But in terms of the conduct, his treatment prior to the interview, I think we're going to dispute all of it, apart from the statement he made to U.S. law enforcement about being smacked on the back of the head on one occasion.

So I don't know if that effects the calculation here, but that's what I anticipate we'll be saying.

THE COURT: And how do you see these disputes being resolved. Do you see them resolved on papers? Do you see it by live testimony? What?

MR. HEEREN: Well, I mean, I anticipate what our witnesses would say is in sum and substance, the same as what was documented in their report that was attached to our briefing, and what I just articulated, that that's the only complaint he had. There was on other harm they observed, and so forth.

So I don't know if that requires a hearing or not. Obviously, if Mr. Augustine is going to testify to

put some support behind an affidavit, we're fine with that, and we're happy to examine him on it.

THE COURT: Now does the defense want to think about that or have you thoughts at this point?

MS. GLASSHAUSSER: Well, I would ask your Honor, to order the government to respond in writing first with specifically what it is that they are disputing factually other than we just dispute all the facts, and what the basis is for that dispute.

I think that is the appropriate procedure. We have certainly met our burden now, and their original papers did not dispute any of the facts.

THE COURT: Right.

MS. GLASSHAUSSER: So I think it is their --

THE COURT: Yes, let's assume they're going to do that.

MS. GLASSHAUSSER: -- first, and then to decide from there.

THE COURT: We'll get for that. It sounds though it's going to be fairly -- I don't think there will be any surprises, and then the question is what's the next step, and do you want to then read what they have to say, and then make a suggestion to the Court?

MS. GLASSHAUSSER: Yes, your Honor.

THE COURT: Okay.

MR. HEEREN: Your Honor, just one last point, unless defense counsel has anything else. I think that's the last issue.
MS. GLASSHAUSSER: Just bail.
MR. HEEREN: Oh, I'm sorry.
MS. GLASSHAUSSER: But not before bail.
MR. HEEREN: We can deal with this after bail. It's just I wanted to just make a Speedy Trial record, which we can do at the end. I just didn't want to forget.
THE COURT: Oh, okay. So for your response, for the affidavit?
MR. HEEREN: Sorry. Oh, a date?
THE COURT: Let's set up a schedule.
MR. HEEREN: I'm sorry, your Honor.
THE COURT: A schedule.
MR. HEEREN: I mean, yeah, a week, two weeks. I don't think it needs to go long. Yeah, could have the 17th? Is that too much time?
THE COURT: That's fine. Is that a problem for the defense?
MS. GLASSHAUSSER: No, your Honor.
THE COURT: And then would the defense like to make a proposal to the Court afterwards?
MS. GLASSHAUSSER: Yes, that sounds good.

Could we have till January 27th?

THE COURT: Yes. Any objection?

MR. HEEREN: No, your Honor.

THE COURT: Okay. All right.

(Sealed portion begins at 2:38:02 p.m. and concludes at 3:18:38 p.m.)

MR. HEEREN: Once again, this is Craig Heeren for the United States.

The government just wanted to note, we haven't talked about Speedy Trial Act over the course of several hearings.

THE COURT: Right.

MR. HEEREN: The government's done a calculation of it. It's the government's assessment that we still based on both prior orders of excludable delay, the referral to your Honor, as well as the pending motions, there's several provisions of the Speedy Trial Act that apply that have still protected the time, and we calculate that there is 60 of the 70 days remaining.

There is nine days that were lost from indictment to arraignment because there was a pending complaint, and one day lost when the Court, Judge Johnson -- arguably lost, when Judge Johnson moved a court day one day.

So I don't think there's any issue, I just in

light of the parameters in the Speedy Trial Act, and since we haven't talked about in a long time, I thought it was important to just put it on record in case there is any questions about it, in case defense counsel or defendant has any views on it. They disagree with. We can make sure that we deal with it, rather than confront an issue down the line.

So I don't think there's any issue. I think the motions are still pending, and under advisement, which protects the record, but if there were any issues, I just wanted to get it out there, so that with Mr. Augustine's presence here, since there's a constitutional dimension to the Speedy Trial.

THE COURT: And you're not looking to exclude additional time at this point.

MR. HEEREN: I don't think we need to because the motion is pending. If counsel thinks we need to, I certainly would move to exclude time on the basis of the pending motions, as well as the Court. Judge Johnson designated this a complex case, which would be another basis for it, as well.

I don't think it needs to be designated, but I would defer to defense counsel if they disagree. Sorry, I don't believe this needs an excludable delay, unless defense counsel disagrees.

MS. GLASSHAUSSER: I have no position.

THE COURT: Anything further on that issue?

MR. JACOBSON: No, your Honor.

THE COURT: Okay.

MR. JACOBSON: I did want to raise, we had pending in our motion still two alternative grounds for Mr. Augustine's release, and we're not necessarily asking for a ruling from the Court today.

In particular, the law of the Circuit is that at some point, the length of the detention implicates the Eighth Amendment, and due process.

And obviously, ordinarily, pre-trial detention is not covered by the Eighth Amendment because it's administrative, and notwithstanding the Bail Reform Act, it doesn't implicate due process, but there is a sort of totality of the circumstances test in the Circuit that invovles the weight of the evidence, the length of the detention, and the extent of the prosecution's responsibility for that length of detention. This is on page 7 of our November 14th letter.

And I think we are getting to a point in this pre-trial detention where that's going to become an issue, especially with these complex motions pending, and no trial date before the district court.

The cases we cited in our footnote where courts

have upheld the detention as administrative are all far shorter than Mr. Augustine has spent detained. The majority of the cases are eight months to, I think the longest, opinion we found was for a detention -- a total detention of 30 or 31 months.

THE COURT: And what are we up to now?

MR. JACOBSON: We're up to four years now in this case. He was arrested in February of 2016, and the government, of course, is going to point out that that was a different prosecution in Tunisia --

THE COURT: Right.

MR. JACOBSON: -- but I don't think that's actually the question under the precedent. I think the question is the extent of the prosecution's responsibility for that delay.

I think the prosecution here took on that -- the burden of that delay the moment they told the Tunisians that they would take custody of Mr. Augustine. But so I think that four years is chargeable to the government. It's certainly -- even if the Court doesn't agree with that, and thinks he's only been detained for 24 months, it's still towards the higher end of the cases that we've cited. In fact, there was only -- there are only one or two cases that have come before the Circuit longer detentions than 24 months.

And I think when -- in conjunction with the third prong, which is the strength of the evidence, we've obviously briefed that and argued that extensively.

THE COURT: Right.

MR. JACOBSON: But still, the government has not pointed to a single case where the evidence was weaker than Mr. Augustine's, and I think that's extremely relevant, both to the analysis under the Bail Reform Act that we've discussed but also to the analysis, the constitutional analysis, that this Circuit has addressed. So it's an issue, I -- again, I think it's ripe for decision. I don't know that we need to decide it today, but at a certain point, I think we are nearing the point where we would argue that it does implicate his constitutional rights.

And we, of course, think that it is currently burdening those rights because it's -- four years is quite a lengthy detention for not having had any trial with process whatsoever. As we know, the Tunisian prosecution essentially involved a judge interrogating him, and telling him that he had to cooperate with the Americans. So I don't count that as a trial that would be meaningful in this analysis.

Our second grounds for release is under 3142(I), which provides authority to the Court to release

Mr. Augustine into the custody of an appropriate person. In this case, it would be his mother signing as third-party custodian, either to assist in the preparation of his own defense, or to -- for another compelling reason, and I think the due process concerns could be that compelling reason.

I think there are many compelling reasons in this case, rehabilitation of someone who was a teenager when they were arrested. So something for the Court to consider. I understand the Court also wants to see perhaps different conditions that would better satisfy the other subsections of the Bail Reform Act, and perhaps we can address this at a later date, and at the same time the suppression.

THE COURT: All right. So I hear you.

With respect to counsel's ability to meet with Mr. Augustine, that was an issue at the last hearing. Has that been resolved to everyone's satisfaction?

MR. HEEREN: I'll let defense counsel indicate whether it's been resolved. I know the government was in touch with the MDC. I believe we put in a letter to the Court advising on the issues that -- effectively the way it was explained to us is these were a fairly idiosyncratic issue that occurred --

THE COURT: Uh-hum.

MR. HEEREN: -- in terms of the timing that -- the dates that were identified specifically to us. The MDC legal counsel also provided some recommendations for how to deal with future issues, such that they can help address them at the moment.

And with regard to the separation component, it's my understanding that at least one separation order is no longer in place. I don't know -- I don't want to speculate as to other orders.

THE COURT: Uh-hum.

MR. HEEREN: So I don't know if that impacted positively, their ability to see him or not. We haven't been advised either by MDC or defense counsel that there's been any issue since then.

MR. JACOBSON: The issue now, your Honor, is that Mr. Augustine --

THE COURT: Is in the SHU.

MR. JACOBSON: -- is in protective custody, which makes it even more difficult for us to see him, and it's not the first time he's been in protective custody, as Ms. Glashausser says. He has elected to be in protective custody several times in the past.

I think also supporting our application is the fact that he's never had any compliance issues whatsoever with the rules at MDC. But we have not been able to see

him -- Ms. Glasshausser and I have not been able to see him since the last court appearance when he went into the SHU. I think Ms. Glashausser was able to see him earlier today in the pens. So that issue is better than it was the last time.

The advice given to the government by MDC legal I think was that we should arrive at MDC at 8 a.m. for legal visits, so that whoever he has a separation order with is not already in the visiting room, precluding his visit.

We can, of course, try that. The issue with that is I have in the past, waited in an empty visiting room for Mr. Augustine, and been told that he couldn't come down. So I think it's not just a matter of the people he has separation orders being in the visiting room, it can also be they're on a floor, or in the elevator, or in a space outside of his unit that they can't bring him through.

THE COURT: Are the separation orders at Mr. Augustine's request at this point?

MR. JACOBSON: Not that he knows of. He hasn't requested any.

THE COURT: Do we need them then?

MR. JACOBSON: He's -- as the Court knows, he's requested protective custody --

THE COURT: Right.

MR. JACOBSON: -- when he feels that he's a target, but he has not given names of any individuals that he wants to be separated from.

THE COURT: So who's -- where does that come from?

MR. HEEREN: I don't know that we're allowed to say for MDC security reasons.

THE COURT: Okay.

MR. HEEREN: The other point I would just make is that the other suggestion that was made is that it's my understanding from what MDC counsel told me, and I don't know if this came across in the letter clearly, is that on the days that Mr. Augustine has visiting rights, which I think is one day a week, he can visit separate and apart from counsel, with somebody who would come visit him during visiting hours, it is even more likely that he would be able to visit with legal counsel on those days, either during legal counsel time, or during social visiting time. I apologize, I don't know what it's called.

Because if it's his day, anyone else that he would be separated from, they're the ones who are frozen, as I understand it.

I'm not suggesting that he should be deprived

of social visiting hours, and that's why the government pointed out that Mr. Augustine can advise his attorneys of when he is going to have social visitors on social visit days, but to the extent he isn't having somebody visit that is one day in particular --

THE COURT: Okay.

MR. HEEREN: -- that I was aware of, according to MDC.

THE COURT: Okay. All right. If there's anything you need from the Court to make the visiting work better, let me know.

All right. Anything else?

MR. HEEREN: No, your Honor.

MS. GLASSHAUSSER: No, your Honor.

MR. HEEREN: Thank you.

(Matter Concluded)

-o0o-

**C E R T I F I C A T E**

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **22nd** day of **January**, 2020.

Linda Ferrara

Linda Ferrara

AAERT CET 656

Transcriptions Plus II, Inc.