UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X **Docket#**
UNITED STATES OF AMERICA, : 18-cr-00393-SJ-RML-1
:
:
- versus - : U.S. Courthouse
: Brooklyn, New York
:
BERNARD RAYMOND AUGUSTINE, : February 24, 2020
Defendant : 12:56 PM
-------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR PROCEEDING
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A P P E A R A N C E S:**

**For the Government:** **Richard P. Donoghue, Esq.**
United States Attorney

BY: **Michael Keilty, Esq.**
Assistant U.S. Attorney
271 Cadman Plaza East
Brooklyn, New York 11201

**For the Defendant:** **Allegra Glashausser, Esq.**
**Samuel Jacobson, Esq.**
Federal Defenders of New York
One Pierrepont Plaza
16th Floor
Brooklyn, NY 11201

**Transcription Service:** **Transcriptions Plus II, Inc.**
61 Beatrice Avenue
West Islip, New York 11795
laferrara44@gmail.com

Proceedings recorded by electronic sound-recording, transcript produced by transcription service

THE CLERK: Criminal Cause for A Status Conference, case number 18-cr-393, United States v. Bernard Augustine.

Counsel, please state your appearances.

MR. KEILTY: Good afternoon, your Honor.

Mike Keilty for the government.

THE COURT: Good afternoon.

MS. GLASHAUSSER: Good afternoon, your Honor.

Allegra Glashausser and Sam Jacobson representing Mr. Augustine, who is here with us. We are also joined by Rachel Bass, a paralegal at the Federal Defenders.

THE COURT: Good afternoon.

Okay, so we have a few issues here. We've got the government's letter with the speedy trial issues. We've got discovery issues. We've scheduled a suppression hearing, and I'd like to know whether we've scheduled enough time for it, and what it's going to look like.

MR. JACOBSON: Did we schedule one?

THE COURT: Oh, you didn't see it? We just --

(Court and clerk confer)

THE COURT: Oh, we didn't do it yet.

THE CLERK: Not yet.

THE COURT: Okay. I've held some time.

MR. KEILTY: Okay, your Honor.

THE COURT: I've mentally scheduled it. I guess you haven't read my mind yet. Okay. So --

MR. KEILTY: Your Honor, with respect to speedy trial, as your Honor is aware, this case has been designated complex, and there's also a motion pending at this time.

THE COURT: Right.

MR. KEILTY: The government filed a letter on January 24th, and we considered that, at that point, the motion to be fully briefed. Today's the thirtieth day. We assume since this is a complex set of motions, that the Court is dealing with, the Court needs more time to decide those motions, so we'd ask that time continued to be excluded until the date of a potential suppression hearing, your Honor.

MR. JACOBSON: I think we don't take a position, Judge, but I think under 3161, if your Honor sets a suppression hearing today, time would automatically continue to be excluded from that date.

THE COURT: Yes, it would automatically.

MR. JACOBSON: And we just also wanted to advise the Court we're planning on filing a short letter in connection with our motion to dismiss either later this week, or early next week. So that would be an

independent basis to continue the exclusion.

THE COURT: Okay. And I think the discovery motion has -- would have some bearing as well, on the decision on the motion to dismiss.

All right, so the application is granted --

MR. KEILTY: Thank you, your Honor.

THE COURT: -- on all those grounds.

MR. KEILTY: And then, your Honor, I mean, I'll just discuss the --

THE COURT: Yeah.

MR. KEILTY: -- defendant's request. Your Honor, at your Honor's request, we went back and we checked our production that we received, Tunisia, and we did file a letter to the Court --

THE COURT: Right.

MR. KEILTY: -- and in sum and substance, that request asked for -- it was to answer some of the defense's questions, it was while the defendant was still in custody in Tunisia. We asked for an interview with the defendant, and we asked for all documents related to the defendant -- the Tunisian investigation, and his detention in that country.

Now, we didn't wind up getting the results of that MLAT until the defendant was actually here in the U.S. So therefore, we also received some documents on

his trial over there.

So we've checked all of our holdings, and we've produced everything that's relevant to all those matters, so there's nothing further for us to produce. The defense in their letter raises some issue with some missing documents.

THE COURT: Yes.

MR. KEILTY: We don't have those documents. We never received them, so we can't possibly turn them over. We've checked, your Honor. So the government's complied with all of its discovery obligations, Brady, Giglio, and Rule 16 at this time, your Honor.

And just in terms of the actual MLAT, I mean, most courts have held that the MLAT is not -- the actual MLAT is not discoverable. It's a communication between two independent sovereigns through diplomatic channels. There's an expectation of confidentiality, and courts have held that a defendant -- it's not discoverable under Rule 16. There's some small exceptions. There's one case in the Southern District where there's a statute of limitations issue the government raised, and therefore, it had to turn it over.

But here, this defendant does not have standing to receive this diplomatic confidential communication between two independent sovereigns.

THE COURT: And what would the MLAT look like anyway? Would it be simply a short request, or would it be more detailed?

MR. KEILTY: Your Honor, the MLAT would cite certain treaty provisions, the basis for the request, and then there's a part of it which asks for the request, and we went through -- at your Honor's direction, we went through that request, and we've summarized into those two parts, there's not just those two things, but in general, they all relate to the defendant's Tunisian investigation, his detention, ultimately the trial, which we did not ask for, but we did get, and then there's some other provisions regarding confidentiality, is one of them, that this is a diplomatic cable. There's a treaty. This involves foreign relations. The State Department has some certain expectations here, so that's -- it's approximately a ten-page document, again a lot of it would be boilerplate except for the request that we we've asked of Tunisia.

THE COURT: Okay.

MR. JACOBSON: A few things, Judge, I think first -- and I think this does actually matter in terms of the Court's ability to order certain further productions, but I'm not aware that the United States has a legal assistance treaty with Tunisia, so I think

formally speaking, the request to the Tunisian government was probably a letter rogatory, and not an MLAT request.

MR. KEILTY: That's correct, your Honor. However, the substance of the letters rogatory request would be similar to an MLAT.

MR. JACOBSON: Right, I think probably the content of the request would be similar, but the difference is that courts can have more authority to actually issue letters rogatory to order the production of letters rogatory, than if it was pursuant to an MLAT. And there is case law that shows that, in fact, your Honor could, from the Court, issue a letter rogatory to Tunisia to confirm what they did and did not produce to the United States.

Our issue, and this is set forth in our response to the government's short letter is that the materials that were produced referenced a number of other exhibits and materials that we didn't receive, and it's especially surprising that the U.S. wasn't able to produce those to the defense because there were a number of members of the U.S. government present for all of those Tunisian proceedings, and as we've argued in our double jeopardy motion, played a significant role in those proceedings.

In fact, the Tunisian judge at Mr. Augustine's

trial acknowledges all of the members of the U.S. government who were present in the courtroom and, in fact, says that he's conducting the trial pursuant to a letter rogatory from the United States government.

There were at least two special agents there. There were several legal attaches from the U.S. embassy. There was an interpreter, who I believe was produced by the U.S., and other personnel, as well.

So they shouldn't need to get these documents pursuant to the letter rogatory. They should have it already because they were there, and part of the proceedings. So we continue -- we would renew our motion to compel --

THE COURT: Right, but are you saying that their presence, or mere presence at the trial would've entitled them to, or actually resulted in their receiving these documents?

MR. JACOBSON: I think it would entitle them to the documents. It's also surprising that they wouldn't have those documents because they were participating in the proceeding, and I understand that for this prosecution, the government then issued that additional letter rogatory to receive the materials, but I think the special agents on this case likely have some of those materials, or produced their own -- we have redacted 302s

from some of it, but either the agents were sitting -- numerous agents and lookouts were sitting there, observing the proceedings, and just didn't take any notes, or produced any 302s whatsoever, or there are additional materials that we don't have, and we know that there are additional materials because they're referenced in the materials that we do have.

MS. GLASHAUSSER: Well, and just to put a -- it's not just that they're referenced, the materials actually say that they're attached which state -- either that was incorrect, or there are attachments that we just haven't received because the Tunisians in responding to the U.S. say there's this list of attached materials, and that's how we know that there are missing things --

THE COURT: Right.

MS. GLASHAUSSER: -- because we haven't gotten the attachments.

THE COURT: Well, are you saying that the U.S. government has this information either in its possession to the agent's custody through the agents, or control through letters rogatory, that it could send to Tunisia?

MS. GLASHAUSSER: I think the answer is yes, your Honor. We're not sure whether, and we don't know if the agents have the attachments . It seems that they should have the attachments as the Tunisians say these

are attached, and the government just hasn't turned them over, it's with -- it's not with the particular AUSAs, it's with whoever was working on the case previously, or it's just information that is in their control because they can receive it by saying you said you attached it, we didn't get the attachment, can you please send it again.

THE COURT: Uh-hum.

MS. GLASHAUSSER: But it's in the government's control, not ours obviously.

MR. KEILTY: Your Honor, I don't know what else to say here. I mean, what they're saying is pure -- a lot of it's pure speculation. You know, you said the agents participated. First of all, they didn't participate in any trial. Did they observe some of it? Perhaps. But that does not entitle them to receive documents. So saying that they should have these documents, well we don't have them, so I don't know what else to say to that, other than that's speculation.

In terms of these missing attachments, again, your Honor, we've gone through the file, and we've turned over exactly what we have that's relevant to the investigation detention. I don't know what else to say other than we don't have them.

THE COURT: So what I am wondering then is does

the government have an obligation to request them if you don't have them? Is it somehow in your control, or is there no obligation at this point? Is your obligation only to turn over what's in the files?

MR. KEILTY: Our only obligation, your Honor, is to turn over what's in our possession and control, in the U.S. government possession and control. We can't make Tunisia provide us documents.

THE COURT: Right. But does a request to Tunisia -- what is control? I haven't had this come up in a criminal case before, but if you asked, please -- you said we asked you for these documents, you turned over the documents, they referenced attachments, the attachments weren't included. Would you please send them. Is that something that would make it within your control, at least or no?

MR. KEILTY: It's -- again, your Honor, it's just -- I mean, it's a request. So Tunisia could've completely ignored our initial request for these documents. They're under no obligation --

THE COURT: Right.

MR. KEILTY: -- to provide them to us. So I don't know.

THE COURT: Do you object to requesting them?

MR. KEILTY: Your Honor, we're happy to go back

and request. You know, this could be a six-month --

THE COURT: It could be.

MR. KEILTY: -- turnaround.

THE COURT: Yeah.

MR. KEILTY: So I don't know --

THE COURT: Is that something that the embassy officials in Tunisia could simply walk over to the Ministry of Justice and say hey, can we just copy these attachments, they -- you know, obviously meant to send them and you forgot.

MR. KEILTY: We're happy to inquire, your Honor, if that's --

THE COURT: Okay.

MR. KEILTY: -- what the Court would like.

THE COURT: Well, I just think it would be good to close this issue once and for all, and to make sure that all the information that both sides need is available.

And the same with respect to the agents, I don't know who would've been in contact with the agents or where they even are at this point, but has someone circled back to them to see whether they've got any documents?

MR. KEILTY: We have, your Honor. We had conversations with them.

THE COURT: Okay. So that loop has been closed then?

MR. KEILTY: Yes, your Honor.

THE COURT: Okay.

MR. JACOBSON: It's just a little strange that you would get a response to a letter rogatory that says here are all these things are attached, and none of them are attached, and not follow-up with the Tunisian Ministry of Justice on that.

So I think all we're asking is that they revisit that question. I don't know if -- there had been some initial discussion in this case about classified materials, and we had set a date for a SEPA hearing. The government then determined that the classified materials in their estimation were not discoverable under Rule 16.

So if some of that, if maybe some of these cables from Tunisia are classified and initially the government didn't believe they were discoverable, perhaps we should revisit that as well because some of those materials might be part of the SEPA materials that were never turned over.

MR. KEILTY: I don't believe that's the case, your Honor, but I will double-check.

THE COURT: I would really appreciate that because this discovery issue has gone on for a while, and

it's -- I'm sure it's driving both of you crazy, but if we can just get it resolved, then we can move on, and know exactly what we have.

MR. KEILTY: Your Honor, I will check the documents that the defendant has referenced in his letter, and I'll ask if something can be done in an expedited manner to receive those documents that supposedly were sent, but like I said, we don't have.

THE COURT: Right, and there's usually some liaison, or some official in the embassy that would know the answer to that, and would be able to go over and photocopy if it's available.

MR. KEILTY: Yes.

THE COURT: Okay.

MR. JACOBSON: Can I make one brief additional point, Judge?

THE COURT: I'm sorry.

MR. JACOBSON: Can I make one --

THE COURT: A brief additional point?

MR. JACOBSON: -- brief --

THE COURT: Yeah.

MR. JACOBSON: I have one more point I'd like to make, if possible on this issue --

THE COURT: Okay.

MR. JACOBSON: -- which is that we have a

partially summary of the proceedings -- of the Tunisian proceedings, and as I've mentioned earlier, the Tunisian judge says I am conducting these proceedings at the request of the United States government.

So I think relevant to both trial, and our double jeopardy motion, if the U.S. letter rogatory in fact, requested this prosecution, I think that would be discoverable, and should be turned over, and is certainly relevant to the government meetings it burden on the double jeopardy issue.

THE COURT: Is that a disputed fact of this statement, that the U.S. government requested?

MR. KEILTY: Yeah, your Honor, we did not request the trial in the letters rogatory.

THE COURT: You've read the letters rogatory.

MR. KEILTY: I have, your Honor. I mean, I will -- I read it a few weeks ago when your Honor -- when myself and Mr. Heeren read it. Obviously, that's a serious point, which I do agree would weigh heavily on their -- so, I will go back today, and I will again check but to my recollection, there's no request in there to try him, on -- for our behalf.

THE COURT: Okay. It seems that that is something that probably would've jumped out at you if --

MR. KEILTY: I would assume so, your Honor,

yes.

THE COURT: Okay. So you'll look at that and --

MR. KEILTY: I will check. So I will two things. I will check that point, and I will also speak with the Legat (ph.) in Tunisia to see about the feasibility of receiving these documents, and I can file a letter with the Court.

THE COURT: Great.

MR. KEILTY: By Monday, if that's all right?

THE COURT: Sure, Monday's fine.

MR. KEILTY: I'm advising both the Court and defense counsel about those issue.

THE COURT: Okay. So I think that takes care of the discovery issues, correct?

MR. KEILTY: Yes. For the government it does, your Honor.

THE COURT: Defense?

MS. GLASHAUSSER: Yes, your Honor.

THE COURT: Okay. All right. And we've taken care of the speedy trial issue. So I guess the next question is the suppression hearing.

MR. KEILTY: Your Honor, the government is available at the Court's -- there's two of us, so we can handle it between --

THE COURT: Okay.

MR. KEILTY: -- once of us should be available, whatever date the Court has.

THE COURT: What's the defense's position again on the suppression hearing?

MS. GLASHAUSSER: Well, I mean, our permission I think is laid out in our letter of January 27th, is that the government -- it's the government's burden to show that Mr. Augustine's statements were voluntary, and that they have not actually disputed the facts.

So our position is that a hearing is not necessary, but we don't object to your -- if the government is seeking one, or if your Honor thinks it's appropriate obviously, we're happy to proceed with one, but on the record that the government has presented, they haven't actually disputed any of the facts in a specific or material way.

THE COURT: I know that issue's out there. What's the government's position on that?

MR. KEILTY: Your Honor, I believe defense counsel in their motion and the affidavit, talks about Mr. Augustine being tortured, beaten, prior to the FBI interview, which we dispute.

THE COURT: Um-hum.

MR. KEILTY: So I believe there's an issue of

fact there.

MS. GLASHAUSSER: Just saying you dispute the fact is not a dispute. Usually it comes up in the other direction where it's the defense saying that we just dispute a fact --

THE COURT: Right.

MS. GLASHAUSSER: -- and the government says well, you have to actually make a specific, clear showing, of what it is that you're disputing, and what your version of the facts is. And the government hasn't done that. They haven't presented any alternative version of the facts. They haven't explained even why they dispute that fact, given all of the evidence that we have put in to support what Mr. Augustine has said.

So the conclusory allegation that they disputed is just not enough to meet their burden.

(Counsel confer)

MS. GLASHAUSSER: Right. And specifically, they have no affidavit with respect to what happened before the FBI met Mr. Augustine, and in fact have no affidavit at all about what the facts are that they believe to be true.

MR. KEILTY: Your Honor, we have turned over the 302 of the agents, which is their account of Mr. Augustine, his appearance, his demeanor, what happened

before the interview. They would testify to that.

MS. GLASHAUSSER: I'm sorry, they would testify about what happened before the interrogation?

MR. KEILTY: They would testify as to their conversation with Mr. Augustine, his appearance, questions that they asked him about his treatment.

MS. GLASHAUSSER: Right, so what we've presented, and what I understand the government to be disputing, is that the facts that led up to Mr. Augustine meeting with the FBI and being interrogated by the FBI.

The government hasn't put in an affidavit or anything explaining what they think happened in that time period before Mr. Augustine met with the FBI that would dispute what we're presenting.

They haven't said at all what they think happened. For example, in our papers, we explained how he had to stand up facing a wall for many, many hours in a stressed position, that he heard other people being tortured, that he saw them limping as they walked out of the room.

The government just says they dispute those things, but they haven't explained what they think happened, or why -- what their basis is to dispute it, which would normally be through an affidavit of somebody with personal knowledge about what happened prior to the

FBI meeting Mr. Augustine.

MR. KEILTY: The basis is the question that they've asked. They asked Mr. Augustine prior to beginning their interview about his treatment, and his -- the conditions of his detention prior to their interview.

THE COURT: And according to --

MR. KEILTY: He said nothing, other than they're -- we concede the slap on the back of the head prior to the interview.

MS. GLASHAUSSER: Right, so he told them that --

MR. KEILTY: But he said nothing about torture, facing a wall, anything that they raised in their affidavit.

MS. GLASHAUSSER: Right, so what the government is saying is that the FBI Asked Mr. Augustine a question, and he said I was hit in the head right before I came here, by the person that is standing in the room with me now, and then as I understand the government's argument to be, he didn't -- the fact that he didn't say anything further, while the person who had just been physically abusing him was standing there, is something that your Honor should take as an inference, that the other stuff didn't happen. They can make that argument, but that's not disputing the facts about what happened before with

somebody who has actual knowledge about what happened before.

This FBI agent was not there before, so they don't -- they haven't presented anyone -- information from anyone that was there during that time period which was, I think about 24 hours or more, where Mr. Augustine was repeatedly interrogated, and subject to these abusive conditions.

THE COURT: Do you want to add anything to this?

MR. KEILTY: I have nothing else to add, your Honor. The government is prepared to have a hearing if necessary. If the Court doesn't believe that a hearing is necessary, that's also fine. We've laid out our arguments in our papers.

THE COURT: So are both saying that you'd be happy to proceed on the affidavits that you have?

MS. GLASHAUSSER: Well, the government doesn't have an affidavit, so I'm not sure how to answer that question exactly --

THE COURT: Well, that you have --

MS. GLASHAUSSER: -- your Honor.

THE COURT: That you have.

MS. GLASHAUSSER: Our position is that the factual as it stands, the government hasn't met their

burden, and we could proceed through argument. We don't object to having a hearing, however, if the Court thinks one is necessary.

THE COURT: Who would be the witnesses if we had a hearing?

MR. KEILTY: It would be the two -- either the one or the two FBI agents, your Honor, who interviewed Mr. Augustine.

THE COURT: And they would say what you summarize --

MR. KEILTY: And what's in the affidavit.

THE COURT: -- in the affidavit.

MR. KEILTY: Correct, your Honor.

THE COURT: And that, in effect, is -- satisfies your burden of production, and then that would have to be rebutted by the defense? Is that the way you're looking at it?

MR. KEILTY: Yes, your Honor.

MS. GLASHAUSSER: Your Honor, our position is that that does not satisfy it because it does not address the issue which is the time period prior to those people meeting Mr. Augustine, and what happened. So our presentation would be that -- you know, if we were to respond to the government through testimony, would be to show what happened to Mr. Augustine in all of those hours

prior to meeting with the FBI.

MR. KEILTY: And I -- sorry.

THE COURT: The government.

MR. KEILTY: I understand their argument, your Honor, and like I said, the government is willing to proceed on its argument in its papers, but if the Court feels that a hearing -- a factual hearing is necessary, we are prepared to have a witness.

THE COURT: But you're telling me that you don't think there will be any additional facts that would come out --

MR. KEILTY: Beyond the -- beyond what's been turned over to 302, that's correct, your Honor.

MS. GLASHAUSSER: I mean, our position would be that what the government should be showing at a hearing if they wished to dispute the facts would be the Tunisian interrogators, or somebody who was there during those Tunisian interrogations, who could testify about the facts about what happened in those hours directly before Mr. Augustine met with the FBI.

THE COURT: As I'm hearing it, the government would be saying we -- these agents, either through an affidavit, or through their testimony, have demonstrated that despite questions asked of Mr. Augustine, Mr. Augustine never advised them that he had been tortured,

or anything physically intimidating had occurred, other than the slap, and then you would be rebutting that by saying we have affidavits or we have testimony to show that something else happened, and then the burden would be on the government to rebut that.

MS. GLASHAUSSER: Well, the burden is already on the government to rebut that, as we have put in the affidavits about those facts, and the government hasn't rebutted the facts that we've put in.

THE COURT: From the affidavit --

MS. GLASHAUSSER: We don't -- we're not really disputing -- I don't think there's a dispute about what the agents are going to say was said in the FBI interrogation. The dispute, as I understand the government's dispute to be -- it's about what happened prior to the FBI interrogation.

We've put in affidavits explaining that Mr. Augustine was physically abused, and the government has said we dispute that, full stop.

THE COURT: Right. Okay. All right. Well, let me read the affidavits again one more time. I'm hearing, essentially, that nothing would come out in live testimony that's different from what's in the affidavits, correct? Cross-examination isn't necessary, and the affidavits are sufficient for both sides -- to support

both side's position, at least that's what he started saying.

MS. GLASHAUSSER: Our position is that our affidavits are sufficient. Yes, I'm not sure if the --

THE COURT: And you don't have anything that you would -- that live testimony would add.

MS. GLASHAUSSER: If the government calls the Tunisian interrogators, then I think live testimony would certainly add to your Honor's consideration of the issue, or if the government calls somebody who has some knowledge about what was happening during that time period before Mr. Augustine was interrogated by the FBI, I think that would definitely inform your Honor's decision.

THE COURT: Right.

MS. GLASHAUSSER: That doesn't sound like that's who the government is planning to call.

THE COURT: Well, I don't think any of the government's agents were present during the interrogations before, and so the government's relying on statements made to the agents by Mr. Augustine, and you're rebutting that essentially.

MS. GLASHAUSSER: Well, no, your Honor, we're not rebutting the statements made to the agents. We're introducing factual evidence about what preceded that --

THE COURT: Right, to rebut.

MS. GLASHAUSSER: -- interrogation.

THE COURT: Yeah.

MS. GLASHAUSSER: The question isn't about what Mr. Augustine said, it's about what actually happened.

THE COURT: Okay. All right.

Anything else?

MR. KEILTY: The dates, your Honor, potentially if there is a hearing.

THE COURT: Oh, March 3rd is the date we were looking at, in the morning, if we need a hearing.

MR. KEILTY: Okay. Is that next week, your Honor?

THE COURT: Next week. I mean, are you planning on calling -- well, I guess I need to tell you right away, pretty much, right?

MR. KEILTY: Yeah, the only issue, your Honor, is that the agents that would potentially testify are -- one, is I believe in San Francisco, and the other is overseas right now. We can get them here as soon as possible, but we might need more than a week.

THE COURT: How much time would you like?

MR. KEILTY: The end of March would be best, your Honor.

THE COURT: Okay. And who would be the

witnesses you would call, if you had witnesses?

MR. JACOBSON: Well --

THE COURT: The short answer is we're not sure, your Honor, and it would depend on what the government intends to present.

MR. JACOBSON: I think it depends what witnesses they're calling, Judge. If they're only calling the one or two special agents, as we've said, I don't know how much that adds because they're asking the Court to make an inference that we submit shouldn't be made, which is that someone would fully disclose coercion while the person who had been coercing them is physically present, and is about to go back into that person's custody following the interview.

So I don't even know -- at that point, we're not clear which witnesses would be helpful. We've put in a affidavit for Mr. Augustine. We've put in an affidavit for Dr. Porterfield (ph.). Perhaps Dr. Porterfield could clarify some issues in her affidavit, but I think the only way this would be valuable on the facts as Mr. Glashausser has said, is if they can produce someone who was an eyewitness to this. Otherwise, they're -- they have nothing that's relevant to the suppression motion.

MR. KEILTY: Well, I wouldn't say nothing is relevant, there would be -- and again, we've laid it out

in our papers, I think what you mean is nothing further would come out that hasn't already been provided to you, and provided to the Court.

THE COURT: Okay. All right. Thanks. I'll let you know shortly.

MR. KEILTY: Thank you, your Honor.

MS. GLASHAUSSER: Do you want to set a date, your Honor, just while we're all here or --

THE COURT: Just in case. Sure. Do we have the end of March? My calendar doesn't work here.

(Counsel and clerk confer)

THE CLERK: So on Wednesday, March 25th, we have basically the entire afternoon open, the --

THE COURT: Don't I have to be in Washington, Wednesday?

THE CLERK: Oh, let me see.

THE COURT: Or is that Tuesday?

THE CLERK: I don't see that this week, on this particular week at all.

THE COURT: Anyway, how's the 26th, just in case?

THE CLERK: The 26th, we could do it like later in the afternoon. There's something ending at 3:15, and then nothing else on the rest of the day. The 27th, is not a good day.

THE COURT: What about the following week?

THE CLERK: The 30th, there's -- Monday, is a juror return date.

THE COURT: Well, if we have a hearing that day, I think that would be fine. So Monday, the 30th?

MR. JACOBSON: It doesn't really work for me, but I --

THE COURT: We can find another day.

MR. JACOBSON: If -- we'd prefer not to push it to April, so if there's not another day earlier in March, I can try to move my appearances from March 30th.

THE CLERK: The 31st, there's an open spot like starting at 12:30 and ending at 2, but I don't know if that's enough time, it's a half-day otherwise.

THE COURT: All right. Let me see if I have to be in Washington the 26th. If I don't, that's probably good. Otherwise, the 30th. Okay.

MR. KEILTY: Thank you, your Honor.

MR. JACOBSON: Thanks.

MS. GLASHAUSSER: Thank you, your Honor.

MR. JACOBSON: Your Honor, I'm sorry, if we can sorry, brief --

(Off the record)

MR. JACOBSON: -- can be resolved on the papers, but the double jeopardy issue in particular is

fact-intensive, we have put in a number of documents that I think clearly make out a prima facie case that these were not separate prosecutions.

So our position like with suppression is now it's the government's burden to prove that they were in fact, separate sovereigns, and if the government feels that a hearing is necessary for them to make their case, or the Court feels it's necessary, I think some of those same government witnesses might be important to a hearing, as well.

There were also -- and I don't know if the government intends to put in affidavits from them, but there two prior AUSAs on this case who were involved in the Tunisian end of the investigation, who were no longer on the case, I think the government could -- and I -- we just don't know, because they haven't responded to, and we're going to put in another letter, hopefully in the next week or so, but we were hoping for some resolution on whether the Court feels that a hearing is necessary since the prima facie case has been made.

MR. KEILTY: We don't think a hearing is necessary, your Honor, but we can respond to them -- to their letter, if the Court would like, next week if they raise that issue.

MR. JACOBSON: I think it's sort of the same

issue of suppression, where we put in a lot of documents based on the discovery, we've made our factual case, and the government responds not with anything in the record, but just by saying well, they were separate prosecutions, and I think under the case law, that's just not sufficient.

So we do feel that the Court can decide in our favor on the papers, but if the Court wants to hear more, and wants testimony on the involvement of the special agents, and the AUSAs in Tunisia, we're happy to do so, but we would ask for at least some heads up about witnesses in advance of the hearing, and whether the hearing -- the Court intends to hold the hearing on the same day.

MR. KEILTY: This is the first we're ever hearing of this, your Honor, so I -- if the Court needs a hearing on it, this factual issue, if the Court needs to address, we're happy to do that obviously, but we don't believe a hearing is necessary.

THE COURT: I think as we dig into the motion, I'll have a better idea. Are you thinking that the AUSAs would be testifying, or you would be calling them as to what --

MR. JACOBSON: Well, I would --

THE COURT: -- their role was?

MR. JACOBSON: I think the government could call them, if -- to meet their burden. I think -- I guess our position is we've made the prima facie case, the government now is -- the burden now squarely falls on the government, and they haven't put in any affidavits or testimony to meet that burden.

THE COURT: What if the Court were to think that the government had met its prima facie case, would you be presenting evidence then?

MR. JACOBSON: Well, the prima facie case is ours to be made. Once that case has been made, the government then, I believe by a preponderance, although it's not clear in the case law, then it is certainly the government's burden to show that there was no aspect of control, and entanglement, and there was not tanglement, that would be sufficient to trigger the separate sovereigns doctrine. And they haven't put in anything in that regard.

And as I said earlier today, I think all of the discovery points to quite substantial entanglement, and substantial control, when you have the judge, the Tunisian judge starting the hearing by saying we're doing this at the request of the United States, even absent all of the other materials that we've put in in connection with that issue, I think that establishes the prima facie

case right there, and it's now on the government to meet their burden, which I raise -- I know your Honor is still considering the motion, I'm only raising that because if there ends up being a factual dispute on that issue, too it might make sense to have both hearings on one day, but we don't know if the government disputes our facts because they haven't said.

THE COURT: Okay. You know, we don't -- okay. You submit your letter, and we'll take a look at it.

MR. JACOBSON: Thank you, Judge.

MR. KEILTY: Thank you, your Honor.

THE COURT: Thanks.

(Matter Concluded)

-o0o-

## C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **21st** day of **August**, 2020.

Linda Ferrara

Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.