**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/MTK
F.#2016R00308

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 6, 2020

By ECF and Email

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Bernard Raymond Augustine
Docket No. 18-CR-393 (SJ) (RML)

Dear Judge Johnson:

The government writes in opposition to the defendant's renewed motion for pretrial release. (See Motion for Bond (ECF No. 92)) (the "Motion"). This is the defendant's third motion seeking release from custody after he was initially detained upon his return to the United States in February 2018. His prior motions, in October 2018 and November 2019, were both denied by Magistrate Judge Levy. The defendant, an avowed supporter of ISIS, remains both a flight risk and danger to the community, and his claim that continued pre-trial detention is unconstitutional is without merit. The government respectfully requests that the Court deny the defendant's motion for release.[1]

I. Background

The defendant is charged with attempting to provide material support to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B, after traveling to North Africa to join the Islamic State of Iraq and al-Sham ("ISIS") in Libya. The defendant's goal was to provide himself as personnel for ISIS' terrorist cause. Specifically, the defendant stated that he wanted to join ISIS in order to "seek the ultimate justice," to fight for a caliphate that required the "spilling of blood," and to ultimately die a martyr. Before traveling to join ISIS, the

[1] The government has previously addressed at length why the defendant presents a danger to the community and a risk of flight in its prior briefs opposing the defendant's motions for pretrial release, and the government incorporates those arguments by reference. (See Resp. in Opp. to Mot. for Bond, ECF Nos. 46, 53, 55, 56).

defendant watched propaganda videos, including a video showing the beheading of 20 people in Libya by ISIS members and videos by individuals who instructed ISIS supporters to conduct acts of violence in United States. The defendant also conducted searches that included "how to safely join isis [sic]," searched for firearms, and visited a gun retail website only a few months before he traveled. The defendant was arrested after traveling to Tunisia, en route to Libya to join ISIS.

After serving a sentence in Tunisia for violating that country's laws against terrorism, the defendant was returned to the United States where he was arrested on the pending charges. The defendant was ordered detained by Magistrate Judge Scanlon when he was first arraigned in February 2018. The defendant moved for reconsideration of this order in October 2018; Magistrate Judge Levy denied the motion and continued his detention. Notably, Judge Levy found that the government met its burden as to both the risk of flight and danger to the community, and that "the government's arguments do show that there was . . . at the last time that we really understood what this defendant's intentions are, a serious risk of flight and a danger to the community at that time." (See Hrg. Tr. at 33:25-34:4, dated Oct. 30, 2018 (ECF No. 38)). On November 14, 2019, the defendant again moved for pretrial release. (See Mot. for Bond (ECF No. 42)). After conducting multiple evidentiary hearings, Judge Levy again denied the defendant's renewed bail motion on January 3, 2020. (See Minute Entry, ECF No. 59).

The defendant now makes a third motion for pretrial release. In addition to again claiming that he should be released under the Bail Reform Act, the defendant also claims that he should be released because he is unable to access counsel, his conditions of confinement are improper, and the length of detention is unconstitutionally excessive. For the reasons set forth below, these arguments fail.

## II. The Defendant Remains Both a Danger to the Community and a Risk of Flight

Federal law requires that a defendant must be detained pending trial if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Courts consider several factors in this determination: (i) the nature and circumstances of the offense charged, including specifically whether the offense is a federal crime of terrorism; (ii) the weight of the evidence against the defendant; (iii) the history and characteristics of the defendant, including family ties, employment, community ties, and past conduct; and (iv) the nature and seriousness of the danger to the community or to an individual. See 18 U.S.C. § 3142(g). For certain offenses, including the offense charged in this case, the law presumes that there is no set of conditions that will reasonably assure the defendant's appearance or the safety of the community. 18 U.S.C. § 3142(e)(3). This presumption may be rebutted by the defendant, provided the defendant is able to present evidence that he is neither a danger nor a risk of flight. See United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

The danger to the community presented by the defendant is demonstrated by the fact that he attempted to join ISIS, a violent terrorist organization that has claimed responsibility for murderous attacks in the United States and around the world. The charged offense is specifically enumerated as a criterion in the detention analysis. See 18 U.S.C. § 3142(g)(1) (court

shall take into account the fact that the charged offense is "a Federal crime of terrorism"). The weight of the evidence of the defendant's guilt is overwhelming. The evidence shows, among other things, that the defendant explicitly searched for "how to join ISIS," told people he wanted to be a martyr, watched beheading videos and other propaganda that made ISIS' pernicious conduct unambiguously clear, and proselytized about the "battle" he saw between "Islam and the world." He then bought a one-way ticket to Tunisia, which immediately borders what was at that time the ISIS stronghold of Libya, sent messages telling his family that he was going to fight for the "ultimate justice," and directed his family to avoid contacting him until he reached Libya so that he could avoid being tracked and captured. Only the defendant's capture by Tunisian authorities prevented the defendant from completing his journey to join ISIS in Libya, and carrying out his plan to fight, participate in acts like the beheadings of Libyans he watched before he traveled, and become a martyr.

The defendant is also an unstable person, whom family members described as angry and requiring mental health treatment. The defendant embraced an extreme, violent ideology, and made numerous statements confirming his desire to fight and die for ISIS's jihadist cause. The defendant spent his time before custody watching ISIS propaganda videos, including sermons by individuals who advocated for committing terrorist attacks in the United States. The defendant also searched for firearms, ways to purchase guns, and shooting ranges. In online posts, he told people that, if they did not live under sharia law, they deserved to die. The defendant's release creates a grave risk to the community. ISIS supporters have repeatedly used household items and ordinary vehicles with intended deadly effect, and the defendant would have the same ability if released. See, e.g., United States v. Saleh, No. 15-CR-393 (E.D.N.Y.) (defendant convicted of attempting to join ISIS and attempting to kill law enforcement officer by lunging at him with a kitchen knife in Staten Island residence); United States v. Saipov, No. 17-CR-722 (S.D.N.Y.) (defendant charged with murder in aid of racketeering and other offenses for murdering eight victims by running them over with a rental truck).

The defendant should also remain detained because he constitutes a flight risk. The conduct at issue here involves foreign travel, and reflects a demonstrated ability by the defendant to leave the country if he desires. The defendant has shown that ties that ordinarily bind a person and make flight less likely, such as family in the United States, would not deter him from fleeing in this case. The defendant stated that he wanted to "burn his passport" once he got to the Islamic State, and that he would be happy to die a martyr for their cause rather than return to his family in the United States. Additionally, he has traveled abroad on multiple occasions, and has family connections in a foreign country. The defendant's decision to travel on a one-way ticket using a near-expired passport to join a terrorist organization clearly demonstrates that he is willing to leave the United States without any intent to return.

## III. The Defendant's Purported Lack of Access to Counsel Is Not a Basis for Release

The defendant now claims that, even if he does not meet the requirements of the Bail Reform Act, he should be released because he purportedly lacks access to counsel as a result of prison conditions. (See Motion at 2). A prison regulation violates a defendant's Sixth Amendment right to counsel only where the regulation has "unreasonably burdened the inmate's

opportunity to consult with his attorney and to prepare his defense." Benjamin v. Fraser, 264 F.3d 175, 187 (2d Cir. 2001) (internal citation and quotation marks omitted). Specifically, to prove a Sixth Amendment violation, the defendant must show conditions that "'unjustifiably obstruct the availability of professional representation or other aspects of the right of access to the courts . . . in light of the central objective of prison administration, safeguarding of institutional security.'" United States v. Ellison, No. 18-CR-834-9 (PAE), 2020 WL 1989301, at *1 (S.D.N.Y. Apr. 27, 2020) (quoting Benjamin, 264 F.3d at 187) (ellipses in original).

First, the claim that defendant lacks access to counsel is not true. Although they identify periodic technical issues with telephone calls, defense counsel concede that they have been permitted both telephonic meetings and in-person visits with the defendant. (See Motion at 2). Thus, the defendant has not been denied access to counsel. Furthermore, the limitations placed on visitation and movement at the Metropolitan Detention Center in Brooklyn ("MDC") (like other Bureau of Prisons ("BOP") facilities) was reasonably done to mitigate the risk of exposure to COVID-19. Putting aside that legal visits are no longer suspended, the MDC has been implementing additional procedures to ensure attorney access to inmates by telephone and videoconference during this crisis, including additional times for attorney calls and additional dedicated telephones for these calls.

Second, any limitations on access to counsel imposed as a result of the pandemic are not a basis for release. This same argument has been repeatedly considered and rejected by courts in this Circuit during the COVID-19 pandemic. In one recent decision, Judge Garaufis found that "every pandemic-era decision of which the court is aware has found that temporary restrictions on attorney visits and legal calls is reasonable in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large," and held that "[t]he temporary suspension of legal visits at the MDC is a reasonable restriction on [the defendant's] Sixth Amendment right to counsel in light of the COVID-19 pandemic." United States v. Shipp, No. 19-CR-29 (NGG), 2020 WL 3642856 at *4 (E.D.N.Y. July 6, 2020) (internal citations and quotations omitted) (collecting cases). The Court's conclusion in Shipp is even more compelling now, since the suspension of legal visits has been lifted. See also, e.g., Ellison, 2020 WL 1989301, at *1-2 (holding that defendant failed to demonstrate a Sixth Amendment violation under Benjamin v. Fraser on the basis of BOP restrictions put in place to limit the spread of COVID-19, and citing cases); United States v. Landji, No. 18-CR-601 (PGG), 2020 WL 1674070, at *6 (S.D.N.Y. Apr. 5, 2020) (rejecting claim of violation of defendant's Sixth Amendment rights and declining to find that "BOP's decision to suspend all legal visits for 30 days is unreasonable in light of the global pandemic and the threat it poses to inmates, residents of New York City, and the nation at large"). The defendant's Sixth Amendment claim is without merit.[2]

[2] The cases cited by the defendant are not to the contrary. In United States v. Hossain, the defendant claimed multiple bases for release, including the inability to access and review discovery materials (a concern not present in this case), and the Court's order does not indicate the basis for release. See Order, 19-CR-606 (SHS) (S.D.N.Y. July 13, 2020) (ECF No. 37). United States v. Carrillo-Villa involved a situation where the defendant had only one communication with defense counsel since his arrest that March, the issue arose near the height of the pandemic when legal visits were suspended, the defendant was charged in a single-count drug conspiracy that involved

IV. The Defendant's Conditions of Confinement Do Not Warrant Release

The defendant also argues that his conditions of confinement—specifically factors associated with the COVID-19 pandemic and [redacted][3]—warrant his release. (Motion at 3-6). The defendant's argument related to COVID-19 is not that he suffers from any unique medical conditions that make him more susceptible to the illness, but that the general prison conditions caused by COVID-19 are so oppressive that he must be released. (See id. at 4). The defendant provides no legal support to justify release on this basis. Nor could he. If the fact of prison conditions resulting from the COVID-19 pandemic was a basis for release, then all defendants at the MDC would be released. As Judge Donnelly recently explained in denying bail to a defendant charged with a terrorism offense: "[t]he fact of the pandemic does not establish an 'exceptional reason' requiring the defendant's release." Order, United States v. Ahmed, No. 17-CR-378 (AMD) (E.D.N.Y.) (ECF No. 37). Indeed, numerous courts have held that defendants, including those facing terrorism charges, should remain detained during the pandemic. See id. (denying bail to defendant who pled guilty to one count of attempting to provide material support to ISIS who sought release based on pandemic); see also, e.g., United States v. Redzepagic, No. 17-CR-228 (DRH) (E.D.N.Y.) (ECF No. 119) (defendant charged with attempting to provide material support to ISIS and al-Nusrah Front denied bail in part because his underlying medical condition did not merit release); United States v. Khusanov, 17-CR-475 (WFK) (E.D.N.Y.) (ECF No. 102) (defendant charged with conspiring to and attempting to provide material support to ISIS and al-Nusrah Front denied release because, among other reasons, the charged conduct "weighs heavily in favor of Defendant's detention," the evidence against the defendant was strong, and the COVID-19 outbreak was not a sufficiently compelling countervailing reason for release).

[redacted]

---

a relatively small quantity of narcotics and the defendant was only alleged to be a lower-level participant in the conspiracy. See Complaint and Order, 20-MJ-3073 (S.D.N.Y.) (ECF Nos. 1 and 20).

[3] The defendant has publicly filed a version of the Motion that redacts portions relating to [redacted]. The defendant does not make any request to seal these portions of the Motion, nor provide a legal basis for why such information should be kept under seal. Out of an abundance of caution, the government likewise has redacted the portions of this letter related to [redacted]. However, the government does not object to filing an unredacted copy of this letter if ordered to do so by the Court.

[4] [redacted]

[redacted]

V. The Defendant's Period of Detention Is Not Excessive

The defendant also argues that he should be released because his period of incarceration has been excessive. (Motion at 6-9). "Pretrial detention satisfies due process only if its purpose is regulatory rather than punitive." United States v. Briggs, 697 F.3d 98, 101 (2d Cir. 2012). "Permissible regulatory purposes include preventing danger to the community and ensuring a defendant's presence at trial." Id. (internal brackets, citations, and quotation marks omitted); see also 18 U.S.C. § 3142. The Second Circuit has "consistently held that due process places no bright-line limit on the length of pretrial detention." Briggs, 697 F.3d at 101. Rather, where a defendant claims that the length of his pretrial detention violates due process, the Second Circuit considers the following factors: (1) "the strength of the evidence justifying detention," (2) "the government's responsibility for the delay in proceeding to trial," and (3) "the length of the detention itself." Id. All three factors support the defendant's continued detention.

First, as discussed above and in the government's other filings opposing the defendant's prior requests for pretrial release, the evidence supporting detention is strong. There is substantial documentary evidence, and no real dispute from the defendant himself, that he researched how to "join" ISIS, watched ISIS propaganda material such as beheading videos, encouraged family members to support ISIS, and then traveled on a one-way flight with the intent to provide himself as personnel to ISIS' terrorist cause. The evidence shows that the defendant presents a grave danger to the community and real risk to flee the country.

Second, contrary to the defendant's absurd claims, the delay in the case is not the fault of the government. The defendant alleges that he has been incarcerated for four-and-a-half years—but that improperly counts the two-year prison term the defendant served in Tunisia after he was convicted of crimes in that country. As to this case, which began in February 2018, counsel for the defendant has repeatedly requested and agreed to multiple adjournments and exclusion of time under the Speedy Trial Act. Following his arraignment on a complaint, the defendant and defense counsel agreed to exclude time and postpone indictment for five months while the parties attempted to negotiate a resolution of the case. See Orders to Continue (ECF Nos. 12 and 14). Even after the defendant was indicted, defendant and defense counsel requested and agreed to multiple adjournments without setting a trial date. Indeed, the government advised that it was prepared to proceed to trial at a status conference in April 2019—nearly a year-and-a-half ago—

[redacted]

but defense counsel demurred and requested "additional time for motions and investigation." See Minute Entry, April 10, 2019. The defendant was given till July 12, 2019 to file motions, but then requested an additional two-month extension. See Letters requesting extension of time (ECF Nos. 30 and 44). Finally, in addition to the motions filed in September 2019, defense counsel filed several more motions in November 2019. These motions—which included motions to dismiss on several grounds, a motion to suppress, a motion to compel discovery and a motion for a bill of particulars (as well as the previously discussed bail motion)— required hearings and deliberation by Magistrate Judge Levy. In other words, much of the delay in this case is due to the defendant's decision to aggressively litigate numerous legal issues. Such a litigation strategy is not improper, but the delay such conduct causes cannot then be laid at the feet of the government. Finally, the past several months of delay is due to the national emergency caused by the COVID-19 pandemic, which compelled Chief Judge Mauskopf to continue all jury trials in this district until this past month. While unfortunate, this delay is likewise not the fault of the government. The government plans to respectfully request, at the parties' status conference on Wednesday, that the Court set a trial date, as the government continues to be ready to proceed to trial as it reported to the Court back in April 2019.

Lastly, the defendant's period of incarceration is not unreasonable given the defendant's terrorism offense and the unique circumstances of the past year. Periods of detention similar to the length of the defendant's detention have been found to be constitutional. See, e.g., Briggs, 697 F.3d at 104 (holding that pretrial detention of 26 months did not violate due process); United States v. El-Gabrowny, 35 F.3d 63 (2d Cir. 1994) (holding that pretrial detention of 27 months did not violate due process). In a markedly similar case in this district, United States v. Redzepagic, the court denied bail for a defendant charged with attempting to provide material support to a foreign terrorist organization, who had been detained for approximately two years because, inter alia, the evidence against the defendant was "strong" and counsel would still have ample time to prepare given that a trial date had not yet been set. See No. 17-CR-228 (DRH) (E.D.N.Y.) (ECF No. 119).

Here, the defendant's case is reasonably complex, as it involves conduct occurring both in the U.S. and in a foreign country as well as significant electronic evidence. If convicted, the defendant will be subject to the terrorism enhancement under the United States Sentencing Guidelines, and will therefore be expected to face a recommended sentence of twenty years, the statutory maximum for his crime. The defendant's period of pretrial detention is therefore not close to exceeding his anticipated period of incarceration if convicted. And as discussed above, the delay leading to this period of detention is attributable to the defendant's litigation strategy and a unique national emergency, rather than any acts of the government. Similar to the factors that led the Second Circuit to conclude the detention in El-Gabrowny was not excessive, "[t]he charges levied against [the defendant] by grand jury indictment are extraordinarily serious and indicate a grand jury finding of a high degree of dangerousness." Id. at 65. Additionally, "[i]f convicted of the crimes of which he is accused, the defendant will face a probable very lengthy term of imprisonment. This prospect gives him a great incentive to flee, and his possession of forged passports indicates inclination to contemplate flight." Id. Likewise, the defendant's pretrial detention here is appropriate and should continue.

VI. Conclusion

For the foregoing reasons, the government respectfully requests that the Court deny the defendant's motion for pretrial release.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/ Craig R. Heeren
Craig R. Heeren
Michael T. Keilty
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (by ECF)