**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

DMP:CRH/MTK
F.#2016R00308

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 9, 2020

By ECF

The Honorable Sterling Johnson, Jr.
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Bernard Raymond Augustine
Docket No. 18-CR-393 (SJ) (RML)

Dear Judge Johnson:

The government writes in response to the defendant's objection to the Report and Recommendation issued by United States Magistrate Judge Robert M. Levy. See Report and Recommendation (ECF No. 83) (also identified herein as the "R & R"); Objection to Report and Recommendation (ECF No. 86) (the "Objection"). The government respectfully requests that the Court reject the defendant's Objection, and fully adopt Judge Levy's detailed and well-reasoned Report and Recommendation.[1]

I. Background[2]

A. The Islamic State of Iraq and Al-Sham (ISIS)

ISIS is a designated foreign terrorist organization that, since 2013, has claimed credit for numerous terrorist activities, including seizing Mosul, a city in northern Iraq, and

---

[1] The government apologizes for the brief delay in filing the attached response. As counsel for the government stated at the status conference in this matter on October 7, 2020, the government believed that the response was due on October 14, 2020, based on a misreading of the Court's scheduling order.

[2] A more detailed summary of relevant facts can be found in the government's Memorandum of Law in Opposition to the Defendant's Pretrial Motions (see ECF No. 37 at 2-10 (the "Opposition Brief")), as well as in Judge Levy's Report & Recommendation (R & R at 2-5).

launching rocket attacks on eastern Lebanon in March 2014. ISIS supporters have claimed responsibility for several violent attacks in the United States, Europe and South Asia. These terrorist activities are part of ISIS's broader goal of forming an Islamic state or "caliphate" in Iraq, Syria, and beyond.

Among other places around the world, ISIS has had a presence in Libya. As the government expects to prove at trial, in or about February 2015, following a civil war that left the country unstable, members of ISIS entered the port city of Derna, Libya, and subsequently attacked and took control of Sirte, Libya. In or about August 2015, residents of Sirte took up arms and attempted to expel ISIS from the city. The attempt failed, and ISIS forces largely maintained control of Sirte until late 2016. ISIS has sought to, among other things, use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its residents. Moreover, numerous foreign fighters seeking to join ISIS traveled to Libya and settled specifically in Sirte. In particular, these foreign fighters traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which existed primarily in Iraq and Syria, but which ISIS expanded to places in Libya and throughout the Middle East and Africa. Indeed, once it became more difficult for foreign fighters to join ISIS in Iraq and Syria because, among other reasons, other countries began restricting common travel routes to Syria, Libya became a frequent destination for foreign fighters seeking to join ISIS. One common method foreign fighters tried to join ISIS in Libya was by entering Libya through the neighboring country of Tunisia.

B. <u>The Defendant's Conversion to ISIS Supporter and Attempt to Provide Himself as Personnel to ISIS</u>

The defendant, a U.S. citizen and California resident, expressed an interest in ISIS in 2015 and 2016, before he traveled to Tunisia, including searching online for how he could support the terrorist organization. The defendant sent his mother various ISIS videos that extolled the virtues of living in the Islamic State, and sent text messages that expressed his desire to travel to the Islamic State. For example, the defendant sent his mother the following message eight days before he traveled to Tunisia:

> If I ever get lucky enough to live in khilafah,[3] I'll burn my own passport lol. There's a lot you don't know about the justice of the sharia.[4] If Mabey you understood it you wouldn't want to live here either. [sic]

The defendant actively searched the Internet for information on ISIS, how to join ISIS, radical jihadist propaganda, and firearms. He conducted Internet searches for, among others, (1) "Jihadi John," a British ISIS spokesperson who appeared in numerous graphically-violent Internet videos ordering the murder of captives and personally participating in executions, (2) Abu Musab al Zarqawi, a former senior al-Qaeda leader in Iraq, (3) Abu Bakr al-Baghdadi, the current leader of ISIS, and (4) Ayman al Zawahiri, the current leader of al-Qaeda. On December 15,

---

[3] ISIS commonly uses the term "khilafa" or "caliphate" to refer to their purported Islamic state, or caliphate.

[4] Sharia is a system of Islamic religious law.

2015, the defendant conducted an Internet search for "how to safely join isis." After conducting the search, the defendant clicked on one of the search results, which was an Internet page titled "How does a Westerner join ISIS? Is there a recruitment or application process?" The defendant also posted numerous messages on social media platforms that were graphically supportive of violent jihad and ISIS.

On February 18, 2016, the defendant traveled via an international flight from San Francisco, California to Tunis, Tunisia (via Istanbul, Turkey). The defendant's one-way ticket was purchased the day before he traveled, on February 17, 2016. When the defendant arrived at the San Francisco airport on February 18, 2016, he was required by the airline to purchase a return ticket to the United States; records indicate that he purchased the cheapest available return ticket. Prior to departing the United States, the defendant told a United States Customs and Border Protection ("CBP") officer that he was planning to travel to Tunisia for vacation.

Shortly after arriving in Tunisia on February 20, 2016, the defendant contacted his family via a social media platform and stated that he was "in north africa bodering the mediterrainarian [sic]." The defendant then blocked his family members from his social media account. Additionally, on February 21, 2016, the day after arriving in Tunisia, the defendant emailed his mother the following:

> My purpose in life is to seek the ultimate justice. I see a lot of very wrong and truly evil things happening in this world, things you dont know about, im not mad or mentally ill. I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me. There is two reasons why this is the best path in life for me. 1. When I die, if God accept me. We will all live in paradise forever. 2. If I pass on before you, you and [name redacted] and [name redacted] will learn to see the injustice and because of you being able to see it you will be able to defend yourselves against it. I'm doing this so you [name redacted] and [name redacted] will learn how to protect yourselves from the manipulation of the masters of evil and their lies. … The good people in this world bring balance and push back against evil. And give their lives freely in the process. Today in this day and age I believe this is the right path.

As part of their investigation, the FBI also interviewed the defendant's mother. The defendant's mother stated, in sum and substance, that she did not know that the defendant had purchased a ticket to travel to Tunisia and that he had not previously shown any interest in traveling there. Among other things, the defendant's mother stated that there was no legitimate reason for the defendant to travel to Tunisia. On February 22, 2016, the defendant was detained by Tunisian law enforcement in Monastir, Tunisia on the suspicion that he was attempting to travel to Libya to join ISIS.

C. The Defendant's Detention in Tunisia and Return to the United States

On February 22, 2016, the United States Embassy in Tunis was notified of the defendant's detention, and that he was the subject of a Tunisian criminal investigation. On February 23, 2016, two FBI Assistant Legal Attaches conducted an un-Mirandized interview of the defendant at the Tunisian National Guard headquarters in Tunis, Tunisia.[5] During the interview, the defendant admitted that he was traveling in Tunisia on his way to the Islamic State. The defendant stated that his initial desire was to travel to the Islamic State in Raqqa, Syria, but due to issues with his passport, he instead attempted to travel to the Barqa Province of the Islamic State in Libya. After arriving in Tunisia, the defendant attempted to locate someone who could assist in his travel to Libya. After this attempt was unsuccessful, the defendant decided to travel on foot to Libya, with his stated goal of reaching the Islamic State-held city of Sirte. The defendant stated that he was aware that the Islamic State required compulsory military service and that he may have to fight for the Islamic State. The defendant also stated that he knew that the Islamic State was responsible for multiple terrorist attacks in the world, including in Tunisia. The defendant also informed the agents, in substance and part, that he was only traveling to Libya to see if he liked the Islamic State, and that he would leave Sirte if he did not like the Islamic State. The defendant stated that he had not broken any laws and wished to continue his travel to Libya.

The defendant was charged in Tunisia with violations of Tunisian law: (a) entering Tunisia with the intent to travel to Libya to join a terrorist organization, and (b) intent to join, participate in training, and provide support to a terrorist organization. In November 2016, the defendant was convicted of these charges and sentenced to two years' imprisonment.

On December 9, 2016, the defendant was charged in the Eastern District of New York by complaint with attempting to provide material support and resources to a foreign terrorist organization, in violation of Title 18, United States Code, Section 2339B(a)(1). On February 27, 2018, following his release from Tunisian custody, the defendant was arrested by FBI agents in Tunisia and transported back to the United States. On July 30, 2018, a grand jury sitting in the Eastern District of New York charged the defendant with one count of attempting to provide material support and resources to a foreign terrorist organization, in violation of the same statute.

D. The Report & Recommendation

Between July and November 2019, the defendant moved to dismiss the indictment on six grounds, for a Bill of Particulars, and to compel discovery. In a thorough and well-reasoned 29-page decision, Judge Levy denied each of the defendant's motions.

---

[5] The defendant has filed a motion to suppress these statements. The government opposes that motion on the basis that these statements were voluntary, and may be used to cross-examine the defendant or as rebuttal evidence. See Opposition Brief at 30-37. A decision by Magistrate Judge Levy is pending a suppression hearing, which is expected to be scheduled approximately a month prior to the trial date.

## II. Legal Standard

Pursuant to Title 18, United States Code, Section 636(b)(1) and Rule 59(b) of the Federal Rules of Criminal Procedure, a judge may designate a magistrate judge to conduct hearings and submit proposed findings of fact and recommendations for the disposition of those motions. If a party objects to such findings, the district judge shall make a de novo determination of "those portions of the report or specified findings or recommendations to which objection is made." Id. Portions of the Report that are not objected to are waived. Here, the defendant objects to the entirety of the Report and Recommendation. See Objection at 2.

## III. Argument

Magistrate Judge Levy recommended the denial of each of the defendant's claims based on a careful review of legal precedent and a thorough discussion of the facts of this case, all of which revealed that the defendant's claims are without merit. The defendant does not identify any new material facts or law that Judge Levy failed to consider, and instead simply asks this Court to review the same facts and law and reach the opposite conclusion. However, for the reasons that follow, Judge Levy's proposed findings and recommendation is well-supported and should be adopted by this Court. The defendant purports to object to the entirety of the Report and Recommendation, but addresses only several particular issues in his Objection. The government responds below to those specific arguments, and respectfully refers the Court to its Opposition Brief for a more expansive explanation for why, as Judge Levy concluded, the defendant's motions should be denied.

### A. Judge Levy Correctly Recommended Denying the Defendant's Motion to Dismiss the Indictment

#### 1. The Indictment Properly Charges the Defendant with Attempting to Provide Material Support to ISIS

The defendant argues that he cannot be guilty of attempting to support ISIS when he traveled to Libya in 2016, because the U.S. government later designated an additional foreign terrorist organization, ISIL-Libya, after he was arrested. Objection at 3. Judge Levy correctly rejected this illogical claim. Just because there is a designation of an additional foreign terrorist organization primarily located in Libya does not mean that a different organization (the core "ISIS" organization) did not have a presence in the country prior to the designation. The defendant claims, without a shred of evidence, that "[t]here was no other terrorist group designated in Libya at the time." Setting aside that the defendant could still be guilty of attempting to support ISIS even if he was mistaken in his belief that ISIS was located in Libya, the defendant's claim is simply untrue: the government provided ample evidence that ISIS was in fact in Libya at and around the time that Augustine tried to enter that country. See Opposition Brief at 16-18; R & R at 13 (noting the government's proffer of proof that ISIS conducted operations in Libya).

As Judge Levy cogently explained in the Report and Recommendation, the defendant's argument is "unpersuasive," "untenable," and would lead to absurd results contrary to the law:

> Even if it were the case, as defendant argues, that ISIL-Libya was intended to be distinct from ISIS, there is no evidence that the designation of the former was intended to remove the government's ability to charge material support of the latter in that country. If defendant's argument were followed to its logical extreme, each subsequent designation of a regional ISIS group would render conduct that would otherwise have been chargeable as material support for ISIS, absent the regional designation, effectively immune from prosecution, if that conduct occurred after the designation of ISIS but before the designation of the regional group. I find this interpretation untenable, and thus I interpret the ISIL-Libya designation as expanding, rather than restricting, the number of terrorist groups that, in the State Department's view, were operating in Libya at the time of the designation.

R & R at 12-13.

Indeed, contrary to the defendant's odd theory, several other defendants have similarly been prosecuted for attempting or conspiring to provide material support to ISIS based on their attempt to travel to Libya and other countries outside of Iraq and Syria well before there was any designation of a regional terrorist organization like ISIL-Libya. See, e.g., United States v. Edmonds, No. 15-CR-149 (N.D. Ill.) (defendants convicted of conspiracy and attempt to provide material support to ISIS based in part on evidence that defendant sought to join ISIS by traveling to Derne, Libya in 2015, prior to designation of ISIL-Libya); United States v. Rafik Naji, 16-CR-653 (E.D.N.Y.) (FB) (defendant convicted of attempting to provide material support to ISIS based on travel to Yemen prior to specific designation of ISIL-Yemen as separate FTO). As Judge Levy explained, the government has charged attempted material support of ISIS, an organization that was "unquestionably designated during the relevant period," and proffered sufficient evidence that it can prove at trial "both that ISIS was operating in Libya during the relevant time period and that it was defendant's intent to materially support ISIS." R & R at 13. As a result, this remains "an issue of fact for trial, rather an issue for resolution on a pretrial motion." Id. The Court should adopt this conclusion.

2. The Indictment Adequately Alleges All the Elements of the Offense

The defendant next argues that Judge Levy was wrong to conclude that the government did not need to specifically allege "direction or control" in the Indictment. Objection at 3-5. Where the government charges a defendant with providing material support in the form of "personnel," the government is required to offer sufficient proof—at trial—that the personnel in question were intended to "work under [the FTO's] direction or control," as defined in 18 U.S.C. § 2339B(h). As Judge Levy correctly held, Section 2339B(h) is merely a "definitional provision," and not an essential element, therefore it need not be pleaded in the indictment. See R & R at 9 (noting that the Supreme Court and several Circuit courts have described Section 2339B(h) as "definitional"); Opposition Brief at 12-13. Indeed, every court to consider this issue has concluded that the government does not need to specifically allege "direction and control" in an indictment. See R & R at 9 ("The issue has been considered directly by four district courts, not one of which held section 2339B(h) to be an element."). In particular, Judge Levy found Judge Garaufis' careful discussion of this issue, and conclusion that Section 2339B(h) did not needed to be alleged in an

indictment, to be persuasive and dispositive in denying the defendant's claim. Id. at 10-11 (discussing United States v. Pugh, No. 15-CR-116 (NGG), 2015 WL 9450598 at *8 (E.D.N.Y. Dec. 21, 2015)). The Court should adopt Judge Levy's finding that the indictment states an offense. Id.[6]

3. The Government Is Not Required to Proffer All of Its Evidence Pretrial; Nevertheless, There Is Ample Evidence for a Jury to Find the Defendant Guilty of Attempting to Provide Material Support to ISIS

The defendant next argues that Judge Levy was wrong to conclude that the sufficiency of the evidence was not an appropriate issue for pretrial resolution and, in any event, that the government met the minimal standard needed to demonstrate there is sufficient evidence to state an offense. Objection at 5-7. It is well-settled that a pretrial motion to dismiss based on the sufficiency of the evidence is almost always premature and improper. See Opposition Brief at 19-21 (collecting cases). Judge Levy properly concluded that "the sufficiency of the evidence is not appropriately addressed on a pretrial motion" because the government has "not yet made a full proffer of its trial evidence." R & R at 14; see also United States v. Naseer, 38 F. Supp. 3d 269, 274 (E.D.N.Y. 2014) (denying motion to dismiss because "the sufficiency of the evidence . . . is not appropriately addressed on a pretrial motion to dismiss an indictment" and because "the test of the evidence is the trial").

Even if such a motion were appropriate, it must still fail. As the above-proffered summary of the facts of this case demonstrate, there is ample evidence on which a jury could convict the defendant of attempting to provide material support to ISIS. Indeed, the evidence is overwhelming: the defendant researched how to join ISIS, watched propaganda videos about

---

[6] The defendant's reliance on Mathis v. United States is misplaced. Mathis involved whether certain prior convictions for purposes of the Armed Career Criminal Act (ACCA) included the same elements as the "generic versions" of the offenses of burglary, arson or extortion. See 136 S. Ct. 2243, 2247-48 (2016). There, the court was attempting to distinguish between elements of an offense that are needed to prove guilt and statutes that contained descriptions of factual ways in which an offense could be committed, which are "extraneous" for purposes of a prior conviction analysis under the ACCA. Id. at 2248, 2250 ("This case concerns a different kind of alternatively phrased law: not one that lists multiple elements disjunctively, but instead one that enumerates various factual means of committing a single element.") This distinction between facts and elements is entirely unrelated to the separate question of what parts of a federal criminal statute constitute the elements of a crime that must be alleged in an indictment. The one other court to consider this same argument flatly rejected it. See United States v. Shafi, 252 F. Supp. 3d 787, 797 (N.D. Cal. 2017) (explaining that the Supreme Court "was not enumerating all possibilities describing statutory provisions" and that it "does not stand for the proposition that a given section of a statute must be either an element or meaningless."). Judge Levy heard this same argument and properly gave it no weight in his decision.

beheading and other terrorist acts committed by ISIS, tried to convince others of the righteousness of ISIS' violent ideology, attempted to travel to an area under ISIS control, and explained that he was doing so to become a martyr for ISIS' cause. A number of courts, including the Second Circuit, have upheld guilty verdicts after trial based on similar evidence as is proffered in this case. Opposition Brief at 21-24.

If the defendant believes that the government cannot meet his burden of proving guilt beyond a reasonable doubt, the proper remedy is for the defendant to move pursuant to Rule 29 for a directed verdict of acquittal based on insufficient evidence *after the government has rested its case at trial,* not on a pretrial motion to dismiss. See R & R at 14.

4. The Material Support Statute Is Not Unconstitutional As Applied to the Defendant

The defendant also argues that the material support statute is an unconstitutional infringement on his First and Fifth Amendment Rights. Objection at 8-9. As the government previously explained, the defendant makes this claim by inappropriately separating the defendant's speech from his conduct. The defendant argues that, absent the defendant's travel to join ISIS in Libya, the government is prosecuting him for his speech, and that absent his statements making clear he was trying to offer himself to help with ISIS' terrorist cause, the government is prosecuting him for his travel. See Opposition Brief at 24-25. The defendant cannot break the evidence into these separate components, demand that the Court ignore one part that does not help, and claim that the other sub-set causes a violation of his Constitutional rights. Judge Levy agreed, and correctly found that "it is the combination of speech evincing intent and subsequent action on defendant's part—attempting to travel on a one-way ticket to Libya, a location that the government has proffered it is prepared to prove was an ISIS stronghold—that form the basis of the charge against him." R & R at 16.

The defendant's claim that the indictment should be dismissed because the government charges the defendant with "mere membership" in ISIS is likewise without merit. As the Supreme Court explained in Holder v. Humanitarian Law Project, 561 U.S. 1 (2010) ("HLP"), the material support statute does not violate the First Amendment, even where the material support alleged is "support…in the form of speech," because foreign terrorist organizations are so tainted by criminal conduct that "any contribution to such an organization facilitates that conduct." Id. at 29 (emphasis in original) (providing as examples "teaching [FTO] members how to petition various representatives bodies" and "engag[ing] in political advocacy on behalf of [the FTO]" as appropriate restrictions and not violations of the First Amendment). The conduct here—knowingly providing oneself as personnel to ISIS—is significantly further removed from conduct that passed muster in HLP. See Opposition Brief at 23, 25 (further discussing several cases where defendants were appropriately convicted for providing themselves as personnel for a terrorist organization). The defendant's argument that he is being prosecuted for "mere membership" in a terrorist group is simply contrary to the facts: the defendant is being prosecuted because he attempted to provide himself as personnel to aid ISIS's violent and radical cause. This is not mere membership. A person who tries to enlist in the army may not know what job they have once they finish basic training, but they know that enlisting will help the military's cause. So too here: the defendant may not have known exactly what he was going to do for ISIS once he got to Libya, but

he knew that providing himself as personnel would help ISIS's cause. Numerous cases make clear that enlisting in ISIS is a crime, and Judge Levy properly concluded that the "defendant is not charged with merely attempting to join ISIS; he is charged with attempting to provide material support to ISIS by offering himself as personnel." R & R at 16. The Court should adopt this ruling as well.

5. The Indictment Does Not Constitute Double Jeopardy Based on the Defendant's Tunisian Conviction

The defendant next argues that that his trial in the United States, after his trial and conviction of crimes in Tunisia, constitutes "double jeopardy." Objection at 10-12. This is wrong. Under the "dual sovereignty" doctrine, successive prosecutions by separate sovereigns for the same offense—such as prosecutions by the federal government and a foreign government—are permissible. See, e.g., Gamble v. United States, 139 S.Ct. 1960 (2019) (affirming dual sovereignty principle). Accordingly, as both the law and common sense indicate, a separate prosecution by the Tunisian government has no bearing on the validity of a later prosecution in the United States.

To avoid this conclusion, the defendant relies on a 1959 Supreme Court case, Bartkus v. Illinois, which suggested in dicta that the dual sovereignty principle might be pierced in the unusual situation where the earlier prosecution was "merely a tool of the federal authorities" or that its prosecution was "a sham and a cover for a federal prosecution." 359 U.S. 121, 123-24 (1959). This "exception" has been described as at best being "a narrow one and difficult to prove" and at least two circuit courts "have questioned whether this exception even exists." See United States v. Rashed, 234 F.3d 1280, 1282 (D.C. Cir. 2000) (collecting cases); see also R & R at 18 (explaining that "in the context of sequential foreign and domestic prosecutions, none have held [the exception] to apply"); Opposition Brief at 26-29 (discussing narrow bounds of Bartkus).

Even if the defendant's theory were legally cognizable, the defendant cannot make the exceptionally high showing needed to meet the standard set in Bartkus.[7] There is nothing in the record before the Court that suggests the Tunisian prosecution was a sham prosecution. Indeed, it seems obvious that Tunisia would have a legitimate interest in preventing foreigners from traveling through Tunisia's territory to join a terrorist organization. And far from being a sham

---

[7] The defendant cites an out-of-Circuit decision for his claim that it is the government's burden to prove that the Bartkus exception does not apply. Objection at 10 n.3. In this circuit, courts have concluded that "[a] defendant asserting this narrow exception carries the burden to show that the 'state and federal prosecutions are so intertwined as to undermine the assumption that two supposedly independent criminal actions were prosecuted by separate sovereigns.'" United States v. Castro, 659 F. Supp. 2d 415, 419 (E.D.N.Y. 2009) aff'd, 411 F. App'x 415 (2d Cir. 2011) (quoting United States v. Coonan, 938 F.2d 1553, 1563 (2d Cir. 1991); see also, e.g., Bessaha v. Rock, No. 09-CV-3581 JFB, 2012 WL 1458195, at *24 (E.D.N.Y. Apr. 27, 2012) (denying claim and noting that "the Second Circuit has stated that a defendant must offer 'proof of federal orchestration'" of the other prosecution). Judge Levy correctly concluded that the defendant had failed to meet its burden of production of showing an "intertwined" set of prosecutions, and properly recommends denying this claim. See R & R at 18.

pursued at the direction of the United States, the facts indicate that the Tunisian government initiated its investigation before the United States was even aware of the defendant's conduct and detention. Moreover, the government charged the defendant by complaint in this district in 2016 – contrary to the defendant's argument, the government did not need the defendant to serve two years in Tunisian custody so that the government could put together its case. Based on all of the facts, Judge Levy's thoughtful conclusion on this issue put it best:

> Defendant has not shown that the government's decision to decline to take custody in the first instance amounted to "manipulation" of the Tunisian officials, such that they retained little or no independent volition. I am furthermore not persuaded by the evidence of alleged coordination between the United States and Tunisia in the form of travel to Tunisia by various Department of Justice officials. The case law is clear that even "significant cooperation" between two governments does not provide a basis for applying the Bartkus exception. I therefore find that the dual sovereignty doctrine bars the application of the Double Jeopardy Clause in this case and respectfully recommend that defendant's motion to dismiss on this basis be denied.

R & R at 20 (internal quotations and citations omitted). The Court should adopt this reasoning in full.

B. Judge Levy Correctly Recommends Denying the Defendant's Motion for a Bill of Particulars[8]

Lastly, the defendant argues that Judge Levy was wrong to deny his motion for a Bill of Particulars. A Bill of Particulars is only warranted if an indictment is too vague to inform the defendant of the nature of the charges so as to allow the preparation of a defense, avoid unfair surprise, and preclude double jeopardy. See United States v. GAF Corp., 928 F.2d 1253, 1260 (2d Cir. 1991); United States v. Torres, 901 F.2d 205, 234 (2d Cir. 1990). If the information sought by a defendant is provided in the indictment or through some other means, including discovery, a bill of particulars is not warranted. See United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999); United States v. Bortnovsky, 820 F.2d 572, 574 (2d Cir. 1987); United States v. Urso, 369 F. Supp. 2d 254, 271 (E.D.N.Y. 2005). It is improper for a defendant to use a motion for a Bill of Particulars as a mechanism to limit the government's evidence, or to flush out the prosecution's theories in advance of trial. See e.g., United States v. Albunio, Case No. 91 CR 0403, 1992 WL 281037, at *2 (E.D.N.Y. Sept. 9, 1992) ("The defendant's right to know the crime with which he is charged must be distinguished from his right to know the evidentiary details by which proof of his culpability will be established."); see also Opposition Brief at 37-39.

Judge Levy accurately found that the government has identified the specific type of material support in this case—the provision of the defendant as "personnel"—along with the time period, and the foreign terrorist organization to whom he attempted to provide support, all of which

---

[8] A more detailed response to the defendant's improper claim for a Bill of Particulars can be found in the government's Opposition Brief at 37-40.

is sufficient to satisfy the defendant's need for notice of the nature of the charges against him. See R & R at 26. The reality is that the defendant is trying to use this legal mechanism as a weapon to force the government "to detail the precise manner in which it intends to prove its case." Id. Judge Levy concluded that "this is not a permissible use for a Bill of Particulars," and this Court should adopt that recommended ruling.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court fully adopt the Report and Recommendation issued by Magistrate Judge Levy, and reject the defendant's objections to the Report and Recommendation.

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney

By: /s/ Craig R. Heeren
Craig R. Heeren
Michael T. Keilty
Assistant U.S. Attorneys
(718) 254-7000

cc: Defense Counsel
Clerk of Court (by ECF)