DMP:CRH/JGH/JEA
F.#2016R00308

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -    18-CR-393 (SJ)

BERNARND RAYMOND AUGUSTINE,

Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY**

SETH D. DUCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Craig R. Heeren
Joshua G. Hafetz
Jonathan E. Algor
Assistant U.S. Attorneys

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in support of its motion for an anonymous and partially sequestered jury in the trial of this matter. The Court's deputy has advised that jury selection may commence as soon as March 3, 2021. The government requests that the names, addresses and workplaces of members of both the venire and the petit jury not be revealed to the parties; that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service. In short, the government asks that the Court empanel an anonymous, partially sequestered jury.

Courts in this District have routinely approved the use of anonymous juries in terrorism cases.[1] As explained in greater detail below, the factors warranting the use of

[1] See, e.g., United States v. Kaziu, 559 F. App'x 32, 37-38 (2d Cir. 2014) (upholding use of anonymous jury in prosecution for conspiracy to commit murder overseas and attempted provision of material support to the terrorist organization al-Shabaab); United States v. Ibrahim, 529 F. App'x 59, 65 (2d Cir. 2013) (affirming use of anonymous jury in case relating to plot to detonate fuel tanks at John F. Kennedy airport); United States v. Kadir, 718 F.3d 115, 121 (2d Cir. 2013) (affirming use of anonymous jury in case relating to terrorist plot at John F. Kennedy airport); United States v. Kasimov, 15-CR-95 (WFK), ECF No. 398 (E.D.N.Y. Sep. 11, 2019) (granting government's request for an anonymous, partially sequestered jury in case involving defendant charged with conspiring and attempting to provide material support to ISIS); United States v. al Farekh, No. 15 CR 268 (BMC), ECF No. 102 (E.D.N.Y. June 16, 2017) (granting government's request for an anonymous jury in case involving defendant, an al-Qaeda member, charged with conspiracy to murder U.S. nationals among other terrorism offenses); United States v. Hausa, No. 12 CR 134 (BMC), ECF No. 123 (E.D.N.Y. June 20, 2016) (granting government's request for an anonymous jury in case involving defendant charged with providing material support to al-Qaeda); United States v. Pugh, No. 15 CR 116 (NGG), 2015 WL 8481877 (E.D.N.Y. Dec. 9, 2015) (granting government's motion for an anonymous, partially sequestered jury in trial of defendant accused of providing material support to the Islamic State); United States v. Naseer, 10 CR 19 (RJD), Dkt. No. 361 (E.D.N.Y. Dec. 30, 2014) (approving use of

anonymous juries in these cases—especially, the seriousness of the charges and the expectation of publicity—make an anonymous jury necessary and appropriate in this case. In addition, because the case involves charges of material support to the Islamic State of Iraq and al-Sham ("ISIS")—a terrorist organization with a reputation for extreme and vicious violence, a fair trial requires empaneling an anonymous jury and the other protective measures requested herein.

## I. FACTUAL BACKGROUND

The defendant is charged in an indictment with one count of attempting to provide material support to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. See Indictment (July 30, 2018).

In brief, the charges arise from the efforts of the defendant to provide material support to ISIS in the form of personnel, namely himself. As the Court is aware, the defendant traveled on February 18, 2016 from the United States to North Africa with the goal of joining ISIS. After watching violent terrorist propaganda videos, proselytizing the supposed virtues of the "Islamic state" to family and on the internet, and researching the details of the foreign terrorist organization—including an internet search for "how to safely join isis" [sic]—the defendant traveled to Tunisia, on a one-way ticket, so that he could

---

anonymous jury where defendant was charged with conspiring to provide material support to al-Qaeda); United States v. Ahmed, No. 12 CR 661 (SLT), 2014 WL 6983438 (E.D.N.Y. Dec. 10, 2014) (approving use of anonymous jury in terrorism trial); see also United States v. Stewart, 590 F.3d 93, 125 (2d Cir. 2009) (affirming use of anonymous jury in prosecution in the Southern District of New York of defense attorney and two co-conspirators for involvement with Sheikh Omar Abdel Rahman); United States v. Al Fawwaz, No. 98 CR 1023 (LAK), 2014 WL 5005917 (S.D.N.Y. Sept. 30, 2014) (granting government's request for an anonymous jury in prosecution relating to plot to bomb at the U.S. embassies in Kenya and Tanzania).

provide himself as a willing participant in ISIS's terrorist activity. The defendant was stopped by Tunisian government authorities on February 22, 2016, before he could make it to ISIS-controlled territory across the border in Libya, convicted under Tunisian law of terrorism offenses and sentenced to two years' imprisonment.

A. Background Regarding ISIS

ISIS is a foreign terrorist organization that, since 2013, has conducted terrorist attacks as part of ISIS's goal of forming an Islamic state or "caliphate." At various times over the past few years, ISIS has controlled territory in Syria, Iraq, and Libya, and maintains a presence in other countries as well. [2]

ISIS has claimed credit for numerous terrorist activities during that time frame, including attacks against Americans in the United States and against Westerners abroad. Specifically, ISIS supporters have claimed responsibility for the following attacks in the United States: the May 2015 shooting in Garland, Texas, at an exhibition featuring cartoons of the Prophet Mohammed; the December 2015 shooting in San Bernardino, California, at the Inland Regional Center; the June 2016 shooting in Orlando, Florida, at the Pulse

[2] On or about October 15, 2004, the United States Secretary of State designated al-Qaeda in Iraq, then known as Jam 'at al Tawid wa' al-Jahid, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. On or about May 15, 2014, the Secretary of State amended the designation of al-Qaeda in Iraq as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham ("ISIS" – which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. In an audio recording publicly released on June 29, 2014, ISIS announced a formal change of its name to the Islamic State. On September 21, 2015, the Secretary of State added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO.

nightclub; the October 2017 West Side Highway truck attack; and the December 2017 attempted bombing of the 42 Street-Port Authority Bus Terminal. ISIS supporters have also publicly expressed a desire to continue to target and attack the U.S. and the West.

ISIS and its supporters have also claimed responsibility for many violent attacks in Europe and South Asia as well, including: the November 2015 shootings and suicide bombings in Paris, France, at the Bataclan concert hall, a sports stadium, and several restaurants; the July 2016 truck attack in Nice, France during Bastille Day celebrations; the December 2016 truck attack in Berlin, Germany at a Christmas market; the May 2017 suicide bombing in Manchester, United Kingdom at a concert; the August 2017 van attack in Barcelona, Spain; an August 2018 suicide bombing in Kabul, Afghanistan; and the April 21, 2019 Easter Sunday bombings in Sri Lanka that killed or wounded more than 700 people. Despite the degradation of their territorial control in Syria and Iraq, ISIS remains a potent FTO.

ISIS has released multiple audio and video messages purporting to be from its then-leader, Abu Bakr al-Baghdadi, advocating continued violence by ISIS supporters. On June 29, 2014, ISIS released an audio recording declaring a "caliphate" consisting of territory under ISIS control in Iraq and Syria, and stating that Baghdadi would be the "caliph" or "leader for Muslims everywhere." On July 5, 2014, ISIS released a video recording in which Baghdadi urged Muslims from across the world to "do jihad in the cause of God, incite the believers and be patient in the face of this hardship." On May 14, 2015, ISIS released an audio recording in which Baghdadi urged Muslims to take up arms on behalf of ISIS by either traveling to the Middle East to fight for ISIS or launching attacks wherever they were. On September 29, 2017, ISIS released an audio recording in which

Baghdadi again urged his followers to continue to attack the U.S. and its allies, saying: "Carry on your jihad and your blessed operations. Let not the crusaders enjoy life in their homelands while your brothers are subjected to bombardment and destruction." As recently as April 2019—just weeks after an allied campaign ousted ISIS from a holdout in Baghouz, Syria—ISIS released an eighteen-minute video from al-Baghdadi, in which he stated, among other exhortations, that "jihad continues until judgment day"; congratulated ISIS cells in Libya, Burkina Faso and Mali on then-recent attacks or pledges of allegiance to ISIS; claimed that the Sri Lanka Easter Sunday bombings were "in revenge"; and exhorted ISIS followers to "drain their enemies of all their human, military, economic and logistical capabilities."

ISIS has a presence in, among other places, Libya. In or about 2011, a civil war erupted in Libya between government forces loyal to Libyan leader Muammar Gaddafi and rebel forces who ultimately overthrew the Gaddafi government. After the civil war, conditions in Libya remained unstable. In or about February 2015, members of ISIS entered the port city of Derna, Libya, and subsequently attacked and took control of Sirte, Libya. In or about August 2015, residents of Sirte took up arms and attempted to expel ISIS from the city. The attempt failed, and ISIS forces largely maintained control of Sirte until late 2016.

ISIS has sought to, among other things, use Libya as a base of operations for its terrorist activities and to impose its strict version of Islamic Law on its residents. Moreover, numerous foreign fighters seeking to join ISIS traveled to Libya and settled specifically in Sirte. In particular, these foreign fighters traveled to Libya in order to join the "caliphate" proclaimed by ISIS, which initially existed primarily in Iraq and Syria, but which ISIS expanded to places in Libya and throughout the Middle East and Africa. Particularly relevant

to this case, one common method by which these foreign fighters tried to join ISIS in Libya was by entering Libya through the neighboring country of Tunisia.

In or about 2016, military forces aligned with the Libyan government engaged in numerous battles in an attempt to expel ISIS forces and their supporters from Sirte. Throughout the summer of 2016, Libyan forces and ISIS fighters suffered significant casualties. By October 2016, public statements by Libyan government officials and open source reporting indicated that ISIS fighters had been largely defeated and expelled from Sirte.

At trial, the government intends to introduce evidence that ISIS has aggressively and successfully recruited citizens of many countries, including but not limited to the United States, to come to Libya and join ISIS. Because of the importance of foreign fighters to ISIS's operations, ISIS committed significant resources to recruitment of foreign fighters, in particular but not limited to those with ties to the United States. ISIS's recruitment efforts rely heavily on the use of the Internet, including web-distributed recruitment videos, to motivate foreign fighters to come to Libya and other ISIS-controlled areas (or to carry out ISIS's objectives in other ways, such as by conducting attacks on targets of opportunity in their home nations). Those videos typically depict ISIS fighters marching, training, and fighting; they urge others to either travel to Syria and Libya, to join ISIS, or to carry out ISIS's objectives elsewhere.

B. The Defendant's Attempt to Provide Material Support to ISIS

Beginning in October 2015 and continuing up to his travel to Tunisia in February 2016, the defendant, who had previously identified as an atheist, began to engage his mother on the topics of Islam and ISIS. The defendant sent his mother various ISIS videos

that extolled the virtues of living in the Islamic State. The defendant also sent text messages to his mother that expressed his desire to travel to the Islamic State. For example, on February 10, 2016—eight days before he traveled to Tunisia—the defendant sent his mother the following message:

> If I ever get lucky enough to live in khilafah,[3] I'll burn my own passport lol. There's a lot you don't know about the justice of the sharia.[4] If Mabey you understood it you wouldn't want to live here either. [sic]

During this same time period, the defendant actively searched the Internet for information on ISIS, how to join ISIS, radical jihadist propaganda, and firearms. For example, the defendant conducted Internet searches for, among others, (1) "Jihadi John," a British ISIS spokesperson who appeared in numerous graphically-violent Internet videos ordering the murder of captives and personally participating in executions, (2) Abu Musab al Zarqawi, a former senior al-Qaeda leader in Iraq, (3) Abu Bakr al-Baghdadi, the then-current leader of ISIS, and (4) Ayman al Zawahiri, the current leader of al-Qaeda. On December 15, 2015, the defendant conducted an Internet search for "how to safely join isis." After conducting the search, the defendant clicked on one of the search results, which was an Internet page titled "How does a Westerner join ISIS? Is there a recruitment or application process?" Besides conducting Internet searches, the defendant also posted numerous messages on social media platforms that were graphically supportive of violent jihad and ISIS.

---

[3] ISIS commonly uses the term "khilafa" or "caliphate" to refer to their purported Islamic state, or caliphate.

[4] Sharia is a system of Islamic religious law.

On February 18, 2016, the defendant traveled on Turkish Airlines Flight No. 80, which departed San Francisco, California and arrived in Tunis, Tunisia (via Istanbul, Turkey). The defendant's one-way ticket was purchased on February 17, 2016 – i.e., the day before he traveled. However, when the defendant arrived at the San Francisco airport on February 18, 2016, Turkish Airlines representatives required him to purchase a return ticket to the United States. Records indicate that the defendant purchased the cheapest available return ticket to San Francisco, which had a return date of March 3, 2016. Prior to departing the United States, the defendant was interviewed by a United States Customs and Border Protection ("CBP") officer at the San Francisco International Airport. The defendant told the CBP officer that he was planning to travel to Tunisia for vacation.

Shortly after arriving in Tunisia on February 20, 2016, the defendant contacted his family via a social media platform and stated that he was "in north africa bodering the mediterrainarian [sic]." The defendant then blocked his family members from his social media account. Additionally, on February 21, 2016, the day after arriving in Tunisia, the defendant sent his mother an email that stated, in part: "My purpose in life is to seek the ultimate justice. I see a lot of very wrong and truly evil things happening in this world, things you dont know about, im not mad or mentally ill. I really truly am on a path to fight for justice and if I see unjustified where I'm going I promise I will fight that also. True justice. I can't … sit in ignorance. There is no other meaning in life to me."

On February 22, 2016, the defendant was detained by Tunisian law enforcement in Monastir, Tunisia on the suspicion that he was attempting to travel to Libya to join ISIS. The defendant was subsequently convicted under Tunisian law of terrorism-related offenses, and served approximately two years in Tunisian prison.

## II. LEGAL FRAMEWORK

The Second Circuit has repeatedly upheld the use of anonymous juries where (1) there is strong reason to believe that the jury needs protection, and (2) reasonable precautions have been taken to minimize any adverse effect on the jurors' opinion of the defendants. See, e.g., Kaziu, 559 F. App'x at 37-38; United States v. Arillotta, 529 F. App'x 81, 82 (2d Cir. 2013); Ibrahim, 529 F. App'x at 65; Kadir, 718 F.3d at 120-21. "Within these parameters, the decision whether or not to utilize an anonymous jury is left to the district court's discretion." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012) (quoting United States v. Gotti, 459 F.3d 296, 345 (2d Cir. 2006)).

"In determining whether there is a 'strong reason' to believe that the jury needs protection, courts should consider several factors, including whether (1) the charges against the defendants are serious, (2) there is a substantial potential threat of corruption to the judicial process, and (3) considerable media coverage of the trial is anticipated." Al Fawwaz, 57 F. Supp. 3d at 309 (citing United States v. Quinones, 511 F.3d 289, 296 (2d Cir. 2007), and United States v. Tomero, 486 F. Supp. 2d 320, 322 (S.D.N.Y. 2007)); see also Pugh, 2015 WL 8481877, at *2 (same). While "it is unclear whether any of these factors individually justify impaneling an anonymous jury," "there are numerous cases indicating that anonymity is appropriate when some combination of these factors is present." Pugh, 2015 WL 8481877, at *2 (quoting United States v. Khan, 591 F. Supp. 2d 166, 169 (E.D.N.Y. 2008) (citing Quinones, 511 F.3d at 296)).

Although empaneling an anonymous jury presents "the possibility of unfair prejudice to the defendant," United States v. Tutino, 883 F.2d 1125, 1132 (2d Cir. 1989), "the use of an anonymous jury does not infringe a defendant's constitutional rights, so long

as the court conducts a voir dire designed to uncover any bias as to the issues or the defendant[] and takes care to give the jurors a plausible and nonprejudicial reason for not disclosing their identities," United States v. Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995); see also Kadir, 718 F.3d at 120. "The Second Circuit has consistently 'made clear that when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights.'" Pugh, 2015 WL 8481877, at *2 (quoting Kadir, 718 F.3d at 120).

In United States v. Barnes, the Second Circuit upheld the empaneling of an anonymous jury and specifically rejected any claim that the law requires jurors to disclose their identities:

> If a juror feels that he and his family may be subjected to violence or death at the hands of a defendant or his friends, how can his judgment be as free and impartial as the Constitution requires? If the anonymous juror feels less pressure as a result of anonymity . . . this is as it should be a factor contributing to his impartiality.

604 F.2d 121, 140-41 (2d Cir. 1979) (noting further that "in a case that generated as much pretrial publicity as [this one] and in which allegations of dangerous and unscrupulous conduct abounded, precaution was best taken so that fears would not become realities.").

Similarly, in United States v.Thomas, the Second Circuit explained that the protection of jurors is vital to the proper functioning of the federal criminal justice system, describing jury anonymity as a mechanism to ensure a fair and impartial verdict, free from fear or intimidation:

> As a practical matter, we cannot expect jurors to "take their chances" on what might happen to them as a result of a guilty verdict. Obviously, explicit threats to jurors or their families or even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict. Justice requires that

> when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken.

757 F.2d 1359, 1364 (2d Cir. 1998).

The decision to partially sequester a jury follows the same basic framework as the decision to seat an anonymous jury, and courts in the Second Circuit have frequently seated anonymous and partially sequestered juries. See, e.g., United States v. Wilson, 493 F. Supp. 2d 397, 399-401 (E.D.N.Y. 2006) (seating anonymous and partially sequestered jury in case involving murder of police officers due to, inter alia, seriousness of charges, defendant's membership in a criminal enterprise, defendant's history of attempts to interfere with judicial process, and the significant press coverage of the case); United States v. Urso, No. 03-CR-1382, 2006 WL 1210886 at *1-2 (E.D.N.Y. May 2, 2006) (approving same where "allegations and evidence point to a willingness to interfere with the judicial process."); al Farekh, No. 15 CR 268 (BMC), ECF No. 102 (E.D.N.Y. June 16, 2017) (approving same where defendant was alleged to be a member of al-Qaeda, where charges were seriousness, there was a likelihood that jurors may be afraid of retaliation from the defendant or associates, and where a family member of the defendant had previously made efforts to speak with jurors).

## III. AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY IS APPROPRIATE IN THIS CASE

As noted above, the key factors in determining whether a jury should be anonymous and partially sequestered are (1) the seriousness of the charges against the defendant; (2) the potential threat of corruption of the judicial process; and (3) the expectation of publicity. See, e.g., Quinones, 511 F.3d at 296. As described below, these factors favor empaneling an anonymous jury in this case.

A. The Charges In This Case Are Serious

The defendant faces serious charges. Augustine is accused of attempting to support ISIS, a terrorist organization that has claimed responsibility for vicious, violent attacks in numerous countries, including within the United States. If convicted at trial, the defendant will face an effective range under the United States Sentencing Guidelines of 240 months imprisonment (the statutory maximum sentence) on the terrorism charge.

Courts in this district have regularly approved anonymous and partially sequestered juries in cases involving similarly serious charges. See, n.1, supra. Indeed, the charges at issue in this case carry similar penalties to those charged in terrorism-related cases in this District in which an anonymous jury was used. See, e.g., Pugh, 2015 WL 8481877 (anonymous and partially sequestered jury authorized in case in which the defendant was charged with one count of attempted material support of terrorism and one count of obstruction of justice); see also Kasimov, 15-CR-95 (WFK), ECF No. 398 (E.D.N.Y. Sep. 11, 2019) (anonymous and partially sequestered jury authorized in case involving defendant charged with one count of conspiring to provide material support of terrorism and one count of attempting to do the same).

B. The Judicial Process Is At Risk

In addition to the seriousness of the charges facing the defendant, an anonymous and partially sequestered jury is also warranted because of the risk of interference with the judicial process. As noted above, the defendant is accused of attempting to travel to Libya to support and fight for ISIS. Many jurors will be aware of ISIS's global campaign of violence. As noted above, ISIS has claimed responsibility—and/or the perpetrator(s) have claimed to be acting on behalf of ISIS—for attacks in the

United States, Europe and Africa. Despite the degradation of ISIS's geographical control of territory in Libya, Syria and Iraq, most jurors will know or believe that ISIS remains operational and committed to violently attacking U.S. and other Western interests.

As the Second Circuit has stated, "even a general fear of retaliation could well affect the jury's ability to render a fair and impartial verdict." Thomas, 757 F.2d at 1364. There is a legitimate concern in this case that jurors may fear that an associate of the defendant—accused to be a supporter of ISIS—or a member of another Islamist extremist group will target them. It would not be unreasonable for jurors to believe that disclosure of their identities or information about their families or workplaces may expose them to unnecessarily heightened risk. See Stewart, 590 F.3d at 125 (noting "the reasonable likelihood that the pervasive issue of terrorism would raise in the jurors' minds a fear for their individual safety").

C. Publicity Surrounding the Case

An anonymous and partially sequestered jury is also warranted because of the media attention this case has already generated and the publicity likely to result from trial. Major media sources have reported regarding this case. Due to the ongoing COVID pandemic, this trial is also likely to be one of very few federal trials occurring in New York, allowing for an ever greater focus by the media on the case. This will also be the first terrorism trial in federal court in Brooklyn in over a year. Accordingly, the government expects that the pretrial proceedings and trial will attract substantial media coverage.

Given the level of media attention and public scrutiny that this case has generated and will generate, it is reasonably foreseeable that the trial, including the jurors' identities, may be the subject of media coverage. It is also conceivable that individuals

sympathetic to the defendant (or to his cause) or hostile to the government may seek to obtain information about the jurors.

The Second Circuit has repeatedly held that the expectation of publicity at trial weighs in favor of anonymity to avoid the jurors' exposure "to inappropriate contacts that could compromise the trial." See United States v. Paccione, 949 F.2d 1183, 1193 (2d Cir. 1991); see also United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994); United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991); Tutino, 883 F.2d at 1132; United States v. Persico, 832 F.2d 705, 717 (2d Cir. 1987); Barnes, 604 F.2d at 141. Juror anonymity is an effective remedial measure to prevent possible prejudice and inappropriate contact by the press.

Moreover, potential jurors will be more willing to serve if they are confident that they and their families will not be subjected to scrutiny, harassment and possible threats. See Barnes, 604 F.2d at 141 (upholding anonymous jury and explaining that in a case with "much pretrial publicity" and "allegations of dangerous and unscrupulous conduct," "precaution was best taken so that fears would not become realities"). The media's interest in this case clearly "militate[s] in favor of an anonymous jury." Vario, 943 F.2d at 240.

IV. AN ANONYMOUS AND PARTIALLY SEQUESTERED JURY WILL NOT PREJUDICE THE DEFENDANT

The defendant will not be prejudiced by the use of an anonymous and partially sequestered jury. As noted above, the use of an anonymous jury does not infringe on a defendant's rights provided that (1) "the jurors [are given] a plausible and nonprejudicial reason for not disclosing their identities"; and (2) "the court conducts a voir dire designed to uncover any bias as to the issues or the defendants." Aulicino, 44 F.3d at 1116; see also Kadir, 718 F.3d at 120. The same holds true for partial sequestration. See, e.g., Pugh, 2015

WL 8481877, at *13 ("The court is convinced that semi-sequestration is the only way to adequately protect the jury," citing "the violent nature of the crimes charged and of ISI[S] more generally, and the likelihood of significant press attention to the case.").

Here, the jurors may accurately be informed that these protective measures are being taken due to anticipated media interest, to prevent any arguable inference that the defendant poses a danger to them. See Gotti, 459 F.3d at 345 (upholding use of anonymous jury and finding that prejudice was avoided by "instructing the jury that the special precautions had been implement to protect them from the media"); see also Thai, 29 F.3d at 801 ("In order to provide a nonprejudicial reason for maintaining anonymity, the introduction to the [jury] questionnaire stated, with approval of the parties, that '[s]electing an anonymous jury is not an unusual practice and has been followed in many cases in the Federal Court. Anonymity will ward off curiosity that might infringe on juror's privacy[.]'"); Paccione, 949 F.2d at 1193 (upholding anonymous jury and finding that the court "adequately instructed the jury at the outset of the trial that the special precautions were designed to protect the jury from contacts by the media, thereby implying that the security measures were not the result of threats from the defendants"); Tutino, 883 F.2d at 1133 (upholding anonymous jury procedure where the jury was instructed that "It is a common practice followed in many cases in Federal court to keep the names and identities of the jurors in confidence. This is in no way unusual."); see also Kaziu, 559 F. App'x at 38 ("the district court told jurors that their identities were being hidden only because of the extensive media coverage and did not implicate Kaziu's dangerousness"). Thus, in keeping with Second Circuit precedent, the Court can eliminate any potential prejudice to the defendant by issuing an instruction informing the jury in a neutral manner that anonymity is necessary to

protect them from the media, and that selection of anonymous juries is not an unusual procedure.

Furthermore, the use of an anonymous jury does not conflict with the defendant's right to conduct meaningful voir dire. See Rosales-Lopez v. United States, 451 U.S. 182, 188 (1981). As the Second Circuit explained in Barnes:

> [A]s long as a defendant's substantial rights are protected by a voir dire designed to uncover bias as to issues in the case and as to the defendant himself, then reasonable limitations on the questioning should not be disturbed on appeal.

604 F.2d at 140. The trial court has substantial discretion in controlling and limiting the voir dire process. See Rosales-Lopez, 451 U.S. at 189; Barnes, 604 F.2d at 137. Accordingly, a full voir dire may be conducted about subjects other than the juror's name, address and employer's name, and the parties and counsel have an unrestricted opportunity to observe the jurors during this process. See, e.g., Barnes, 604 at 142-43.

In the anonymous jury context, the Second Circuit has frequently noted that a defendant's rights are protected by the district court's conduct of "a voir dire designed to uncover bias as to issues in the cases and as to the defendant[s]." Vario, 943 F.2d at 242 (quoting Barnes, 604 F.2d at 140); see also Thai, 29 F.3d at 801.

Accordingly, under the circumstances presented, empaneling an anonymous and partially sequestered jury will not prejudice the defendant.

V. CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court grant the government's motion for an anonymous jury, and direct that the names, addresses and workplaces of members of both the venire and the petit jury not be revealed to the parties. The government further respectfully requests that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and that they be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

Dated: Brooklyn, New York
February 11, 2021

Respectfully submitted,

SETH D. DUCHARME
Acting United States Attorney
Eastern District of New York

By: /s/
Craig R. Heeren
Josh Hafetz
Jonathan E. Algor
Assistant United States Attorneys
(718) 254-7000

cc: Clerk of Court (SJ) (via ECF)
Defense Counsel (via ECF)