UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

Plaintiff,

-against-

BERNARD AUGUSTINE,

Defendant.

------------------------------x

18-CR-393(RL)

United States Courthouse
Brooklyn, New York

February 8, 2021
9:00 a.m.

TRANSCRIPT OF CRIMINAL CAUSE FOR HEARING
ALL PRESENT VIA TELECONFERENCE AND/OR VIDEOCONFERENCE
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

APPEARANCES

For the Government: UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: CRAIG R. HEEREN, ESQ.
JOSHUA G. HAFETZ, ESQ.
JONATHAN EDGAR ALGOR, IV, ESQ.
Assistant United States Attorneys

For the Defendant: FEDERAL DEFENDERS OF NEW YORK
One Pierrepont Plaza
Brooklyn, New York 11201
BY: SAMUEL I. JACOBSON, ESQ.
- and -
LAW OFFICES OF SABRINA P. SHROFF
233Broadway
New York, New York 10007
BY: SABRINA P. SHROFF, ESQ.

Court Reporter: LINDA D. DANELCZYK, RPR, CSR, CCR
Phone: 718-613-2330
Fax: 718-804-2712
Email: LindaDan226@gmail.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court; All present via teleconference and/or videoconference.)

THE COURT: All right, we're on the record.

THE COURTROOM DEPUTY: This is criminal cause for a detention hearing in United States v. Augustine, Case Number 18-CR-393.

Counsel, if you could please state your appearances for the record.

MR HEEREN: Good morning, Your Honor. Craig Heeren on behalf of the United States. With me are my colleagues Jonathan Algor and Josh Hafetz appearing via videoconference.

MR. JACOBSON: And good morning, Your Honor. Sam Jacobson and Sabrina Shroff, Federal Defenders, for Mr. Augustine, who is not yet present.

THE COURT: Good morning.

So I understand that the defense has some issue with respect to 3500 material. We'll take those issues first as we're waiting for the witness and Mr. Augustine to be produced.

MS. SHROFF: So thank you, Your Honor. Having reviewed some of the 3500 materials produced to us, I asked the government in an email on February 5th to please update us on certain questions that I had having reviewed the 3500 material.

For example, the 3500 material designated that there

were three telephone calls with this witness, and that the witness had gone back and forth on whether or not he intended to testify at today's hearing.

As I recall, the calls occurred on January 25th, 27th and 28th. The 3500 material does not designate who was on each call, who participated on each call, and what was said to the witness that got the witness to go back and forth and change his mind. I asked for that information from the government and I received no response whatsoever.

I also asked just basic questions about the 3500 material; you know, who was the note taker, who spoke at each one of these calls, and what was said to the witness and what was said back from the witness.

I also did ask if the government had made any representations to Mr. Prasad or his lawyer about their -- any promise or any give, so to speak. I thought that was an appropriate question to follow up on the 3500 material, and that also I did not get an answer to.

And finally, Your Honor, I believe Mr. Jacobson sent an email yesterday asking for updated 3500 material. The government has now noted that they spoke to the witness over the weekend, and we got no new 3500 on that either.

I am not going to seek a delay of this proceeding, because Mr. Augustine wants to go forward, but perhaps if the Court were planning to take a break or whatever it is, and

should the Court deem or believe it is appropriate, we would like a response. Thank you.

Oh, I followed up last night and I urged the government to please respond to me so that we wouldn't have to do this while we were all on a Zoom call, because everything seems to take forever electronically, but I did not succeed.

THE COURT: Mr. Heeren?

MR HEEREN: Thank you, Your Honor. The government's turned over all the 3500 material for this witness.

With regard to any *Giglio* material, the government provided a letter on February 3rd, 2021 to disclose any potentially relevant -- potential *Giglio* material, as well as several attachments related to that. There's nothing else to turn over, Your Honor.

MS. SHROFF: But the government spoke to the witness over the weekend. How many times did the government speak to the witness? Who was on the call? What was discussed?

THE COURT: Mr. Heeren, what's your position on those questions?

MR HEEREN: My position is that Ms. Shroff can ask any questions she deems appropriate on cross.

MS. SHROFF: I'm sorry, that's not how 3500 works. You spoke to a witness. The witness is being called. I'm entitled -- I'm sorry, am I missing something here?

MR HEEREN: There's no requirement to generate 3500

materials specifically. We turned over all statements of the witness that have been documented.

MS. SHROFF: That's correct. There is no requirement to generate, but the failure to take notes would be so that we do not make, generate, or disclose 3500 material, as I understand it, is improper.

And I can certainly cite to you cases in the Southern District where Judge Rakoff and Judge Buckwald have been very, very careful about this kind of practice.

The government spoke to him. It is literally a matter of notes that they took. They can even verbally tell us now what the gist of the conversation was, what they spoke to Mr. Prasad about. Certainly they didn't call to ask him how he was doing in Guiana and what the weather was like, correct?

MR HEEREN: Your Honor, we turned over all 3500 material, and that's the government's position.

THE COURT: And what is your position with respect to any obligation to generate or not to -- deliberately not generate 3500 material?

MR HEEREN: We don't have any obligation to generate 3500 material for every single call.

We spoke to Mr. Augustine shortly before this call. We talked about information that we previously provided them. And we talked --

(Audio interruption.)

MR HEEREN: I'm sorry, Mr. Prasad, Your Honor.

I did not talk -- the government did not talk to Mr. Augustine directly in any way, shape or form.

MS. SHROFF: I'm sorry, Your Honor, what exactly did the government talk to Mr. Prasad about?

MR HEEREN: Your Honor, it's just -- it's an inappropriate question. That's not the purpose of 3500.

Are you able to hear me, Your Honor?

THE COURT: Yes, I can hear you now.

MS. SHROFF: It's a witness statement taken by the government. The government is calling that witness. This witness has three times changed his mind about being a witness at this proceeding.

Is the government really saying that they have no obligation to give this information to me?

THE COURT: I think that's what the government is saying.

MS. SHROFF: Your Honor, they haven't advised us of anything. We don't even know how many times they've spoken to this witness. The government hasn't even told me they spoke to him since their production on Friday.

Is the government saying I'm not entitled to know how many times they spoke to a witness? Did they speak to him on Saturday? Did they speak to him on Sunday? How many times

did they speak to him on Saturday or Sunday? What did they say to him to get him to change his mind to become a witness here?

Was the FBI present? Was law enforcement present? Did somebody take any duty of care to make sure two people were on the call when they spoke to this witness?

This is -- this is 3500 material, especially in light of the recent change in case law where the government has been told that they ought to be careful with each step they take. And now, given their past practices, there's been a memorandum where they are retold each time of their *Brady* obligations.

I do not understand why you wouldn't generate notes in a case like this. This is a serious matter. This is a matter about somebody's liberty. You're calling a witness that you haven't spoken to in over two years. A witness who waffled three times.

And the government is telling this Court, one, that they have no obligation to take notes; two, they specifically didn't take notes; and, three, they won't even now tell you what they spoke to this witness about.

THE COURT: All right, Mr. Heeren, any thoughts?

MR HEEREN: Yes, Your Honor. I'm -- the government's position remains the same. 3500 are witness statements that the government has in its possession, all of

those statements have been turned over.

I'm not aware of any further obligation to answer Ms. Shroff's questions. These seem like questions that are perfectly ripe for cross-examination.

We turned all over the material we believe is appropriate to be disclosed both under 3500 and under our other discovery obligations. Barring a motion in case law, I'm not sure what else to say.

THE COURT: I think we've gotten the respective positions of the parties. Since there's going to be a motion nor some further (audio interference), why don't we wait to see what the witness says here today and how this relates to the testimony.

Do we know whether Mr. Prasad is on the phone at this time?

MR HEEREN: I'm going to ask my colleague who's been trying to reach him. One second.

Josh, if you can hear me, can you give us an update?

MR. HAFETZ: Thank you, Judge, this is Mr. Hafetz.

My understanding from Mr. Prasad about five minutes ago was that he was going -- having great difficulty getting on via the internet and he was going to dial in using the pass code.

I don't know if he's been able to do that. I'm not seeing any addition on the right side of the screen. I guess

we can ask. There's a new wireless caller that just joined.

Mr. Prasad, if you are on the phone, can you identify yourself?

(No audible response heard.)

MR. HAFETZ: Your Honor, it appears that he is not on the phone, so I'll take this opportunity to call him now and see if he is able to join.

The subject matter of our conversation will be whether he is joining the call.

THE COURT: Has someone else joined us that we're not aware of?

MR. HAFETZ: I think, Judge, there's many people on the public side of the line on the right side of the call. So it may be just members of the public.

THE COURT: Okay.

MR. HAFETZ: I'm going to put myself on mute and try him now.

THE COURT: Thank you.

MR HEEREN: Yes, Your Honor. Regarding Mr. Augustine, I received word from the BOP that he will be produced, and they just ask to bear with them, so...

(Pause in the proceedings.)

THE COURT: I have not seen the decisions, Ms. Shroff, that you have referred to by Judge Buckwald or Judge Rakoff. If you have citations, please let me have them.

MS. SHROFF: This is the problem with having been around too long, Judge.

Your Honor, may I just step away for one minute?

THE COURT: Of course.

MS. SHROFF: Thank you.

THE COURT: Yes. We'll go off the record.

(Pause in the proceedings.)

THE COURT: Okay. We're on the record.

MR HEEREN: Thank you, Your Honor. Craig Heeren for the United States.

I contacted the BOP again. They seemed surprised that he hadn't been produced, and they apologized and said that they were checking on it again right now. That was quite literally a moment ago.

So, you know, the government apologizes, but we are -- we're in contact and they appear to be trying to make him available.

So I'll put that aside now, unless the Court has any questions to turn to the other thing the Court asked about.

THE COURT: Yes, let's go to the 3500 material issue. And I'd like to ask Ms. Shroff:

What is it specifically that you are asking the government to do at this point?

MS. SHROFF: So, Your Honor, I just don't want my position to be unclear.

One, the government bears no obligation to generate 3500 material. That's clear.

Two, the government is also not allowed to purposely not take notes, but to not bother to take notes because something that their witness might say or do does not support their position.

Three, regardless of whether it's 3500 or not, if it's *Giglio*, the government must turn it over.

Four, where a witnesses has waffled, such as this witness who has waffled on January 25th, 27th, 28th, and I'm quite certain he waffled over the weekend, otherwise the government would have taken notes, the government's art of persuasion, whatever they told him, to have him now come back and testify is certainly *Giglio*.

So we -- I don't even need to look at 3500 argument. The government is required to give me that *Giglio*. If they didn't take it down then, they should sit down now, to the best of their memory write it down, and then at a later date, the Court can determine whether they should or should not be sanctioned for failing to prepare *Giglio* material.

There is nothing in the case law that would defeat the argument that if a prosecutor persuades a witness by any means, the defense is entitled to know.

And, look, there's a factual basis for this. This has been a witness who has three times now changed his mind.

Do I know that's what happened over the weekend? No, I don't know. I'm only guessing from reading the 3500 material. Why do I have to guess? The reason I have to guess is because they did not -- they chose not to take notes.

You have law enforcement talking to a witness. You take notes. That's it. It's very basic.

I'm not understanding what the government's argument is. If the government did have to persuade him to testify today, tell us and we're done. But as far as I can tell, this is *Giglio*.

I mean, I don't want to belabor this, Your Honor. I don't want to read you the definition of what *Giglio* is. That's my position.

THE COURT: All right, Mr. Heeren?

MR HEEREN: Yes, Your Honor. Ms. Shroff started her lengthy colloquy admitting that we have no obligation to generate a report, and then finished her colloquy stating that we did have an obligation, so she's internally inconsistent.

Putting that aside for a second, now it's clear, as Ms. Shroff said, her claim is not that there's any 3500 obligation here, so we can get that aside; and second --

Please don't interrupt me.

-- and second that the -- that the allegation here is that we're deliberately failing to follow our discovery obligations and deliberately withholding our *Brady* and *Giglio*

material.

That's false. That's categorically false. We've lived up to our *Brady* obligations and our *Giglio* obligations. We're aware of them. We understand how they work.

Frankly, the only party who has violated anything here is the defense when they deliberately disclosed stuff on the docket that was sealed previously. But I don't need to belabor that point because we talked about it before.

So frankly, I resent the implication. We're aware of our discovery obligations. We're aware of our 3500 obligations. We've met them. If the defense has a motion to bring, they should bring that motion and we will respond to it.

MS. SHROFF: Your Honor, I want to be clear here. It's not an implication. I'm not implying anything. I'm flat out saying it outright and clearly, okay?

I'm saying to you, as an officer of this court, one, that I never said you have an obligation as the government to generate 3500 material. What I said is what's repeatedly said in the case law. That a United States Attorney may not chose not to write something down because it does not suit their position. That is what Judge Buckwald said in that opinion, which I hope to find at some point. That is what I said.

Mr. Heeren can recharacterize my argument as much as he wants. That's not the argument I made. That's one.

Number two, 3500 and *Giglio* are two separate things. They should not be confabulated as one. Regardless of whether or not I'm entitled to 3500, I am entitled to *Giglio*.

They called this witness over the weekend. They never told us they called this witness over the weekend. What was the call about? If the call was about persuading him to testify today, they have an obligation under *Giglio* to give it to us. They have not.

It would be so simple. They could just tell you, Your Honor, we did call him, it had nothing to do with having to get him to change his mind about testifying here today. Did he say that to you? No. Why? Because I'm sure that's exactly what the call was about. That's *Giglio*. Two separate arguments, 3500 and *Giglio*.

And, Mr. Heeren, please does not admonish me again. You are not the judge. Thank you.

MR HEEREN: Your Honor, may I be heard briefly, please.

THE COURT: Yes. And I'm going to ask both counsel to address their comments to me rather than to each other.

MR HEEREN: Yes, of course, Your Honor.

Your Honor, the government's aware of its obligations and has met them and will continue to meet them. And that's the government's position.

MS. SHROFF: That's not a position. That's a

rephrase. That's like the chorus of a song. It's a very pointed request, Your Honor.

We are asking the Court, most respectfully, to inquire about the government if the witness waffled over the weekend; if so, make a finding that's *Giglio*, and have them write that down and produce it to us.

And I speak on behalf of both Mr. Jacobson and I. We are completely unaware of anything improper we have done on any docket. So if there is something we did improper, perhaps the government can at a later date share it with us.

But I note that Mr. Jacobson seemed surprised, and I'm most certainly surprised, because I have no idea what the government's talking about.

THE COURT: All right, Mr. Heeren, it appears that Ms. Shroff is asking, in effect, whether or not you agree with her definition of *Giglio*, and whether or not the information that she has described would qualify as *Giglio* material.

MR HEEREN: Your Honor, I think the answer is this: We understand what *Giglio* is. We understand our obligation to turn over *Giglio* material when *Giglio* information is provided to the government. We turned over *Giglio* material.

I don't think there's anything more to say. I don't think -- what Ms. Shroff appears to want is for us to confirm or deny and go through the litany of any contact we've had with somebody and confirm negative and say, No, there is no

*Giglio* here, No, there is no *Giglio* there.

That's not the obligation. The obligation is to turn over *Giglio* or *Brady* material when it is -- when the government is made aware of it in a timely fashion. The government has done so when there has been such information.

THE COURT: All right, so I take it that you agree with Ms. Shroff then, that if the witness had said, I don't want to testify, and the government had said, Well, if you don't testify, X will happen, or this is why you should testify?

It's her position that that would be *Giglio* material, I believe.

MR HEEREN: Your Honor, I would say that we actually did disclose. And I would note that we disclosed reporting that showed that Mr. Prasad initially said he was ready and willing to testify, then declined to testify, then decided to testify again. So we've done that. When that issue arose, we did that.

MS. SHROFF: And the question is whether that happened again over the weekend. If it did, it's *Giglio*, and it should be produced.

And *Giglio* is: Any information that would cast doubt on the reliability of the witness. To waffle would, by definition, cast doubt on the reliability of a witness.

This is a very narrow question which (audio

interference): Did you or did you not speak to the witness over the weekend? Did he waffle? When he waffled, what did you say to him to get him back to your position? It's so simple.

MR HEEREN: Your Honor, again, see, this isn't the issue, Your Honor. We just demonstrated, and defense counsel full well knows that we have turned over *Giglio* material before of exactly this nature. And so she is now just accusing us, without any basis, of withholding it.

We know our obligation. We turned over *Giglio* when we should. Frankly, I'm just not going to feign speculation about what happened. It's just inappropriate, Your Honor.

THE COURT: All right, so I'm going to conclude this discussion now.

Mr. Heeren, you have assured the Court that you understand what your obligations are with *Giglio*. You have agreed with the definition that Ms. Shroff has suggested. And you have advised that any circumstance under which you believe that there is a *Giglio* obligation you have complied with. And that in the past you did advise the defense when the witness had waffled. And that you understand that it is your obligation to do so as to every instance in which you contacted the witness and the witness, quote, waffled.

So I believe that the -- with that understanding, this issue has been more than fully aired.

MS. SHROFF: Thank you, Your Honor. With that understanding of the parties, I appreciate it.

MR HEEREN: And, Your Honor, I obviously can't see the screen now, since I'm on by phone, but I guess it probably would be worthwhile at this moment to see if the BOP has gotten Mr. Augustine to join, and likewise Mr. Prasad.

So for the government, I would just ask quickly:

Mr. Prasad, if you have joined the line, could you just please identify yourself?

(No audible response heard.)

MR HEEREN: And I'm also fine to ask if Mr. Augustine is on the line, but if defense counsel wants to do that, that's fine as well.

(No audible response heard.)

THE COURT: Mr. Augustine, we don't see you. We have not heard you. Are you on the line at this time?

(No audible response heard.)

THE COURT: Okay.

While we're waiting and while we're still on the record, I would like to explore briefly what the ability of counsel, defense counsel, has been to communicate with Mr. Augustine since we last spoke?

MS. SHROFF: Sam, do you want to answer it or do you want me to?

MR. JACOBSON: Sure.

Judge, we were able to have a brief conversation with Mr. Augustine on Friday afternoon. It wasn't nearly enough time to review all of the exhibits and 3500 with him.

I did request an in-person meeting with Mr. Augustine at MDC for Friday. That request was denied by MDC legal counsel.

So we have not been able to see him. We had a 30-minute call with him on Friday, and we, again, were not given a call with him this morning as scheduled, so he has not -- we barely reviewed any of the materials with him from Friday.

And to the extent that the government produced additional materials over the weekend, which they did, including additional exhibits and 3500, Mr. Augustine is not aware of that production, and certainly does not have the ability to discuss it with us.

THE COURT: Do you know whether his unit is under quarantine?

MR. JACOBSON: I don't, Judge.

THE COURT: Do you know of any reason why your visit with him that you had hoped for for last Friday was denied?

MR. JACOBSON: Well, MDC says that they're still not allowing in-person visits at this time and hope to resume that on February 16th, I believe they said.

I requested an exception to that rule, given the

circumstances, given that we're having live testimony today, and that was denied.

What they did say was that they were going to try to extend their phone call and give us additional time with Mr. Augustine, either by phone or video on Friday, but that did not happen. We were given the normal short time slot for a phone call.

THE COURT: And when you suggested that you have not had sufficient time to meet with Mr. Augustine and review 3500 material, et cetera, does that affect your ability to prepare for -- what does that affect your ability to prepare for?

MR. JACOBSON: Well, it's obviously a bit of a catch 22 for us, Judge, because Mr. Augustine wants to proceed with the bail hearing. He wants to proceed with his case. But he has to choose between that and adequately preparing for these hearings and for trial.

So while, of course, we would hope to have more time with our client to review the materials, we know that Mr. Augustine would wish to proceed today as scheduled.

If something arises during the hearing that Mr. Augustine has a question about or that we need to discuss with him, we can let the Court know and perhaps it's possible to have a break-out session. But he does want to proceed today.

He also would prefer to have more time to discuss

these proceedings with counsel.

THE COURT: Right. And have you gotten any indication from Judge Johnson or his chambers as to when the trial might be?

MR. JACOBSON: No, Judge. There's no date.

I know that other judges have been setting trial dates in other matters. There are numerous trials scheduled for the spring and summer and fall. Judge Johnson has not provided a trial date to us yet.

We asked him at the last appearance, we said even just having any date on the calendar would give Mr. Augustine some comfort that he has a date to look forward to. Judge Johnson would not give us a trial date.

We wrote to Chief Judge Mauskopf to make sure that this matter was on her radar and that it had precedence for trial scheduling. We didn't hear back from Judge Mauskopf.

I understand that it's now Chief Judge Brodie. We'll write to her as well, to the extent that she's participating in a committee to figure out which trials take precedence.

But we don't have a court date, and we do know that the slots for the spring and the summer are rapidly filling out -- filling up. And, of course, I think everyone here agrees that Mr. Augustine should have precedence for one of first trials in the EDNY given that to our knowledge no one

has been detained longer without a trial in this district.

THE COURT: What would you need in order to prepare with him for trial?

MR. JACOBSON: Well, if MDC actually does reopen for legal visits on February 16th, we can begin to prepare with him that way.

But, again, Mr. Augustine's choosing between two bad options. Mr. Augustine choses to proceed with trial as quickly as possible, just as he chooses to proceed with the bail hearing today, even if it means that he has less time with counsel than we would like.

THE COURT: When you have telephone conferences with Mr. Augustine and wish to go over 3500 and other materials with him, how do you transmit the documents to him and what -- and how do you go over those documents with him on a non-video conference?

MR. JACOBSON: We can't. And I think Your Honor is hitting on the problem here, which is that we have to read him the 3500 or the exhibits.

Of course, the protective order that's now in place limits us additionally because it means that Mr. Augustine can't have these materials in his possession.

So we can't show them to him, and he can't have them, which means that we have to read it to him and discuss it with him on the phone, for now at least.

MS. SHROFF: Which is what we did on Friday, Your Honor. I -- Mr. Jacobson had another matter, and Ms. Glashausser and I took turns trying to get enough time on the platform log and read him the 3500 material, all because we had such a cumbersome and limited protective order that the government insisted upon and did not negotiate with.

So if we had just been able to send Mr. Augustine the paperwork, we offered to have it kept in the MDC law library, so that Mr. Augustine could take the 3500, under the auspices of the law library, and return it to the law library. But given the time constraints and the protective order, we were not able to do that, so I verbatim read him as much of the 3500 as I could.

THE COURT: Do you have a sense as to how well he understood the materials as they were read to him?

MS. SHROFF: I'm not sure I would want to answer that question.

THE COURT: Okay. All right.

Well, Mr. Heeren, there's some question about the protective order. Can you think of a way that would facilitate the communication between counsel and Mr. Augustine so that the quite unusual obstacles that they're facing now could be lowered and minimized?

MR HEEREN: Yes, Your Honor. So I would just -- just to take a step back with regard to the material we're

talking about here, the only discovery material in this case that's been designated as not being able to held by the defendant in the MDC is materials pertaining to a witness. The witness who's supposed to appear today. That's it. The rest of it he's been allowed to have.

So, first, I would just note we're talking about a very small scope materials.

Second, there's a valid and good cause reason for that, which is materials about people who are assisting the government shouldn't be left at within the prison. There's been a long history of issues of people publicizing witness information in facilities.

And the protective order we obtained, with regard to this, is relatively standard. As we note in the letter to Judge Johnson on this, that we've attached to Your Honor -- to the letter Your Honor, courts have regularly -- we cite a case where courts have regularly approved of this type of protective order.

And I would note that defense counsel for this case, at least one of the defense counsels for this case, approved of a materially identical protective order in another terrorism case in this district in Chudhary. That likewise precluded leaving the materials at the facility.

So I think that the first point is, we don't think it's inappropriate to say that those materials should not

go -- should not stay inside the MDC, that they should be with the attorney, given the types of materials and the limited scope of them.

I understand. I recognize the concern here, their ability to the review it with their client. As defense counsel noted, the in-person legal visits are supposed to be starting up again next week, which obviously will remedy this issue to some degree.

And of course the government would not object to any sort of time, to the extent that defense counsel wants more time, to review materials with them -- with their client.

MS. SHROFF: Your Honor, may I just make clear. I read Mr. Augustine the 3500 material word for word. Mr. Augustine knows every single word of that 3500 material, including the person they are about to call as a witness.

The person's name was publicized by this very prosecutor in an open courtroom, that is this proceeding, with 17 people on it. This cooperating witness, who is no where within the confines of the United States, has expressed no specific concern as to Mr. Augustine.

Surely the government is not arguing to this Court, is it, that by calling a witness now, identifying him by name in an open courtroom, that somehow or the other the 3500 materials related to him should still be subject to a protective order, seems kind of an odd argument to be making.

Not only that, the government knows full well that they are about to unveil this person. And we read the 3500 to him. And Mr. Augustine is not even asking to maintain the material. As a compromise, we simply said send it to the law library.

The MDC is so inept that we have been on this call for an hour, waiting just for Mr. Augustine to be produced. This is for a bail application. If the government was ever at its best, it should be now, to convince you the conditions of confinement are not such that this man cannot prepare for trial.

They can't even get him here for a bail argument. And they're arguing with us about pieces of paper that three lawyers have to divide up amongst themselves to out loud read to him.

Where would Mr. Augustine even make a copy. The MDC doesn't even have running toilet water at this point. They have been in lockdown for more than a year.

Imagine Mr. Augustine's ability to keep it together as a 24-year-old young man. Putting all of that aside, putting all of these concerns aside, not one of the key lawyers even said just give this to Mr. Augustine. We just wanted it to go to the law library. And take him to the law library, let him read it, and let him leave.

And whether or not Mr. Jacobson agreed to it in

another case is totally immaterial. We're not the Department of Justice. We take different positions depending on who our clients are. What is -- what is very confining for one client may not be for another. I know nothing about Mr. Chudhary. Maybe he doesn't read English. I don't know why somebody would take a position in one case and not another. It doesn't matter what somebody does in another case.

I have a case before Judge Sterling Johnson and I'm vociferously arguing against the issuance of a protective order.

What does that matter? It doesn't matter. The parties here we are, it's 10:05, no defendant, and a defendant who didn't get his chance to read 3500 material. That's where we are.

(Continued on the following page.)

THE COURT: Mr. Heeren, is there a problem with having the materials sent to the law library at MDC under seal or lock and key?

MR. HEEREN: Your Honor, we could explore that and look into that. I don't feel comfortable making a decision about a witness' written information or written testimony right here. I'm double checking here, but I don't recall in the e-mail communications from defense counsel that they suggested this before. If I'm wrong, I apologize. I'm checking, I don't recall specifically. But I would note that we provided a draft protective order and there was no proposed edits to the order, it just requires more discussion.

So, your Honor, we would object at this time to turning it over to the facility until we learn more about how that could be done. We're not precluding that entirely but we have to look into it.

THE COURT: All right. If I gave you, look, I have other hearings, it's not going to happen today. If I gave you until the end of the week, could you work that out? Today is Monday, Friday should be enough time.

MR. HAFTEZ: Yes. And just to be clear, your Honor, we could have an answer for you by Friday. I don't know that we would necessarily agree to it but we certainly could find out the details and have a specific position by then.

THE COURT: I have to say that I'm very concerned

about the lack of Mr. Augustine's ability to consult with his attorneys particularly when there's a bail hearing and a trial that are coming up. I'm sure the Government's equally concerned. I'm not sure of the Government's position of criticizing MDC at this point, but it is 10:07 right now. We were supposed to start this hearing at 9:00 o'clock. There was supposed to be a conversation or a conference between counsel and Mr. Augustine before the hearing. And I can only imagine what Mr. Augustine must be thinking when he was expecting to be at a hearing today. He's been confined for such a length of time, he can't see his attorney.

It's very troubling to the Court and it does play into the Court's view of the bail issues and the other issues before the Court. So I'm simply saying at this point that we have to find a way to minimize or overcome these obstacles. And if the only way to do that to is to find a structured way to release him that may be something that the Court will be looking at.

So I'm hoping that the Government, with or without the help of MDC, will be able to deal with these issues because not only in the typical case is it important that defendants be able to meet with their attorneys before critical hearings; and not only is it important that they not be asked to waive their right to counsel in order to have their right to a speedy trial.

Even in a pandemic, I believe that this particular case raises more difficult questions because of Mr. Augustine's history and the difficulty he's had in communicating with counsel and the strain that that's put on the lawyer-client relationship which may in some ways, I'm not reaching any conclusions at this point, which may in some ways be exacerbated by the events similar to those that happened today: That a hearing would be scheduled for what we can tell no reason at all, certainly, no good reason he wasn't produced and he has not been able to consult with his attorneys.

So in many way the attorney-client relationship has been burdened in ways I think strain constitutional norms. So I'm looking to the Government to try to find ways, if it's possible, to ease that strain before we even before we get to the detention hearing.

MR. HEEREN: Yes, Your Honor. We understand.

MS. SHROFF: Your Honor, I'm sorry, just to interrupt but Mr. Jacobson texted me saying he got kicked off the platform. But he asked me to tell you that. I'm sorry about that, but he texted me.

He asked me to inform the Court that both Mr. Augustine's mother and sister are present for the call today. He just wanted me to let the Court know. I don't know if he signed back on but he sent me a text and I'm reading the text into the record.

THE COURT: Thank you. I see him now. I see Mr. Jacobson now.

So we've had many technical difficulties in which both the Government and the defense have not been able to -- counsel have not been able to be on the line fully. Mr. Augustine has not been produced, and we don't know where the witness is. Other than that, this hearing went off smoothly.

MR. HEEREN: I think that's a fair characterization, your Honor.

THE COURT: I don't fault the Government for this, but I don't think the defendant should have to suffer, the attorney-client relationship is.

It's now 10:11, I think we can safely say we're not going to have a hearing this morning. How do we reschedule this in a way that will allow more certainty and make sure this happens. Let me ask the government first.

MR. HEEREN: Your Honor, probably the best way to do it would be to confer with defense counsel about how, you know, I assume they want it as quickly as possible but more specifically what date they want and for us to confer with it confer with our conduit with the MDC about available dates. And obviously, if there is a date that they want, and it's technically not available, we'll advise them of the urgency of this and trying to get on that date anyway with the -- I think

you know this, but obviously, there's a certain limitation in the number of phones and video conferences provided. But, again, the Government recognizes the urgency here and will convey that.

THE COURT: We've been trying for a long period of time to get this hearing scheduled and it's been adjourned several times in order to for the convenience of the witness and the Government. So it's critical that we get a date that's scheduled that both sides can attend and that it's a firm date. And if it's not, the Court will have to try to figure out what the legal implications are of an inability even to schedule a detention hearing in this case.

MR. JACOBSON: Judge, can I ask? Is the witness on the line and prepared to testify this morning?

MR. HEEREN: So this is the Government.

Mr. Prasad, if you're on the line can you please identify yourself?

This is Craig Heeren again. It doesn't appear the witness is on the line. The Government will try to re-contact him after this to find out what the issue was and we'll and we'll proceed from there.

MR. JACOBSON: Judge, what I would say is that I don't think this needs to be adjourned. I think the Court has heard everything that it needs to hear. I think the witness has made it very clear to the Court and the government that he

does not intend to testify in this matter.

And your Honor just noted we had to reschedule for the witness' availability which was the first red flag that the witness was not going to be available to testify. The witness has told the Government that he doesn't want to testify, and now he's telling everyone today in open court that he doesn't want to or intend to testify in this case.

So I don't think just adjourning this matter ad infinitum is going to solve anything. I think what's appropriate today is a ruling on Mr. Augustine's bail motion.

As Ms. Shroff said, his family is on the line yet again today for a bail hearing. They're here to show the Court their support. They're ready to sign. They're ready to have Mr. Augustine at home in California so he can prepare with his counsel for trial.

And I don't know if there is anything we're going to get out of another adjournment, and I think Mr. Augustine is entitled to bail and I just don't think that there's anything to be gained by continued adjournments here.

MR. HEEREN: Your Honor, I would correct the record on one thing.

It's my understanding that the witness was trying to connect today and had issues being able to connect. So I don't know, I have not spoken to him directly so I don't know whether it was a technical issue or whether it was some other

issue. So I don't think it's fair to conclude that he's refusing to testify.

MR. JACOBSON: I think it is fair, Judge. The witness has a phone, the Government has spoken to him on January 25th, 27th, 28th. They spoke to the witness again over the weekend, we don't know how many times because they haven't told us, but they've spoken to him many times. He's certainly able to at least -- forget about the video link -- he's certainly able to dial into this call just as 17 members of the public have dialed into this call and he could at least tell the Court directly that he's having technical issues.

But he didn't do that because he has told the Court and everyone else here in no uncertain terms that he does not intend to testify in this case and rescheduling yet again is not going to do anything because he won't he won't be here the next time here, Judge. It's a waste of the Court's time to give them another opportunity and it's clear he doesn't intend to testify. It's a prejudice to Mr. Augustine and his family.

Mr. Augustine, as the Court is fully aware, has been sitting in jail for five years. On February 24th, it will be five years that Mr. Augustine is in jail without a trial. The Trial Scheduling Committee is now saying that there are no slots available until October. It could be six years that Mr. Augustine is sitting in jail before he has a trial.

So I think it's time, Judge. It's time for

Mr. Augustine to be released. I think aside from the Bail Reform Act, I don't know how his continued detention comports with any understanding of due process. It's punishment at this point. There are people with his exact case who were sentenced to five years incarceration. He could be looking at a sentence of time served because he hasn't even gotten far along in his case to have to been tried.

So we would ask the Court to rule that Mr. Augustine should be released on the bail package that we've proposed in the past and we continue to offer with the sureters present on the line this morning.

MR. HEEREN: Your Honor, I would say the Government's position remains the same which is what we've told you before which is that even without the witness still I believe we can proffer his information. And we also have some other materials that we can share before we're going to proceed on this today based on the exhibits. Even if the Court were to discount that entirely as I'm -- and just rely on the facts that we've discussed previously, they support his continued detention. I'm not going to get into the details there.

I would note that Mr. Jacobson again counts, when he counts the time he's in custody, he counts the, I believe, two years that he was in custody in Tunisia serving his sentence there. But, in any event, the Government is prepared to

proceed and to argue the detention motion.

THE COURT: Does the Government wish to make a proffer.

MR. HEEREN: Yes, Your Honor.

So I would direct the Court's attention to, and we can provide it afterwards, but I would direct the Court's attention to its prior letter that proffered the testimony of this witness. Just to flesh it out some more, and we've talked about this before, but the witness was prepared to testify that he was the cellmate for a period of time with Mr. Augustine; that they spoke, and when they spoke, he was gravely concerned about the statements he made including the information about how Mr. Augustine viewed, believed, that we should arm children so they learn how to execute people in a war; that he believed there was a war between true Islam and the United States. He also advised Mr. Prasad about his -- what he had done in the past and confirmed as a factual matter, not as to the allegation against him, that he was trying to join and participate in and support ISIS originally in Syria, but since his passport was expiring that he went to Tunisia to get to Libya and among other things.

And one of the things Mr. Prasad would have testified to and what he told us previously was that Mr. Augustine, at one point in time, deliberately went to the SHU. He refused to lock in for the evening, refused to return

to his cell one night, and the reason why was he wanted to visit another inmate whose last name is Saleh is what Mr. Prasad remembers who he recalled being in custody for terrorism.

And so, that's why I want to direct your attention for your Honor the Government's exhibits. Exhibits 1 and 2 are the core inmate history quarters for Mr. Augustine and Mr. Munther Omar Saleh who I will get to in a moment. But if you look at these exhibits, and I believe the copies that you have, or at least the copies online should have yellow highlighting, they did, in fact, overlap in June of 2019 in house Z which is, according to the BOP, is the SHU. And they overlapped there for several days.

And I would note that according to Government Exhibit 3, which is Mr. Augustine's disciplinary records, the final on Page 2 of the record, the first incident, the incident at the bottom reflects that Mr. Augustine, "Admitted that he refused to lock down."

Obviously, Mr. Prasad had no access to these documents which go to my records, but it corroborates the information he previously provided the Government: That Mr. Augustine, in 2019, wanted to go visit with Munther Saleh.

Now, who is Munther Saleh? Munther Saleh was -- is -- an ISIS supporter who participated in a set of coordinated attacks on law enforcement in the United States

while armed with knives. He's serving, I believe, 18 months in prison now. Among other things, Mr. Saleh referred to himself as a full-fledged member of ISIS. And he considers himself an ISIS recruiter with a recruiting gift. Excuse me. With a, "Radicalizing gift."

So the Government submits, I believe, that the Court had a keen focus on whether, while Mr. Augustine's conduct prior to and related to the allegations was deeply troubling, whether there have been any change, whether there has been any change in Mr. Augustine during this time. And I think the information that the Government proffers including the records of who he was trying to visit with in another ISIS member, another radicalizing member who committed a crime of violence in the United States demonstrates that he has not changed, that he remains committed to this violent and radical cause and that letting him out would be a danger to the community and would render him a flight risk since he has demonstrated his desire to go and travel and be physically with ISIS.

Just very briefly. I may have said "18 months" for the sentence of Mr. Saleh, I meant 18 years. But that would be the Government's proffer of additional information. There's obviously lots of information the Government has provided in several letters to the Court which I won't belabor today but if the Court has any questions about them I'm happy to answer.

THE COURT: Just to remind me of your position.

Who has the burden of proof at this hearing and by what standard?

MR. HEEREN: Your Honor, remains that this is a presumption case. The Government respectfully submits that the defendant has not met his presumption but, however, even if he has, and the burden shifted back to the government, the Government submits that it's met its burden to prove the case.

As to legal standard, I believe it's a preponderance standard, sorry, clear and convincing evidence standard, I apologize, your Honor, and I believe the standard is hasn't been met in this case.

THE COURT: Clear and convincing evidence for dangerousness, and preponderance for risk of flight?

MR. HEEREN: Yes, Your Honor.

THE COURT: Okay. And I won't put want to put the defense in an awkward position because I know Mr. Augustine would be like to be heard. Would you prefer to respond when Mr. Augustine is present, or would you like respond right now?

MS. SHROFF: We'd like to respond now.

THE COURT: Okay.

MS. SHROFF: Your Honor, we would also like to admit a proffer from the defense if that's okay with the Court.

THE COURT: Tell me what you mean.

MS. SHROFF: Sure.

So, your Honor, after having received the 3500 material, of course, the defense did, as its obliged to do, investigated the matter and we spoke with the witness as well. The witness is Mr. Prasad.

I would like to point out, first, that it's important to look at the 3500 material generated in this case. The date of entry is January 25, 2021. And if you would just scroll down to the page, the document is drafted January 15, 2021. The investigation of this matter took place on December 18, 2019.

THE COURT: 2020 you said?

MS. SHROFF: 2019.

THE COURT: Okay. Go ahead.

MS. SHROFF: As we understand the United States spoke to the witness on December 28th of 2019. Did not draft anything until January 15th of 2021, and then finalized it on January 26th of 2021.

Now, as to the proffer. Let me just pull up my notes. If called as a witness and properly cross-examined and properly directed, we believe Mr. Prasad would tell the Court the following:

That he had been a bunkie with Mr. Augustine for, I would say, all of three weeks. Mr. Prasad will confirm that Mr. Augustine had never been aggressive towards him, violent towards him, lewd, mean, obstreperous or in any way unkind to

him. Mr. Prasad would also say that he was first contacted by Aybar, or a person named Aybar, who told Mr. Prasad that Mr. Aybar was getting a discount for testifying if he had any information on Mr. Augustine and suggested that Mr. Prasad do the same.

Mr. Augustine was roommates or bunky with an individual named Hall. Mr. Hall and Bernard were bunkies. Bernard was then sent to the SHU. Mr. Hall became bunkies with Mr. Prasad. And then when Bernard came back from the SHU, he used to talk to Mr. Hugh and Mr. Prasad. He spoke to Mr. Prasad knowing that Mr. Prasad was a Hindu.

When Mr. Hugh Hall was sentenced to time served, there was an opening in Mr. Prasad's cell and Bernard became Mr. Prasad's bunky, celly, whatever the term is. And when he did so, both obviously knew Mr. Prasad was a Hindu and that Mr. Bernard Augustine was a Muslim.

Now, Mr. Hugh Hall had an elderly lady, mother figure, as a friend named Toneda. And Toneda is known to both Mr. Hall and to Mr. Prasad. Because MDC was having so much trouble keeping lights on, heat on, and there was a blackout, each inmate picked a friend and said, you know, something happens to me, if I happen to die tomorrow, make sure you let my family know because MDC wasn't letting anybody know. And that is how Mr. Hugh Hall introduce his friend Tuniga to Mr. Augustine.

Mr. Augustine also knew Tuniga to be a Non-Muslim, a woman, and Mr. Prasad will testify that he never heard Mr. Augustine speak about or to Tuniga in any way negative way. He never heard her being called bitch, slut, or any other word that would be derogatory towards women.

We asked Mr. Prasad if he knew that Mr. Augustine's lawyers were female, and obviously, you know, since my voice is that of a female voice, that that's the answer was understood.

As far as Mr. Prasad knows, Bernard still remains a positive influence with Tuniga and she with him. Tuniga has never once converted to become a Muslim, and that Bernard was never disrespectful or rude to her.

We specifically asked him questions about the Government's proffer in this case to the Court. Mr. Prasad indicated that he had no fear whatsoever that Mr. Augustine would be violent towards them should Mr. Augustine find out that Mr. Prasad was, in fact, the cooperator.

In fact, according to a conversation that Mr. Jacobson had with the witness and, of course, Mr. Jacobson can correct me, Mr. Prasad said that he was not worried about Bernard, but he was really the person that he was worried about would be just generally in case somebody said, you know, sent word back to Guyana. But he sort of acknowledged that it was just a very amorphous fear, so to speak. As far as I

understand when asked the question about Bernard harming Mr. Prasad, Mr. Prasad laughed and said that Bernard wasn't capable of anything like that. He was very, very gentle.

As to what Mr. Bernard seemed to -- what Mr. Augustine seems to to Mr. Prasad, Mr. Prasad related the following. Mr. Prasad said that he had seen Bernard in, I think, Mr. Bernard is joining us. Let's wait so he can hear this.

THE COURT: Hold on for a minute.

Is Mr. Augustine joining us? Hello. Good morning.

Is Mr. Augustine joining us?

THE DEFENDANT: Hello.

THE COURT: Can you hear me? Is Mr. Augustine joining us.

MDC GUARD: Yes, I am going to produce him in about two minutes.

THE COURT: Okay.

MDC GUARD: Trying to get the audio.

THE COURT: Alexia?

COURTROOM DEPUTY: Yes, Judge.

THE COURT: Dial into the conference line and tell the 10:30 conference that we're going to be late.

COURTROOM DEPUTY: Yes, Judge.

THE COURT: Is anyone attempting to reach your witness at this time?

MR. HEEREN: We can try one more time. One second, your Honor.

THE DEFENDANT: Good morning.

MS. SHROFF: Hi, Bernard.

MR. JACOBSON: Good morning, Bernard.

THE DEFENDANT: Good morning. Let me take this mask off. Should I sit down?

MS. SHROFF: Sit down, please.

MR. JACOBSON: Yes.

MS. SHROFF: Much better, thank you.

Your Honor, may I continue?

THE COURT: Hold on just one minute, please.

THE DEFENDANT: Say that again.

MS. SHROFF: We're in the middle of telling the judge about our investigation so just hang tight, Bernard.

THE DEFENDANT: Okay.

MS. SHROFF: Thank you. Bernard, so we were waiting for you awhile. I'm going to catch you up. I think the judge may have dropped off. Hopefully, they'll all come back.

THE DEFENDANT: Okay.

MS. SHROFF: We are trying to continue the bail application in your case. There was a delay with you. So far we have not been able to reach the witness, and basically, I think you're all caught up. Your mom is on the line. Your sister is on the line.

THE DEFENDANT: What happened about the witness?

MS. SHROFF: Sam, you can handle that one.

MR. JACOBSON: We were waiting for him to call into the line, Bernard, and he hasn't shown up yet. So the prosecutor has just told the judge what they think that he would say if he was testifying. And now Sabrina is in the middle of telling the judge what we think he would say.

MS. SHROFF: Is the judge on the line? I think he left, right?

MR. JACOBSON: I think he dropped but we will wait for him.

THE DEFENDANT: They just woke me up. I thought I missed it. I thought it was cancelled or something so I was still sleeping.

MR. JACOBSON: They were supposed to give us a call together at 8:45 and then have you on video at 9:00 o'clock.

THE DEFENDANT: Yeah. Is my hair okay?

MR. JACOBSON: You're looking good, Bernard.

THE DEFENDANT: I combed it a little bit.

MR. HEEREN: I can't see who is or isn't on.

MS. SHROFF: Is the Court back on?

THE DEFENDANT: The SHU is worse. It's really bad up here.

MS. SHROFF: It smells, right?

THE DEFENDANT: Huh?

MS. SHROFF: It smells?

THE DEFENDANT: Yeah, it smells. But it's like I remember they used to feed people feed people up here. Now, they're giving like half of what was regular they give everyone. Like, the other day, my neighbor got gassed because he was holding his cup for more food.

COURTROOM DEPUTY: This is Alexia.

THE DEFENDANT: Two eggs for lunch.

MR. JACOBSON: One second. The judge's deputy is back on.

COURTROOM DEPUTY: The judge got kicked off the platform so he's going to try to call in by phone.

MR. JACOBSON: Bernard. Just so you know, there's a bunch of people dialed into this call that are not us.

(Discussion held off the record.)

THE COURT: Hello?

MR. JACOBSON: Judge, we can hear you but we can't see you.

THE COURT: I can't get you on video now at this point. I'm going to keep trying. The server won't respond for me but I'm able to reach you by phone. Is that good enough or do you want did wait and see if we can get the video back?

MS. SHROFF: Your Honor, we can continue.

THE COURT: Okay. So as a procedural matter, do we

need to catch Mr. Augustine up on what happened?

MR. JACOBSON: We just did when you were on the line he's all caught.

THE COURT: Okay. Ms. Shroff, we continue.

MR. HEEREN: I don't mean to interrupt you because I can't see. I want to confirm is the court reporter still on and taking the record?

THE COURT REPORTER: I'm still on, Craig. It's Anthony Frisolone.

MR. HEEREN: Oh, hey, Anthony. Thank you.

THE COURT REPORTER: You're welcome.

MR. HEEREN: Sorry about that, Sabrina.

THE COURT: Good morning, Anthony.

THE COURT REPORTER: Good morning, Judge.

MS. SHROFF: Were you able to get the witness, too?

MR. HAFTEZ: Your Honor, I have endeavored just to reach Mr. Prasad and I have not been able to reach him. I will point out that he did call, so I was able to get him on the phone. After the hearing started, I communicated to the Court already. What he told me was his was WiFi terrible. He was trying to log he could not. I instructed him to dial in with the access code that we were previously provided. Since then, I've been unable to reach him.

MS. SHROFF: Your Honor, if I may, Mr. Prasad also informed us that after the two or three weeks that

Mr. Augustine and he had been cellmates, he next saw Mr. Augustine in 2020. He saw Mr. Augustine in 2020 when Mr. Augustine and he were on the same bus to and from the MDC. Both of them had court on the same day.

Mr. Prasad informed us that they went to -- they were in the same marshals pen that day; that they rode the bus with Mr. Augustine to the courthouse, and that he rode the bus back from the Court to MDC with Mr. Augustine.

In speaking with Mr. Jacobson, Mr. Prasad said -- or asked -- and me what could you tell us about your conversation with Mr. Augustine on February 24th, he said he and Bernard talked a lot. They talked about how Bernard was now on a different path. Bernard told Mr. Prasad his views on Islam had changed; that he saw the wrong of his ways, wanted to go home to California, be with his mother and family and, "Live a normal life." This happened in 2020.

They discussed the fact that Mr. Prasad had been sentenced that day. He had gotten a sentence that was -- he didn't know Bernard knew how much time Mr. Prasad had gotten, but Bernard said he was happy for him and he was glad that Mr. Prasad was going home.

When we asked Mr. Prasad, if he had informed the United States about this meeting with Bernard in 2020, Mr. Prasad said he had not. We asked him why and he said the Government, the prosecutors, never asked him. We asked him

about whether or not he had, he had any concern about Bernard and he said, no. He said he was, let me just -- he said, He was a good kid; that he needed guidance, and seemed to have received the guidance and was a totally different person when he spoke to him in 2020.

I keep mixing up names in my head, I'm sorry, your Honor. Mr. Prasad also said that he knew that Bernard would never hurt or in any way harm his mother. That he has since that one comment where he was momentarily upset with her but he repeatedly called his mother. He is very close to his mother and is very kind generally as a person. He reiterated that he had no concerns about Mr. Augustine and that he had not heard or seen Bernard ever say anything negative about people in general.

He noted that he one of us told him of Aybar's comments, that Aybar had told the Government that Bernard had said he wanted to blow something up. Mr. Prasad said that he had never, ever heard Bernard say anything of that kind. He believed that Bernard had talked to Aybar a few times in total. He definitely does not think that Bernard would tell Aybar anything like that and knows that Bernard would never do such a thing.

As to trying to convince others to convert, Mr. Prasad noted that Bernard does ask people or wish and say, I wish you would convert so that we could be together, and he

has never seen or heard of Bernard forcing anyone to convert.

As an aside, your Honor, we would note that we do not believe that the Government is correct that Mr. Bernard Augustine was ever -- and this is not coming from the witness -- I would correct an issue of the exhibits. I do not believe, and I could be wrong, but I do believe that Mr. Bernard Augustine was ever bunkies with Munther Saleh. I think that maybe they ended up in the SHU at the same time, but I do not think that the Government is correct that Munther Saleh and Bernard Augustine were ever housed in the same cell, or on the same unit, and were close in the way that the Government is suggesting.

I do not think that there is any factual support that Mr. Augustine went to the SHU to see Munther Saleh ever. It would behoove the Government to note that there is more than one Muslim inmate with the name Saleh, and that they -- just so I'm on record -- that because the two were on the same unit that the reason that Mr. Augustine went up would not be proper at all.

If I had asked for the BOP records, I might be able to show that Mr. Augustine has been on the same floor with many other Salehs, and there is no factual basis to concede that it is this Saleh that Bernard had ever spoken with.

On the whole, Mr. Prasad said that he did not have any concern with Bernard, that he didn't know Bernard after

2019; had seen him once on that bus trip on the date where he spoke possibly for the longest time than they had ever spoken before. Mr. Prasad describes Bernard as a good kid who needs advice and guidance. That is what Mr. Prasad told us about his opinion of Bernard.

If the Court has specific questions, I'm happy to answer them. We could proffer to the Court that we spoke to the two other witnesses referenced in the Government's 3500 material. And we believe that neither of those two witnesses would support the Government's arguments in any way, shape, or form.

If Mr. Jacobson has something to add, I pass the mic to him to speak.

MR. JACOBSON: Thank you, Ms. Shroff. I would add a few additional comments based on discussions with Mr. Prasad. As to Mr. Saleh, Mr. Prasad said it's not possible that Bernard could be going up there specifically to room with a particular individual because you don't get to choose your roommate in SHU and the C.O.s put you in whatever cell is available at the time.

He also said that if Bernard was going up to try to see Saleh, it had nothing to do with Mr. Saleh being a terrorist, it just may have had to do with wanting to discuss a case with somebody who had similar charges in preparation of a defense.

As Ms. Shroff said, Mr. Prasad clarified with me he did not believe that Mr. Augustine would ever say such things to Mr. Aybar in terms of blowing something up, that that Mr. Augustine only spoke to Mr. Aybar a few times total. And that Bernard, first of all, would never say such things. And, second of all, would never do such a thing even if he had said it.

Regarding any discussions that Mr. Prasad had with Mr. Augustine about an Islamic state or Islamic city, Mr. Prasad told me that Mr. Augustine wasn't talking about the Islamic State, going to the Islamic State, he was talking about going to an Islamic state. That he want to the live in a place where you can practice your faith and that abides by Sharia Law. And that even if Mr. Augustine was going to an Islamic state, he absolutely was not going to do anything violent, and that Mr. Prasad believes that Mr. Augustine would never to any violence where ever he is.

Also, similar to Ms. Shroff, I spoke with Mr. Prasad about later conversations that he had with Mr. Augustine.

As the Court knows from the 3500, the Government has only shared with the Court information about Mr. Prasad's conversations with Mr. Augustine in March of 2019 when they were cellmates and that was two years ago at this point. But the Government never asked Mr. Prasad whether they had conversations after that. And as Mr. Prasad told myself and

Ms. Shroff, they had very positive conversations after that and Mr. Augustine never said anything concerning, in the two years after March of 2019. And, in fact, they had that extremely positive conversation on the bus ride to and from court in February of 2020 which was the day that Mr. Augustine had court and Mr. Prasad was being sentenced and Mr. Augustine was telling Mr. Prasad about his desire to go back to California to be with his family to live a normal life and to put his past behind him.

As Ms. Shroff said, we had separate conversations with Ms. Tomlinson and Hugh Hall. And Mr. Prasad had said which is that Mr. Augustine, "Is a good kid. Totally innocent. Peaceful. Would never harm anyone. Would never do violence to anyone. And the Court should have told faith this his be ability to do well on bail."

We also asked Mr. Prasad about his intent to testify, and like the Government's 3500 notes he didn't definitively tell us one way another but he did at one point say he said to us, "I'm glad you're hearing my voice today," which was a few days prior to today, "because you won't be hearing it on Monday." And I took that to mean that he was reluctant to testify and perhaps didn't want to testify. When we asked him why he was saying that. He said, "Because Bernard should be on bail. He's not a danger to anyone. He's a good and peaceful kid."

That's essentially what we have, your Honor, regarding our proffer of our conversations with Mr. Prasad, with Mr. Hall, with Ms. Tomlinson. The other thing other I want to the note is the Government had intended to introduce a number of exhibits at the hearing today. Ms. Shroff said there is no indication that Mr. Augustine was actually in the same cell with Mr. Saleh. In fact, there is no way he could have been because that's not how the SHU works. The C.O.s put you where they want to put you.

But also in terms of disciplinary records that Mr. Herren just mentioned. I think it's interesting. The Government is relying on an incident from the spring of 2020 that the Court has already very familiar with. Over the summer, Judge, we had discussed with your Honor Mr. Augustine's injuries that he sustained when he was assaulted in a cell and we discussed, and the Government never disputed, that the C.O.s had been trying to -- had been purposefully trying to put Mr. Augustine in cells with gang members where they knew Mr. Augustine had had prior issues with. And Mr. Augustine pleaded with them to not be put in those cells because he knew there were going to be issues.

At one point, he did refuse to end the cell because he knew that that was not a healthy placement for him and he had told the C.O.s that. And when they finally did put him in a cell with an individual, he was assaulted. And that's all

of the disciplinary infractions that are reflected in this report from 2020. The refusal to lock in, the disobeying an order, and the, "fighting," which, in reality, was Mr. Augustine being injured by an inmate where the C.O.'s knew he would be injured and put him in that situation where they knew he would be injured.

I hope, Judge, this gives you a little bit of an insight. Even the witness that the Government intended to --

Sabrina, I think you're on mute. You're on mute.

MS. SHROFF: Stop moving because we can't hear you.

MR. JACOBSON: Sorry.

MS. SHROFF: Thanks.

MR. JACOBSON: Judge, if you missed anything I'm happy to repeat it.

We just hope this gives the Court a clearer picture of not only what this witness, the Government's witness today would have said, but what the other potential witnesses mentioned in the 3500 would say and what the exhibits that the government intended to introduce, in fact, reflect.

So, for all of these reasons, and the reasons that we discussed at prior bail hearings, we believe that Mr. Augustine should be released on the proposed package.

THE COURT: Mr. Herren, do you wish to be heard?

MR. HEEREN: Yes, Your Honor. Briefly.

I would just note a couple of things. I would note

that as I understand it unless I missed something that the proffer provided by the defense does not dispute the core parts of the proffer the Government provided regarding the information that Mr. Augustine provided Mr. Prasad when they were cellmates regarding his interest in arming children and their views on there being a war. Rather, the focus was that his views had evolved since then about these things.

So, apparently, according to the proffer, had not evolved so much that he didn't want to still live somewhere under what he viewed as appropriate laws which would not be the United States laws. I think the information that Mr. Prasad provided is largely uncontradicted in that respect. The only other thing I would ask for at this time -- oh, I would note also to clarify the record, the Government did not say Mr. Augustine was bunkies or cellmates with Mr. Saleh. The information provided to the Government was that Mr. Augustine refused to lock in because he wanted to go to the SHU because Mr. Saleh was in the SHU as well. We're not suggesting or saying that he knew or would be able to definitely get in as cellmates. And we're not saying we have any evidence to say that they were cellmates, just that the information was that he was trying to get closer to Mr. Saleh, an ISIS terrorist. And that the records, the independent records, corroborate that testimony from Mr. Prasad. Corroborates that information from Mr. Prasad and show that,

as Mr. Prasad describes, he refused to lock in one day. And, as Mr. Prasad describes, he went to the SHU at the same time that Munther Saleh was in the SHU.

The last thing I'd ask is I would ask the Court to ask defense counsel for the dates that they spoke to Mr. Prasad, and if the Court would ask whether they will turn over their notes of that meeting or meetings, I should say.

THE COURT: Would the defense like to respond to that, please?

MS. SHROFF: Yes, Your Honor. If I may, and I'm sure Mr. Jacobson can also chime in. I do think Mr. Prasad would disagree with the Government's core characterization of their 3500 material. One, they disagreed that Mr. Augustine was in any way violent. Two, they would disagree that he would routinely refer to women with such as bitch or slut. Three, he would disagree with the Government as to whether or not Mr. Augustine is a risk of flight. Four, he would disagree that he is a danger to the communicate. Five, Mr. Prasad would have in no way know which Saleh that Mr. Augustine ever had any interest in talking to or helping. He has no way to know that, in fact, it was Munther Saleh.

And, again, I reiterate here: If I had the same access to BOP records, there is more than one Saleh, one other Saleh who is quite ill. And very much so, a person might want to actually provide help to a sick Saleh as opposed to go talk

to Munther Saleh.

And, frankly, as Mr. Augustine suggests go to the SHU willy-nilly and be next to another terrorist defendant that reflects poorly on the BOP and the United States, and is not nearly a reflection of Mr. Augustine.

Again, and again, and again I point out that Mr. Prasad said that he had never heard Bernard saying he was going to blow anything up and he has never heard Bernard ever want to blow anything up, or ever do anything violent. That's what goes to danger not whether or not Mr. Augustine wants to go live in a country that is not governed by the laws of the United States. Is the government really telling us that he wanted to go live in the Islamic Republic of Pakistan or in the Republic of India, Afghanistan or Kazakhstan that someone would be a lesser human being or more of a danger?

I mean, I'm sorry, I'm an immigrant and I would really empathize with anybody who wanted to go live somewhere else. I don't think that goes one way or another. It certainly does not reflect that a person should not get bail.

Repeatedly, this witness told us repeatedly that he literally laughed when asked was Mr. Augustine ever violent. I am not sure what core argument is left here as to the discussion in their 3500 material where he and Mr. Augustine were talking about kids or there's America is beautiful but it's not. There was much discussion with Mr. Augustine about

how America does not treat black people the same way as it does white people. There was discussion about how America does not treat Muslims the way it treats non-Muslims.

Mr. Augustine had several considerations and, in fact, has clipped articles from interest newspapers about several things having to do with Syria that have nothing to do with the Islamic State. He talked about the Bashar al-Assad regime. How the drone strikes Trump -- Assad -- routinely on children and it was heartbreaking to see such children become targets of violence. And perhaps it is, in fact, that context that the Government's questioning can be put in place. I cannot speak to more of that specifically now, but I can assure the Court that there is nothing about Mr. Augustine in 2020 that relates to any core arguments that the government made from 2019 that they did not bother to write up in 2021.

Finally, Mr. Prasad would say that at no time was he so worried about anything that Bernard said that he ever alerted a BOP employee, that he ever alerted a counselor, that he alerted a guard, or that he ever alerted his own lawyer or reached out of fear to tell the prosecutors, hey, you should look into this person.

He was only told of Bernard by Aybar, and Aybar suggested to him that he, too, could get credit and less time in jail because the prosecutor, who Aybar would have been talking to, was interested in information about Bernard

Augustine. There was not a scintilla of concern or fear that ever prompted Mr. Prasad to do anything on his own by contacting a guard, another inmate, a prosecutor, or his own defense lawyer to say here is my concern about Mr. Augustine.

Mr. Jacobson, you can add what you would like.

MR. JACOBSON: That's all I have. Thanks.

THE COURT: Mr. Herren.

MR. HEEREN: I have two more things if your Honor is okay with that.

THE COURT: Go ahead.

MR. HEEREN: First is just kind of a small point earlier about the date of the 302, of the agent report regarding the December 2019 interview of Mr. Prasad. It's true that the report is dated January 26, 2021. The additional 3500 includes the original notes that were taken contemporaneous with the interview. So minor point there.

The one other thing I would note is, well, I would make two points.

The first is, as we've said before, this witness did not say, other than one incident where there is apparently a fight in the facility or a potential fight in the facility, it did not say he was engaged in acts of violence, but that he described his views and his intent with relationship to them such as the one I described before. An intent, an interest in violence, is what makes him dangerous. The second point I'd

make --

THE COURT: I'm sorry, could you just amplify on that. Tell me what you mean more specifically.

MR. HEEREN: Sure, your Honor.

The conversations they had that according to Mr. Prasad told us caused him grave concern was his statements about arming children so that they could fight in a war so they could execute people. His concern when he told it to us, his concern was how he viewed the world as Islam against the United States, that there was a war going on, that he viewed it as a war. He even went so far as telling Mr. Prasad that at the time that if his mother was on the side of the Government, then he's not with him, she's got to go. The reference to calling a woman a bitch was regarding his ex-girlfriend who said that bitch must die. And this is consistent to the other evidence that the government has provided that the evidence for this trial which is the defendant's violent rhetoric throughout the time period immediately prior trying to join ISIS.

The record that we have is a man who is interested in violence, who discusses violence, who has told people that he wants that he wants to become a martyr for a violent foreign terrorist organization. So I think it's consistent with that.

The last point I would make is that with regard to

security, Mr. Prasad told us, as the 3500 reflects, on February 1st, seven days ago, that he was concerned about his security and that he was aware that Mr. Augustine communicates with people outside the MDC including, as defense counsel confirmed, Hugh Hall and Tuniga Tomlinson.

So getting the substantive points aside, I would again ask the Court to ask defense counsel to provide their notes of their communications and identify when they spoke to the witness.

THE COURT: Mr. Herren, before I speak to the defense. The defense would appear to have responded that regardless of what Mr. Augustine may have said to Mr. Prasad in 2019 is usable. In any of the interviews that you or your colleagues had, or agents had, with Mr. Prasad, did Mr. Prasad express that to you?

MR. HEEREN: No, Your Honor, he did not.

THE COURT: Was he asked -- had resolved or evolved, or did anyone ask whether there'd be any subsequent discussions with Mr. Augustine between Mr. Augustine and Mr. Prasad after the initial ones that you described?

MR. HEEREN: We asked. I don't believe we asked that specific question, your Honor. We discussed with him his prior information that he gave to the Government when we spoke to him again and he never volunteered any additional information.

THE COURT: Okay.

MS. SHROFF: Your Honor, we have no obligation to turn over any dates or any 3500. But, nevertheless, I'm happy to tell the Court exactly how many times we spoke to Mr. Prasad. But that Mr. Prasad who reached back out to us or not. And I note that we do that even where we have zero obligations to do that and we do not -- as the Government does.

So Mr. Jacobson spoke to Mr. Prasad yesterday. Mr. Prasad reached out to me and Mr. Jacobson, I believe -- let me just check the dates, okay -- on Friday and we also spoke on the Friday. I don't think I spoke to him on Saturday but, you know, I definitely spoke to him on Friday. And he reached out to me on Friday asking me for further follow-up information and he spoke with Mr. Jacobson yesterday. Yesterday is when he informed us that the Government had repeatedly tried to get him to change his mind, which is Giglio, and he informed us that he had spoken to the government over the weekend for which we never got any 3500. And yesterday is when he said that he had absolutely -- he laughed -- and said he absolutely zero fear about Bernard Augustine. The fear was a generic one because he lived in Guyana and people in the jail talk.

At no point did he ever say anything about Mr. Augustine being hostile to women. He talked about

Mr. Augustine's continuing relationship with Ms. Tuniga Tomlinson and we spoke to her and we asked her and, by the way, right now, she reached out to me again to ask how things were going. She says she has treated with nothing but respect by Bernard.

It is absurd for the Government to say anything about Mr. Augustine's viewing the world as America against Islam. I don't see that anywhere in their write-ups of the notes and I frankly point out again that it is shocking to me that the government never once asked the witness, their key witness, hey, what is Mr. Augustine's view? Did you ever talk to him after 2019? That is a basic question. Did you talk to him in 2020? Did you talk to him in 2021? In all the times that you've known Mr. Hall and you knew Tuniga, has Bernard ever threatened you? Has Bernard ever reached out to you? Have you had any flack from Bernard? The answer would have been a universal no. These are very basic questions they should have asked. I mean, Mr. Jacobson asked and I don't think he's much of a prosecutor.

I turn it over to him if there is anything more to add. But there is nothing in these notes at all about Mr. Bernard Augustine views of Muslim versus the world. There is no such notation of any such belief now. We're asking for relief now.

So I don't really understand what exactly the

Government is saying to the Court, and I urge the Court to take a look at all the handwritten notes because I am going through them now and I don't see any such mention.

And as to the comments about the mother. Mr. Prasad specifically noted to Mr. Jacobson that he and his mother are extremely close and he was absolutely not talking about any violence towards his mother.

THE COURT: Ms. Shroff, you said that Mr. Prasad said the government was trying to get him, Mr. Prasad, to change his mind. What specifically did Mr. Prasad say?

MS. SHROFF: We did not ask. We did not ask.

THE COURT: Change his mind about what?

MS. SHROFF: We did not ask whether he was or was not going to testify. What led him to change his mind, why he was going back and forth, we did not think that was necessary for us to know. We didn't ask him this question. If he wanted to testify with us --

THE COURT: Okay. I understand.

MS. SHROFF: We said that it's the Government's obligation, not ours.

THE COURT: Okay. All right. I think that concludes this hearing. Is there anything -- I think we've said a lot -- is there anything that's been unsaid? Mr. Herren anything more?

MR. HAFTEZ: No. Thank you, your Honor --

MR. HEEREN: No thank you, your Honor.

THE COURT: Ms. Shroff? Mr. Jacobson?

MS. SHROFF: No, Your Honor. But is there any way you can at least help us talk to Bernard? I think we've looked at him because he needs to talk with his lawyers and we would very much like that.

THE COURT: I'm more than happy to request that the MDC allow you to speak with him after we all get off the phone now.

MS. SHROFF: Bernard, is there a guard there?

THE DEFENDANT: Repeat that.

MS. SHROFF: Is there a guard around that can hear us so you can ask to be able to talk to us a little bit. Is there anybody next to you?

THE DEFENDANT: Not anybody that would care.

MS. SHROFF: Okay.

THE DEFENDANT: They regular guards. They don't really care about anything.

MS. SHROFF: Bernard ask for a legal call.

THE DEFENDANT: Ask for a legal call?

MS. SHROFF: Yes.

THE DEFENDANT: Okay. I'm going to do that. Before I wanted to go, I want to say something.

MS. SHROFF: Don't say anything, let it go. We're going to talk to you shortly.

THE DEFENDANT: Okay. Okay. I will do that.

MS. SHROFF: Thank you, Bernard. Thank you.

THE COURT: So, Ms. Shroff, we can conclude this hearing and those of us who are not part of the defense drop off you may have an opportunity to speak to Mr. Augustine.

MS. SHROFF: Thank you so much, your Honor. We would really appreciate that.

THE COURT: Okay. Thank you very much.

MR. JACOBSON: Alexia, is it possible to leave the line going for a few minutes?

COURTROOM DEPUTY: I can leave it up. I will leave it up.

MR. JACOBSON: We will able to see when everyone drops off, I think.

COURTROOM DEPUTY: Okay.

MR. JACOBSON: Okay. Hold on, Bernard. We'll wait until everyone's off the call.

COURTROOM DEPUTY: Everyone is dropping off. But I don't control this link BOP does.

(WHEREUPON, this matter was adjourned.)

* * * * *