UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA, : 18-CR-393 (SJ)

Plaintiff,

-against- : United States Courthouse, Brooklyn, New York

BERNARD RAYMOND AUGUSTINE,

Defendant. : Friday, August 20, 2021, 12:00 p.m.

- - - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR TRIAL
BEFORE THE HONORABLE STERLING JOHNSON, JR., AND A JURY
UNITED STATES DISTRICT SENIOR JUDGE

A P P E A R A N C E S:

For the Government: JACQUELYN M. KASULIS, ESQ.
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: CRAIG HEEREN, ESQ.
JOSHUA HAFETZ, ESQ.
JONATHAN E. ALGOR, IV, ESQ.
Assistant United States Attorneys

Standby Counsel For the Defendant: GARY S. VILLANUEVA, ESQ.
11 Park Avenue
Suite 1601
New York, New York 10007

AND

SUSAN G. KELLMAN, ESQ.
25 8th Avenue
Brooklyn, New York 11217

AND

BERNARD RAYMOND AUGUSTINE
*Pro Se*

A P P E A R A N C E S (Continued)

Court Reporter: DAVID R. ROY, RPR
225 Cadman Plaza East
Brooklyn, New York 11201
drroyofcr@gmail.com

Proceedings recorded by Stenographic machine shorthand, transcript produced by Computer-Assisted Transcription.

P R O C E E D I N G S

--ooOoo--

(In open court; outside the presence of the Jury.)

THE COURT: Are we ready for the charge conference?

Who wants to go first?

MR. HEEREN: Yes, Your Honor. I think the one thing we just need is, if I could ask your clerk, I guess, before I forget, to unmute the microphones?

THE COURT: What is it you're asking?

(No response.)

THE COURT: Let's go to the charges that you would have before me.

MR. HEEREN: Yes, Your Honor.

THE COURT: Page by page.

MR. HEEREN: The Government --

THE COURT: What page?

MR. HEEREN: The first one is on Page 10, Your Honor --

THE COURT: Okay.

MR. HEEREN: -- unless the defendant has any earlier edits.

THE COURT: Just what page do you have? What do you want on Page 10?

MR. HEEREN: On Page 10 under Evidence, we can strike --

THE COURT: Wait a second.

MR. HEEREN: Yes, Your Honor.

THE COURT: Do you have it, Ms. Kellman?

MS. KELLMAN: Yes.

THE COURT: You have it.

What is not evidence?

MR. HEEREN: We can strike the sentence that begins, "Third." There are no stipulations in this case.

THE COURT: Third.

Okay.

(Pause in proceedings.)

THE COURT: Okay.

Next?

MR. HEEREN: Page 13.

THE COURT: Go ahead.

MR. HEEREN: The paragraph with the header Stipulations.

THE COURT: Yes.

MR. HEEREN: That entire paragraph going on to Page 14, can be struck --

THE COURT: Okay.

MR. HEEREN: -- as there are no stipulations.

THE COURT: Okay. You have no stipulations.

Okay. Next?

MR. HEEREN: Page 14, under Charts and Summaries, in the first sentence we would request that you replace the words "in addition to" with "in place of" --

THE COURT: Wait just a second.

Okay. "In addition to."

Go ahead.

MR. HEEREN: Should be, "In place of the underlying documents."

THE COURT: All right.

Is there any objection, Ms. Kellman?

MS. KELLMAN: No, Your Honor.

THE COURT: Okay.

You got that, Marielle?

THE COURTROOM CLERK: Yes.

THE COURT: Okay. Next?

MR. HEEREN: The following two paragraphs, the

Government believes are not necessary and could be struck. But if the Court wants them in, we have no objection to them being in.

THE COURT: Do you have any objection, Ms. Kellman?

MS. KELLMAN: No, Your Honor, no objection.

THE COURT: The next two paragraphs are all right.

MR. HEEREN: And, Your Honor, just for the record, the Government has no objection to Ms. Kellman stating the defendant's wishes. I just want it to be clear for the record that what Ms. Kellman is stating is what the defendant wishes to do, just so that it's an accurate record of the defendant.

THE COURT: Well, if she states it, that's what he wants. She is advising counsel. That is all right.

MR. HEEREN: Understood, Your Honor. Thank you.

On Page 15 --

THE COURT: Yes.

MR. HEEREN: -- I believe this entire section from Page 15 to 16 is likely not to be needed, so we would likely be able to strike the entire thing. It is possible that the Government may introduce on cross-examination a transcript and audio recording, but --

THE COURT: What says you, Ms. Kellman?

MR. VILLANUEVA: So far it doesn't seem necessary,

Judge, but I guess we'll see after we all rest. I don't think it's going to be necessary.

THE COURT: I will reserve on that.

MR. HEEREN: That's fine, Your Honor. Thank you.

THE COURT: That's fine.

All right. Next?

MR. HEEREN: The next one is Page 20.

THE COURT: Yes.

MR. HEEREN: I don't believe there's been any discussion or argument about investigative techniques, so I think this may be able to be struck subject to --

THE COURT: Any objection, Ms. Kellman?

MS. KELLMAN: No, I agree, Your Honor.

THE COURT: Okay.

MS. KELLMAN: We agree.

THE COURT: Next?

MR. HEEREN: Page 29.

THE COURT: Go ahead.

MR. HEEREN: If the defendant does testify, that can, obviously, be struck. I know there is an "or" in there.

THE COURT: Okay. The defendant's going to testify, but...

MR. HEEREN: Yes. So, of course, he retains the right not to if he chooses.

THE COURT: Next?

MR. HEEREN: Page 38, Your Honor.

THE COURT: Go ahead.

MR. HEEREN: The first paragraph can be cut because there is only one charge in the case.

THE COURT: Do you want to knock out this first paragraph?

MR. HEEREN: The one that begins, "Because certain legal requirements..."

THE COURT: What do you say, Ms. Kellman?

MS. KELLMAN: No. I think that's true, because we only have one charge.

THE COURT: Okay. It will be stricken.

MR. HEEREN: The second proposal, Your Honor, is on the same page. The Government submitted a letter on this.

THE COURT: Which one?

MR. HEEREN: It's regarding the sentence that begins, "A person acts intentionally..." in the third paragraph.

THE COURT: I see "...A person acts knowingly..."

THE COURTROOM CLERK: Below that, the second sentence.

THE COURT: Oh, okay.

MR. HEEREN: But that's actually the definition

for willfully, Your Honor. We would propose putting in the definition for intentionally. Because willful conduct is not required, we had provided the language for intentionally to your clerk in a letter that was filed last night.

THE COURT: Oh, okay. That's the one that I just received?

THE COURTROOM CLERK: Yes.

THE COURT: Any objection?

MS. KELLMAN: No. We have no objection to that, Your Honor.

THE COURT: Okay. We'll put that in, Marielle.

Next?

MR. HEEREN: Paragraph -- or I'm sorry, Page 42.

THE COURT: All right.

MR. HEEREN: The first sentence, replace Count 1 with the phrase, "...providing material support to a designated foreign..." --

THE COURT: Wait a minute.

Count 1, it says, "...to provide in violation of section..."?

MR. HEEREN: But in the first sentence, Your Honor --

THE COURT: Yes.

MR. HEEREN: -- "I will now read the elements of Count 1." Instead of Count 1, because there's only one

count, I would recommend saying, "I will now read the elements of providing material support to a designated foreign terrorist organization."

THE COURT: That language is there any objection, Ms. Kellman?

MS. KELLMAN: No, Your Honor.

MR. HEEREN: The next paragraph that begins, "To prove a violation..." that can be struck because it's just an inadvertent duplicate of the paragraph of the sentence immediately before.

THE COURT: This next paragraph?

MR. HEEREN: The two next sets -- the two following sentences are identical. There's just a duplication error.

THE COURT: Okay. Oh, yeah, I see it, uh-huh.

MR. HEEREN: So just one needs to be struck.

THE COURT: Any objection, Ms. Kellman?

MS. KELLMAN: No, Your Honor.

THE COURT: Okay.

MR. HEEREN: On that same page, Your Honor --

THE COURT: Yes.

MR. HEEREN: -- in the paragraph that begins with the word "Fourth" that's underlined --

THE COURT: Yes.

MR. HEEREN: -- two more elements need to be added

at the end of it. So after "2," the Government would propose adding "3, The defendant is an national of the United States; or, 4, the offense occurred in or affects interstate or foreign commerce."

THE COURT: Any objection?

MS. KELLMAN: I'm sorry. I apologize, Judge. What page are we on -- is that on?

THE COURT: Same thing, 42.

MS. KELLMAN: Let me just get there. I'm sorry.

(Pause in proceedings.)

MS. KELLMAN: Yes, no, not a problem.

THE COURT: Okay.

Next?

MR. HEEREN: And then on Page 47.

THE COURT: Go ahead.

MR. HEEREN: The Government proposes adding one sentence to the beginning of that section, and the sentence is this: "The Government is required to prove that the defendant attempted to provide material support to a foreign..." -- "...to a designated foreign terrorist organization, comma, not that he actually did so." Period.

THE COURT: Any objection to that, Ms. Kellman?

MS. KELLMAN: No, I think that's right, Judge.

THE COURT: Okay.

MS. KELLMAN: I think that's right.

THE COURT: Okay. You got that, Marielle?

THE COURTROOM CLERK: Uh-huh.

THE COURT: All right.

Next?

MR. HEEREN: That is all of the proposed changes by the Government, Your Honor.

THE COURT: Okay. Thank you.

Ms. Kellman?

MS. KELLMAN: Your Honor, the one that we wanted to focus on was the "membership in a foreign terrorist..."

THE COURT: No, no, no. Page?

MS. KELLMAN: It's not in there, Judge.

THE COURT: All right. Go ahead.

MS. KELLMAN: So we would ask Your Honor to add language to the effect that, "Membership in a foreign terrorist organization is not enough for a conviction." And I think that's *Holder versus Humanitarian*.

"The Government must..." -- "Under the law, the Government must prove beyond a reasonable doubt that Bernard Augustine attempted to provide to a foreign terrorist organization services at the direction of a foreign terrorist organization or at a time when Mr. Augustine was..." --

THE COURT: Under the direction?

MS. KELLMAN: "...under the direction of a foreign

terrorist organization or at a time when Mr. Augustine was under the direction or control of a foreign terrorist organization."

THE COURT: Is that the law?

MR. HEEREN: I believe so, Judge, yes, it is, the *Holder* case.

I can pull the case up. It's *Holder versus the Humanitarian Law Project*.

THE COURT: Draft that language --

MS. KELLMAN: Yes.

THE COURT: -- in available form for the prosecutor and myself.

MS. KELLMAN: I will do that right away, Judge.

MR. HEEREN: And, Your Honor, may we have the opportunity to put something in writing in response when we receive that?

THE COURT: Yeah, you can object to that, and you know --

MR. HEEREN: Thank you.

THE COURT: -- if you want to do it, fine.

MR. HEEREN: Okay.

THE COURT: But go ahead.

MS. KELLMAN: That's all we have, Judge.

THE COURT: All right.

MR. HEEREN: Your Honor, I'm sorry. I missed one

extremely small one.

It's just a typo on Page 46.

THE COURT: 46?

MR. HEEREN: Yes, Your Honor. The first paragraph.

THE COURT: Hold on a second.

MR. HEEREN: Sure.

(Pause in proceedings.)

THE COURT: Go ahead. The first paragraph?

MR. HEEREN: The first paragraph at the very end of the paragraph, immediately before the number 4, there should be the word "or," O-R.

THE COURT: I see it.

What sentence are you referring to?

MR. HEEREN: The first paragraph --

THE COURT: Okay. I see it.

MR. HEEREN: Okay.

THE COURT: There's 4. I see 4.

MR. HEEREN: Right. And right before the number 4, there should be an "or" there, because it's "1, 2, 3 or 4."

THE COURT: I see. "...O-R in part within the United States; or 4..."

MR. HEEREN: Yes, Your Honor.

THE COURT: Any objection to that?

MS. KELLMAN: No, Your Honor.
THE COURT: Okay.
All righty. You can bring the jury in.
MR. HEEREN: Your Honor?
THE COURT: Wait a second.
Yes.
MR. HEEREN: The Government plans to call -- the Government took Your Honor's recommendation to heart. We identified an expert witness who is a member of law enforcement, and we would like to put him on this morning.
THE COURT: All right. And how long is he going to be?
MR. HAFETZ: About an hour, Judge.
THE COURT: Cut it down.
MR. HAFETZ: Yes, sir.
THE COURT: All right.
MS. KELLMAN: Your Honor, I would just put on the record, we do not have any 3500 material on this witness. We don't have a CV. We don't know whether or not he's testified previously.
We ask that --
THE COURT: What documentation do you have to back him up?
And they couldn't get the 3500 material because I ruled yesterday that the expert witness that the Government

called originally was not an expert, at least in this matter.

MS. KELLMAN: Understood.

MR. HAFETZ: Your Honor, he has not testified before, and there is no 3500 material for him.

We provided last night -- or excuse me, before court this morning, we provided a copy of the materials that he reviewed in preparation for his testimony today.

THE COURT: Okay.

MR. HEEREN: Your Honor?

THE COURT: Yes.

MR. HEEREN: Before the jury comes in, I just wanted to make sure I understood. Do you have need to hear voir dire before we put him on, or do you anticipate you will likely accept his testimony as an expert?

THE COURT: You got to have him qualified as an expert.

MR. HEEREN: Yes, Your Honor.

Would you like to hear voir dire first outside of the presence of the jury to ensure that --

THE COURT: How long is it going to take?

MR. HAFETZ: Five minutes or less, Judge.

THE COURT: Put him on, then.

MR. HEEREN: Thank you, Your Honor.

MR. HAFETZ: Thank you, Your Honor.

Your Honor, the United States is calling Andrew Ver Steegh to the stand.

(The witness takes the witness stand.)

**A N D R E W V E R S T E E G H,**

called as a witness having been first duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM CLERK: Okay. You can have a seat.

THE WITNESS: Thank you.

THE COURTROOM CLERK: Can you state and spell your name for the record, please.

THE WITNESS: My name is Andrew Ver Steegh.

THE COURTROOM CLERK: Can you spell it, please.

THE WITNESS: Oh, the last name is V, as a "Victor"; E-R; space; S, as in "Samuel"; T-E-E-G-H.

MR. HAFETZ: May I inquire, Your Honor?

THE COURT: You may.

MR. HAFETZ: Thank you.

VOIR DIRE EXAMINATION

BY MR. HAFETZ:

Q Where do you work, sir.

A I work for the Federal Bureau of Investigation.

Q How long have you worked for the FBI?

A I've been with the FBI since 2013.

Q What is your title with the FBI?

A I currently am a special agent.
Q And what section of the FBI are you currently assigned to?
A I work at the FBI in New York Joint Terrorism Task Force.
Q How long have you worked on the Joint Terrorism Task Force?
A Since 2016.
Q How long have you been working on terrorism investigation for the FBI?
A Since 2013.
Q Where did you attend college?
A I attended Macalester College.
Q Did you do any graduate studies?
A I did.
THE COURT: Wait a second.
Where is Macalester?
THE WITNESS: It's in St. Paul, Minnesota.
THE COURT: Okay. Go ahead.
BY MR. HAFETZ:
Q Did you ever graduate, sir?
A I did. I attended the University of Chicago and received a Master's Degree in Middle Eastern Studies.
Q And what languages do you speak, if any, besides English?

A Arabic.
Q Have you received training while at the FBI on terrorist groups, including the Islamic State?
A I have.
Q Generally, what are your duties or responsibilities on the JTTF?
A In my current assignment, I'm responsible for investigating terrorism matters, primarily North Africa.
Q As part of your work at the FBI, have you been stationed abroad as an Acting Assistant Legal Attaché, or ALAT?
A I have.
Q What is an ALAT?
A An ALAT is a representative of the FBI at the U.S. Embassy that handles relations with the host nation, law enforcement communities, as well as the FBI's relations with other Governmental agencies at the embassy.
Q And where have you been stationed as an acting assistant ALAT?
A Both in Rabot, Morocco and Tunis, Tunisia.
Q While stationed as an acting assistant ALAT, did you work on terrorist investigations there?
A I did.
Q Have you received training with the FBI in Islamic extremist ideology?

A I have.
Q And approximately how many terrorist investigations have you participated in since you joined the FBI?
A I would estimate in the hundreds.
Q And how many terrorist investigations have you yourself been the lead case agent on?
A I would estimate that as dozens.
Q And how many of the hundred or so or more that you've worked on and participated in relate to ISIS?
A I would say it's 50 to 60 percent.
Q While assigned to the JTTF, have you worked on investigations of individuals who have travelled to join ISIS?
A I have.
Q As part of your organization do you have to conduct interviews of and debrief ISIS members?
A Yes.
Q Have you interviewed an emir of ISIS?
A Yes.
Q What is an emir of ISIS?
A That's a person who has a leadership position.
Q As part of your work with the JTTF, have you travelled to countries in North Africa to conduct terrorist investigations?
A Yes.

Q What countries in North Africa have been involved in terrorism investigations in, including ISIS?
A Mauritania, Morocco, Tunisia, Libya, and Sudan.
Q When was the last time you travelled to Libya to participate in a terrorist investigation?
A Earlier this year.
Q As part of your work for the JTTF, have you become familiar with ISIS's leadership structure and propaganda material?
A Yes.
Q And have you personally reviewed ISIS propaganda material, including numerous videos produced and dissimilated by the Islamic State?
A Yes.
Q Based on your knowledge, training, and experience conducting terrorism investigations, are you familiar with specialized terms specific to the Islamic State and Islamic extremist groups?
A Yes.
Q Have you read and consumed a significant volume of primary source material created by supporters or members of ISIS, including on social media?
A Yes.
Q Does the primary source of materials that you've reviewed include ISIS materials recovered from the

battlefield in Syria?
A Yes.
Q Have you researched and are you familiar with the way in which ISIS has sought to recruit people from overseas to travel to join ISIS, including in 2015 and 2016?
A Yes.
Q And, sir, did you participate in the investigation of Bernard Augustine?
A No.

MR. HAFETZ: Your Honor, at this point, I would offer Agent Ver Steegh as an expert in terrorism and on ISIS and its recruitment policies and propaganda.

THE COURT: Mr. Augustine, do you want to cross this witness?

MR. AUGUSTINE: No, Judge.

THE COURT: Okay. He will be received.

MR. HAFETZ: Thank you, Your Honor.

THE COURT: All right.

MR. HAFETZ: Thank you, Judge.

THE COURT: All right. Let's have the jury in, please.

(Pause in proceedings.)

(Jury enters the courtroom.)

(Jury present.)

THE COURT: You may be seated.

All right. We are ready to begin.

All right. Does the Government want to call your witness?

MR. HAFETZ: Thank you, Your Honor. The Government calls Andrew Ver Steegh.

**ANDREW VER STEEGH**,

called as a witness having been first duly sworn/affirmed, was examined and testified as follows:

THE COURTROOM DEPUTY: Have a seat.

Please state and spell your name for the record, sir.

THE WITNESS: My name is Andrew Ver Steegh, Ver -- the last name is spelled V, as in "Victor"; E-R, space, S-T-E-E-G-H.

MR. HAFETZ: Your Honor, may I inquire?

THE COURT: You may.

MR. HAFETZ: Thank you.

DIRECT EXAMINATION

BY MR. HAFETZ:

Q Where do you work, sir?
A I work for the Federal Bureau of Investigation.
Q What is your title at the FBI?
A I am a special agent.
Q How long have you worked at the FBI?

A I've been with the FBI since 2013, and I have been a special agent since 2016.
Q And what section of the FBI are you currently assigned to?
A I work for the Joint Terrorism Task Force at the New York field office.
Q That's otherwise referred to the JTTF?
A Yes.
Q Special Agent, did participate in the FBI investigation into Bernard Augustine?
A No, I did not.
Q Sir, what languages do you speak, if any, besides English?
A Arabic.
Q Have you received training at the FBI on Islamic extremist ideologies, including ISIS?
A Yes.
Q How many terrorism investigations have you worked on in the course of your career at the FBI?
A I would estimate it in the hundreds.
Q While assigned to the JTTF, did you work on investigations of individuals who have traveled to join ISIS?
A Yes.
Q All right. And as part of your work at the JTTF, have

you travelled to countries in North Africa to conduct terrorist investigations, including ISIS-related terrorist activity?
A Yes, I have.
Q Have you travelled to Libya for that purpose?
A I have gone to Libya for counterterrorism investigations.
Q As part of your work for the JTTF, have you become familiar with ISIS's leadership structure and propaganda materials?
A I have.
Q Have you personally reviewed ISIS propaganda materials, including numerous videos produced and disseminated by the Islamic State?
A Yes, I have.
Q Does this primary source material that you've reviewed include ISIS material recovered from the battlefield in Syria?
A Yes.
Q Have you researched and are you familiar with the ways in which ISIS has sought to recruit people from overseas to travel and join ISIS, including in 2015 and 2016?
A Yes, I am.
Q Briefly, sir, what is ISIS?
A ISIS, also known as the Islamic State, is a designated

foreign terrorist organization. It's a Sunni extremist organization that wants to impose a very specific vision of Islamic Law, and uses violence to achieve that goal.
Q To be clear, when we say the Islamic State or ISIS, are we talking about the same terrorist group?
A Yes.
Q Briefly, how was ISIS formed?
A ISIS has a number of predecessor organizations starting in the mid-2000 in Iraq, specifically the network organizations of Abu Musab al-Zarqawi. And over the years, it's developed away from an association with al-Quaeda into its own distinct organization.
Q From 2014 to 2016, who was the leader of ISIS?
A Abu Bakr al-Baghdadi.
Q And very briefly, what are the goals of the Islamic State?
A The goal of the Islamic State is to create a state that imposes a true interpretation of Shariah Law and to use violence to achieve that end, to -- to wage jihad.
Q What is jihad?
A Jihad, in the context of ISIS, refers to what we would call in English a religious war or a holy war.
Q And were these the stated goals as you've described them of ISIS and its leadership in 2015 and 2016?
A Yes.

Q Who does ISIS consider to be legitimate targets of violence?
A There are a number of groups of people that ISIS considers to be a legitimate target of violence. It -- it can be summed up as anyone who opposes the Islamic State. Their propaganda specifically will identify, for example, Shiites, Yazidis, Jews, Westerners, Americans, members of the Western police and military.
Q Did ISIS ever declare what is called a caliphate?
A They did.
Q And briefly, what is a caliphate?
A The caliphate is a translation of the Arabic term "khalifa." In English we would say something like a religious monarchy.
Q Where and when did ISIS declare caliphate?
A Omar Bakr al-Baghdadi made the declaration in 2014 in Mosul, Iraq.
Q And what, if any, name change occurred at the time the caliphate was announced --
A At that --
Q -- to the organization?
A At that time, they adopted the name Islamic State, dropping the prior name of Islamic State of Iraq and al-Sham and the Islamic State of Iraq and Levant. Those are two specific geographical areas, and they're removing the name

of the geographic location on the organization.
Q Was Baghdadi's address that you've just described publicized in Western media outlets, including in the United States?
A It was.
Q As part of the declaration of the caliphate, what did ISIS and Baghdadi say regarding the duty of ISIS supporters and Muslims to fight on behalf of the Islamic State?
A They said that it was a mandatory religious obligation for Muslims to -- to wage jihad for the Islamic State.
Q In 2015 and 2016, what efforts, if any, did ISIS make to recruit foreign fighters to travel to ISIS-controlled territory?
A ISIS was actively producing propaganda in Western languages, specifically English, to reach a global audience to -- to attract new recruits.
MR. HAFETZ: I'm showing the witness now what is Government's Exhibit 504, which is in evidence.
Q I would like to turn to Page 41.
MR. HAFETZ: If we can publish that? Thank you.
(Pause in proceedings.)
THE COURT: It's not on the screen.
THE COURTROOM DEPUTY: It went to sleep. It's waking up. It should be up there in a moment.
MR. HAFETZ: Thank you.

(Government's Exhibit Number 504 is published to the jury.)

BY MR. HAFETZ:

Q Are you familiar, special agent, with a video known as *Flames of War*?

A I am.

Q Briefly, what is it?

A It is an ISIS propaganda film just under an hour in length --

Q Who produced --

A -- that --

Q I'm sorry. Go on.

A No, please.

Q Who produced *Flames of War*?

A The al-Hayat Media, which is a media wing of the Islamic State.

Q And when was the video release?

A In 2014.

Q Have you seen the entire video?

A I have.

Q What is the basic message of *Flames of War*?

A That it -- it -- it emphasizes the Islamic State core message of fighting for the Islamic State of jihad, of taking up arms to -- to protect and spread the caliphate.

Q Following its release, was *Flames of War* widely

disseminated on the Internet in 2014 and 2015 and thereafter?

A Yes.

Q I'm going to --

MR. HAFETZ: May I approach the witness, Your Honor?

THE COURT: You may.

MR. HAFETZ: Thank you.

BY MR. HAFETZ:

Q Special agent, I'm going to show you what has been marked Government's Exhibit 802-1 through 802-14.

Do you recognize that?

A I do.

Q What is it?

A So these are clips taken from the full *Flames of War* video.

Q And are they true and accurate copies of sections of *Flames of War*?

A They are.

MR. HAFETZ: Your Honor, I offer Government's Exhibit 802-1 through 802-14.

THE COURT: Mr. Augustine?

MR. AUGUSTINE: No objection.

THE COURT: Received.

MR. HAFETZ: Thank you, Your Honor.

(Government's Exhibit Numbers 802-1 through 802-14 so marked and received in evidence.)

MR. HAFETZ: I now show the witness Government's Exhibit 651, which is in evidence at Page 5.

BY MR. HAFETZ:

Q And while that's being pulled up, I'll ask you --

MR. HAFETZ: One moment, Your Honor.

(Pause in proceedings.)

THE COURT: Go ahead.

BY MR. HAFETZ:

Q Are you familiar, Special Agent, with a video called *The Rise of the Khilafah and the Gold Dinar* regarding ISIS's economic program?

A I am, yes.

Q And briefly, what does khilafah mean?

A Khilafah is the Arabic word that we translate to English as caliphate.

Q Have you seen that video?

A I have.

Q And briefly, what is *The Rise of the Khilafah and the Gold Dinar* about?

A It discusses ISIS's or the Islamic State's video for imposing an Islamic monetary system on the world to replace that of the United States Federal Reserve.

Q Who made that video?

A The Islamic State.
Q What language is the *Gold Dinar* primarily in?
A English.
Q Are you aware of any other ISIS propaganda video with the title, *The Rise of Khilafah* that is about ISIS's financial system?
A I am not.
MR. HAFETZ: Your Honor, may I approach?
THE COURT: You may.
MR. HAFETZ: Thank you.
Q Special Agent, I'm showing you an exhibit marked 801-2 through 801-3.
Do you recognize that?
A I do.
Q And what does it contain?
A This contains clips from the *Gold Dinar* video.
Q You've reviewed the disk yourself?
A I have.
Q And are your initials on it?
A My initials are on it.
MR. HAFETZ: Your Honor, I would offer Government Exhibit 801-2 through 801-3 into evidence.
THE COURT: Mr. Augustine?
MR. AUGUSTINE: No objection.
THE COURT: Received.

(Government's Exhibit Numbers 801-2 through 801-3 so marked and received in evidence.)

MR. HAFETZ: Thank you, Your Honor.

BY MR. HAFETZ:

Q I show now Government's Exhibit 335, which is in evidence.

MR. HAFETZ: And if we could publish that for the jury.

(Government's Exhibit Number 335 is published to the jury.)

Q Do you recognize this photograph?

A I do.

Q What is it from?

A This is a still shot from an ISIS propaganda video called *Until There Comes to Them Clear Evidence*.

Q Who made that video?

A The Islamic State, specifically the al-Furquan Media wing.

Q What is al-Furquan?

A It is a media wing of the Islamic State.

Q Very briefly, what is the video about?

A The video presents ISIS's version of the treatment of Christians in Islamic State.

MR. HAFETZ: May I approach, Your Honor?

THE COURT: You may.

BY MR. HAFETZ:

Q Showing you what is marked as Government's Exhibit 810-1 through 810-4. And I'll ask you if you recognize that, sir?

A I do.

Q And are your initials on the disk?

A They are.

Q Did you review it?

A I did.

Q What does it contain?

A It contains clips from the full video of the version I received.

MR. HAFETZ: Your Honor, I'll offer Government's Exhibit 810-1 through 810-4 into evidence.

THE COURT: Mr. Augustine?

(Pause in proceedings.)

MS. KELLMAN: Your Honor, may we have a discussion about this?

THE COURT: I can't hear you.

MS. KELLMAN: Can we have a discussion about this particular video after the Government -- I don't think we'll run into a problem with it.

THE COURT: Well, he's got to make -- does he object to it or does he --

MS. KELLMAN: Your Honor, he's a little unclear at

the moment.

THE COURT: Okay.

MS. KELLMAN: If we could have a few moments just to chat about it, if we could?

MR. HAFETZ: I can move on for now, Your Honor, that's no problem.

THE COURT: Yeah.

MS. KELLMAN: Thank you, Your Honor.

BY MR. HAFETZ:

Q Now I would like to show you what is now in evidence as Government's Exhibit 802-9.

(Government's Exhibit Number 809-2 is published to the jury.)

Q I'll pause 19 seconds into it. This is the short clip from what you've identified as *Flames of War*.

THE COURT: I'm sorry. Did you say this was in evidence?

MR. HAFETZ: It is in evidence, yes.

(Video starts.)

(Video stops.)

BY MR. HAFETZ:

Q First, who is the individual rising to speak at the pulpit on the video?

A This is Omar Bakr al-Baghdadi.

Q And where is he speaking?

A He is speaking in Mosul, Iraq.

MR. HAFETZ: All right. Continue playing the video.

(Video plays.)

(Video stops.)

BY MR. HAFETZ:

Q When Baghdadi references the word "Mujahedeen," what does it mean as it relates to ISIS?

A Mujahedeen, means the Arabic word for the people who undertake jihad or who wage jihad. So it refers to those fighting or engaged in jihad; and specifically in the context of the Islamic State, it refers to people fighting jihad.

Q And according to ISIS and its teachings, what reward awaits for a Mujahedeen, or a holy war warrior who engages in jihad?

A If -- if they were to die while engaged in jihad, they would achieve martyrdom.

Q What about their family, what happens to them?

A The -- the martyr would be able in the afterlife according to the Islamic State, to intercede on their behalf and provide benefits to them in the afterlife.

Q Thank you.

MR. HAFETZ: You could play it.

(Pause in proceedings.)

(Video starts.)
(Video stops.)
BY MR. HAFETZ:
Q The reference to Allah, what does that mean?
A The word "Allah," is the Arabic word for God.
Q And according to Baghdadi as outlined in this speech and elsewhere, who are the enemies of Allah?
A According to the Islamic State, the enemies of God are the people who oppose the Islamic State, with specific reference to the groups that we referenced or mentioned earlier.
Q What does the term "Kuffar," K-U-F-F-A-R, mean as it relates to ISIS?
A Kuffar is the plural of the Arabic word "kafir," which means infidel. So kuffar means infidels.
Q I'm showing you now very briefly Government's Exhibit 305.
MR. HAFETZ: Which is in evidence, and I publish it to it jury.
(Government's Exhibit Number 305 is published to the jury.)
BY MR. HAFETZ:
Q Do you recognize that?
A I do.
Q What is it?

A This is a still shot of the speech that Baghdadi did that we've been discussing.
Q By the time -- is it the same video that we just watched?
A Yes.
Q By the time Baghdadi declared the caliphate in mid-2014, did ISIS already control territories in Syria and Iraq?
A Yes.
MR. HAFETZ: I'll show just for the witness Government Exhibit 205.
Q And ask you if you recognize it?
A My monitor's still blank.
(Pause in proceedings.)
THE WITNESS: There it is.
Q Do you recognize that?
A I do.
Q What is it?
A This is a map of North Africa, the Middle East, and the Mediterranean region.
MR. HAFETZ: Your Honor, I'd offer Government's Exhibit 205 into evidence.
THE COURT: Any objection?
MR. AUGUSTINE: No objection.
THE COURT: Received.

MR. HAFETZ: Thank you, Your Honor.

(Government's Exhibit Number 205 so marked and received in evidence.)

BY MR. HAFETZ:

Q How did ISIS gain control of the territories it occupied in 2014, '15, and '16?

A Through armed conflict.

THE COURT: Through what?

THE WITNESS: Armed conflict, through military force.

THE COURT: All right.

BY MR. HAFETZ:

Q Did ISIS impose any kind of legal code on the land it conquered by force?

A Yes, it did.

Q And can you describe that briefly?

A So the -- they imposed their interpretation of the Sharia. Sharia is the Arabic word that just refers to Islamic Law. This is a very big topic. There's a lot of history and tradition behind what is the Sharia.

Speaking specifically of ISIS, they adopted a very narrow interpretation of Sharia, and then sought to impose that specifically on the areas within their control.

Q And as a practical matter, what are some of the hallmarks of ISIS's version of the Sharia?

A Well, specifically adopting very brutal types of punishment. In Arabic, they would be referred to as a hudud, and adopting ISIS, specifically their own interpretation of what that would mean.
Q And what are some examples of those punishments?
A They can include amputations. They can include executions, crucifixions, throwing people off buildings, in one example. Things of that nature.
Q Was this true in 2015 and 2016?
A Yes.
Q And was ISIS's use of this punishment you've described, including crucifixions and decapitations, in the territory controlled widely publicized in Western media in 2015 and 2016?
A Yes, it was.
Q And did ISIS itself make video recordings of such punishments and publish them on the Internet?
A Yes, they did.
Q In addition to the territory you described as "taking by force," has ISIS also committed acts of terrorism?
A Yes, they have.
Q What type of acts of terrorism is ISIS associated with committing?
A It -- it can cover a wade range, suicide bombings; attacks involving explosives; coordinated attacks using

firearms; attacks using knives, using vehicles, as essentially, blunt-force objects.
Q Did ISIS commit the attacks you described in 2014, '15, and '16?
A Yes.
Q What, if anything, was ISIS's leadership position in those years regarding other ISIS members and supporters should engage in such attacks against citizens and soldiers of Western Nations, including the United States?
A The -- the view point was that these types of attacks are part of the -- ISIS's jihad, and they are good and obligatory.
Q And did ISIS actually carry out such attacks on Westerners?
A Yes.
Q And are you familiar with an individual named James Foley?
A I am.
Q Briefly, who was he?
A He was a journalist who was kidnaped by the Islamic State and beheaded.
Q What citizenship or what nation was he from?
A He was an American Citizen.
Q What happened to him?
A He was kidnapped by the Islamic State and beheaded.

Q Was that publicized on the Internet?
A It was.
Q Did ISIS make a video of it?
A They did.
Q Are you familiar with the terrorist attacks that occurred in November of 2015 in France?
A I am.
This would be the Bataclan attack, which was a terrorist attack across the city of Paris that involved multiple attackers and multiple locations. Over a hundred people died in this attack.
Q Who claimed credit for that terrorist attack?
A The Islamic State.
Q And was that November 2015 Paris attack, including ISIS's claiming credit for it, widely covered in Western media, including here in the United States?
A It was.
Q I'm showing you Government's Exhibit 311.
MR. HAFETZ: Which is in evidence, and I would ask to publish it to the jury.
(Government's Exhibit Number 311 is published to the jury.)
BY MR. HAFETZ:
Q Who is that?
A This is an individual who is identified as having a

leadership role in the Bataclan attack.
Q Are you aware of other countries in which ISIS carried out terrorist attacks in 2015 and early 2016?
A Yes.
Q Can you name some of those, some of those countries, I mean?
A It -- it would include Libya, for example.
Q Are you familiar with the term "foreign terrorist organizations"?
A I am.
Q Is it also referred to as an FTO?
A Yes.
Q Briefly, what is an FTO?
A An FTO is also called a designated foreign terrorist organization. It's an organization that's designated by the United States Government, specifically the Secretary of State, as a terrorist organization. The State Department maintains a public list of these designated terrorist organizations.
MR. HAFETZ: May I approach the witness, Your Honor?
THE COURT: You may.
MR. HAFETZ: Thank you.
Q I'm handing you what has been marked for identification as Government's Exhibit 900 through 903 inclusive.

MR. HAFETZ: And I have provided a copy to Defense Counsel immediately before this.
Q I would ask you to look through that, Special Agent, and when you are finished, raise your hand.
A (Witness complies.)
Q Do you recognize these?
A Yes, I do.
Q What are they?
A These are pages from the *Federal Register*.
Q Do they include a designation --
MR. HAFETZ: Excuse me.
Your Honor, I would offer Government's Exhibit 900 through 903 into evidence.
THE COURT: Mr. Augustine?
MR. AUGUSTINE: No objection.
THE COURT: Received.
(Government's Exhibit Numbers 900 through 903 so marked and received in evidence.)
BY MR. HAFETZ:
Q Special Agent, does this include the designation for the Islamic State and ISIS?
A Yes, it does.
Q Directing your attention to Government Exhibit 903, the right-most column in the middle of the page, is that the designation of ISIS, also known as ISIL and the

Islamic State?

A Yes, it is.

Q And can you see the date of the designation?

A I can.

Q And what does it say?

A September 21st of 2015.

Q Was ISIS still designated a foreign terrorist organization throughout 2016?

A Yes, it was.

Q Is it still a designated FTO today?

A It is.

Q Directing your attention back to foreign fighters, which you mentioned before. What, if any, value do English-speaking foreign fighters have to ISIS?

A So English-speaking foreign fighters to ISIS would have value in -- in a -- a few different ways. In -- in line with their propaganda messaging, these would be examples of people who had traveled from the West from English-speaking countries to the Islamic State for the purpose of furthering the goal of the Islamic State, which is the -- exactly the type of person they were attempting to attract through propaganda.

Another potential benefit would be native speakers of English could produce, or even skilled speakers of English, if not native, could produce English-language

propaganda to allow the more dissemination and more production of that material.

A third way would be people coming from English-speaking countries could have potential value in potentially returning as operatives, because they have international passport. They're familiar with international travel. They would also potentially be able to provide information about locations or things of interest to ISIS in those countries that they came from.

Q Are you familiar with an individual known as Jihadi John?

A I am.

Q Who was he?

A He was an English-speaking British Islamic State member who was featured in -- in Islamic State propaganda.

Q What is he best known for for ISIS?

A For -- for participating in beheadings.

Q Were those beheadings widely disseminated by video on the Internet?

A Yes, they were.

Q Showing you Government's Exhibit 802-2, another clip from *Flames of War* --

MR. HAFETZ: And I would ask that -- and it is in evidence, and I ask that that video be published to the jury.

(Government's Exhibit Number 802-2 is published to the jury.)

(Video plays.)

(Video stops.)

BY MR. HAFETZ:

Q Special Agent, whose fighters are shown in the beginning of that clip from *Flames of War* flying a black flag on an armored vehicle?

A Fighters of the Islamic State.

Q And the translated statement, "Then we will come for you from every corner of the earth to fight you," how does that statement relate to ISIS's goal and propaganda?

A That indicates that the scope of the jihad advocated by ISIS is global.

Q And I ask --

THE COURT: Global? Did you say global?

THE WITNESS: Yes, global.

MR. HAFETZ: Thank you, Judge.

I would now ask to publish 802-3 in evidence to the jury, the Number 3 clip from *Flames of War*.

(Government's Exhibit Number 802-3 is published to the jury.)

(Video plays.)

(Video stops.)

BY MR. HAFETZ:

Q Special Agent, how does that clip from *Flames of War* relate to ISIS's efforts to recruit foreign fighters through English-speaking propaganda?
A So this is a video clip that depicts ISIS fighters who are identified as coming from foreign countries to pledge allegiance and support the Islamic State, and this is -- is valorizing and glorifying their choice to do that. And so this is very much in keeping with that theme of propaganda.
MR. HAFETZ: I'd ask that we now play Government's Exhibit 802-4, in evidence, and publish it to the jury, another very brief clip from *Flames of War*.
(Government's Exhibit Number 802-4 is published to the jury.)
(Video plays.)
(Video stops.)
Q Special Agent, the individual identified as Commander Maghrebi, what flag is behind him?
A That is the flag of the Islamic State.
Q How does the messaging contained in here about the world we like compared to the hereafter relate to ISIS's goal of recruitment of foreign fighters?
A The Islamic State is pushing the message here that the rewards of the afterlife, which can be obtained through jihad on behalf of the Islamic State --
MR. AUGUSTINE: Objection, Judge.

THE COURT: What's your objection?

MR. AUGUSTINE: That's not Islamic State saying something, that's the Qur'an.

THE COURT: Overruled. The jury will decide whether this expert is correct or not.

BY MR. HAFETZ:

Q To be clear, what is the individual identified as Commander McGreggy reciting; what is he reciting from in this clip?

A He is reciting from the Qur'an.

Q And for what purpose did ISIS use this portion of the Qur'an and the commander from ISIS reading it in *Flames of War*?

A This is, as I understand it, presenting the message that the rewards that can be obtained in the hereafter through participation in the Islamic State are better than or superior to the comforts, or whatever one may have, in this world or life.

MR. HAFETZ: Showing you Government's Exhibit 576 in evidence and published just a second or two of that video.

(Government's Exhibit Number 576 is published to the jury.)

(Video plays.)

(Video stops.)

BY MR. HAFETZ:
Q Is that the same ISIS propaganda we just watched from *Flames of War*?
A Yes, it is.
Q And showing you Government's Exhibits 358 and 381 in evidence.
MR. HAFETZ: And I would ask to publish them to the jury.
(Government's Exhibit Numbers 358 is published to the jury.)
Q What is depicted in 358?
A This is the flag of the Islamic State.
MR. HAFETZ: And I will ask to show 381 briefly.
(Government's Exhibit Number 381 is published to the jury.)
BY MR. HAFETZ:
Q What is that?
A This is also the flag of the Islamic State.
Q Is it fair to say that the black flag is an iconic ISIS symbol?
A Yes.
Q Directing your attention now to Government's Exhibit 802-11, another very brief clip from *Flames of War.*
MR. HAFETZ: And I would ask to publish it to the jury. It is in evidence.

(Government's Exhibit Number 802-11 is published to the jury.)

(Video plays.)

(Video stops.)

(Continued on the next page.)

DIRECT EXAMINATION (CONTINUING)

BY MR. HAFETZ:

Q What is happening at this point in *Flames of War*?

A This is a sequence towards the end of the *Flames of War* video that shows fighters of the Islamic State capturing a Syrian military facility and taking a number of Syrian soldiers prisoner.

Q The man in the mask is speaking, he used the word "kuffar," how does that relate ISIS's goals?

A He is identifying the members of the Syrian military here as being infidels and it is lawful to fight and kill infidels, according to the Islamic State.

Q Very briefly can you describe what happened immediately next in the video after the clip we just watched.

A The soldiers had been made to dig their own graves and then the next sequence after this video is the prisoners' being executed and falling into the ditch.

Q Is that shown in the video?

A It is.

Q I'd like to publish now in evidence, Government's Exhibit 802-14, a very brief clip from *Flames of War*.

(Video recording played.)

(Video recording stopped.)

Q Special Agent, at what point in the 55-minute movie of *Flames of War* does this message come?

A This is at the very end.
Q What purpose did the message serve in terms of ISIS propaganda?
A This is indicating that ISIS will bring violent conflict to the United States. It is a message directly to the United States.
Q And whose name is represented at the bottom of that message?
A That is Abu Bakr al-Baghdadi.
Q Why does it say Khalifah Ibrahim al-Bakr?
A It's my understanding when one is appointed as a Khalif, one uses one's true name for that process and then Abu Bakr al-Baghdadi, he is sort of the nom de guerre, if you will.
Q Are you familiar with the term "Nasheed"?
A I am.
Q What is a Nasheed?
A A Nasheed an Islamic spiritual song or an Islamic hymn, if you will.
Q How, if at all, did ISIS use Nasheed as part of its propaganda?
A ISIS used them as the soundtrack to their propaganda extensively.
Q I'd like to play a brief clip from Government's Exhibit 576-9, which is in evidence. Starting from 106 I'm just going to play 10 seconds of that video.

(Video recording played.)

(Video recording stopped.)

Q Special Agent, the verse, "The men who migrated to fulfill their duty of making God's work the greatest," how does that fit into ISIS's goals and its propaganda?

A This is in reference to the people who traveled for the purpose of coming to the Islamic State, to support the Islamic State or fight on behalf of the Islamic State. So the migration in Arabic ISIS uses the term "hijrah." This would be in reference to what I would call, as an FBI agent, foreign fighters.

Q I'm going to direct your attention now to play from minute 139 another brief clip.

(Video recording played.)

(Video recording stopped.)

Q The verse, "We are men that love death just as you love your life," how does that relate ISIS and its propaganda message to foreign fighters?

A This is a continuation or another way of getting at the idea that the rewards available to the Mujahideen after death is more desirable and the Mujahideen strive for that in the same way that other people westerners, for example, love their material, worldly possessions.

Q The verse, "We will march to the gates of paradise where our maidens await," how does that relate to ISIS propaganda

and its message to foreign fighters?
A This would be in reference to the idea that maidens are part of the reward a martyr would have in heaven.
Q And the verse, "Fighting for the sake of Allah is the ultimate gain," how does that fit in ISIS's propaganda messaging to foreign fighters?
A This is a continuation of this central theme, that anything you do here on earth pales in comparison to the reward that you can achieve by waging jihad for the Islamic State.
Q Are you familiar with the publication known as Dabiq D-A-B-I-Q?
A I am.
Q Briefly, what is it?
A It was a magazine produced by the Islamic State. It was another propaganda channel for the Islamic State that was disseminated on the internet.
Q Was it available on the internet in the United States in 2015 and early 2016?
A It was.
Q Have you yourself read copies of Dabiq?
A I have.
Q What types of articles were published in Dabiq by ISIS?
A It would be a variety of articles that hit on these themes that we've been seeing in the videos, those were the

core propaganda message of the Islamic State.
Q Are you familiar with a website known as jihadology?
A I am.
Q What is that briefly?
A Jihadology is a website run from sort of an academic research perspective that catalogs and makes available the material produced by jihadists and extremist organizations.
Q In 2015 and 2016, was jihadology a source for ISIS propaganda material?
A Yes.
Q A source meaning a place people could view it?
A Yes. Yes, it was.
Q In 2015 and early 2016, was jihadology's content online available to anyone without an account or password?
A Yes, it was an open website.
Q What about today, do you need an account and password to log-in?
A Yes, you do now.
Q Are you familiar with an organization or website known as Liveleak?
A I am.
Q What is that briefly?
A It's a video hosting website that I know it for its reputation for hosting violent or offensive types of content.
Q Are you familiar with English speaking residents of

western countries who use the internet to encourage others to support Islamic extremist groups including ISIS?
A Yes, I am.
Q Are you specifically familiar with an individual named Anwar al-Awlaki?
A Yes, I am.
Q Who is he?
A He was a Yemeni American Islamic scholar of sorts who was very prolific in the production of English language extremist content.
Q What role did he play, if any, in the radicalization and/or recruitment of individuals to wage violent jihad?
A He spoke very effectively to English-speaking audiences and he was incredibly prolific.
Q Showing you Government's Exhibit 575, which is in evidence, I'd ask to publish it to the jury.
(Exhibit published.)
MR. HAFETZ: I'd ask my colleague to focus in on the section under "Subscriptions."
Q The first entry, do you recognize the individual in the image?
A I do.
Q Who is it?
A This is a picture of Anwar al-Awlaki.
Q I'll show you Government's Exhibit 333, which is also in

evidence, and I publish it to the jury.

(Exhibit published.)

Q Do you recognize the individual on the right-hand side of that image?

A I do, yes.

Q Who is he?

A This is a somewhat pixilated image Anjem Choudary. I apologize I'm probably mispronouncing his last name.

Q Briefly who is he?

A He is a British-based sort of Islamic televangelist who promotes extremist ideas and extremist interpretations.

Q Now I ask to publish to the jury Government's Exhibit 316 in evidence.

(Exhibit published.)

Q Who is that?

A This is Abu Haleema who is also a British-based person who promotes radical Islamic views on the internet.

Q Showing you published Government's Exhibit 327 in evidence, who is that?

A This is Musa Cerantonio who was -- or is an Australian-based, sort of -- in the same vain as Anjem and Abu Haleema, very active on social media producing Islamic content with an extremist bent.

Q Did Cerantonio advocate support for ISIS?

A He did.

Q Showing you Government's Exhibit 329 in evidence, who is that?
A This is Sheik Faisal.
Q Who is he?
A He was a Jamaica-based Islamic preachier who, again produced a lot of online content supportive of extremism and he in fact is on a U.S. Treasury sanctions list related to his support for the Islamic State.
Q I want to direct your attention, Special Agent, back to foreign fighters. What mechanisms, if any, did ISIS have to assist in finding roles for people who successfully traveled to ISIS territory?
A So the Islamic State had what we could call sort of an intake infrastructure. So in certain areas they would have things like guesthouses for people who just arrived to Islamic State territory where those people could be vetted, they would have forms that you would fill out describing who you were, where you were from, what skills you had, things of that nature.
Q Who decided what role a recruit would have in ISIS territory?
A The Islamic State.
Q Did ISIS require a person interested in coming to ISIS territory to know in advance what role they were going to play in support of ISIS?

A No.
Q Could a recruit show up or arrive in ISIS territory without contacting anyone in ISIS first?
A Yes.
Q Did ISIS recruits have to have any special skill to join and support ISIS?
A No.
Q Did ISIS recruits have to bring any weapons with them to join and support ISIS?
A No.
Q Did they have to bring any military hardware with them?
A No.
Q To provide support for ISIS, did a person interested in doing so have to do anything other than get themself to ISIS territory?
A No, that was the basic -- the basic thing.
Q And in territory that ISIS controlled, were there jobs or activities for individuals who did not want to fight in combat but still wanted to support ISIS?
A Yes.
Q And if a person was selected to do something, other than fighting, by ISIS, was that still helpful to the Islamic State?
A Yes, it was.
Q How?

A So the name of the Islamic State is the Islamic State, and that's very literal. They were involved in building a state apparatus of government. So in addition to, you know, the sort of the military side, the jihad, they had this intake infrastructure, they had administrative infrastructure, they had people who had policing functions, they had people who ran hospitals who provided medical services, things of that nature. I mean it's a holistic type of thing.
Q Based on your review of the ISIS propaganda and your other experience in this field, did ISIS create propaganda aimed at convincing tourists to come to ISIS territory?
A I do not believe so.
Q Did ISIS create any propaganda that you're aware of aimed at convincing young men to come live in ISIS-controlled territory without contributing to the Islamic State?
A No, not that I'm aware of.
Q Are you aware of foreign fighters taking steps to avoid detection or capture on their way to ISIS territory?
A Yes, I am.
Q What are some examples of such tactics?
A It could be something very basic like not informing others of your travel plans or intentions, not telling family members. Concealing the ultimate destination of your travel depending on, you know, the type of journey that you need to undertake, you know, and people would do this out of fear that

their family members or friends who would not approve of this kind of thing would report on them to the authorities.

Q And how, if at all, did ISIS provide guidance on such tactics?

A ISIS provided guidance through their propaganda operations.

Q Now I'm going to publish to the jury Government's Exhibit 801-3 in evidence. It's a short video and it will be the second to last we play. Yes, play the whole thing.

(Video recording played.)

(Video recording stopped.)

Q Special Agent, in this section from Gold Dinar the word jizya, J-I-Z-Y-A, was used. What does that mean as used by ISIS?

A That's in reference in here specifically the example they provided visually is that of Christians. Jizya is the task imposed by the Islamic State on certain non-Muslims for them to continue to live in the Islamic State without conversion to is Islam.

Q And what did ISIS do with the money collected from jizya or other sources as referenced in this video, "The Rise of the Khalifah and the Gold Dinar"?

A It's my understanding the jizya revenue was just another source of revenue for the Islamic State. It was very literally a tax.

Q And in practice, did ISIS always honor its claims to collect jizya and let other religions live under its rule in peace?
A No.
Q Were Muslims who did not want to practice ISIS's extreme version of Islam, as you described it, eligible to pay the jizya tax and live peacefully under ISIS?
A No, they were not. The jizya rules apply only to non-Muslims.
Q What happens to the Muslims who don't pay or aren't offered to pay -- excuse me, who don't practice the extreme version of Islam?
A They are at risk of being deemed apostates or infidels by the Islamic State.
Q How did ISIS treat infidels or apostates?
A Incredibly harshly. It is lawful to fight and kill them --
Q Are you familiar --
A -- according to the Islamic State.
Q Excuse me. Can you finish that last sentence. I apologize.
A No, I -- with regard to the status of infidels, it is their blood is lawful according to the Islamic State.
Q Are you familiar with a group of people known as the Yazidis Y-A-Z-I-D-I-S?

A I am.
Q What occurred with them in relation to ISIS in 2014 and 2015?
A The Yazidis were and are an ethnic and religious minority in Norther Iraq and the Islamic State pursued a policy that I think fairly can be described as genocide or ethnic cleansing against them.
Q Was that treatment of the Yazidis by ISIS well publicized in western media at the time?
A It was.
Q Turning to the end of that clip from "Rise of the Khalifah and the Gold Dinar," what was ISIS's goal regarding the American and western world's financial system as expressed in that video?
A The main thrust of that video is that the Islamic State is bringing back a divinely ordained economic system based on gold, silver, precious metals and that this will replace the infidel system, the current financial system based on the U.S. dollar and the actions of U.S. Federal Reserve.
Q Finally, directing your attention to Libya and the 2015 time period, did ISIS control territory there?
A Yes, they did.
Q What was happening on the ground in Libya in 2015 and 2016?
A Libya was involved in civil conflict.

Q How did ISIS come to control territory in Libya in that time period?
A Through force of arms, through violence.
Q Showing you what's marked for identification, to the witness only, Government's Exhibit 214. 2-1-4.
Can you see that?
A Yes, I can.
Q What is it, briefly?
A This is a map of the Mediterranean showing the shoreline.
Q Map is fine.
MR. HAFETZ: Judge, I offer Government Exhibit 214 in evidence.
THE COURT: Mr. Augustine.
MR. AUGUSTINE: No objection, judge.
THE COURT: Received.
(Government's Exhibit Number 214 so marked and received in evidence.)
MR. HAFETZ: Thank you. I offer to publish that to the jury.
(Exhibit published.)
Q Special Agent, what is Government's Exhibit 214 specifically?
A It's a map of the Mediterranean sea showing the piece of the North African coastline.
Q Relative to the screen you're looking at, where is

Tunisia on that map?
A Tunisia is over on the left-hand side.
Q And does it share a border with Libya?
A It does.
THE COURT: What is this island all the way to your east, do you see it?
THE WITNESS: Yes, I do.
THE COURT: What island is that?
THE WITNESS: I do not read Greek but I believe that would be Crete. I don't read Greek though.
THE COURT: All right.
BY MR. HAFETZ:
Q Where on that map did ISIS control territory in 2015 and 2016?
A In certain pockets in Libya, specifically the coastline area around the vicinity of Sirte and certain areas over in north eastern Libya. May I use the drawings?
Q I'm not sure if the touch screen is available.
A Okay.
Q My colleague can circle it for you if he knows where it is. Sirte.
I'll ask you if where he circled is correct. Is that the location of Sirte where my colleague just circled it.
A Yes, that's location of Sirte, yes. So in general we're discussing that area, I don't mean a hyper-specific geographic

identification.

Also we would be talking about areas over the Benghazi, Derna area in North Eastern Libya and then there were also locations in the western part of Libya as well as the southern part of Libya, which is not shown on this map.

THE COURT: Where is Benghazi?

THE WITNESS: Benghazi is the second red circle right here.

MR. HAFETZ: Thank you.

Q Special Agent, in 2015 and 2016 what guidance, if any, did ISIS's leadership provide regarding ISIS supporters' obligation to travel to support ISIS and fight for ISIS in Libya?

A ISIS emphasized that if one could not make it to Syria or Iraq to join the Islamic State there, then one should proceed to one of ISIS's other geographic locations, including specifically Libya to join the Islamic State branch there.

Q Did Abu Bakr al-Baghdadi tell supporters and followers of ISIS that it was an obligation to travel to Libya to support ISIS?

A Yes, as part of the broader obligation.

MR. HAFETZ: Your Honor, I only have about a minute left or two minutes left to question, this might be the time for the break because I think --

THE COURT: Do your minute or two minutes.

MR. HAFETZ: -- we're back to the issue that defense counsel raised that I think she wanted to discuss -- or standby counsel.

MR. AUGUSTINE: Judge, it was --

THE COURT: No, no. Come on, come over sidebar.

MR. HAFETZ: Thank you, Judge.

(Continued on the next page.)

(The following occurred at sidebar.)

MR. AUGUSTINE: Judge, I never watched this video outside, like, at home five days ago. I tried to download it, I tried to watch it, but I was never able to download it or watch it. I mean, they had the still image on my computer, but I tried to download and watch it, but I couldn't.

THE COURT: But you don't object to it.

MR. AUGUSTINE: That's why I was objecting to it.

MS. KELLMAN: He was objecting, Judge, essentially they are showing materials that presumably was on his computer that he saw, but he's saying he was never able to open that, so he never saw it.

THE COURT: Did you complain to anybody you never saw this?

MR. AUGUSTINE: No, Judge, I --

MS. KELLMAN: This would have been when he was still home, Judge, before he was arrested. In other words, the --

THE COURT: Before he was arrested?

MS. KELLMAN: The government's position is that this was on his computer so he would have seen it, except he's explained to us he tried to open it but could not open it so he's actually never seen it --

THE COURT: But it was on his computer, but --

MS. KELLMAN: But he's never seen and that's why he was objecting.

MR. AUGUSTINE: Judge, it wasn't on my computer, the video, it's just a still image. And there's thousands of images that get pulled up on the computer, but there is a still image from that video which I never watched, like.

THE COURT: Now, it is in evidence --

MR. AUGUSTINE: Okay.

THE COURT: -- number one.

Are you going to testify?

MR. HAFETZ: To clarify, Judge --

MR. AUGUSTINE: Yes, Judge.

MR. HAFETZ: -- it's not yet in evidence. I offered it, he objected, and we waited until now --

THE COURT: Okay. I'm going to allow it, that's number one.

Number two, are you going to testify?

MR. AUGUSTINE: Yes, Judge.

THE COURT: You can explain that you never saw that.

MR. AUGUSTINE: Okay, I'll do that, Judge.

THE COURT: Okay.

MS. KELLMAN: Very good.

THE COURT: Now what's going to happen, he's going to testify either Mr. Villanueva -- we'll allow Mr. Villanueva or Ms. Kellman to --

MS. KELLMAN: Ask questions.

THE COURT: -- present his case. All right.

MR. HAFETZ: Thank you, Judge.

MS. KELLMAN: Judge, will we have a break between when the government rests and we have a time to spend with our client.

THE COURT: Yes.

MR. AUGUSTINE: Thank you, Judge.

MR. HAFETZ: Thank you, your Honor.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

THE COURT: What number is that?

MR. HAFETZ: 810-1 through 810-4.

May I proceed, Judge?

THE COURT: Yes.

BY MR. HAFETZ:

Q Special Agent, did ISIS commit terrorist attacks in Libya in 2015 and 2016 that you're aware of?

A Yes.

Q Directing your attention to April of 2015, are you familiar with the video entitled "Until There Came to Them Clear Evidence"?

A Yes, I am.

Q I'm going to show you what's marked as Government's Exhibit 810-1 through 810-4.

MR. HAFETZ: May I approach, your Honor?

THE COURT: You may.

MR. HAFETZ: Thank you.

Q Do you recognize that, sir?

A I do.

Q What's contained on that disc?

A These would be video clips from the propaganda film -- the propaganda video, "Until There Came to Them Clear Evidence."

Q Have you seen all of "Until There Came to Them Clear

Evidence"?
A Yes.
Q You initialed this disc that has the clips on it?
A Yes, I did.
Q Are these clips fair and accurate copies of short portions of that whole movie you just described?
A Yes, they are.
MR. HAFETZ: Your Honor I offer 810-1 through 810-4?
THE COURT: Any objection.
MR. AUGUSTINE: No, Judge.
THE COURT: Received.
MR. HAFETZ: Thank you, your Honor.
(Government's Exhibit Numbers 810-1 through 810- 4 so marked and received in evidence.)
BY MR. HAFETZ:
Q Just generally, briefly, what is contained on the video "Until There Came to Them Clear Evidence"?
A It is a video that discusses the topic of the treatment of Christians specifically in the Islamic State.
Q Briefly, how does the video end?
A It ends with two mass executions.
Q To be clear, do the clips, the four clips contained on 810-1 through 810-4, do they contain any graphic violence?
A No, they do not.
MR. HAFETZ: I'm going to show you Government's

Exhibit 810-2, which is a very short clip from that movie and I ask that be published to the jury.

(Video recording played.)

(Video recording stopped.)

Q What's represented by phrase "Wilayat Barqa" in the middle of the screen?

A So this is in reference to the Islamic State controlled territory in eastern Libya. Barqa is the Arabic term for the geographic east of Libya. In English we say Cyrenaica. And then Wilayat is the Arabic word for state or province. So this is very literally the Barqa province of the Islamic State.

MR. HAFETZ: I'll ask you to play the rest of the video.

(Video recording played.)

(Video recording stopped.)

Q Who are the men dressed in the orange jumpsuits?

A Those would be prisoners identified in the video as Christians.

Q And who are the men dressed in camouflage?

A These are Islamic State fighters.

Q Towards the rear right of the screen who is the man dressed in black?

A This is an Islamic State fighter and I notice that he's wearing all black which seems to distinguish him from the

other Islamic State fighters in the video.
Q I'm going to finally show you one-second long clip, 810-4.
(Video recording played.)
(Video recording stopped.)
Q Special Agent, what's the next thing that happens in this video?
A The prisoners are beheaded by the Islamic State fighters.
Q What role, if any, did this video play in ISIS's efforts to spread its message and recruit foreign fighters to Libya?
A This was a propaganda video that was produced by the Islamic State and disseminated.
MR. HAFETZ: I have no further questions, your Honor. Thank you.
THE COURT: Cross.
MR. AUGUSTINE: Yes, Judge.
CROSS-EXAMINATION
BY MR. AUGUSTINE:
Q Good afternoon, sir.
A Good afternoon.
THE COURT: Speak into the mic. Where is the microphone?
Q Good afternoon, sir.
A Good afternoon.
Q Regarding the *Flames of War* video, do you know a lot of

Muslim youth worldwide watched this video?
A I don't specifically know how many people worldwide have seen it.
Q But a lot of Muslim youth have watched this video online because it's disseminated online, correct? You can assume?
A That seems like a reasonable thing to say, yes.
Q From your training do you know that a lot of 19-year old Muslim youth think this is a really cool video?
A I don't.
THE COURT: You're asking him what other people think?
MR. AUGUSTINE: Yes.
THE COURT: I'll sustain that.
MR. AUGUSTINE: Can we -- can I please select a clip from the Rise of the Gold Dinar video?
THE COURT: What exhibit is it?
MR. AUGUSTINE: It's Exhibit 801.
MR. HAFETZ: Your Honor, we're happy to play the two clips in evidence for him. Those are the only two clips we have of the movie.
THE COURT: Well, he wants to play it.
MR. HAFETZ: Yes, but which one?
MR. AUGUSTINE: Can I have a -- play for the whole video.
MR. HAFETZ: Your Honor, the whole video is not in

evidence nor have we made clips of it. Only the two portions --

THE COURT: It's not in evidence.

MR. AUGUSTINE: So can I offer it into evidence, Judge?

THE COURT: Any objection by the government?

MR. HAFETZ: There's no objection, your Honor, but I think it may be best for us to speak briefly at sidebar to address a similar issue to what was raised before.

THE COURT: Come sidebar.

(Continued on the next page.)

(The following occurred at sidebar.)

THE COURT: Go ahead.

MR. HAFETZ: Judge, we have no objection to the admission of the entire video, but I want everyone to understand that we intentionally shortened and clipped the video because the video includes very graphic images of violence, including the destruction of the World Trade Center, which might be deeply prejudicial to the defendant and so we held that and it's not part of the clips we offered. And so he's asking to admit the entire thing, and I want to make sure everyone knows, including his standby counsel --

THE COURT: Do you understand that.

MR. AUGUSTINE: Yes, I beg to differ, Judge. That video doesn't have that much violence except in the beginning, but most of the video is --

THE COURT: It's received. It's received.

MR. HAFETZ: Understood, your Honor.

MR. AUGUSTINE: Thank you, Judge.

(End of sidebar conference.)

(Continued on the next page.)

(In open court.)

(Defendant's Exhibit Number 801 so marked and received in evidence.)

MR. HAFETZ: We're trying to ascertain which portion of the video he would like to play.

THE COURT: He said he wanted the whole thing.

MR. AUGUSTINE: Judge, it's just a selection from the video, Judge.

THE COURT: What are you playing?

MR. HAFETZ: Your Honor.

THE COURT: What's the number?

MR. HAFETZ: 801.

THE COURT: 801.

MR. HAFETZ: 801. The full copy. No objection from the government.

THE COURT: Play it.

MR. HEEREN: Yes, your Honor.

(Video recording played.)

(Video recording stopped.)

MR. AUGUSTINE: Can you play just a couple of minutes forward a couple. A little bit more. Okay. Okay that's it.

(Video recording played.)

(Video recording stopped.)

MR. AUGUSTINE: Go ahead just a minute.

THE COURT: Let's this play, don't talk.

MR. AUGUSTINE: Okay.

(Continued on the next page.)

(In open court.)

(Recording played.)

CROSS-EXAMINATION

BY MR. AUGUSTINE (continuing):

Q Do you recognize that man in the video?

A I do not.

Q Do you know that law enforcement has identified this man as an American?

A I do not know that.

MR. AUGUSTINE: Okay. Go ahead.

(Recording played.)

Q You see the kids in the background, right?

A Yes.

Q Again, you can say these are civilians?

A Yes, they appear to be civilians.

Q Do you know what happened to those kids?

A No, I do not.

Q Do you know that they are in concentration camps in Syria right now?

MR. HAFETZ: Objection, Your Honor.

THE COURT: Sustained.

MR. AUGUSTINE: Go ahead.

(Recording played.)

MR. AUGUSTINE: Pause.

Q These are civilians also, right?

A Yes.
Q The girl and the little kid is not a soldier for the Islamic State; is that correct?
A No, in this video these people don't appear to be.
Q So outside this video they might military ISIS soldiers, is that what you are saying?
A No. I have no knowledge of them outside of the video.
Q So you are saying that it's possible that, without knowing, they may be Islamic State soldiers outside the video, this girl and this kid there?
A I simply don't know.
MR. AUGUSTINE: Okay. That's it. That's it for that video.
THE COURT: Okay.
MR. AUGUSTINE: I have a few more questions.
Q James Foley was an American?
A Yes.
Q Was he a Muslim?
A I don't know.
Q You don't know. Do you know what he was doing in a Muslim country?
A It's my understanding that he was a journalist.
Q Was he permitted to be there?
A I don't know.
Q Did do you know if any Muslims invited him to that

country?
A No, I do not.
Q And that country was Syria?
A Yes, as I recall.
Q So you don't know if any Muslims invited him over there?
THE COURT: Asked and answered.
MR. AUGUSTINE: Okay.
Q About the Paris attacks, this was in November 13, 2015?
A Yes, November 2015.
Q Do you know that France was bombing the Islamic State before those attacks happened?
A Yes, I believe -- yeah, I recall that.
Q Do you think it's possible that some of the bombs might have dropped on that little girl and that guy?
MR. HAFETZ: Objection.
THE COURT: Sustained.
Q Okay. Can you play the -- oh, actually, let me ask you something else.
You know about jihadology.com?
A Yes, I do.
Q Is it run by an American called Aaron Zelin?
A Yes.
Q And these videos are free, no one has to pay for it?
A Yes. When I was most frequently accessing that website it was just a website on the internet that you could go to

without paying, without logging in, or anything like that.
Q Do you know if Aaron Zelin sometimes works for the U.S. Government as an expert?
MR. HAFETZ: Objection, judge.
THE COURT: Sustained.
Q Okay. Would you say that Aaron Zelin, by putting these videos up on a website, is providing material support?
THE COURT: Sustained.
Q Anwar al-Alwaki, he was born in America -- pardon me.
Remind us who Anwar al-Alwaki was.
A He was a Yemeni American Islamic preacher.
Q Was he born in the United States?
A I don't recall specifically where he was born.
Q Okay. Was he an American citizen?
A Yes, he was.
Q Do you know that the United States dropped a bomb on him?
MR. HAFETZ: Objection.
THE COURT: Sustained.
Q Do you know if Anwar al-Alwaki went to trial --
MR. HAFETZ: Objection.
THE COURT: Sustained.
Q Anjem Choudary, the preacher from London, has he ever been to the Islamic State?
THE COURT: Sustained.
The issue is not what these people you are bringing

up has anything to do with the issue of what this witness testified to. It's not relevant.

THE DEFENDANT: Okay.

Q ISIS in Libya. You said that they took over with force of arms?

A Yes.

Q So can you explain, where exactly did they come from?

Did they like sail across from Syria and Iraq on the Mediterranean on a boat and get to Libya like that, or they teleported maybe?

MR. HAFETZ: Objection.

THE COURT: Do you know where they came from?

A I'm aware that there were Libyans from Libya who were members of the Islamic State in Libya. So they came from Libya.

THE COURT: That's your answer.

MR. AUGUSTINE: Okay.

Q And do you know that they were fighting -- when you say they took control with force of arms, Libya at this time -- was there a state ruling Libya at this time?

It was 2000 -- well, do you know if there was a state control of Libya at this time?

A No. This was after the Libyan Revolution in 2011. So there were multiple groups competing for control of Libya.

THE COURT: Was that after Gaddafi died?

THE WITNESS: I'm sorry, Your Honor?
THE COURT: After Gaddafi died?
THE WITNESS: Yes.
BY MR. AUGUSTINE:
Q These multiple groups controlling Libya, do you know that they are sometimes -- some of them are funded by the United States?
MR. HAFETZ: Objection.
THE COURT: Sustained.
Q Okay. Did you know that these groups they rape and they kill --
MR. HAFETZ: Objection.
THE COURT: Sustained.
MR. AUGUSTINE: Okay. Can we play the convoy video.
MR. HAFETZ: Which exhibit?
MR. AUGUSTINE: I don't remember, one of the first ones.
MR. VILLANUEVA: Which one?
(Mr. Augustine confers with Mr. Villanueva.)
MR. AUGUSTINE: It was the planes of war. It was some sort of an Arabic Muhammadan statement.
THE COURT: What is it you want to play?
MR. AUGUSTINE: One of the clips they played earlier.
MR. HAFETZ: We just need the number, judge.

MR. AUGUSTINE: I don't know exactly which one it was.

MR. HAFETZ: I believe he is looking for 802-2.

THE COURT: 802?

MR. HAFETZ: Dash two.

THE COURT: Okay. We will play 802-2.

MR. HAFETZ: Certainly. If that's wrong, just let us know.

THE COURT: Is that the one?

MR. AUGUSTINE: Yes, yes, judge.

BY MR. AUGUSTINE:

Q Can you read that name of the narrator?

A Shake Abu Muhammad al-Adnani.

Q Can you tell what type of military vehicle is in the background?

A I'm not an expert in military vehicles, but these appear to be, to me, military-style vehicles.

Q It looks somewhat sophisticated military vehicle; am I correct?

A That seems like a reasonable statement to me. My knowledge of military vehicles is limited.

THE COURT: Just a second. I'm asking the prosecution: What is being played?

MR. HAFETZ: Your Honor, this is 802-2.

THE COURT: Thank you.

MR. HAFETZ: Okay. In evidence.

BY MR. AUGUSTINE:

Q It shows the Islamic State in possession of these vehicles?

A Yes.

Q Do you know that these are American vehicles?

MR. HAFETZ: Objection.

THE COURT: Sustained.

Q Would you say that since these vehicles are in possession of the Islamic State that the United States provided material support to the Islamic State?

MR. HAFETZ: Objection.

THE COURT: I'm going to sustain it.

MR. AUGUSTINE: Okay. All right.

Q Muhammad Adnani, is he a leader of the Islamic State?

A Yes. He had a leadership position in the Islamic State.

Q Are you familiar with a speech, "Indeed Your Lord is Ever Watchful," made by Muhammad Adnani?

A It sounds familiar. I would need to refresh my memory regarding it, though.

Q Did Muhammad Adnani at any point -- Muhammad Adnani called for attacks -- called for U.S. Muslims in countries who fight the Islamic State to carry out terrorist attacks in their home country; is that correct?

A I don't recall specifically what Muhammad al-Adnani said.

I am aware that ISIS was calling for Muslims to carry out attacks in their home country, yes.

MR. AUGUSTINE: Okay. Can I show this to the witness, judge? It's a speech by Muhammad Adnani.

THE COURT: Mark it for an exhibit. What is the exhibit?

MS. KELLMAN: Defendant's 1, Your Honor.

THE COURT: Defendant's 1, exhibit. Give it to Mr. Villanueva, and he will give it to the witness.

MR. HAFETZ: Your Honor, I don't anticipate any objection. We haven't seen it before. I would just ask briefly to look at it.

THE COURT: Okay. Show it to the prosecutor first.

MR. VILLANUEVA: I will, Your Honor.

(Pause.)

MR. HAFETZ: That's fine. Thank you.

MR. VILLANUEVA: May I approach the witness, Your Honor?

THE COURT: Yes.

THE WITNESS: Thank you.

MR. VILLANUEVA: You're welcome.

THE COURT: All right. Mr. Augustine.

MR. AUGUSTINE: Yes, judge. I'm getting my copy now.

BY MR. AUGUSTINE:

Q Will you please turn to -- will you please turn to page 11.

THE COURT: I'm telling the jury this is not in evidence. So, therefore, you can't see it. Only the witness can see it.

Go ahead.

Q Okay. Have you turned to page 11?

A I'm sorry. One second. All right. Yes.

Q Okay. Third paragraph, can you read the first sentence, please?

THE COURT: Read it to yourself. You can't mention what's in it.

MR. AUGUSTINE: He can't say it out loud. Okay.

Q Moving to the last paragraph, does that refresh your memory of Adnani's speech?

THE COURT: I'm going to sustain.

You can see that his memory needed to be refreshed.

THE DEFENDANT: Okay.

BY MR. AUGUSTINE:

Q So do you remember Adnani called for attacks by Muslims in their home countries who were fighting against the Islamic State?

THE COURT: Did he testify that this person called for attacks, yes or no? I thought he said yes, but I'm not sure.

MR. HAFETZ: I believe so, Your Honor; and I believe the witness testified that ISIS and its leadership did call for ISIS to call for terrorist attacks both in the United States and elsewhere.

MR. AUGUSTINE: All right. That's going to be it, judge.

THE COURT: Okay. Just a second.

(Pause.)

(Mr. Augustine and Mr. Villanueva confer.)

MR. AUGUSTINE: All right. Thank you, judge.

MR. HAFETZ: No redirect, Your Honor. Thank you.

THE COURT: No redirect. Okay. You can step down.

Ladies and gentlemen, I'm going to give you a half hour -- well, let's see. We will come back at 3 o'clock. Is it 3:00?

THE CLERK: It's 2:35 now.

THE COURT: Go ahead. Does the Government rest? Are there any other witnesses?

MR. HEEREN: Your Honor, at this time the Government rests its case.

THE COURT: Okay. We will come back at 3 o'clock. Give you a nice little break.

MR. HAFETZ: Thank you, Your Honor.

(Jury exits.)

MR. AUGUSTINE: Pardon me, judge. I would like

to --

THE COURT: Just a second. Go ahead.

MR. HEEREN: Your Honor, just one second. I'm sorry.

MR. AUGUSTINE: Judge, I would like to introduce into evidence a video that the Government said that I showed my mom and that I watched for my testimony. It's called -- the title of the video is called "Greetings from Raqqa."

THE COURT: What number is the video?

MR. HAFETZ: I'm not sure what the defendant is referring to, Your Honor. I would need to see what you're talking about.

THE COURT: What number is the video, do you know, Ms. Kellman?

MS. KELLMAN: I don't think we need Your Honor for this. We can work this out among us.

THE CLERK: Just so I know, what was the name of that document that was entered in for ID-only purposes, D-1.

MS. KELLMAN: Defendant's Exhibit 1.

THE CLERK: Does it have --

MS. KELLMAN: It was a speech by --

MR. ALGOR: Muhammad al-Adnani.

MR. HEEREN: I believe it's A-D-N-A-N-I.

MR. HAFETZ: Correct.

(Recess.)

(Defendant present.)

THE COURT: Go ahead.

MR. HEEREN: Your Honor, we are printing out one more item for the defendant. So we have somebody back at our office printing it out now. It should take us about five -- five, ten minutes at the outside to get it back over here to him. So if we could have just another five or ten minutes, not much longer.

THE COURT: I will give you five minutes.

Now, defendant is going to testify. Do you have any other witnesses besides yourself, Mr. Augustine?

MR. AUGUSTINE: No, judge.

THE COURT: Okay. What my intention is -- and this is for both parties -- is after the defendant testifies -- and I assume that he is going to rest -- what I will do, I will let the jury go home and you will have over the weekend to give your -- think about your closing arguments; and I will charge the jury on Monday.

MS. KELLMAN: Sounds like a plan.

MR. AUGUSTINE: Sounds good, judge.

THE COURT: Any objection to that?

MR. HEEREN: No, Your Honor.

THE COURT: Okay.

THE CLERK: So we will need extra time?

MR. HEEREN: About five or ten minutes.

(Recess.)

THE COURT: On the record.

MR. AUGUSTINE: Excuse me, judge?

THE COURT: Yes.

MR. AUGUSTINE: Judge, I wrote something out for my testimony, and I wish that I would be able to read this out. Is there any way that I can read this out?

THE COURT: I don't know who is going to -- Mr. Villanueva?

MS. KELLMAN: Mr. Villanueva has volunteered, yes.

THE COURT: There is a format for giving direct testimony. You speak to Mr. Gary Villanueva.

MR. AUGUSTINE: Okay. Thank you, judge.

(Recess.)

THE COURT: Did your printout come back?

MR. HEEREN: Yes. We have given them the printout. So whenever the defendant is ready, the Government is ready.

THE COURT: Are you ready?

MS. KELLMAN: We need another minute or two.

(Pause.)

THE COURT: Are you ready?

MR. AUGUSTINE: One second, Your Honor.

MS. KELLMAN: We are ready, Your Honor.

(Pause.)

(Jury enters.)

THE COURT: Be seated, ladies and gentlemen.

Did you rest, the Government?

MR. HEEREN: Yes, Your Honor. The Government rests.

THE COURT: Okay. Mr. Augustine?

THE DEFENDANT: Yes, judge?

THE COURT: Your turn. Do you have a case?

MR. AUGUSTINE: Yes, judge. I would like to testify.

THE COURT: Okay. Mr. Villanueva, you are going to conduct the direct?

MR. VILLANUEVA: I am, Your Honor.

THE COURT: All right. Come on up.

Swear him in, Ana, Michele.

THE CLERK: Raise your right hand.

B E R N A R D   A U G U S T I N E,

called as a witness, having been first duly sworn/affirmed, was examined and proceeded to testify as follows:

THE DEFENDANT: Please state and spell your name for the record.

MR. AUGUSTINE: Bernard Augustine, B-E-R-N-A-R-D A-U-G-U-S-T-I-N-E.

THE COURT: Be seated.

MR. VILLANUEVA: May I inquire, Your Honor?

THE COURT: You may.

DIRECT EXAMINATION
BY MR. VILLANUEVA:
Q Can you hear me, Mr. Augustine?
A Yes, sir.
Q Before I begin, Mr. Augustine, you are the defendant in this case, correct?
A Yes, sir.
Q And you are representing yourself; is that correct?
A Yes.
Q In preparation for your testimony, you and I discussed the questions that I would ask you, correct?
A Yes.
Q And these are the questions that you asked me to ask you; is that correct?
A Yes.
Q Okay. Fair enough.
If I speak too quickly, Mr. Augustine, stop me. Okay?
A Okay.
Q Fair enough.
Mr. Augustine, how old are you today?
A I'm 25 years old.
Q Okay. In 2015, that would have made you 19; is that correct?
A Yes.

Q All right. And what religion were you raised in, Mr. Augustine?
A I was raised as a Jehovah's Witness.
Q Were you raised with your family?
A Yes.
Q Do you have sisters, or siblings?
A Yes, two.
Q And you have a mom?
A Yes.
Q Okay. Fair enough.
Were you raised in California?
A Yeah, I was raised in California.
Q Did you finish high school, Mr. Augustine?
A Yeah, I finished high school.
Q After high school did you go to college?
A Yes.
Q And college did you also have a job?
A Yes, I had a job.
Q What was your job?
A I worked in a security, for Securitas company. It's the one with the three red dots.
Q Got you. In college did you make a friendship with a young women who testified in this trial a couple of days ago?
A Yes.
Q And that young woman, you and that young woman became

boyfriend and girlfriend; is that correct?
A Yes.
Q At some point you guys lived together?
A Yes.
Q Fair enough. Now, you told the jury that you were raised as a Jehovah's Witness?
A Yes.
Q Did there come a time sometime in the fall of 2015 that you became interested in the Muslim religion?
A Yes.
Q How did that come about?
A Well, I saw the November 13 Paris attacks by the Islamic State, and I started learning the Islamic religion to understand why they would do such a thing.
Q And what did you do to educate yourself about the Muslim religion?
A I just did a lot of YouTube searches, watched a lot of YouTube lectures on the biography of the Prophet Muhammad, peace be upon him, and his companions, and I read a lot of history about Islam. I did a lot of Google searches. I watched Islamic State videos, and I went on forums, political forums, various political forums.
Q Is it fair to say you were teaching yourself?
A Yes.
Q Did there come a time that you decided to reach out to a

Muslim religious leader?
A No. I reached out to my neighborhood Muslim like he was an Imam.
Q Tell the jury what happened.
A I knew him for a few years already, since I was in middle school; and I just went to him, and I asked him -- his name is Hakeem -- I asked him that I want to become Muslim. I told him I want to become Muslim.
Q What happened?
A He said you don't have to be shy about that and, well, the next week Friday, January the 8th of 2016, I went to the mosque with Hakeem and his nephew; and I took my Shahada. That's the statement of Islam, there is no God but God alone and Muhammad is the messenger of God and I became a Muslim on that day.
Q What date was that, do you remember?
A January 8, 2016.
Q So you had been trying to become a Muslim for what, two or three months; is that correct?
A I wasn't trying to become a Muslim for two or three months. I decided in early January that I would become a Muslim. I was just learning about Islam previously.
Q So what I'm asking for is: How long were you researching what it takes to be a Muslim before becoming a Muslim on January the 8th, 2016?

A A couple of months, like since November.
Q Okay. Let me direct your attention.
Did you meet the gentleman who came in and testified, I think yesterday, the Imam?
A Yes. I met him on January 8, 2016.
Q That was the first time you met him?
A That is the first time I met him.
Q Tell the jurors how long were you in his presence.
A I was in his presence about five to ten minutes.
Q Is that it?
A That's it.
Q What happened in that five-to-ten-minute period of time?
A We did the Shahada again in front of him. Because I did it previously privately with my friend from my community. And he told me about the five pillars of Islam and gave me a Koran, like a soft-cover Koran; and he mentioned about Islam having nothing do with extremism and he said if all Muslims were terrorists we would take over the world and that's it.
Q Okay.
A Yeah, that's it.
Q Did you speak or did you meet with the Imam after that?
A I met him -- I met him a couple of times after that.
Q How many times?
A One time after that, that I remember, when I went to jamaat again, and I greeted him before I left; and then one

time in the airport in Istanbul.

Q When you met him at the mosque how long did you interact with the Imam on that second date?

A Just barely. I just greeted him. That's all.

Q So you didn't have any religious discussion with him on the second time?

A No.

Q Other than interaction with the Imam, had you interacted with any other religious leaders of the Muslim faith between the time you started investigating or researching being a Muslim to the time that you were arrested later in 2016?

A No.

Q So I'm going to take you back to Ms. Faria Ashad.

Was she a friend of yours?

A Yes, she was my friend.

Q Girlfriend?

A Yes.

Q Lived together?

A Yes, shortly.

Q Did you have discussions with Ms. Ashad about being a Muslim?

A Before I was researching about Islam, like I used to joke with her about becoming Muslim, because she is a Muslim herself. I used to joke about it, but that's pretty much -- I actually asked her when we first started dating that she

should teach me about Islam, and I think she just thought I was joking or ignored me about it, but I was serious at that time.

Q Oh, one other point before we move on from the Imam. The Imam testified on direct examination that he turned over a pamphlet or pamphlets to you.

Do you recall that?

A No, not at all. I never received those pamphlets. I never received any pamphlets from him about extremism or any pamphlets at all, just a Koran. That's the only thing he gave me, a soft-cover Koran.

THE COURT: Okay.

Q Okay. So let's go on chronologically.

January 8, 2016 you were still 19 years old; is that correct?

A Yes.

Q You had become a Muslim; is that correct?

A Yes, I became a Muslim.

Q You were still researching what it takes to be a Muslim?

A Yeah, I was still researching.

Q Did there come a time that you decided, or did you share your desire to become a Muslim with your parents, with your mom and your sisters?

A I mentioned. I would talk to my mom about the Islamic religion before I became Muslim, and after I became Muslim I

mentioned it to my mom. She actually asked me -- she asked me if I became Muslim, and I told her yes, I did.
Q When you told your mom that you had become a Muslim, was she still a Jehovah Witness?
A Yes.
Q Did she approve of your becoming a Muslim?
A No. She was very upset that I became a Muslim.
Q How about your sisters?
A My sisters were not fully in the loop. They weren't really paying attention to the situation. It was mostly between me and my mother.
Q So there came a time that you traveled to Tunisia; isn't that correct?
A Yes.
Q Can you share with the jurors the reason why you decided to travel to Tunisia?
A Yes. I traveled to Tunisia because I wanted to cross the border from Tunisia into Libya.
Q So let me stop you.
When are we talking about?
A We are talking about January -- January 18, 2016 I got on the airplane.
Q Okay. Why did you get on that airplane?
A Because I wanted to travel to Tunisia so I can cross the border into Libya, to go to the Islamic State.

Q Did you tell your mom before you left?
A Yes, I told my mom that I wanted to go live in the Islamic State as a Muslim.
Q What was your thinking?
A I was thinking that I don't like living here. I don't feel comfortable here.
Like I was Muslim. I really loved what I saw as the Islamic Caliphate, especially the civilian part of it. I wanted to be part of that. I wanted to live over there. I wanted to be at home over there. I wanted to make it my new home.
MS. KELLMAN: Your Honor, may I have permission to approach the witness?
THE COURT: You may.
MS. KELLMAN: I'm handing him what's been previously marked as Defendant's Exhibit number 1.
Q Mr. Augustine, do you recognize what's been previously marked as Defendant's Exhibit number 1?
A Yes.
Q What is that document?
A It as a translated speech by Islamic State spokesman Muhammad al-Adnani.
Q Did you see or read a copy of that speech prior to you leaving the country, leaving the United States and traveling to Tunisia in February of 2016?

A Yes. I heard a part of the speech where they called for attacks against civilians in response to the coalition warfare against the Islamic State. They told Muslims stay where you are at and attack your home country.

Q Did that speech affect your decision to travel to Tunisia?

A Not at all. Like I barely paid attention to that speech. I just came across it and I ignored it completely.

MS. KELLMAN: Okay. Your Honor, I would offer Defendant's Exhibit number 1.

THE COURT: I thought that you offered it; it was in evidence.

MS. KELLMAN: I don't think we put it in, judge.

THE COURT: Okay. Any objection?

MR. HEEREN: No, Your Honor.

THE COURT: All right.

MS. KELLMAN: Thank you, judge.

(Defendant's Exhibit Number 1 so marked and received in evidence.)

Q Who is the fellow who gave that speech?

A His name is Abu Muhammad al-Adnani. He is a spokesman for the Islamic State. He is second in command of what would be the Islamic State, who would be second in command.

Q What did he advocate in that speech?

A I'm sorry?

Q What did he advocate or urge in that speech?
A He urged the soldiers of the Islamic State to be patient and persevere in the fighting against the opposition and he urged -- the speech was in response to the coalition.
THE COURT: No, no. What did he say in the speech?
A (Continuing) He said to -- he said to attack the -- he said to attack -- if you can kill an American or European especially the spiteful and --
(Pause.)
THE COURT: A little louder and slower because everything you say is being taken down by the court stenographer. They are very good but they are not super.
MR. AUGUSTINE: Okay.
A He said, if you can kill a disbelieving American or European, especially the spiteful and filthy French or an Australian or a Canadian or any other disbeliever from the disbelievers waging war, including the citizens of the countries that entered into a coalition against the Islamic State, then rely upon the law and kill him in any manner or way, however it may be.
Do not ask for anyone's advice and do not seek anyone's verdict. Kill the disbeliever, whether he is a civilian or military, for they have the same ruling. Both of them are disbelievers. Both of them are considered to be waging war.

Q Is it fair to say, Mr. Augustine, that his speech basically said if you want to participate in ISIS you should stay home and do violence in your home country? Is that what the point is?
A Yes.
Q You were familiar with that, correct?
A I was familiar with it, yeah.
Q Is it a fact, Mr. Augustine, that while you were in California you never applied for any weapons?
A No, I never applied for any weapons.
Q California is a state where you can buy weapons in Walmart; is that correct?
A Yes.
Q You can buy assault weapons at Walmart; is that correct?
A Yes.
Q As a 19-year-old you were able to take your driver's license and go into Walmart and buy an assault weapon; is that correct?
A That's right.

(Continued on the next page.)

DIRECT EXAMINATION (CONTINUED)

BY MR. VILLANUEVA:

Q And you did not do that; is that correct?

A I did not do that.

Q So in going to Tunisia, what was your purpose in going to Tunisia?

A My purpose was in -- to try to go to Libya where they tried to take it and -- that's what I was trying to do.

Q And what was the point of going to Libya?

A To get -- to go to the Islamic State captured territory.

Q And do what?

A I want to live over there as a civilian.

Q And what was your understanding of living over there as a civilian?

A I -- I believe that I could go there, I could live by the -- under the Islamic Law. I could have a family. I could have kids. I could be around other Muslims like myself, and -- and be a Muslim in a Muslim country and in a Muslim environment.

Q Did you hear the testimony of the Government's expert this afternoon?

A Yes.

Q Did you hear his testimony with respect to whether or not that was possible, living as a civilian in a -- in Libya

controlled by the Islamic State?
A I don't recall.
Q Okay.
Do you recall his testimony when he said that it was really difficult to do so, and you exposed yourself to violence from the Islamic State if you lived in Libya and did not participate as a combatant?
A Yeah. I -- I don't -- I don't recall him saying that, but -- no, I don't recall him saying that.
Q Okay. Were you prepared to live in Libya and not be a combatant?
A Yes, I was prepared to do that.
Q Were you prepared to live in Libya and not give any money to the Islamic State?
A Yes.
Q What was your intention?
A My intention was fully to live there independently.
Q And what would happen if they tried to force you to become a combatant, a fighter; what would you do?
A They wouldn't be able to force me.
Q Well, why is that?
A Because I'm -- I'm free to do however I want, and I'm not afraid of them.
Q Before going to Libya, did you have any concerns that you would be forced to become a fighter in Libya?

A No, I had no concern.
Q None whatsoever?
A No.
Q And your intensions were always to be peaceful as a Muslim?
A Not necessarily.
Q Okay. What were your intentions?
A If -- if I -- if I was living in an Islamic State and one of these gangs or militias, that they had attacked us, like, I would defend myself or I would defend my family like -- or my property.
Q Fair enough.

MR. VILLANUEVA: I'm going to ask the Government to pull up Government's Exhibit 405.

MR. HEEREN: I'm sorry, one second.

Okay.

MR. VILLANUEVA: Can you highlight Item Number 14, please.

MR. HEEREN: 14?

MR. VILLANUEVA: 14, yes.

MR. HEEREN: One second.

MR. VILLANUEVA: Okay.

(Pause in proceedings.)

MR. HEEREN: All right.

MR. VILLANUEVA: Okay.

BY MR. VILLANUEVA:

Q Mr. Augustine, let me show you what has been entered into evidence as Government's Exhibit 14.

It's a text message, correct?

A Yes.

Q Can you see it on your screen?

A I can see it.

Q Okay. And is that a text message from you to your former girlfriend?

A Yes.

Q Okay. And I ask you to read out loud what it says, please.

A It says, "I haven't done anything wrong, and I don't plan on it. It's not wrong to have an opinion."

Q What were you expressing in that text?

A I was expressing that I don't think it's -- the Islamic State is how people say it to be. I think that we can -- I was saying that I wanted to go live over there because I think it's a good place for Muslims to live. I don't think it's -- I was saying that I wanted to live over there, and it's not bad, how people say it is.

Q And you also say, "It's not wrong to have an opinion."

What does that mean?

A That I believe that they -- I don't believe that the Islamic State is just a -- like some a military conflict

organization. It's a territory that people live under as civilians, and that's what I -- that's what I'm -- that's what I was trying to tell her, that it's not wrong to have an opinion, that to -- that opinion that I could live over there.

Q Okay.

All right. Did you ever indicate to your former girlfriend that you were going to join ISIS?

A I made a joke a long time before I became Muslim. Like, I made a -- I made a -- I made a joke a long time ago before becoming Muslim like, that, oh, I'm -- I'll become ISIS. It was a joke a long time ago, like -- but --

Q Did you have --

A -- when we first started dating. But that was just a joke because it was on the news 24/7.

Q Did you have any intention of joining ISIS as a combatant?

A No, not at all.

Q At any point?

A No, not -- not at all.

Q Okay.

I'm going to direct your attention to your Google searches.

A Okay.

Q Do you recall the Government's evidence, there were a

lot of Google searches put into evidence; do you remember those?

A Yeah, I remember that.

Q Did you do a Google search on 12/17, the 17th day of December, 2015, entailed, What am I going to do with my life?

A Yeah. I searched for -- I searched for Google, I don't know -- I don't know what to do with my life. I...

Q And what did you find? What happened as a result of that?

A I don't remember. That was forever ago.

Q And why did you put that?

A Because that's how I felt. Like, I -- I mean, I was working -- I think I -- at that time I might have been out of work. I worked at a security tower so that was superboring.

I mean, generally in life, like I just didn't -- I just didn't know -- I just didn't know what I wanted to do and how I was supposed to live. So, I mean, I just Googled it out of nowhere.

Q And what happened as a result of that search; what came back?

A I don't remember.

Q Okay. And that was about a month before you became a Muslim?

A Yes.
Q Were you having second thoughts or uncertainty --
A Right --
Q -- about --
A Right before becoming Muslim, I was -- I was sometimes having a -- a little bit of doubt. But at -- at some point I became certain about believing in God -- and not God alone, and believing in the -- the Messenger and the Prophet Muhammad.
Q So let's go to -- what happened to you -- well, withdrawn.
About what date did you arrive in Tunisia?
A I arrived in Tunisia a couple days after. I left on the 18th, so it must have been the 20th of February.
Q And how long were you -- and in Tunisia what happened to you?
A Well, I hung out for a little while on the streets, and I was -- I was just -- on the first day, I was just looking around the capital. I -- I -- I was -- I was moving around the capital, I met a couple of people who were showing me around. They spoke English, and they were just showing -- showing me around. We smoked some cigarettes, you know, drank coffee, ate some Tunisian food.
Q You were sightseeing?
A Yes.

Q Okay.

All right. Did there come a time when you found yourself in a Tunisian jail?

A Yes.

Q Okay. And how many days after you arrived did that happen?

A A couple of days. That -- like three days after my arrival.

Q Had you gone --

THE COURT: Three days?

THE WITNESS: Yes, Judge.

BY MR. VILLANUEVA:

Q And in those three days, were you sightseeing or wandering around in the city?

A The first day I was sightseeing. The second day I -- I was -- I decided to find a way to get to Libya --

Q Okay.

A -- before --

Q And what happened?

A Basically, I -- I -- I asked somebody how to get to Libya, and there was a lot of -- like, he just told on me to the police, like, and -- and -- and the police come and -- came and picked me up.

Q And what happened to you?

A I went to a -- they arrested me and they took me to

a -- like it was a National Guard center.
Q And what happened?
A They interrogated me.
Q Okay. Uh-huh.
A And there was a -- there was a -- there was a -- there was a lot of interrogation, a lot of questions asked. And I -- I basically told them the same thing I'm telling you right now, that I want to go live over there.
Q And did you have a trial?
A I had -- I was charged -- I was charged in -- I was charged, and I did eventually go to trial --
MR. HEEREN: Objection, Your Honor.
A -- nine months later.
THE COURT: Objection to what?
MR. HEEREN: His testimony about a trial in another country.
THE COURT: Why are you objecting to that?
MR. HEEREN: To the defendant having a trial in another country.
THE COURT: I'm good.
Denied.
A Yes. I had a trial nine months --
THE COURT: No, no, no. Finish your testimony.
A I had a trial about nine months later after being arrested and in prison. Yes, I had a trial nine months

later.

BY MR. VILLANUEVA:

Q How long was your trial?

A Ten minutes long.

Q And what happened?

A I was convicted.

Q And then what happened?

A I was convicted and sentenced.

MR. HEEREN: Objection, Your Honor. He's testifying about sentencing.

THE COURT: It's his testimony as to his defense. No, I'm going to allow it.

What were you convicted of?

THE WITNESS: I was convicted of intent -- intention to join a terrorist organization.

THE COURT: Okay.

BY MR. VILLANUEVA:

Q And what happened to you in terms of punishment?

A They were sentencing me to two years.

Q In jail?

A In -- yeah, in Tunisian prison.

Q What language did they speak in Tunisia?

A I was in an international room, so we spoke English, French, Arabic, Spanish. And there were, like, other -- there was Swedish over there. There was Chinese, Iranian,

Libyan, and West African.

Q All right. Before you were arrested, did you make it to Libya?

A No.

Q Had you met anybody associated with ISIS?

A No.

Q Had you talked to anybody associated with ISIS?

A No.

Q Had you given ISIS any money?

A No.

Q Had you done anything while in Tunisia to cause you to be in touch with ISIS?

A No.

Q So after spending two years in prison, what happened?

A I -- I was -- I was released from prison and they sentenced -- they put -- they took me to an immigration center.

Q And then what happened?

A I -- the U.S. Embassy said I was going to be deported by the Tunisians.

Q And what happened? Just tell us what happened.

A Okay. And -- and I -- I -- I went with the Tunisians. They escorted me to the airport -- I was free without -- I was not handcuffed or forced or anything. They escorted me to the airport. I met the U.S. Embassy over there. And

then they introduced me to some people who were dressed in civilian clothing. The embassy was dressed in suits.

They -- they strip-searched me, and they took photographs of me while I was naked, and then they -- they said it was a medical examination.

Q Uh-huh, okay.

A And -- and then they dressed me up. And then they walked me to an airplane. It was -- it was, like, sort of a small -- sort of a small private jet. It was like something you would see in the movies. It was really nice on the inside.

Q Okay, uh-huh.

A And I -- I remember one of the agents -- or one of the -- the -- the personnel telling me, Don't just walk up on the plane. He said, Wait for us to walk up with you.

Q Okay.

A And then I walked up onto the plane -- the plane, and the FBI Agent Ryan Larkin was there. I recognized him from two years -- I mean, about two years earlier.

Q Uh-huh, okay.

A So I recognized him from then. He was there, and they said -- he said, Oh, you're going to be brought back home, and -- but you're under arrest.

Q Did he --

A And then he -- you said something?

Q Oh, no. I apologize. Go ahead.
A Basically, yeah, they -- they -- they put -- they put me in -- in chains, handcuffs, and then they put me -- put a blindfold over me and ear muffins (sic), and put me -- take me to the -- one of the seats.
When I -- when we were up on the flight about an hour in, they took it off, and they asked me some questions. They asked me -- they said -- Ryan Larkin and his partner -- I don't remember his partner's name, but it starts with Jim -- he said -- they asked -- they said, Will -- We don't care about what you said in Tunisia or what you did before. Are you going to -- Do you want to tell us what happened?
And I said, No, I'll wait for my lawyer.
And they said, Okay. Will you sign the Miranda Rights form?
And I said, No. I will -- I'll wait to sign it with my lawyer, so...
After that I gave -- I -- they let me watch -- I -- I watched a movie. They gave me the food. I used the bathroom. And then they put the goggles and headphones back on on the descent -- you know, when we approached the United States.
Q Before leaving the Tunisian prison and before getting on the airplane, did you have an understanding about what would happen to you upon leaving jail in Tunisia?

A Yeah, I understood what would happen.
Q And what was that understanding?
A I knew that if I come back to the United States, I would be prosecuted. I -- there was a strong possibility of me being prosecuted. I -- I -- I understood -- I understood that I was going to be prosecuted.
Q Okay. And when you were released from jail, were you released to be -- were you free; could you have walked away? Is that correct?
A Yes, I could have. I could have walked away. I could have refused to get on the U.S. plane. I could have refused to come back home. I could have -- I could have tried a number of things, to go to other places. And -- and I -- and I know Tunisia did not want to extradite me to the United States.
Q But you chose to come back home; is that correct?
A Yes.
Q Why did you decide to come back home?
A Because there was nowhere else left for me to go. I mean, I couldn't go to the Islamic State anymore because it was -- it was destroyed by the U.S. Government and its -- and its allies.
Q Okay.
A I mean, I -- I did want to come see my family. But, I mean, I had nowhere else to go. I just got out of prison,

I'm dead broke. But I -- it caused me to come back home and make some money and then I could probably leave again.
Q Did you text your mother and your sisters?
A I texted them, yes, before -- before I left, around the time I left for Tunisia, yes, I texted them.
MR. VILLANUEVA: Can you pull up Government's Exhibit 401?
Q Does Government Exhibit 401 represent some of the texts to your mom?
A Yeah, this was me texting my mom.
Q Okay. What did you tell your mom, just generally?
A I was just telling her basically about -- I was just trying to explain, like, how I started believing -- I mean, or how I started believing in God after being a disbeliever. I mean, I grew up in -- but when I was around 17, I didn't start believing in anything. So -- so I just started explaining to her why I started believing.
Q And why was that?
A Because of -- of the Islamic contrast of community of God, the one God, and not worshipping anything but God alone. It is the missing part of myself, and it -- it -- it felt complete, whereas it had never felt complete to me.
Q And so being a Muslim filled you out and made you complete?
A I mean, completed my belief in God and my obligations,

yes, regarding that.

MR. VILLANUEVA: Can we look at Government's Exhibit 406?

(Government's Exhibit Number 406 is published to the jury.)

BY MR. VILLANUEVA:

Q Do you see that, Mr. Augustine?

A Yeah, I see it.

Q Can you tell us what that exhibit is?

A It was a text message.

Q And what did you express in that text?

A I said, "I saw your message, Mom. I love you. I'm so happy you're my mother. I know I've been stupid and done a lot of stupid things, I'm glad you never gave up on me."

I -- I tried to show her the response from the Islamic State. But the reason for the text message is just that because she'd advised me, and I guess I was just arguing with her, and I -- I -- I was just thanking her for, like, being patient with me.

Q When was the last time you saw your mom?

A Currently?

Q Yes.

A In November of 2019.

MR. VILLANUEVA: Can we look at Government's Exhibit 559 in evidence?

MR. HEEREN: What was the number again?

MR. VILLANUEVA: 559.

(Government's Exhibit Number 559 is published to the jury.)

BY MR. VILLANUEVA:

Q Let me show you what has been marked as Government Exhibit a 559, Mr. Augustine.

Are you familiar with it?

A Yes, I'm familiar with it.

Q What is it?

A It's an email -- it's the last email I sent my mom before getting arrested, because I was anticipating crossing the border into Libya.

Q And tell us about that email. What's important about it?

A I -- I -- I was feeling like -- like I don't know when the next time I'm going to speak to them, so I just wanted to tell them everything -- the most important things that I felt that I needed to tell them.

Q And what was that?

A I wanted to tell them why -- why I left my home. Why I'm doing what I'm doing. Why I want to go live in the Islamic State.

I -- I -- I basically -- I -- I told her, like, that I believe like I -- I love the Islamic State. I really

believe that it's -- it's doing a lot of good things. I mean, they are fighting a war, but they're doing a lot of good things, the civilians there, people live over there.

In the top of the email I said, I'm truly on a path to fight injustice, and if see injustice -- I wrote unjustified, where I'm going, I promise I will fight that also. I was referring to that -- that even if the Islamic State was doing wrong, that it would be my obligation as Muslim to -- to fight against them, or be opposed to them if they were doing some of the things that people were saying that they were doing, such as killing babies and, you know, raping women, such like that.

Q You said that that it would be your obligation?

A Yeah, that would be my obligation. Like, if as a Muslim, if they were really doing those things.

Q And you would stop -- you would try to stop them, is that what you're saying?

A Yeah. It's the obligation as a Muslim to go ahead and -- and do that. Yes, I would try.

MR. VILLANUEVA: One minute, Your Honor.

(Pause in proceedings.)

BY MR. VILLANUEVA:

Q As your own lawyer, Mr. Augustine, is there anything that I haven't asked you that you would like to share with this jury?

A Yes. You were asking me about -- about what I meant when I -- in this -- in this email.
Q Okay.
A Regarding the battles and the -- the victory over man -- over God's enemies?
Q Yes. What did you mean by that?
A I was anticipating before I left, I knew that -- that the -- the coalition against the Islamic State is going to make a -- a war effort -- a war effort against the Islamic State in -- in Libya, and they -- they generally -- I understood that they generally use proxies to fight their wars. They do not put American ground troops on the ground over there. So basically it would be proxies, gangs and militia like who they find and hire in Libya.
And I was anticipating that they might -- they were going to attack the Islamic State territory, and I -- I -- I -- I thought that if I was there, and they did attack me, and if I had a family, I would -- I would -- I would defend myself against them.
Q Is there anything else in that email that I should ask you about?
A Yeah, like, I wrote to my mom over here. I told her I'm not -- can I go ahead?
Q (Indicating.)
A I told her, "I'm not saying this because I'm trying to

be the most pious man or I'm trying to go to paradise...I'm doing this because there is no meaning in this world. Truly as you contemplate, there is nothing. This world is designed to break your heart and destroy you, make you evil, greedy, selfish person. I was -- I was on that path. I hurt you and Lycia and Natasha..." -- those are my sisters -- "...and my love, Faria, so many times for those reason and committed evil acts for those reasons, and I am truly sorry for it."

I just thought that -- I mean, this thing -- I -- felt like going over there and starting a new life was a correction to the things that I did over here. So I just wanted my mom to know those things, my reasons for leaving home, and that's why -- that's it.

(Continued on the next page.)

DIRECT EXAMINATION (CONTINUING)

BY MR. VILLANUEVA:

Q Is there any other facts that you would like me to elicit consistent with your defense?

A Only the fact that, yes, I knew that Mohammad Adnani and the Islamic State corporate tax in the United States and I had no interest in that at any point. Like, I didn't -- I don't want to do that, it would not interest me. I had never found that appealing nor did I like that.

I only had interest in living the Islamic State as a civilian, just the same way as anybody here would live as a civilian.

I had no intention of participating with the organization over there. I didn't think the organization would try to recruit me. And, like, I -- like, just the same way, like, a civilian here doesn't have anything to do with the U.S. military or the government, like, I had no intent to have anything to do with the Islamic State organization. I just, however, intended to live under the territory controlled by it, because I feel that's a religious obligation for a Muslim. And I liked, especially when watching the video, I really loved to see the civilian life in Islamic State. It really captured my heart. That's what I really loved about it, about those videos.

Q And at this time you were 19-years old; is that correct?

A I was 19.

MR. VILLANUEVA: Lastly, your Honor, I would ask that Mr. Augustine's entire Google search be admitted into evidence.

THE COURT: Any objection?

MR. HEEREN: No, your Honor.

THE COURT: Received.

(Defendant's Exhibit Number 2 so marked and received in evidence.)

MR. VILLANUEVA: I guess we'll mark it Government Exhibit number two --

MS. KELLMAN: Defendant's.

MR. VILLANUEVA: I'm sorry, Defendant's Exhibit number two.

MR. HEEREN: You want the whole thing?

MR. VILLANUEVA: The whole thing.

Q Anything else, Mr. Augustine?

A No, I don't have anything else --

Q Thank you very much.

A -- to ask myself thank you.

MR. VILLANUEVA: Thank you, sir.

THE COURT: Cross.

MR. HEEREN: Thank you, your Honor. May I have one moment?

MR. AUGUSTINE: Pardon me, Judge, is it too late for

me to add one more thing?

THE COURT: Just a second. He wanted to add one more thing.

MR. VILLANUEVA: Sure.

Q Sure, yes, Mr. Augustine.

A Yes, I just want to tell the jury that I do not regret my decision, I'm proud of my decision and if I could go back and start over I would do it again, and if I became a free man tomorrow I would do it again, I would leave and I would do that again. I have no regrets about it and I'm proud of it. And I believe that all Muslims must immigrate to the Islamic State upon its establishment, especially ones living in the west.

Q When you say "it" what are you referring?

A The Islamic State territory.

Q Living in the Islamic State territory as a non-combatant, is that what you're referring to?

A Yes.

Q And when you say "it," do you mean that you would go and fight for the Islamic State territory?

A For the Islamic State organization?

Q Organization, excuse me.

A No, I would not go fight for the Islamic State organization and I don't advocate for them to go fight for the Islamic State organization, but I do say that Muslims must

leave upon establishment of the Islamic State caliphate, they must leave the United States, they must leave the western countries and they must immigrate to the Islamic State caliphate upon its establishment, yes.

Q Thank you, sir, anything else?

A That's it.

MR. VILLANUEVA: Thank you.

THE COURT: Cross.

MR. HEEREN: Thank you, your Honor. May I inquire?

THE COURT: Go ahead.

CROSS-EXAMINATION

BY MR. HEEREN:

Q You've described yourself earlier as a typical 19-year old; is that right?

A Yes.

Q By the time you were 19 you had graduated high school, right?

A Right.

Q And you went to college and studied mathematics for a period of time?

A Yes, among other things.

Q And you worked AS a security guard for a period of time?

A Yes.

Q And you owned a car that was registered in your name?

A Yes.

Q And for a period of time you lived outside of your mother's home in Los Angeles, correct?
A Yes.
Q With another person, with Ms. Arshad?
A Yes.
Q And by February of 2016, you were old enough to vote, correct?
A February 2016, yes.
Q You were old enough to buy a gun in California?
A Yes.
Q You were old enough to join the U.S. army, right?
A Right.
Q Now you traveled to Tunisia on February 18th, 2016; is that right?
A Yes.
Q And you bought your one-way ticket about a day or two before, correct?
A Yes, one day before.
Q And you left from San Francisco Airport?
A That's correct.
Q And at the airport you spoke to a representative at Turkish Airlines, correct?
A That I don't remember, but I mean I talked to somebody who was at the ticket counter.
Q And that person was Vu Mai, correct?

A The lady? No, the dude, yeah, yeah, it was somebody -- it's too long for me to remember, but I spoke to somebody.
Q You heard Mr. Mai's testimony at trial yesterday or in the past few days, correct?
A Yes.
Q You TOLD Mr. Mai that you were going on vacation, right?
A Yeah, I told the airport staff that I was going on vacation when inquired.
Q And that wasn't true, right?
A It is true.
Q You were going on vacation?
A Yeah.
Q So it's your testimony that when you told them you were going on vacation that was true?
A Yes.
Q Wasn't your testimony just a few minutes ago that you planned to stay and live in the Islamic State?
A Yes.
Q Before you boarded the flight, you were interviewed by members of the Customs and Border Protection, correct?
A Yes.
Q And you told the CBP officers you were going on vacation too, right?
A Right.
Q And then -- and again you weren't going on vacation,

correct?
A It's not mutually exclusive, I was permanently vacating.
Q I see.
Did you tell them you were permanently vacating the United States --
A No --
Q -- to stay permanently in Libya?
A -- of course not.
Q Of course not.
A No.
Q Because they would have stopped you, correct?
A Yes, of course.
Q You contacted your sister you got on the plane, correct?
A Yes.
Q And you told her I'm on the plane, it's already left, right?
A Right.
Q And that's the first time that you told her that you were leaving the United States, right?
A No, that's not true.
Q That's the first time you told her after you had bought the ticket to Tunisia that you were going to Tunisia, correct?
A No.
Q You told her before this?
A Not about Tunisia but I told her before, I mentioned to

her before about wanting to leave to go to Syria or the Islamic State in general.
Q But you didn't tell her you were leaving to go to Libya on the trip that you bought a ticket to until you got on the airplane, correct?
A No, I didn't tell her that.
Q Right. And that's because once you got on the airplane she couldn't stop you, correct?
A That's correct.
Q Now when your airplane to Tunisia stopped in Turkey, you ran into the Imam from Modesto, California Imam Kayello, correct?
A Correct.
Q And you told him as well that you were traveling for vacation, correct?
A I actually I told him something else.
Q You did not tell him that you're traveling on vacation?
A No, I told him I was making hijrah.
Q You heard the Imam Kayello's testimony at trial, correct?
A Right.
Q So it's your testimony and he testified that you told him you were going on vacation, correct?
A I remember him saying that at this stand, yes.
Q So it's your testimony that he testified falsely?
A Yes.

Q Now in that message to your sister from the airplane you directed your sister to deliver a message to your mother, right?
A Correct.
Q And that's because, like your sister, you hadn't told your mother that you had bought that plane ticket and were flying either, correct?
A That's correct.
Q Now in that message you did not tell her you were planning to cross into Libya, correct?
A That's correct.
Q In fact, you specifically told her don't ask me any questions, right?
A Correct.
Q You also said don't try to contact me?
A That's right.
Q And you told your family not to speak to anyone, right?
A That's right.
Q Now you didn't bring much with you on that flight, correct?
A That's correct.
Q Two suits and a few ties and a few other things, correct?
A That's correct.
Q Would you agree with me that Tunisia and Libya are normally a warm climate?

A In the summer.
Q You didn't bring any shorts or T-shirts, did you?
A No, no shorts; I had a T-shirt.
Q And after you decided to go to Libya you left the suitcase in a taxicab, correct?
A Yes.
Q That's because you didn't need it anymore, right?
A Yeah, I didn't need it anymore. It would weigh me down like.
Q And you created a new Facebook account after you left the United States, right?
A I don't recall creating a new Facebook account after I left. I think I created the same one while I was on the airplane, the one I sent to my sister, the text message -- the messages.
Q You created that after you got on the airplane; is that right?
A Yes, that's correct.
Q You had a prior Facebook account isn't that true?
A A while ago, yeah.
Q And after you contacted your family members you blocked them from that account, correct?
A Which account are you referring to?
Q The Facebook account that you were using after you had decided to travel to Tunisia?

A Yes, I had blocked them from that account.
Q Now do you recall on direct examination testifying about telling your mother about the Islamic State?
A Yes. Oh, I --
Q And after you texted your mother about the Islamic State, one of her responses was, they are horrible and merciless people, isn't that true?
A Yeah, that's her opinion.
Q She also said you joining them make you like one of them, isn't that what she said?
A Right, that's what she said.
Q Now I believe you said, and correct me if I'm wrong, but I believe you said -- well, strike that.
You testified earlier that ISIS directed supporters to kill Americans, correct?
A That's correct.
Q And your testimony is that because you didn't do that, because you didn't go out and immediately kill supporters, you didn't support ISIS, correct?
A Yes, of course.
Q But that's not the only way ISIS asks supporters -- that's not the only thing ISIS asks supporters to do, correct?
A That's correct.
Q They ask supporters to kill other westerners, right?
A You mean like Europeans?

Q Yes, like Europeans.
A Sure, yes.
Q Like the November Paris attacks?
A Of course.
Q Where they killed over a hundred people, correct?
A Yes.
Q And ISIS was waging a brutal war in Syria, at the time, and Iraq, correct?
A Everyone was waging a brutal war in Syria and Iraq at that time.
Q Does that include ISIS?
A That includes them.
Q And they were calling for people to come to Syria and Iraq to help them fight that war, correct?
A Yes, they were calling people to come and help them fight.
Q And they were calling for people to come and fight in Libya as well, correct?
A Yes, they were calling people to come and fight in Libya.
Q And as you said, the Islamic State, ISIS, also ran the caliphate, correct?
A Yeah, yeah, they were -- they were the governing entity of the territory.
Q They also needed people to help run the government, correct?

A Yes, of course.
Q They needed doctors to treat the fighters who were fighting U.S. soldiers, correct?
A Yes.
Q Would you agree me that's another way to support the Islamic State?
A According to how the United States perceives it, yes, of course.
Q And they needed people to farm and make the food for the fighters who fought U.S. and other soldiers, isn't that true?
A Sure.
Q And they also had, as you know, a propaganda arm, isn't that right?
A Yeah, they had a propaganda arm.
Q They had an organization called Al-Hayat Media; is that right?
A Yes, that's correct.
Q You watched a lot of videos from Al-Hayat Media, isn't that true?
A I watched a couple of videos.
Q The videos you watched were all in English, right?
A Yeah, the two videos I watched they were in English.
Q So you'd agree with me that it's important to have -- ISIS needed English speakers in the Islamic State, correct?
A But they needed all types of speakers in the Islamic

State.
Q And among those speakers they needed were English speakers, correct?
A That's correct.
Q So they could produce propaganda to recruit more westerners?
A Not necessarily for that, but I mean there are other things they use them for too.
Q You're familiar with the video *Flames of War*, correct?
A Yes.
Q And in that video the video is in English, correct, for the most part?
A That's correct.
Q And you're familiar with the video "For the Sake of Allah," correct?
A Yes, I'm familiar.
Q That was in English as well, correct?
A That's correct.
Q And so they needed an English speaker to do that as well, right?
A That's correct.
Q And you saw the clips today from the video of -- the beheading video in Libya, right?
A I never watched that video.
Q You saw that today though, correct?

A Yeah, that's the first time I saw that video, like, I never watched it while I was back home.
Q In that video the person who was going -- who was leading the beheadings was speaking in English, correct?
A Yes, that's correct.
Q And they were filming that and distributing that to the west, correct?
A Yeah, they were distributing it to everyone not just the west.
Q Now one reason why you decided to go live in the caliphate is because you hate America; isn't that true?
A Yeah, that's true.
Q You said that you hate the American religion and democracy and secularism, correct?
A That's a fact.
Q And you had said a week before you traveled that if you made it to the caliph, the caliphate you'd burn your passport?
A Yeah, definitely.
Q And your original plan was to go to Syria, correct?
A Yeah, I was hoping at first to get to Syria but I -- it was -- the window for that closed and my passport had some issues as well and I was worried about the fighting on the front lines with the Kurds so I wouldn't be able to pass through that area.
Q When you say you were worried about the fighting on the

front lines, the Kurds you mean the fighting between the Islamic State and the Kurds?

A Yes.

Q You also knew about the Islamic State fighting with other groups, correct?

A Yeah, they were fighting with the Mujahedeen, they were fighting with the Taliban, they were fighting with the Iraqi, the Shiite government.

Q And they also attacked the Yazidis, you knew that as well, correct?

A Yes, I know that they attacked the Yazidis.

Q And they slaughtered the Yazidis; isn't that true?

A Yeah, I understand that they killed a lot of the men over there. Yes.

Q Are you aware of the fact it's been described as an ethnic cleansing?

A Yes, people described it like that.

Q And they took the women and sold them as sex slaves; isn't that true?

MR. VILLANUEVA: Objection.

THE COURT: What were you saying again?

BY MR. HEEREN:

Q Were you aware of the fact after ISIS slaughtered the Yazidi men they took the Yazidi women and sold them off as sex slaves?

MR. VILLANUEVA: Objection.

THE COURT: No, I'll allow it, it's cross-examination.

A I understood that they were just slaves.

Q And --

THE COURT: Just slaves?

MR. AUGUSTINE: Yes, Judge, like, it was not specifically sex slaves, it was just, like, slaves --

THE COURT: Regular slaves.

THE WITNESS: -- generally. Yes, Judge.

Q And they were slaves for people in the Islamic State and Syria, correct?

A Yes.

Q The place where you wanted to go?

A Yes.

Q Would you agree -- let me strike that.

Do you believe it's important to defend your values, Mr. Augustine?

A I'm sorry.

Q Do you believe it's important to defend your values?

A If you believe in something I believe you would defend it also, yes.

Q You stated in the past that you believe extremism is good, correct?

A I think I made that statement on some sort of forum but

way before I became a Muslim. I was like, like neoconservative at that point.
Q I see. You made the statement you have to be extreme, you fight extremism with extremism, right?
A Yes, I was referring to a situation in France, I was actually advocating for a right wing revolution in France. That was before I was Muslim.
Q My question was: You stated you have to be extreme, you fight extremism with extremism, is that what you stated?
A That's what I stated, yes.
Q And you wrote that statement on December 13th, 2015, correct?
A I don't remember exactly which date, but when I reviewed the discovery material I recognized it as a statement I wrote.
Q Let me show you, Mr. Augustine.
A Okay.
Q I'm showing what's already been admitted into evidence as Government Exhibit 651.
A Yes. Right.
Q Do you see that, Mr. Augustine?
A Yes, I see it.
Q And that's December 13th, 2015, right?
A That's correct.
Q You wrote: You have to be extreme, you fight extremism with extremism, right?

A That's correct.
Q You also wrote: You must take everything you want with force. Did you write that?
A Yeah, I wrote that.
Q And you wrote: Yes, I'm advocating revolution, though you spelled it wrong, correct?
A Yes, I wrote that. That was before I was Muslim and before I considered any of this stuff.
Q And you wrote: And if it must be, violence, correct?
A Yes.
Q That was two months before you decided to go join the Islamic State in Libya, correct?
A That's correct.
Q And you talked about ISIS even before that; isn't that right?
A I think I mentioned it before that. You mean on this forum?
Q Among other places, yes, on this forum, right?
A Yes, I think I mentioned it somewhere.
Q You said: They are the ultimate fighters in all sense, correct?
A That's true.
Q The Mongols were just as ruthless as ISIS and they dominated everyone. You said that also, right?
A I wrote that.

Q And the key to winning is keeping in check and taking no prisoners. Always be on the offense and making no compromises. You wrote that, right?
A I wrote that.
Q Now you testified on direct examination that you conducted research about -- excuse me, you testified on direct examination that you educated yourself about the Muslim religion; is that accurate?
A Yes.
Q And in educating yourself about the Muslim religion you went to the Islamic Center in Modesto, correct?
A No, that was not part of my education.
Q Okay. So you didn't take any education from the Imam?
A No.
Q The only education you got was your own education; isn't that right?
A The education what I got off the internet, yes.
Q And that included watching -- researching about the Islamic State, correct?
A That's correct.
Q And researching all the things that they did, right?
A Yes.
Q And so that included researching and seeking out the *Flames of War* propaganda video?
A Yes. I mean it's a really cool video. You should watch

the whole thing.
Q When you say it's a really cool video, when they execute a bunch of Syrians and push them in their own graves they dig, was that part cool?
A Syrian soldiers who gassed Muslims, yes, I mean, that's not cool that's good. Like, I wouldn't say that's cool, but the other parts of the video that you didn't show the jury were pretty cool.
Q And the parts where they behead people, that part was cool as well?
A No, that's good, it's good, but I wouldn't say it's cool to do that.
Q And the parts where they show Islamic State Mujahideen --
A Yeah.
Q -- fighting and engaging in a martyrdom and suicide attacks, that part was cool?
A Yeah. Hell, yeah, it was cool. Yeah.
Q So you've now testified this is good, correct, all this stuff I just described?
A I'm sorry?
Q I believe you just said -- well, withdraw that.
On direct you also said that what you wanted to do was not bad, correct?
A Yeah, I mean, like, I had no intention of fighting for the Islamic State organization.

Q But the Islamic State organization ran the Islamic State, right?
A Of course. I mean they --
Q And providing --
MR. VILLANUEVA: Objection. Objection. Please allow the witness to finish his answer.
THE COURT: You can't -- oh, that's right you are. What was the objection.
MR. VILLANUEVA: I asked the witness be allowed to finish his answer.
THE COURT: Yes, let him finish his answer.
A Say that question again.
MR. HEEREN: I'll withdraw the question, your Honor.
A Okay.
Q Now would it be fair to say -- well, withdraw that as well.
On December 2nd, 2015, you searched for "Do ISIS recruits get wives," correct?
A Yeah.
Q And you went to URLs about ISIS recruiting, correct? You went to websites that talked about ISIS's recruiting practices?
A I think I made a search about how to safely join ISIS that was with regards to how I could travel there safely without getting killed or put in prison because it's in a war

zone.

Q And another article you searched for and found was an article titled, "ISIS Uncovered: The real life of the jihadists revealed by French recruits." Isn't that right?

A I don't remember it right now, but I remember it from reviewing the discovery material you gave me, yes.

Q And that was one of the URLs you went to after searching around for ISIS, correct?

A Honestly I don't recall five and a half years ago what I saw on the internet exactly, but I assume that if you had it in there I looked at it.

I mean I don't think you guys would fake this stuff. I hope not.

THE COURT: Counsel, let's go.

MR. HEEREN: Yes, your Honor, one second please. Sorry, your Honor.

Q Directing your attention to Government's Exhibit 504 page 29, do you see the portion that I've highlighted?

A Yes, I see it.

Q You see that it says: ISIS real life jihadists revealed by French recruits?

A I see it.

Q Does that appear to be the URL?

A That's a URL.

Q And that's from your search history?

A It's not something I searched, it's just something I clicked on and on Google popped it up for me and I clicked on it.
Q I see. But you agree with me you clicked on it?
A Yeah, I clicked on it.
Q And that article it discusses the real life of French recruits to ISIS, right?
A Yes.
Q People who travel from the west to Syria, correct?
A Correct.
Q Similar to yourself, right?
A Yeah.
Q And they discussed how they had their identity documents confiscated, right?
A Correct.
Q How they had daily training of shooting Kalashnikov rifles and rocket launchers, right?
A Sure.
Q How occasionally they are required to participate in public throat slitting sessions and beheadings?
A I don't know about that, but I don't remember looking at that in the discovery material.
Q More generally were you aware that ISIS practiced acts such as that?
A Yeah, yeah, they did that.

Q In the place where you wanted to go, correct?
A Yes, of course, yes, they did it there. It's not a secret.
Q And the Islamic State is not a democracy, correct?
A Thank God.
Q The leadership directs how the Islamic State is run, correct?
A Yeah.
Q And tells people what to do who are under their authority, correct?
A You can say that they can generally give an order to -- I mean, leadership can give an order to somebody, yeah.
Q Like to fight, correct?
A Yeah, they can try. I mean, they can try to ask somebody to fight, sure, why not.
Q And to be clear, your testimony on direct examination was that you would do it all again and you would go back today?
A No, tomorrow when they let me off.

MR. HEEREN: One moment, your Honor.

No further questions, your Honor.

THE COURT: Any redirect?

MR. VILLANUEVA: Briefly, Judge.

(Continued on the next page.)

(In open court.)

REDIRECT EXAMINATION

BY MR. VILLANUEVA:

Q Mr. Augustine, on cross-examination the Government asked you whether -- a series of questions about contributing to ISIS.

Are a doctor?

A No.

Q Are you a farmer?

A No.

Q Have you ever contributed to ISIS monetarily?

A No.

Q In any other way?

A No.

Q Have you ever made an English language video by them?

A No.

Q Are you a fighter?

A Not until I came to prison.

Q Would you -- you said on direct examination that you wanted to live as a civilian; is that correct?

A That's correct.

Q You disagreed with -- your mom disagreed with you about your religious choice?

A Yes, my mom disagreed with me. She actually told me at one point I hope you leave to go to Syria soon because I don't

want a Muslim living under my house. I mean, I know she said that being upset. She probably didn't mean that.

Q By the way, did you ever go to Syria?

A No, I didn't.

Q Did you ever try?

A I mean, the furthest I tried was like doing a Google search.

Q So your testimony is you learned all this stuff through Google searches; is that correct?

A Yes, that's correct.

Q Is there anything else that you would like to add on your defense?

A I would just like to add that I went to the Islamic State so fast. I made the decision from learning about Islam to becoming Muslim to leaving. I had nothing holding me back. I didn't have like anything tie me down.

I made the decisions impatiently. I wanted to get out of here as soon as possible. I didn't want to wait, and I'm not afraid of winging it. I'm not afraid of being broke. So I just -- I just went to whoever I had and I winged it.

Q My last question: How old were you at this time?

A Nineteen.

MR. VILLANUEVA: Thank you.

THE COURT: Any recross?

MR. HEEREN: Very briefly, Your Honor, two or three

questions.

THE COURT: Go ahead.

RECROSS-EXAMINATION

BY MR. HEEREN:

Q Mr. Augustine, you testified earlier about the coalition against the Islamic State.

Do you remember that?

MR. VILLANUEVA: Judge, that's outside the scope.

THE COURT: Yes, it is.

MR. HEEREN: Is it sustained, Your Honor?

THE COURT: Outside the scope of redirect.

MR. HEEREN: Okay.

Q Mr. Augustine, Mr. Villanueva asked you about your job skills.

You're high-school educated, correct?

A That's correct, yeah, I'm high-school educated.

Q You are fluent in English?

A Yeah. It's my first language.

Q If you are asked to read a script, could you read it?

A Sure, yeah. I think I have done that over here.

Q You could read a script for one of those cool Islamic ISIS propaganda videos, correct?

A It's hypothetically, yeah, I could do it. I could do it pretty well.

MR. HEEREN: No further questions, Your Honor.

THE COURT: You say English is your first language or your second language?

THE WITNESS: It's my first language, judge.

THE COURT: Pardon me?

MR. AUGUSTINE: It's my first language.

THE COURT: What is your second language?

MR. AUGUSTINE: I grew up speaking a little bit Indian Arabic when I was living in Kuwait, but later on when I went to prison I learned to speak French when I was over there.

THE COURT: Okay. You can step down.

MR. AUGUSTINE: Thank you. I can take off these dorky glasses now. Oh, my mask.

THE COURT: Any other witnesses, Mr. Augustine?

MR. AUGUSTINE: No, I don't have any more witnesses, judge.

THE COURT: Does the defendant rest?

MR. AUGUSTINE: Yes, judge, I rest.

THE COURT: Ladies and gentlemen, both sides have rested. The next part of the trial is there will be closing arguments, and we are going to do that on Monday, closing arguments, and then I will read the law to you.

So you go home. It's a decent hour. We will see you again Monday at 12 o'clock. Be safe.

Juror number 4 will remain. I want to speak to her,

Alternate number 4.

(Pause.)

THE COURT: Hold on a second. All right. Be safe. Don't discuss the case. See you Monday at 12 o'clock.

(Jury exits.) Now.

THE COURT: Where is Alternate 4? Come on up.

Alternate 4 has a -- who is it, your husband?

ALTERNATE JUROR 4: Yes, my husband has eye surgery on my Monday.

THE COURT: He has surgery on Monday, and she would like to be excused. Any objection?

MR. AUGUSTINE: No objection, judge.

MR. HEEREN: No objection, Your Honor.

THE COURT: We will excuse you.

Thank you for participating in this jury trial; and we all, defense, prosecution, and myself, wish you and your husband a lot of luck, and God bless you.

ALTERNATE JUROR 4: Thank you.

THE COURT: You don't have to come back Monday.

ALTERNATE JUROR 4: Thank you.

THE COURT: And we are praying for you. Okay. Thank you very much.

(Alternate Juror 4 exits the courtroom.)

THE COURT: Okay. Monday, 12 o'clock.

How long do you think your closing argument is going

to be?

MR. ALGOR: About 45 minutes, Your Honor.

THE COURT: Mr. Augustine, how long is your closing argument going to be?

MR. AUGUSTINE: I think it shouldn't be more than 20 minutes or a half hour.

THE COURT: And closing charge will be about 45 minutes, I think, or an hour. An hour. All right.

We will see you. Have a good weekend and be safe.

MR. HEEREN: Thank you. You too, judge.

MS. KELLMAN: Thank you.

MR. VILLANUEVA: Thank you.

(Trial adjourned to Monday, August 23, 2021 at 12:00 p.m.)

--ooOoo--

*I (we) certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*/s/ David R. Roy* — *21st Day of August, 2021*

*DAVID R. ROY* — *Date*

# ***I N D E X***

## ***W I T N E S S E S***

### **A N D R E W V E R S T E E G H**


VOIR DIRE EXAMINATION BY MR. HAFETZ 266

DIRECT EXAMINATION BY MR. HAFETZ 272

CROSS-EXAMINATION BY MR. AUGUSTINE 324


### **B E R N A R D A U G U S T I N E**


DIRECT EXAMINATION BY MR. VILLANUEVA 345

CROSS-EXAMINATION BY MR. HEEREN 380

REDIRECT EXAMINATION 402
BY MR. VILLANUEVA

RECROSS-EXAMINATION BY MR. HEEREN 404


## ***E X H I B I T S***


Defendant's Exhibit Number 1 354

Defendant's Exhibit Number 2 378

Defendant's Exhibit Number 801 328

***I N D E X (CONTINUED)***

***E X H I B I T S (CONTINUED)***

Government's Exhibit Numbers 802-1 through 802-14 280

Government's Exhibit Numbers 801-2 through 801-3 282

Government's Exhibit Number 205 288

Government's Exhibit Numbers 900 through 903 293

Government's Exhibit Number 214 314

Government's Exhibit Numbers 810-1 through 810-4 322